IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

|  |  |  |
|---|---|---|
| ONE HUNDRED MILES, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. _____ |
| THE UNITED STATES ARMY CORPS OF ENGINEERS, and Colonel DANIEL HIBNER in his official capacity as District Commander of the Savannah District, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This case challenges the United States Army Corps of Engineers' (the "Corps") decision to conduct spring and summer hopper dredging in Brunswick Harbor without first conducting an adequate environmental review under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA").

2. Because hopper dredging is harmful to federally protected loggerhead sea turtles and other sensitive species, the Corps has historically conducted maintenance dredging activities only in winter months, when fewer sea turtles and other sensitive species are present in southeast shipping channels.

3. This year, however, the Corps intends to begin maintenance dredging in Brunswick Harbor as early as mid-May, in a quiet but abrupt departure from three decades of practice.

4. According to state biologists, this shift would almost certainly kill and injure federally threatened and endangered sea turtles, as well as fisheries and other sensitive species.

5. This action seeks a declaration that the Corps violated NEPA and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, by failing to complete an Environmental Impact Statement ("EIS"), or any NEPA review at all, and an order enjoining the Corps and its agents from proceeding with year-round hopper dredging unless and until the Corps conducts a legally sufficient environmental review under NEPA.

## JURISDICTION AND VENUE

6. This action arises under NEPA, 42 U.S.C. §§ 4321 *et seq.*, and the APA, 5 U.S.C. §§ 701 *et seq*.

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and may issue declaratory and other relief pursuant to 28 U.S.C. §§ 2201–02.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events giving rise to these claims occurred in this district.

## PARTIES

**A.  Plaintiff One Hundred Miles**

9. Plaintiff One Hundred Miles (OHM) is a nonprofit organization headquartered in Brunswick, Georgia.

10. OHM's mission is to protect and preserve Georgia's 100-mile coast through advocacy, education, and citizen engagement.

11. To further this mission, OHM works to protect threatened and endangered wildlife that lives along Georgia's coast, including sea turtles, shorebirds, and North Atlantic right whales.

12. As part of these efforts, OHM coordinates public education and outreach regarding rare species and organizes and participates in volunteer opportunities to protect these species.

13. Some examples of this work include OHM's efforts to designate Georgia's coast as a Western Hemisphere Shorebird Reserve Network Landscape of Hemispheric Importance and OHM's North Atlantic right whale education and advocacy campaign. With respect to sea turtle conservation, OHM has been involved in the Georgia Sea Turtle Cooperative since 2014.

14. In addition, OHM regularly evaluates project and policy proposals that impact Georgia's coastal wildlife and advocates for science-based approaches to species protection.

15. In evaluating these project and policy proposals, OHM often relies on the procedural processes and information afforded under NEPA.

16. As part of its efforts to protect Georgia's loggerhead sea turtles and other coastal wildlife from year-round hopper dredging, OHM submitted comments to the Georgia Department of Natural Resources opposing year-round hopper dredging and a letter to the Corps requesting NEPA review of any removal of seasonal dredging restrictions in Georgia's harbors.

17. In addition to its interests as an organization, OHM has approximately 975 members, many of whom have individual interests in observing, photographing, studying, and protecting coastal wildlife like loggerhead sea turtles and North Atlantic right whales.

18. These members will continue to maintain an interest in observing, photographing, studying, and protecting Georgia's coastal wildlife going forward.

19. In addition to their interests in observing, photographing, studying, and protecting wildlife, OHM, its members, and its staff have a strong interest in ensuring that the Corps complies the substantive, procedural, and informational provisions of NEPA.

20. Because OHM and its members have interests in protecting Georgia's coastal wildlife and in ensuring that the Corps complies with NEPA, OHM is harmed by the Corps' failure to complete any NEPA analysis in connection with its removal of longstanding dredging restrictions.

21. These harms would be redressed by an order from this Court.

**B.     Defendants**

22. Defendant U.S. Army Corps of Engineers is an agency within the United States Department of Defense. The Savannah District of the Corps is responsible for overseeing civil works projects in Georgia, including the dredging of Brunswick Harbor.

23. Defendant Colonel Daniel Hibner is the current District Commander at the Savannah District Office. "The district commander is the Corps NEPA official responsible for compliance with NEPA for actions within district boundaries." 33 C.F.R. § 230.5. Colonel Hibner is sued in his official capacity.

## LEGAL FRAMEWORK

### The National Environmental Policy Act

24. NEPA is a procedural statute that "requires federal agencies to examine and disclose the environmental impacts of their proposed actions." *Pac. Coast Fed'n of Fishermen's Ass'n v. Blank,* 693 F.3d 1084, 1088 (9th Cir. 2012); *see also* 42 U.S.C. § 4332.

25. These dual objectives ensure that agencies "consider every significant aspect of the environmental impact of a proposed action" and "inform the public that it has indeed considered environmental concerns in its decision-making process." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 97 (1983).

26. For major federal actions significantly affecting the quality of the environment,

NEPA requires that federal agencies prepare a detailed statement called an Environmental Impact Statement ("EIS") assessing the direct, indirect, and cumulative impacts of the proposed action and analyzing all reasonable alternatives to the proposed action.  42 U.S.C. § 4332(C)(i)–(ii); 40 C.F.R. § 1508.25(c)(1)–(3).

27. Where it is not readily discernible whether the environmental effects of a proposed action will be significant, federal agencies may first prepare a less rigorous Environmental Assessment ("EA") to establish the project's level of impact.  40 C.F.R. §§ 1501.4(b), 1508.9(a)(1); 33 C.F.R. §§ 230.10–.11. If any impacts may significant, however, an EIS is then required.

28. Following the preparation of an initial EIS, NEPA requires federal agencies to prepare a supplemental EIS if "[t]here are significant new circumstances of information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). This obligation extends to EAs as well.

29. Similarly, under the Corps' NEPA regulations, the Corps is required to prepare a new or supplemental EIS for "proposed major changes in the operation and maintenance of completed projects," 33 C.F.R.§ 230.8, and a new or supplemental EA when there are "changes in environmental impacts which were not considered in the project EIS or EA," 33 C.F.R. 230.7(d).

## FACTUAL AND PROCEDURAL BACKGROUND

**A.     Hopper dredging is harmful to sea turtles, fisheries, and other sensitive species.**

30. On information and belief, the Corps intends to begin maintenance dredging with a hopper dredge in Brunswick Harbor as early as May 2021.

31. Maintenance dredging in this context involves the periodic removal of built-up sediment from existing navigational channels in order to keep the channels at their authorized depth.

32. Although there are several methods of dredging available, the Corps typically prefers hopper dredging.

33. Hopper dredges work by removing sediments with suction pipes—essentially vacuuming up everything on the bottom of the dredged area.

34. Unfortunately, this often includes sea turtles and other sensitive species, which can easily become entrained in the hopper dredge pipes.

35. When this happens, the pipes' rotating blades can cause massive fractures, crushed organs, hemorrhage, and death.

36. These effects are heightened in late spring, summer, and early fall, when there are more sea turtles in southeast shipping channels.

37. Biologists have recognized the dangers of hopper dredging since at least 1980, when over 70 turtles were killed or injured by hopper dredges between July 1980 and November 1980 in Canaveral Channel, Florida.

38. Closer to home, in 1991, a single observer documented 35 sea turtle deaths during spring and summer hopper dredging in the Brunswick and Savannah channels.

39. It is likely that these numbers are greatly underestimated, as the probability that turtles are found after injury or mortality in the water usually does not exceed 10–20%.

40. Hopper dredging also poses threats to other valuable wildlife resources.

41. For example, impacts to fisheries during hopper dredging events, such as entrainment and increased sedimentation, can be significant.

42. Like impacts to sea turtles, these effects can also be amplified during certain times to the year due to changes in the habitats that species use during different times of the year.

43. This is a particular concern in Brunswick Harbor, which contains areas that have been designated by the South Atlantic Fishery Management Council as "essential fish habitat" (EFH), defined as "those waters and substrate necessary for spawning, breeding, feeding, or growth to maturity" for certain species of fish. 16 U.S.C. § 1802(10).

44. Some of this habitat has also been designated as "habitat areas of particular concern," which are "subsets of [essential fish habitat] that … [are] rare, stressed by development, provide important ecological functions for federally managed species, or are especially vulnerable to anthropogenic (or human impact) degradation." Nat'l Marine Fisheries Serv., Habitat Areas of Particular Concern within Essential Fish Habitat, https://www.fisheries.noaa.gov/southeast/habitat-conservation/habitat-areas-particular-concern-within-essential-fish-habitat.

**B.     To avoid these impacts, state and federal agencies have successfully imposed seasonal hopper dredging windows for three decades.**

45. In order to minimize these impacts, state and federal agencies have historically restricted hopper dredging activities to winter months when there are fewer federally protected loggerhead sea turtles and other sensitive species in southeast shipping channels.

46. At the state level, the Georgia Department of Natural Resources ("DNR") has implemented winter dredging windows though the State's Clean Water Act § 401 Certifications and Coastal Zone Management Act consistency determinations.

47. At the federal level, the National Marine Fisheries Service ("NMFS") has until recently imposed winter hopper dredging windows through its South Atlantic Regional Biological Opinions, or "SARBOs," which assess impacts to federally protected species through

dredging and related activities at a regional level. *See* NMFS, *Biological Opinion: Dredging of Channels in the Southeastern United States from North Carolina Through Cape Canaveral, Florida* (Nov. 25, 1991); NMFS, *Biological Opinion: Hopper Dredging of Channels and Beach Nourishment Activities in the Southeastern United States from North Carolina Through Florida East Coast* (Aug. 25, 1995); NMFS, *Biological Opinion: The Continued Hopper Dredging of Channels and Borrow Areas in the Southeastern United States* (Sept. 25, 1997).

48. The South Atlantic Division of the Corps has also adopted guidelines during certain years establishing a hopper dredging window of December 15 through March 31 to reduce impacts to sea turtles. *See, e.g.*, U.S. Army Corps of Eng'rs, South Atlantic Division, *Hopper Dredging Protocol for Atlantic Coast: FY 98 – FY 03*.

49. By every measure, these seasonal dredging windows have been tremendously effective as a mitigation tool, balancing the need for efficient dredging with protection of sea turtles, fisheries, and other wildlife.

50. Although as of 2020 winter dredging windows are no longer mandated by federal guidance, the Corps has never conducted any NEPA review assessing the substantial environmental impacts of dredging outside of these traditional winter dredging windows.

**C.    In a substantial departure from its historical practice, the Corps intends to begin maintenance dredging in southeast ports this summer.**

51. Despite the tremendous success of seasonal dredging windows, last year the Corps began quietly soliciting bids on maintenance dredging contracts for Brunswick Harbor and other regional harbors without placing any restrictions on when dredging could be conducted.

52. On information and belief, on September 23, 2020, the Corps awarded a bid to the Great Lakes Dredge & Dock Company, LLC with updated specifications that did not include any dredging windows for Brunswick Harbor or other southeast harbors.

53. The Corps has indicated that it intends to continue this practice in the future. On March 30, 2021, the Corps held an "Industry Day" event and announced its intent to begin advertising and soliciting bids in June and July 2021 for maintenance dredging in Brunswick Harbor to be completed between March and August 2022. *See* U.S. Army Corps of Eng'rs, South Atlantic Division: FY22 Regional Harbor Dredging Contract Industry Day (March 20, 2021).

54. Based on the Corps' weekly dredging schedule update, it appears dredging could begin in Brunswick Harbor as early as mid-May.

55. Yet the Corps still has not issued any public notice, released any NEPA analysis, or solicited any public comment related to maintenance dredging outside of traditional winter dredging windows.

**D.    The Georgia Department of Natural Resources has strongly objected to dredging outside of traditional winter dredging windows.**

56. The Georgia Department of Natural Resources ("DNR") has strongly objected to hopper dredging outside of traditional winter dredging windows.

57. According DNR biologists, "[D]ata and decades of experience clearly show that winter dredging windows are the best way to maintain deep water channels in Georgia and minimize mortality of threatened loggerhead sea turtles in hopper dredges. Summer dredging will place nesting female loggerhead sea turtles—and loggerhead recovery efforts generally—at unnecessary risk." Letter from Rusty Garrison, Dir., Wildlife Res. Div., Ga. Dept. of Nat. Res. To Margarett McIntosh, U.S. Army Corps of Eng'rs (Sept. 28, 2020).

58. Because of these concerns, DNR has unequivocally advised that "[i]n order to assure recovery of the NRU population of loggerheads, hopper dredging activity in Georgia should be restricted to winter months (15 December – 31 March)." Memorandum from Mark

Dodd, Sr. Wildlife Biologist, Ga. Dep't of Nat. Res., to Kelie Moore, Coastal Consistency Coordinator, Ga. Dep't of Nat. Res. (Feb. 22, 2021), at 9.

**E.      The Corps has not prepared any NEPA document assessing the impacts of dredging outside of traditional winter dredging windows.**

59.     Despite substantial data showing that year-round dredging is harmful to federally threatened loggerhead sea turtles, fisheries, and other sensitive species, the Corps has not prepared any environmental review under NEPA to assess the potential environmental impacts associated with dredging outside of traditional winter dredging windows in Georgia.

60.     On information and belief, in previous years, the Corps has relied on a 1998 EIS prepared in connection with the Brunswick Harbor deepening project to satisfy its NEPA obligations relating to harbor maintenance dredging.

61.     However, although the 1998 EIS briefly considered potential environmental impacts associated with future maintenance dredging, it assumed, based on NMFS and Corps restrictions in effect at the time, that "[a]ll hopper dredging will only be performed from December 15 through March." U.S. Army Corps of Eng'rs, Final Environmental Impact Statement: Brunswick Harbor Deepening Project (Mar. 1998) at 42; *see also id.* at v-vi; 23, 23.

62.     As a result, the 1998 EIS did not adequately consider the impacts to sea turtles, fisheries, or other wildlife from hopper dredging between April 1 and December 14.

## STANDARD OF REVIEW

63.     Because NEPA does not contain an internal citizen suit provision, the APA governs the scope and standard of review of OHM's NEPA claim against the Corps.

64.     Upon review of agency action under the APA, the court shall "hold unlawful and set aside actions . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

## CLAIMS FOR RELIEF

### NEPA—Failure to prepare a new or supplemental EIS or EA

65. OHM incorporates by reference the allegations contained in the preceding paragraphs.

66. NEPA obligates the Corps and other federal agencies to "take a hard and honest look at the environmental consequences of their decisions" before undertaking a proposed project.

67. To this end, NEPA requires federal agencies to publish an EIS analyzing and documenting the environmental impacts, including direct, indirect, and cumulative impacts, of "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c).

68. The decision to conduct maintenance dredging in Brunswick Harbor outside of traditional winter dredging windows is a major federal action to which NEPA applies.

69. The Corps has not prepared an EIS—or even an EA—relating to year-round maintenance dredging in Brunswick Harbor.

70. Because the 1998 Brunswick Harbor Deepening EIS did not address the environmental impacts of maintenance dredging between April 1 and December 14, the Corps may not rely on it or other former NEPA analyses to satisfy its NEPA obligation with respect to upcoming spring or summer maintenance dredging.

71. Even if the Corps had considered the impacts of dredging outside of traditional winter dredging windows in the 1998 EIS or another former NEPA analysis, there is significant new information relevant to environmental concerns that has arisen since, prompting the need for a supplemental EIS.

72. The Corps' failure to prepare a new or supplemental EIS or, at a minimum, an EA confirming the need for an EIS, is arbitrary, capricious, not in accordance with law, and without observance of procedures required by law in violation of NEPA and the APA.

## PRAYER FOR RELIEF

OHM respectfully requests that this Court:

A. Declare that the Corps' failure to prepare a new or supplemental EIS or EA violates NEPA and is arbitrary, capricious, not in accordance with law, and without observation of procedures required by law in violation of NEPA and the APA;

B. Enjoin the Corps from proceeding with year-round hopper dredging in Brunswick Harbor until it complies with applicable NEPA requirements;

C. Award OHM the costs of this action, including reasonable attorneys' fees; and

D. Grant OHM such additional relief as the Court deems just and proper.

Respectfully submitted this 30th day of April, 2021.

**SOUTHERN ENVIRONMENTAL LAW CENTER**

/s/ *Megan Hinkle Huynh*
Megan Hinkle Huynh
Georgia Bar No. 877345
Robert D. Sherrier
Georgia Bar No. 979890
*Pro hac vice motion forthcoming*
Ten 10th Street NW, Suite 1050
Atlanta, Georgia 30309
Phone: (404) 521-9900
Fax: (404) 521-9909
mhuynh@selcga.org
bsherrier@selcga.org

*Counsel for Plaintiff One Hundred Miles*