IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| **One Hundred Miles**, | Case No. 4:21-cv-00134-RSB-CLR |
| Plaintiff, | |
| v. | **Federal Defendants' Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 5).** |
| **U.S. Army Corps of Engineers**, and **Col. Joseph Geary**, in his official capacity as District Commander of the Savannah District, | |
| Defendants.[1] | |

## INTRODUCTION

Sedimentation has decreased water depth at the entrance to the Congressionally-authorized navigation channel in Brunswick Harbor.  As a result, cargo vessels need to wait for high tide to safely enter the channel, disrupting shipping in the process.  The U.S. Army Corps of Engineers has therefore contracted for maintenance dredging to remove the sediment.  The dredging is set to begin on May 25, lasting twenty days.

Plaintiff seeks to preliminarily enjoin the dredging, fearing it will kill loggerhead sea turtles (a threatened species).  To make the showing of irreparable harm necessary for preliminary injunctive relief, however, Plaintiff must clearly demonstrate that the

---

[1] Col. Geary is substituted for Col. Daniel Hibner under Federal Rule of Civil Procedure 25(d).

dredging is likely to result in harm to the loggerhead population significant enough to impact Plaintiff's members' enjoyment of the species.  Plaintiff has not made that showing.  To the contrary, the National Marine Fisheries Service—one of the agencies Congress tasked with implementing the Endangered Species Act—has concluded that *all* Corps maintenance dredging activity throughout the South Atlantic (let alone just that planned for this spring in Brunswick Harbor) is not expected to cause an appreciable reduction in the likelihood of either the survival or recovery of loggerhead sea turtles.

Because Plaintiff has failed to demonstrate that its members will be irreparably harmed and because the balance of harms weighs against an injunction, Plaintiff's motion for preliminary injunctive relief should be denied.  That is the necessary outcome even though Plaintiff will, on the merits of its case, likely succeed in achieving a remand to the Corps for the agency to explain why it concluded that it did not need to conduct further analysis under the National Environmental Policy Act, or, should the Corps so choose, to conduct further analysis.

## FACTUAL AND REGULATORY BACKGROUND

### I.  The Brunswick Harbor Federal Navigation Channel.

This case involves the U.S. Army Corps of Engineers' maintenance of the Congressionally-authorized navigation channel in Brunswick Harbor.  *See* Rivers and Harbors Act of 1950, Pub. L. 81-516, § 101, 64 Stat. 163, ch. 188 (May 17, 1950); Water Resources Development Act or 1986, Pub. L. 99-662, § 847, 100 Stat. 4178 (Nov. 17, 1986).

In 1996, the Corps' Chief Engineer recommended to Congress that the channel be deepened, thereby reducing tide-related navigational delays and increasing efficiency by avoiding the need for vessels to light load.[2]  *See* Oct. 6, 1996, Memo. from Lt. Gen. Joe N. Ballard 1, 2 (attached as Ex. A); Final Env't Impact Statement, Brunswick Harbor Deepening Project ("1998 EIS") ii, 1 (Mar. 1998), ECF No. 5-16 at 3, 12.  The Corps completed an Environmental Impact Statement for the deepening project in 1998, *see generally* ECF No. 5-16, and Congress authorized the deepening in 1999.  *See* Water Resources Development Act of 1999, Pub. L. No. 106-53, § 101(a)(19), 113 Stat. 269, 277 (Aug. 17, 1999).[3]

The navigation channel entrance is located 10.7 miles off St. Simons Island, where the authorized depth is thirty-eight feet.  Decl. of Jonathan A. Broadie ("Broadie Decl.") ¶ 2.  The channel enters the inner harbor at a point adjacent to the St. Simons Island lighthouse.  Broadie Decl. ¶ 2.  In the inner harbor, the navigation channel's authorized depth is thirty-six feet, running through the Brunswick, East, Turtle, and South Brunswick Rivers.  Broadie Decl. ¶ 2.  The channel serves the Colonel's Island, Mayor's Point, and East River shipping terminals.  Broadie Decl. ¶ 3.  Brunswick Harbor is a

---

[2] "Light-loading" involves cargo ships taking on less than their full capacity of cargo in order to reduce vessel draft.  *See* Decl. of Katherine E. Brutsché ("Brutsché Decl.") ¶ 5.

[3] Congress recently authorized the Corps to undertake a new feasibility study analyzing the need for further channel modifications.  *See* 2016 Water Resources Development Act, Pub. L. No. Pub. L. 114-322, § 1201(12), 130 Stat. 1628, 1682 (Dec. 16, 2016).  The Corps is in the process of completing that feasibility study and the accompanying NEPA review.  A Draft Integrated Feasibility Report and Environmental Assessment was released for comment in June 2020.  *See* Decl. of Mary Richards ("Richards Decl.") ¶ 2.

significant and critical regional and national port.  *See* Broadie Decl. ¶ 3.   When it is properly maintained, more than $13 billion worth of cargo pass through the navigation channel every year.  Brutsché Decl. ¶ 5; *see also* Humphreys, J., et al., The Economic Impact of Georgia's Deepwater Ports on Georgia's Economy in FY 2019 (July 2020 (attached as Ex. B).  The Colonel Island Terminal is the largest automobile port in the nation.  Broadie Decl. ¶ 3.

Part and parcel to the channel's creation and deepening is the need to maintain it at the Congressionally-authorized depth.  In a process called shoaling, sediment naturally builds up in navigation channels over time, which can impact navigation for large vessels.  *See* Broadie Decl. ¶¶ 4–7.  The Brunswick Harbor entrance channel has a shoaling rate of approximately 1,200,000 cubic yards annually.  Richards Decl. ¶ 4.  The Corps using dredging to clear the sedimentation and maintain the navigation channel.  Richards Decl. ¶ 4; Broadie Decl. ¶ 4.

Of concern here is what are called trailing suction hopper dredges.  Broadie Decl. ¶ 8; South Atlantic Regional Biological Opinion for Dredging and Material Placement Activities in the Southeast United States ("2020 SARBO") 43–47 (July 30, 2020) (excerpts attached as Ex. C).[4]  Hopper dredges are ships equipped with suction pipes trailing over the vessel's side.  Broadie Decl. ¶ 8.  Drageads at the end of the suction

---

[4] Given the length of the 2020 SARBO, our exhibit includes only the pages to which we cite or that are otherwise relevant to Plaintiff's motion.  The entire document is available at https://www.fisheries.noaa.gov/content/endangered-species-act-section-7-biological-opinions-southeast (last visited May 14, 2021).

pipes collect sediment and slurry, transporting it to the ship's hopper (hence, the name) located in the hull.  Broadie Decl. ¶ 8.  Once the hopper is full, the ships sails to a designated disposal site to place the dredged material, returning to continue dredging. *See* Broadie Decl. ¶ 8.

## II.   The South Atlantic Regional Biological Opinion and Loggerhead Sea Turtles.

Like all dredging, hopper dredging effects the environment, including species in the vicinity.  Thus, in the early 1990s, the Corps' South Atlantic Division began programmatic consultation with the National Marine Fisheries Service regarding the potential for Corps maintenance dredging in the region to effect species listed as threatened or endangered under the Endangered Species Act.  *See* 2020 SARBO at 637–39; *id.* at 13–14 (describing programmatic consultation).[5]

The consultation process between the South Atlantic Division and the National Marine Fisheries Service has been completed and reinitiated several times, resulting in a series of "biological opinions," which are generally identified by the opinion's date and the acronym SARBO, for South Atlantic Regional Biological Opinion.  *See* 2020 SARBO at 637–47 (describing consultation history).  The National Marine Fisheries Service issued the most-recent SARBO—the "2020 SARBO"—in March 2020.  *See* 2020 SARBO at 1–2.

---

[5] The Corps is organized into several Division offices, within the geographic boundaries of which also sit one or more District offices.  *See* 2020 SARBO at 64.  Brunswick Harbor falls within the geographic boundaries of the Corps' Savannah District.

Neither Plaintiff's lawsuit nor the present motion challenge the Corps' compliance with the Endangered Species Act.  But a general understanding is helpful for context. Section 7 of the statute requires federal agencies to ensure that any action that they authorize, fund, or carry out is not likely to "jeopardize the continued existence of any [federally listed] endangered species or threatened species or result in the destruction or adverse modification of [federally designated] habitat of such species . . . ."  16 U.S.C. § 1536(a)(2).

Section 7 and its implementing regulations set out detailed consultation procedures to provide action agencies with expert advice from the National Marine Fisheries Service and/or U.S. Fish & Wildlife Service to determine the biological impacts of their proposed activities.  16 U.S.C. § 1536(b); 50 C.F.R. Pt. 402.  Section 7 consultations are concluded after the Service(s) determine that the action is not likely to adversely affect listed species or critical habitat, or—if the effects are likely to be adverse—issue a biological opinion determining whether the proposed action is likely to jeopardize the continued existence of a listed species or destroy or modify designated critical habitat.  *See* 50 C.F.R. §§ 402.14. Thus, in short, by conducting covered maintenance dredging in accordance with the 2020 SARBO, the Corps is in compliance with Section 7 of the Endangered Species Act.

Plaintiff's motion concerns potential effects on loggerhead sea turtles.  The federal government listed the loggerhead sea turtle as a threatened species in 1978, identifying several distinct population segments.[6]  2020 SARBO at 203.  The population segment

---

[6] A "threatened species" is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C.

implicated here is that in the northwest Atlantic. *Id.* Recovery units have been identified for the purpose of implementing a recovery plan; the relevant one is the Northern Recovery Unit, which spans from the Florida-Georgia boundary through southern Virginia. *Id.* at 205.

Reliably estimating loggerhead population size is difficult. *See* 2020 SARBO at 206. But 2009 modeling by the National Marine Fisheries Service for the northwest Atlantic "suggest[ed] the adult female population size [was] approximately 20,000–40,000 individuals, with a low likelihood of females' numbering up to 70,000." 2020 SARBO at 211. "A less robust estimate for total benthic females in the western North Atlantic was also obtained, yielding approximately 30,000–300,000 individuals, up to less than 1 million." *Id.* "A preliminary regional abundance survey of loggerheads within the northwestern Atlantic continental shelf for positively identified loggerhead in all strata estimated about 588,000 loggerheads . . . . When correcting for unidentified turtles in proportion to the ratio of identified turtles, the estimate increased to about 801,000 loggerheads . . . ." *Id.*

Loggerhead mating season is from late-March to early-June, with females laying eggs in the summer months. 2020 SARBO at 205. "Numbers of nests and nesting females can vary widely from year to year." *Id.* at 206. Female sea turtles tend to return to the same nesting area (they have "strong nest site fidelity"), but nest only every three

---

§ 1532(20). An "endangered species" is one "which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6).

to four years.  *Id.* at 205, 206.  Within the Northern Recovery Unit, loggerhead nesting trends showed declines through 2008, but have since improved.  *See* SARBO at 208–09. "In-water research suggests the abundance of neritic juvenile loggerheads is steady or increasing."  *Id.* at 210;[7] *see also* Nuse, Bryan L., et al., An integrated population model for loggerhead sea turtles in the Northern Recovery Unit 21–25, 27–28, 34 (Oct. 21, 2020), ECF No. 5-8 at 93–97, 99–100, 106 (same).

Previous iterations of the SARBO limited maintenance dredging to the winter months.  *See* 2020 SARBO at 637.  This was done, in part, to reduce sea turtle mortality, given that the turtles may be more abundant in warmer months and that females approach beaches during the summer to nest.  *Id.* at 637; *see id.* at 327, 339–40, 644.  But the loggerhead sea turtle is only one of twenty-five threatened or endangered species in the relevant area.  *See id.* at 644.  The 2020 SARBO is "an approach to balance the needs of all 25 ESA-listed species and designated critical habitats" along the southeast coast, including "potential effects to North Atlantic right whale," which is among the species "identified as being at greatest risk from [maintenance dredging], without sufficient protective measures."  2020 SARBO at 645.  *See* Decl. of Deborah H. Scerno ("Scerno Decl.") ¶ 5; Richards Decl. ¶ 6.

Even with the shift away from winter maintenance dredging, the National Marine Fisheries Service determined that *all* covered Corps maintenance dredging throughout the South Atlantic "is not expected to cause an appreciable reduction in the likelihood of

---

[7] "Neritic" refers to coastal areas overlying the continental shelf.

either the survival or recovery of loggerhead sea turtles in the wild."  2020 SARBO at

391; *see id.* at 427.  This included consideration of potential spring and summer

maintenance dredging at Brunswick Harbor.  *See* 2020 SARBO at 62–65 (Corps action

area); *id.* at 321 (listing navigation channels).[8]

### III.    The Planned Maintenance Dredging in Brunswick Harbor.

Maintenance dredging in Brunswick Harbor is currently scheduled to begin on

May 25.  Broadie Decl. ¶ 13.  The dredging will occur at the entrance channel, where

shoaling has reduced channel depth to about twenty-nine fee—nine feet shallower than

the Congressionally-authorized depth.  *See* Broadie Decl. ¶¶ 13; Brutsché Decl. ¶ 5.  The

shallower water has led to transport restrictions or delays, which (if implemented in the

long term) could disrupt over $5 billion worth of cargo annually.  Broadie Decl. ¶¶ 5–6;

Brutsché Decl. ¶ 5.  The entrance channel also continues to shoal at a rate of between

100,000 to 150,000 cubic yards per month.  Brutsché Decl. ¶ 5; Broadie Decl. ¶¶ 14–15.

The maintenance dredging will be conducted by two vessels over twenty days (ending

---

[8] Separately, Section 9 of the Endangered Species Act prohibits "take" of threatened or endangered species without a special exemption.  *See* 16 U.S.C. § 1538(a).  The statute defines "take" includes harm or death.  *See* 16 U.S.C. § 1532(19).  The 2020 SARBO includes an incidental take statement—an exception to the prohibition against take—for covered Corps activities so long as the Corps complies with conditions identified in the 2020 SARBO.  *See* 2020 SARBO at 427–33.  With respect to hopper dredging, the 2020 SARBO assumes that the estimated take of loggerhead sea turtles resulting from entrainment—214 takes over a three period—will be lethal take.  *See* 2020 SARBO at 322–33, 352.  There is non-lethal loggerhead take associated with Corps maintenance dredging activities (*see* SARBO at 430), but Plaintiff focuses its alleged irreparable harm on lethal take.

June 14).  Broadie Decl. ¶ 13.  The Corps anticipates that 1,580,000 cubic yards of material will be removed.  Broadie Decl. ¶ 13.

The Corps implements several measures to avoid or limit loggerhead sea turtle mortality during hopper dredging.  For example, the Corps requires the dredges to use draghead deflectors, which produce a sand wave while the dragheads operate on the sea floor to move any turtles away from draghead's suction.  *See* Richards Decl. ¶ 5.  All pumps are disengaged when not on the seafloor to reduce turtle entrainment.  Richards Decl. ¶ 5.  Screens are placed on and around the dragheads and inflow boxes (where sediment enters the hopper) for the same purpose.  Richards Decl. ¶ 5.  Protected species observers monitor the dredging at all times.  Richards Decl. ¶ 5.  The Corps also follows any other hopper dredge requirements in the 2020 SARBO.  Richards Decl. ¶ 5; *see* 2020 SARBO at 432–33, 529–31.

The planned maintenance dredging at Brunswick Harbor is part of a regional contract, which also covers three other ports in Georgia and North Carolina.  Broadie Decl. ¶ 16.  The consolidated contract is intended to reduce mobilization and demobilization costs for the dredges and, thus, contracting costs for the United States.  Broadie Decl. ¶ 16.  Plaintiff has challenged and moved to preliminarily enjoin only the maintenance dredging planned for Brunswick Harbor.  *See* Compl. ¶¶ 1, 65–72, ECF No. 1; Pl.'s Mot. for Temp. Restraining Order & Prelim. Inj. & Mem. of Law in Supp. ("Pl.'s Mot.") 1–2, 20, ECF No. 5.

## STANDARD OF REVIEW

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).  An injunction "'is not a remedy which issues as of course[.]'"  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citation omitted).  Instead, "[a] plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

The burden of proof in justifying an injunction is solely on Plaintiff; Federal Defendants bear no burden to defeat the motion.  *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 442–43 (1974).  To be entitled to preliminary injunctive relief, Plaintiff must "clearly establish[ ] the burden of persuasion *as to each* of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (emphasis added) (internal quotations and citations omitted).

## ARGUMENT

Plaintiff's motion should be denied because Plaintiff has not shown that the dredging in Brunswick Harbor this spring is likely to result in a species-level harm to loggerhead sea turtles that will, in turn, diminish Plaintiff's members' enjoyment of that species.  Given Plaintiff's failure to establish irreparable harm, the balance of the harms

11

and public interest weigh in favor of allowing the Congressionally-authorized
navigational channel to be maintained.  And, because a movant is only entitled to
preliminary injunctive relief if it can make a clear showing as to each of the four factors,
Plaintiff's likelihood of success on the merits of its case is irrelevant, even though
Plaintiff is likely to achieve some success.

I.    **Plaintiff Has Not Demonstrated a Likelihood of Irreparable Harm to Its Members' Interests.**

"A showing of irreparable injury is the sine qua non of injunctive relief."  *Siegel*,
234 F.3d at 1176 (internal quotations and citations omitted).  The movant must
"demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555
U.S. at 22.  "Issuing a preliminary injunction based only on a possibility of irreparable
harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an
extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is
entitled to such relief."  *Id.*

Plaintiff makes two arguments in support of irreparable harm.  Plaintiff first argues
that its members will be irreparably harmed by an allegedly lacking National
Environmental Policy Act (NEPA) review of potential effects on loggerhead sea turtles
from spring and summer dredging in Brunswick Harbor.  *See* Pl.'s Mot. 12–13.  Plaintiff
then claims that "year-round hopper dredging will almost certainly kill and injure
federally threatened loggerhead sea turtles," *id.* at 13, and argues that a preliminary
injunction is necessary to prevent those deaths and also to prevent injury to Plaintiff's
members' enjoyment of turtles through observation, study, and photography.  *Id.* at 16.

12

When analyzing the alleged facts under the appropriate standards, however, Plaintiff's attempting showing quickly falls apart.

### A.    The Governing Law

Three points of law undercut Plaintiff's attempted showing of irreparable harm.

First, an alleged NEPA violation is not a substitute for irreparable harm.  Even with a clear violation of a statute whose purpose is to protect the environment, a plaintiff must still demonstrate irreparable harm to justify an injunction.  *See Winter*, 555 U.S. at 32–33; *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545–46 (1987).  Indeed, the Supreme Court has held that an injunction does not presumptively follow even when a plaintiff *actually prevails* on a NEPA claim.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157–58 (2010).  The Supreme Court has also held that an injury resulting from an alleged failure to follow a procedural requirement (like those in NEPA) is insufficient for Article III's less-demanding standing requirements unless the procedural violation is accompanied by a concrete, on-the-ground injury to the plaintiff's interests.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009); *infra* at 23–24 (discussing NEPA).[9]

Second, Plaintiff is incorrect that harm to the environment—here, a species—can, standing alone, constitute irreparable harm for purposes of injunctive relief.  Rather, it

---

[9] *Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989), pre-dates the Supreme Court's more-recent precedents.  *See* Pl.'s Mot. 12–13 (relying on case).  In any event, the case "did not mean 'that a likely NEPA violation automatically calls for an injunction; the *balance of harms* may point the other way.'"  *Conservation Law Found. v. Busey*, 79 F.3d 1250, 1272 (1st Cir. 1996).

must be *the movant* that is likely to suffer irreparable harm.  *Winter*, 555 U.S. at 20

(requiring plaintiff to establish "that *he* is likely to suffer irreparable harm" (emphasis

added)); *accord Friends of the Earth v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 181

(2000) (to demonstrate standing, a plaintiff must show that the harm "is not injury to the

environment but injury to the plaintiff").  Thus, the only relevant portion of Plaintiff's

attempted harm showing is its claim that the alleged harm to loggerhead sea turtles would

also irreparably harm Plaintiff's interest in the turtles.  *See Fund for Animals v. Frizzell*,

530 F.2d 982, 986–87 (D.C. Cir. 1975).

 The cases Plaintiff cites on page sixteen of its motion do not call for a different

conclusion.  *Humane Society v. Hodel* involved questions of standing, which (unlike the

showing necessary for injunctive relief) does not require irreparable harm.  *See* 840 F.2d

45, 51–62 (D.C. Cir. 1988).  And the harm in question was to the plaintiff-organization's

members' interest.  *See id.* at 51–52.  The portion of *Fund for Animals, Inc. v. Lujan* to

which Plaintiff cites also addresses standing.  *See* 962 F.2d 1391, 1396 (9th Cir. 1992).

When the court there turned to the question of preliminary injunctive relief, it upheld the

district court's conclusion that the plaintiff had failed to demonstrate irreparable harm.

*See id.* at 1400, 1402.  *Amoco Production Company v. Village of Gambell* and *United

States v. Jenkins* also included allegations of harm to the movant's interests.  *See Amoco

Prod. Co.*, 480 U.S. at 535 (leasing of federal lands would affect hunting and fishing

rights); *United States v. Jenkins*, 714 F. Supp. 2d 1213, 1216–17, 1222–23 (S.D. Ga.

2008) (harm to historical artifacts on federal land).

The majority of the other cases Plaintiff cites (Pl.'s Mot. 15–16) also included allegations of harm to the movant's interest.  *See Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-21747-CIV, 2008 WL 11332080, at *11 (S.D. Fla. Nov. 14, 2008) (flooding could affect plaintiff's property); *Sierra Club v. Norton*, 207 F. Supp. 2d 1310, 1317 (S.D. Ala. 2002) (relying, for standing purposes, on a prior case involving the same species, which noted the same plaintiff's members' recreational interest in observing wildlife (citing *Sierra Club v. Babbitt*, 15 F. Supp. 2d 1274, 1276–77 (S.D. Ala. 1998))); *Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 222 (D.D.C. 2003) (asserting harm to ability to view and interact with wildlife); *Fund For Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (plaintiff lived near and enjoyed observing and photographing bison).

As for the three of Plaintiff's cited cases that appear to base irreparable harm solely on harm to the environment, two involved construction projects challenged by local or regional organizations (whose members presumably lived nearby).  *See Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 404 F. Supp. 2d 1352, 1354 (S.D. Fla. 2005); *Protect Key W., Inc. v. Cheney*, 795 F. Supp. 1552, 1554 (S.D. Fla. 1992).  The third was reversed because the statute under which the case arose did not apply to the federal government—the agency could not be enjoined to begin with.  *See Sierra Club v. Martin*, 933 F. Supp. 1559, 1570 (N.D. Ga. 1996), *rev'd*, 110 F.3d 1551 (11th Cir. 1997).

Third, harm to individuals of a species is generally not enough to demonstrate irreparable injury to a plaintiff's interest in that species.  Instead, the movant must show harm at the species level.  *See W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 47–48 (D.D.C. 2020) ("[N]either is the court convinced that the killing of a single

member of a threatened species constitutes irreparable harm . . . [t]he case law simply does not support such a conclusion."); *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1262–63 (W.D. Wash. 2015). This does not mean that Plaintiff must demonstrate a likelihood of extinction-level harm, but rather a population-level impact significant enough to irreparably injure Plaintiff's members' stated interests.[10]

### B.   Plaintiff Has Failed to Meet Its Burden.

Here, Plaintiff has failed to demonstrate that this spring's planned maintenance dredging in Brunswick Harbor is likely to harm loggerhead sea turtles at a level that would diminish Plaintiff's members' interest in protection, observation, study, and photography of the species. "This is not to say that the injuries Plaintiff[ ] assert[s] are not real, but rather that . . . the injury is not irreparable." *SUWA*, 811 F. Supp. at 642.

For example, none of Plaintiff's declarants attempt to opine on the population-level effect this spring's dredging would have on the relevant loggerhead population segment. Instead, the declarants either assume a negative impact or make conclusory

---

[10] Courts have frequently denied injunctive relief for a failure to demonstrate species-level harm. *See, e.g., Water Keeper All. v. U.S. Dep't of Defense*, 271 F.3d 21, 34 (1st Cir. 2001) (no showing on "how these deaths may impact the species"); *Defenders of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1209–11 (D. Mont. 2009) (no proof that harm would be significant for the species as a whole); *Fund for Animals v. Mainella*, 294 F. Supp. 2d 46, 58 (D.D.C. 2003) (the "six-day hunt is not designed to eradicate or even significantly reduce the black bear population"); *Fund for Animals v. Babbitt*, 2 F. Supp. 2d 562, 566–67 (D. Vt. 1996) ("The plaintiffs have presented virtually no concrete evidence to support their contention that their ability to view or photograph moose will be impaired as a result of the proposed limited hunt."); *S. Utah Wilderness All. (SUWA) v. Thompson*, 811 F. Supp. 635, 642 (D. Utah 1993) (failure to establish irreparable injury because "the coyote population [would] remain viable . . . .").

statements.  *See* Norton Decl. ¶¶ 21–22, 24 , ECF No. 5-5; Ridley Decl. ¶¶ 20, 22, ECF

No. 5-19; Bell Decl. ¶ 12, ECF No. 5-20; Carroll Decl. ¶ 18, ECF No. 5-21; Janssen

Decl. ¶ 10 ECF No. 5-22.  A finding of irreparable harm cannot be based on conjecture or

speculation.  *See Siegel*, 234 F.3d at 1176.

The National Marine Fisheries Service, on the other hand, has opined on the

expected impact that future Corps maintenance dredging will have on loggerhead sea

turtles.  *See* 2020 SARBO at 388–91.  The Service concluded that, even when considered

together, *all* Corps maintenance dredging activity throughout the South Atlantic—let

alone just that planned for this spring at Brunswick Harbor—"is not expected to cause an

appreciable reduction in the likelihood of either the survival or recovery of loggerhead

sea turtles in the wild."  2020 SARBO at 391; *see id.* at 427.[11]

Plaintiff relies on Brunswick Harbor dredging that occurred in September 2009,

during which four loggerhead mortalities occurred over nine days.  *See* Pl.'s Mot. 14

(citing DRN Mem., ECF No. 5-4 at 4).  But the document to which Plaintiff cites—a

Georgia Department of Natural Resources memorandum from Mark Dodd—notes that,

given the small sample size, "[t]he results may not be representative of all summer

dredging in all years."  ECF No. 5-6 at 4.  More importantly, however, the memorandum

describes how, when it observed the larger than anticipated loggerhead mortality, *the*

*Corps stopped dredging.  See id.* ("the project was discontinued.").  Plaintiff's motion

---

[11] "To the extent Plaintiff[ ] [is] dissatisfied with the 2020 SARBO's substantive
conclusions, such a challenge would have to be made against NMFS and not the Corps."
*Altamaha Riverkeeper v. U.S. Army Corps of Eng'rs*, No. 4:18-cv-251-JRH-CLR, 2020
WL 5837650 at *18 (S.D. Ga. Sept. 30, 2020).

also acknowledges that practice.  *See* Pl.'s Mot. at 14.   "The Corps would not and could not allow a single project to use all the take authorized under the 2020 SARBO since [the Corps] must manage all navigation projects under the 2020 SARBO . . . ."  Scerno Decl. ¶ 8.  And, for *all* the covered Corps maintenance operations, the 2020 SARBO authorizes the collective observed lethal take of only 107 logger sea turtles over any three period. *See* 2020 SARBO at 430.  Even during the winter, the Corps has stopped dredging activities where observed loggerhead mortality was greater than anticipated.  *See* Bed Leveler Evaluation Report 3 (Jan. 2015) (ECF No. 5-8 at 115).

Plaintiff is misplaced in focusing on the fact that the 2020 SARBO allows for lethal take of up to 214 loggerheads over any three-year period.  *See* Pl.'s Mot. 14.  The total take level is a *regional* one and says nothing about Brunswick Harbor specifically, let alone this spring's planned dredging.  It also is the very same take level that the National Marine Fisheries Service assumed would occur when concluding that the Corps' maintenance dredging in the region is not expected to cause an appreciable reduction in the likelihood of species survival or recovery.  *See* 2020 SARBO at 388.  Plaintiff appears particularly concerned about the potential death of pregnant female loggerheads on their way to nest.  *See* Pl.'s Mot. 13–14.  But the National Marine Fisheries Service separately considered that potential (in the form 65 lost egg clutches) as part of its analysis.  *See* 2020 SARBO at 388–91.[12]

---

[12] Plaintiff's assertion (Pl.'s Mot. 14) that "as many as 87% of the females nesting in the vicinity of the Brunswick shipping channel" could be killed assumes, without any support for the assumptions, that: (1) the entirety of the 2020 SARBO's authorized lethal

Plaintiff's other exhibits similarly do not help its argument.  The Georgia

Department of Natural Resources memorandum states (in Table 1) that a total of thirty-

five loggerheads were killed during twenty-six years of periodic maintenance dredging at

Brunswick Harbor—not even two a year.  *See* DNR Mem., ECF No. 5-4 at 3–4.  The

study on the docket at ECF No. 5-6 and to which Plaintiff cites (Pl.'s Mot. 13) estimates

that, after 1992, total sea turtle (not just loggerhead) take "ranged from 0.25 to 1.87

turtles per project."  ECF No. 5-6 at 9.

Plaintiff's proffered facts do not support a conclusion that this spring's planned

maintenance dredging in Brunswick Harbor is likely to result in population-level harm to

loggerhead sea turtles.  Plaintiff's motion should be denied on that basis alone.  *See*

*Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("Because

[plaintiff] must meet all four prerequisites to obtain a preliminary injunction, failure to

meet even one dooms its appeal." (citing *Siegel*, 234 F.3d at 1176)).

## II.   The Balance of the Equities Weighs Against Preliminary Injunctive Relief.

Plaintiff also has not met its burden to demonstrate that the balance of the relative

harms and the public interest weigh in favor of an injunction.  Those two factors "merge

when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In determining whether to issue an injunction, courts "'must balance the competing

claims of injury and must consider the effect on each party of the granting or withholding

---

loggerhead take over any three year period (214) would occur during this spring in
Brunswick Harbor; and (2) all of the loggerheads would be females.

of the requested relief.'"  *Winter*, 555 U.S. at 24 (citation omitted).  "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'"  *Id.* (quoting *Romero-Barcelo*, 456 U.S. at 312).

Shoaling has altered the Brunswick Harbor navigation channel's Congressionally-authorized dimensions.  Brutsché Decl. ¶ 5.  That alteration is impacting shipping, as vessels need to wait for high tide to navigate into the Harbor.  Broadie Decl. ¶¶ 5–6.  The navigational impacts, in turn, have economic consequences.  *See* Brutsché Decl. ¶ 5; Broadie Decl. ¶ 6.  The channel also continues to shoal.  Brutsché Decl. ¶ 5.  Thus, the delays and economic harms will continue (and potentially worsen) until the relevant areas of the navigation channel can be dredged.  Brutsché Decl. ¶ 5; Broadie Decl. ¶¶ 15, 17.

Plaintiff attempt to counter that harm with the potential harm to loggerhead sea turtles.  *See* Pl.'s Mot. at 17.  As explained above, that showing does not rise to a level that would justify preliminary injunctive relief.  In any event, Plaintiff is not on as solid ground as it would seem in asserting that an injunction and any resulting winter (as opposed to spring and summer) dredging would necessarily avoid environmental harm. Dredging during the winter also has the potential to harm threatened and endangered species, including the North Atlantic right whale.  Richards Decl. ¶ 6.  For that reason, among others, the National Marine Fisheries Services removed from the 2020 SARBO the seasonal dredging requirements that been included in prior iterations.  Scerno Decl. ¶ 7; *See* 2020 SARBO at 644–46.  Even with respect to sea turtles, Plaintiff's submissions show that mortality can occur during the winter dredging for which Plaintiff

advocates.  *See* Bed Leveler Evaluation Report 3 (Jan. 2015), ECF No. 5-8 at 115 (noting six incidental takes of sea turtles over eleven days of dredging, and three incidental takes on one day)Brief.  The Corps also may suffer contract costs and programmatic impacts if an injunction issues.  *See* Broadie Decl. ¶ 16.

Plaintiffs is certainly correct that there is a public interest in compliance with the law.  *See* Pl.'s Mot. at 19.  But this is not a case in which no NEPA compliance has occurred; the Corps completed an Environmental Impact Statement for Harbor deepening and maintenance in 1998.  *See* ECF No. 5-16.  And the Corps' maintenance of the navigation channel is an on-going activity, with dredging occurring as needed and as Congressional appropriations allow.  *See* Broadie Decl. ¶¶ 4, 14.  Thus, if this spring's dredging proceeds, NEPA's purposes could still be served by the Corps undertaking further NEPA review (or explaining its reasons for not doing so) before any future spring or summer maintenance dredging in Brunswick Harbor.  Given its nature as an APA case, we expect that this matter would be resolved through dispositive briefing (or by some other means) before next spring.  The balance of the harms weighs against preliminary injunctive relief.

## III.    A Likelihood of Success on the Merits Cannot Overcome Plaintiff's Failure to Demonstrate Irreparable Harm or Balance of the Harms.

Plaintiff asserts that the Corps should have supplemented its 1998 Environmental Impact Statement (or undertaken an independent NEPA review) to consider impacts on loggerhead sea turtles that could occur from maintenance spring or summer dredging.  *See* Compl. ¶¶ 65–72.  Given Plaintiff's failure to demonstrate irreparable harm and a

favorable balance of the harms, the Court need not consider Plaintiff's likelihood of success on the merits.  *See Winter*, 555 U.S. at 32–33; *Wreal*, 840 F.3d at 1248.

Nonetheless, as explain below, Plaintiff is likely to succeed on an argument that the Corps procedurally erred in failing to explain why it chose not undertake additional NEPA review.  But Plaintiff's likelihood of success on the merits does not relieve Plaintiff from its burden to make a clear showing under the other necessary factors for preliminary injunctive relief.  *See Siegel*, 234 F.3d at 1176.

The Administrative Procedure Act.  Claims alleging federal agency violations of NEPA are reviewed under the Administrative Procedures Act (APA), 5 U.S.C. § 706. *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1359–60 (11th Cir. 2008); Compl. ¶¶ 63–64, 72.  Under the APA, the district courts act like appellate tribunals, reviewing the agency's decision and administrative record only to determine whether the agency acted arbitrarily and capriciously or contrary to law.  *See Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1348 (S.D. Ga. 2019).  "Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the least latitude in finding grounds for reversal."  *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990).  "The reviewing court may not substitute its judgment for that of the agency but must, instead, defer to the agency's technical expertise."  *City of Oxford v. FAA*, 428 F.3d 1346, 1352 (11th Cir. 2005).  "[A] party seeking to have a court declare an agency action to be arbitrary and capricious carries 'a heavy burden indeed.'"  *Legal Env't Assistance Found. Inc. v. EPA*, 276 F.3d 1253, 1265 (11th Cir. 2001) (citation omitted).

"Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). If an agency explanation is lacking such that "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see Motor Vehicle Mfrs.*, 463 U.S. at 55–57.

The National Environmental Policy Act. NEPA aims to focus federal agency attention on a proposed federal action's potential environmental impacts so that those impacts can be considered in agency decision-making. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989); 42 U.S.C. § 4332(2)(C). NEPA, however, does not require environmentally-friendly action; "it simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted); *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978). Agencies are to accomplish NEPA's goals through development of an environmental review document: either an environmental impacts statement or, if it is

likely that impacts will not be significant, a less-demanding environmental assessment. *See* 40 C.F.R. §§ 1501.5, 1502.1.[13]

Consistent with the structure of APA review, the courts' role in reviewing agency compliance with NEPA is a limited one.  Courts are only to "insure that the agency has considered the environmental consequences" of its proposed action, not to "'interject [themselves] within the area of discretion of the executive as to the choice of the action to be taken.'"  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991) (quoting *Stryker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28 (1980) (per curiam)).

The NEPA issue here is one of "supplementation"—agencies are to "prepare supplements" to their environment impact statements in certain circumstances where "a major Federal action remains to occur[.]"  40 C.F.R. § 1502.9(d)(1).  Agencies, however, may also conclude that those conditions are not met "and therefore do not require a supplement[.]"  *Id.* § 1502.9(d)(4).

The Corps informs us that it did not document its reasoning and explanation for deciding to proceed with this spring's maintenance dredging at Brunswick Harbor without additional NEPA review.  Thus, it is likely that a remand to the Corps will be

---

[13] Council on Environmental Quality regulations govern agency NEPA implementation, the current version of which became effective on September 14, 2020.  *See* 85 Fed. Reg. 43,304 (July 16, 2020); 40 C.F.R. pts. 1500–1508 (2020).  Though we cite here to the current regulations, there may be a question as to whether the current or former regulations are applicable in this case.

necessary in this case so that the agency can provide an explanation.  *See Fla. Power & Light*, 470 U.S. at 744.

Because the Corps has previously conducted NEPA review for its maintenance dredging program in Brunswick Harbor, however, any error here would be a procedural one under the APA, not necessarily a violation of NEPA.  *See* 40 C.F.R. § 1502.9(d)(1), (4).  Only with an agency explanation to review would the Court be able to determine whether the decision not to conduct additional NEPA review was arbitrary and capricious or contrary to law.  Though Plaintiff's Complaint does not explicitly raise failure to explain as a basis for its allegations of arbitrary decision-making, we acknowledge that, until the Corps has provided an explanation for its decision, Plaintiff is likely to succeed on such an argument.  But, as explained above, Plaintiff has failed to meet its burden with respect to the other factors.

## IV.   The Temporal Reach of Plaintiff's Requested Injunction Is Not Appropriate.

Finally, even if Plaintiff had met its burden (it has not), the injunction that Plaintiff requests goes too far.  Plaintiff "asks the Court to enjoin the Corps from conducting hopper dredging outside of traditional winter dredging windows until the agency has conducted a legally sufficient evaluation of the environmental impacts of dredging between April 1 and December 14."  Pl.'s Mot. 1–2.  The request is overly broad and is the same relief Plaintiff requests on the merits.  *See* Compl. at 12 (prayer for relief).  Preliminary injunctive relief is intended to prevent irreparable harm during the pendency of litigation.  Thus, the length of any preliminary injunction would need to be tied to an

order resolving the merits of Plaintiff's claims or otherwise disposing of the case. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) ("[T]he purpose of the injunction is not to conclusively determine the rights of parties, but only to balance the equities in the interim as the litigation proceeds." (citing *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017)).

## CONCLUSION

Plaintiff has failed to meet its burden to demonstrate irreparable harm because it has not shown that the planned dredging will result in a species-level harm to loggerhead sea turtles that will impact Plaintiff's members' enjoyment of the species. Because that showing is a necessary perquisite to injunctive relief, and because the balance of the harms and public interest weigh in favor of channel maintenance, Plaintiff's motion should be denied.

May 14, 2021

DAVID H. ESTES
Acting United States Attorney

__*s/ O. Woelke Leithart*_____
O. WOELKE LEITHART
(Idaho Bar No. 9257)
Assistant United States Attorney
U.S. Attorney's Office
Post Office Box 8970
Savannah, Georgia 31412
Tel: (912) 652-4422
Woelke.Leithart@usdoj.gov

JEAN E. WILLIAMS
Acting Assistant Attorney General

_*s/ Kristofor R. Swanson*_____
KRISTOFOR R. SWANSON
(Colo. Bar. No. 39378)
Natural Resources Section
Env't & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0248
kristofor.swanson@usdoj.gov