

**UNITED STATES DEPARTMENT OF COMMERCE**
National Oceanic and Atmospheric Administration
**NATIONAL MARINE FISHERIES SERVICE**
Southeast Regional Office
263 13th Avenue South
St. Petersburg, Florida 33701-5505
https://www.fisheries.noaa.gov/region/southeast

Issued March 27, 2020                                   F/SER31:KR
Revised July 30, 2020                                   SERO-2019-03111

Dr. Larry McCallister
Director of Programs, South Atlantic Division District
U.S. Army Corps of Engineers
60 Forsyth Street Southwest
Atlanta, Georgia 30303

Dr. Jeffrey Reidenauer
Chief, Marine Minerals Division
Office of Strategic Resources
Bureau of Ocean Energy Management
45600 Woodland Road, VAM-MMD
Sterling, Virginia 20166

Dear Drs. McCallister and Reidenauer:

The enclosed Biological Opinion ("Opinion") known as the 2020 South Atlantic Regional Biological Opinion for Dredging and Material Placement Activities in the Southeast United States (2020 SARBO) responds to your request for consultation with us, the National Marine Fisheries Service (NMFS), pursuant to Section 7 of the Endangered Species Act (ESA). The Opinion considers dredging and material placement activities under the jurisdiction of the United States Army Corps of Engineers (USACE) Civil Works and Regulatory Programs and dredging/sand mining in borrow sites in federal waters under the jurisdiction of the Bureau of Ocean Energy Management (BOEM) Marine Minerals Program in the Southeast United States from the North Carolina/Virginia Border through and including Key West, Florida and the Islands of Puerto Rico and the U.S. Virgin Islands. Activities considered under the 2019 SARBO include dredging (maintenance dredging, dredging/sand mining in borrow sites, and restoration dredging/muck dredging to improve water quality); dredge material placement (sand placement for beach nourishment, nearshore placement, placement in in ocean dredged material disposal site (ODMDS), upland placement, transportation of materials between dredging and material placement locations); geotechnical and geophysical (G&G) surveys, conducted by USACE,[1] necessary to complete dredging and material placement projects, and monitoring for and handling of ESA-listed species encountered during projects covered under this Opinion.

NMFS concludes that the proposed action is not likely to jeopardize the continued existence of ESA-listed species or result in adverse effects to designated critical habitats considered in the Opinion (Table 8). This Opinion includes an Incidental Take Statement (ITS), with associated Reasonable and Prudent Measures (RPMs) and Terms and Conditions (T&Cs). The RPMs and T&Cs incorporate elements of the proposed action that appropriately minimize the impact of incidental take. Because NMFS has concluded the Project Design Criteria (PDC) include the measures necessary and appropriate to minimize the

---

[1] BOEM has previously consulted on G&G activities in the Atlantic, including within the action area, under NER-2018-15093: Biological Opinion: Sand Survey Activities for BOEM's Marine Minerals Program: Atlantic and Gulf of Mexico.



**Defendants' Exhibit C**

impact of incidental take of incidental take, the RPMs/T&Cs impose no additional requirements beyond those specified by the proposed action.

The requirements of this Opinion are separate and distinct from any requirement under other applicable laws, including the Marine Mammal Protection Act, the Magnuson-Stevens Fishery Conservation Act (MSA), and other federal, local, or state requirements. SARBO therefore does not replace consultation with the NMFS under the Essential Fish Habitat (EFH) provisions of the MSA. The routes of effect that NMFS evaluated under SARBO to determine if the actions proposed by USACE and BOEM are likely to jeopardize the continued existence of a listed species and/or result in the destruction or adverse modification of critical habitat differ considerably from the routes of effect NMFS evaluates during an EFH consultation to identify measures to avoid, minimize, or compensate for adverse impacts to EFH. Therefore, the PDCs in the 2020 SARBO should be viewed as neither substitutes for EFH conservation recommendations nor as necessarily sufficient steps for avoiding, minimizing, or compensating adverse impacts to EFH under the MSA.

We also note that NMFS and the United States Fish and Wildlife Service (USFWS) share jurisdiction over ESA-listed sea turtles. Therefore, USACE may need to consult with USFWS regarding impacts from beach nourishment activities, or any activity, that may affect sea turtles and/or their habitats in the terrestrial environment.

The project has been assigned a tracking number in our new NMFS Environmental Consultation Organizer (ECO), "SERO-2019-03111". Please refer to the ECO tracking number in any future inquiries regarding this project.

We look forward to further cooperation with you on other projects to ensure the conservation of our threatened and endangered marine species and designated critical habitat. If you have any questions on this consultation, please contact Karla Reece, Section 7 Team lead, by email at karla.reece@noaa.gov.

Sincerely,

Roy E. Crabtree, Ph.D.
Regional Administrator

Enclosure (s)
cc: Larry.D.Mccallister@usace.army.mil, Jeffrey.Reidenauer@boem.gov,
John.D.Ferguson@usace.army.mil, Eric.L.Bush@usace.army.mil, Richard.D.Davis@usace.army.mil,
Deborah.H.Scerno@usace.army.mil, Nicole.Bonine@usace.army.mil, and
Douglas.Piatkowski@boem.gov

File: 1514.22.f.11

**Defendants' Exhibit C**

**Endangered Species Act - Section 7 Consultation**
**Biological Opinion**

**Action Agency**:  United States Army Corps of Engineers (USACE), and the Bureau of Ocean Energy Management (BOEM);

**Activity**:  South Atlantic Regional Biological Opinion for Dredging and Material Placement Activities in the Southeast United States (2020 SARBO)

North Carolina/Virginia Border through and including Key West, Florida and the Islands of Puerto Rico and the U.S. Virgin Islands.

**Consulting Agency**:  National Oceanic and Atmospheric Administration (NOAA), National Marine Fisheries Service (NMFS), Southeast Regional Office, Protected Resources Division, St. Petersburg, Florida

Consultation Number SERO-2019-03111

**Approved by**:  
_____
Roy E. Crabtree, Ph.D., Regional Administrator
NMFS, Southeast Regional Office
St. Petersburg, Florida

**Date Issued**   March 27, 2020
**Date Revised**  July 30, 2020

**Defendants' Exhibit C**

**Table of Contents:**

1       CONSULTATION HISTORY .................................................................. 15
2       DESCRIPTION OF THE PROPOSED ACTION AND ACTION AREA ......... 16
3       Potential Routes of Effect to ESA-listed Species and Critical Habitat................. 90
4       Status of Species Likely to be Adversely Affected ........................................ 180
5       ENVIRONMENTAL BASELINE.......................................................... 300
6       EFFECTS OF THE ACTION ............................................................... 319
7       CUMULATIVE EFFECTS .................................................................. 375
8       Jeopardy Analysis ............................................................................ 377
9       CONCLUSION ................................................................................ 427
10      INCIDENTAL TAKE STATEMENT .................................................... 427
11      CONSERVATION RECOMMENDATIONS................................................ 434
12      REINITIATION OF CONSULTATION.................................................. 438
13      LITERATURE CITED ...................................................................... 439
Appendix A.   South Atlantic Regional Biological Opinion (2020 SARBO) Project Design
Criteria (PDCs) Overview and General PDCs................................................... 519
Appendix B.   2020 SARBO General PDCs ....................................................... 521
1       Eligibility Criteria PDCs: PDCs that Define if an Activity Meets the Criteria to be
Covered under the 2020 SARBO.................................................................... 521
2       Standard/General PDCs: PDC Requirements that Apply to All Projects Covered under
the 2020 SARBO .................................................................................... 525
3       Equipment-Specific PDCs for Projects Covered under the 2020 SARBO......... 529
Appendix C.   2020 SARBO Coral PDCs .......................................................... 534
1       Description of the Areas Coral PDCs Apply ............................................ 534
2       Requirements for All Dredge and Material Placement Projects Within the Range of ESA-
listed Corals    539
3       Beach Nourishment Survey Protocol ..................................................... 547
4       Pipeline Survey Protocol................................................................... 548
5       Coral Relocation Protocol for ESA-Listed Corals ...................................... 550
Appendix D.   2020 SARBO Johnson's Seagrass PDCs ....................................... 554
1       Description of the Area Where Johnson's seagrass PDCs Apply...................... 554
2       Johnson's seagrass PDCs for SARBO ................................................... 557
3       Johnson's seagrass surveys ................................................................ 560
Appendix E.   2020 SARBO Sturgeon PDCs ..................................................... 562
1       Description of the Area Sturgeon PDCs Apply ......................................... 562
2       Sturgeon PDCs for SARBO ............................................................... 564
3       Sturgeon River Dredging Restrictions ................................................... 564
4       Cutterhead Dredging Monitoring in Sturgeon Rivers.................................. 588
Appendix F.   2020 SARBO USACE and BOEM North Atlantic Right Whale Conservation Plan
        589
1       Introduction................................................................................... 589
2       Conservation Measures ..................................................................... 590
Appendix G.   Geophysical and geotechnical surveys PDCs ..................................... 597
1       2020 SARBO Geophysical and Geotechnical (G&G) PDCs ............................ 597
Appendix H.   Handling and Reporting Protocol for ESA-listed Species Observed or
Encountered and Protected Species Observer (PSO) Roles and Responsibilities .......... 600

**Defendants' Exhibit C**

1        Observations and Reporting Observations of ESA-listed Species ..................... 600
2        PSO Credentials ..................................................................................... 602
3        PSO Responsibilities ............................................................................... 602
4        Handling and Reporting Dead ESA-listed Species ............................................ 611
5        Sea Turtle Handling, Tagging and Genetic Sampling Protocol for Relocation Trawling
         614
6        Sturgeon Handling, Tagging and Genetic Sampling Protocol for Relocation Trawling  617
7        Smalltooth Sawfish Handling, Tagging and Genetic Sampling Protocol for Relocation
Trawling        621
8        Giant Manta Handling Data Recording, and Genetic Sampling Protocol for Relocation
Trawling        623
9        Shark Handling, Tagging and Genetic Sampling Protocol for Relocation Trawling626
Appendix I.    Relocation Trawling Net Guidance ....................................................... 630
Appendix J.    NMFS Recommendations to Consider when Developing the Risk Assessment for
the 2020 SARBO ................................................................................................ 634
1        Pre-Construction Risk Assessment .................................................................... 634
Appendix K.    SARBO Additional Consultation History ............................................... 637
1        USACE Consultation History ........................................................................... 637
2        Reinitiation of Consultation for the 2020 SARBO ............................................ 639
Appendix L.    Revision History ........................................................................... 648

**Defendants' Exhibit C**

**Table of Figures:**

Figure 1.  Floating pipeline from a cutterhead dredge ..................................................................37
Figure 2.  Pipeline from a hopper dredge used for beach nourishment. ......................................38
Figure 3.  Split Hull Hopper Dredge MURDEN. ........................................................................38
Figure 4.  Side-casting dredge MERRITT. ..................................................................................39
Figure 5.  Mechanical clamshell dredge. .....................................................................................40
Figure 6.  Backhoe Dredge NEW YORK. ....................................................................................41
Figure 7.  Cutterhead pipeline dredge schematic shown on the top and 2 representative close-up
photographs below to show the variety in size of cutterhead dredges. ........................................42
Figure 8.  Hopper dredge illustration.  Image provided by USACE in SARBA. ........................44
Figure 9.  Illustration of a hopper dredge draghead with installed sea turtle deflector ...............45
Figure 10.  Draghead with (left) and without (right) UXO Screening .........................................46
Figure 11.  Images of various inflow boxes that shows the variety in size and screening ............47
Figure 12.  2 examples of overflow screening .............................................................................48
Figure 13.  Example bed-levelers (USACE 2015a) .....................................................................49
Figure 14.  The image on the left shows a bed-leveler design with the attachment points extending
beyond the side of the blade leading to a potential pinch point.  The image on the right shows
additional bade being welded in place to eliminate the pinch point (USACE 2015a). .................50
Figure 15.  Spatial extent of the density current in the Gironde estuary (Ginger 2012) ..............51
Figure 16.  Image of the USACE Survey Vessel (Florida II). .....................................................52
Figure 17.  Sub-bottom profiler. ..................................................................................................55
Figure 18.  Photo of a side-scan sonar. ........................................................................................56
Figure 19.  Photo of a magnetometer. ..........................................................................................56
Figure 20.  Drawing of a Standard Penetration Test. ...................................................................59
Figure 21.  Photo of a Grab Sampler. ...........................................................................................60
Figure 22.  General Action Area for SARBO. ..............................................................................63
Figure 23.  Map of the USACE SAD jurisdictional boundaries. ..................................................64
Figure 24.  Threatened (light) and endangered (dark) green sea turtle DPSs: ...........................183
Figure 25.  Green sea turtle nesting at Florida index beaches since 1989 ..................................188
Figure 26.  Kemp's ridley nest totals from Mexican beaches (Gladys Porter Zoo nesting database
2019) ............................................................................................................................................193
Figure 27.  Leatherback sea turtle nesting at Florida index beaches since 1989 ........................201
Figure 28.  Loggerhead sea turtle nesting at Florida index beaches since 1989 ........................208
Figure 29.  South Carolina index nesting beach counts for loggerhead sea turtles ....................209
Figure 30.  The North American Atlantic coast depicting 3 shortnose sturgeon metapopulations based
on mitochondrial DNA control region sequence analysis (Wirgin et al. 2010). .........................238
Figure 31.  The Extent of Occurrence (dark blue) and Area of Occupancy (light blue) based on
species distribution (Lawson et al. 2017) ...................................................................................248
Figure 32.  Reef zonation schematic example modified from several reef zonation-descriptive studies
(Bak 1977; Goreau 1959). ...........................................................................................................260
Figure 33.  Range of Johnson's seagrass ....................................................................................293
Figure 34. Percent occurrence of Johnson's seagrass in Indian River Lagoon as measured from 35
fixed-site transect surveys. ..........................................................................................................295
Figure 35. Percent coverage of Johnson's seagrass at 36 fixed-site transect surveys conducted each
year................................................................................................................................................296
Figure 36.  Extent of coral disease outbreak across the Florida reef tract. .................................311
Figure 37. Broward County, Florida Beach Nourishment Segments 1, 2, and 3.........................359
Figure 38.  Broward County Segment 2. ETOF, hardbottom edge, and *Acropora* surveys. ............360

**Defendants' Exhibit C**

Figure 39.  Broward County Segment 2. ETOF, hardbottom edge, and *Acropora* surveys. ............361
Figure 40.  Broward County Segment 2. ETOF, hardbottom edge, and *Acropora* surveys. ............362
Figure 41.  Broward County Segment 2. ETOF, hardbottom edge, and *Acropora* surveys. ............363
Figure 42.  Broward County Segment 2. ETOF, hardbottom edge, and *Acropora* surveys. ............364
Figure 43.  Broward County Segment 2. ETOF, hardbottom edge, and *Acropora* surveys. ............365
Figure 44.  Broward County Segment 2. ETOF, hardbottom edge, and *Acropora* surveys. ............366
Figure 45.  Broward County Segment 2. ETOF, hardbottom edge, and *Acropora* survey. ...............367
Figure 46.  ETOF in Broward Segment 3, Hollywood/Hallandale Beach (NMFS 2011b). .............368
Figure 47.  Staghorn coral colonies located in Broward Segment 3, north Section Hollywood/Hallandale Beach (NMFS 2011b)...................................................................369
Figure 48.  Staghorn coral colonies located in Broward Segment 3, South Section Hollywood/Hallandale Beach (NMFS 2011b)...................................................................370
Figure 49.  The left image is for *Acropora* critical habitat Area 1 (Florida Unit) and the right image is for Area 2 (Puerto Rico and Associated Islands)....................................................535
Figure 50.  The left image is for *Acropora* critical habitat Area 3 (St. Thomas/St John, U.S. Virgin Islands Unit) and the right image is for Area 4 (St. Croix, U.S. Virgin Islands Unit)......................536
Figure 51.  *Acropora* critical habitat exclusion in the Dania restricted anchorage area shown as the break in the *Acropora* critical habitat area shaded pink.....................................................537
Figure 52.  Illustration showing the areas described in the beach nourishment PDCs .....................543
Figure 53.  Johnson's seagrass critical habitat units ........................................................................555
Figure 54.  Image of the Baker's Haulover borrow site location provided by the USACE...............557
Figure 55.  Atlantic sturgeon critical habitat rivers ........................................................................563
Figure 56.  Roanoke River ...............................................................................................................571
Figure 57.  Tar-Pamlico River .........................................................................................................572
Figure 58.  Neuse River ...................................................................................................................573
Figure 59.  Northeast Cape Fear River .............................................................................................574
Figure 60.  Cape Fear River .............................................................................................................575
Figure 61.  Great Pee Dee River ......................................................................................................576
Figure 62.  Waccamaw River ...........................................................................................................577
Figure 63.  Black River .....................................................................................................................578
Figure 64.  North/South and Mainstem Santee River with the Rediversion Canal...........................579
Figure 65.  Cooper River ..................................................................................................................580
Figure 66.  North/South and Mainstem Edisto River ........................................................................581
Figure 67.  Combahee-Salkehatchie River .......................................................................................582
Figure 68.  Savannah River ..............................................................................................................583
Figure 69.  Ogeechee River ..............................................................................................................584
Figure 70.  Altamaha River Sturgeon Seasonal Aggregation Area ...................................................585
Figure 71.  Satilla River ...................................................................................................................586
Figure 72.  St Marys River................................................................................................................587
Figure 73.  An Example of the Early Warning System Tracklines (blue lines)..................................592
Figure 74.  Seasonal Management Area for North Atlantic Right Whale ..........................................596
Figure 75.  Examples of obvious signs of decomposition. ................................................................612
Figure 76.  Sea Turtle Identification Key Image from the Southeast Fisheries Science Center Sea Turtle Research Techniques Manual, updated January 2013 (NOAA Technical Memorandum NMFS-SEFSC-579, https://repository.library.noaa.gov/view/noaa/3626)(NMFS 2008)..............................614
Figure 77.  Atlantic and shortnose sturgeon species identification guide.........................................617
Figure 78.  Diagram of different types of measurements for sturgeon. .............................................619
Figure 79.  Standardized Location for PIT Tagging all Gulf, Atlantic, and shortnose sturgeon (Photo Credit: J. Henne, USFWS)................................................................................................620

**Defendants' Exhibit C**

Figure 80.  Image of a smalltooth sawfish. ..................................................................621
Figure 81.  Mobula Ray Identification Guide ..............................................................624
Figure 82.  Shark Identification and Federal Regulations for the Recreational Fishery of the U.S. Atlantic, Gulf of Mexico, and Caribbean ..............................................................629

**Table of Tables:**

Table 1.  USACE Civil Works Reported Dredging Totals under 1997 SARBO (1997-2018) ............19
Table 2.  New Dredging Areas ..................................................................................21
Table 3.  Estimated Combined Annual Hopper Dredging in the 2020 SARBO ................22
Table 4.  Examples of Geophysical Survey Equipment Provided by USACE ...................54
Table 5.  BOEM Borrow Sites ..................................................................................66
Table 6.  EPA ODMDS Sites ...................................................................................67
Table 7.  Example of Requests that may be submitted under SARBO Supersede and the rationale for potential approval ......................................................................................84
Table 8.  Effects Determination(s) for Species the Action Agencies and/or NMFS Believe May Be Affected by the Proposed Action ..............................................................91
Table 9.  Effects Determinations for Designated Critical Habitat the Action Agency and/or NMFS Believe May Be Affected by the Proposed Action ..........................................93
Table 10.  Reported Take Associated with Mechanical Dredging and Placement Equipment ..........101
Table 11.  Reported Take Associated with Cutterhead Dredging ..................................105
Table 12.  Reported Takes from Hopper Dredging per year since 1997 SARBO. ...........110
Table 13.  Capture Relocation Data within the Action Area ........................................117
Table 14.  Hearing Ranges of ESA-Listed Species ...................................................138
Table 15.  Acoustic Thresholds for Sea Turtles from Impulsive Sound Sources (U.S. Navy 2017a)141
Table 16.  Impulsive Acoustic Threshold for ESA-Listed Fish (i.e., sturgeon, Nassau grouper, and elasmobranchs) and Non-Impulsive Acoustic Threshold for Sea Turtles and ESA-listed Fish ........142
Table 17.  Acoustic Threshold for Marine Mammals (NMFS 2018a) ............................144
Table 18.  Geophysical Survey Sound Characteristics ...............................................147
Table 19.  Calculated Distance to Level A and B Harassment for Marine Mammals .......148
Table 20.  Geophysical Survey Sound Characteristics (BOEM 2014) tested by JASCO .................148
Table 21.  ESA-Listed Coral Species Distribution within the SARBO Action Area. ......156
Table 22.  *Acropora* Critical Habitat PBFs ..............................................................164
Table 23.  Atlantic Sturgeon Critical Habitat PBFs ...................................................168
Table 24.  Green, Hawksbill, and Leatherback Sea Turtle Critical Habitat PBFs ............172
Table 25.  NWA DPS of Loggerhead Sea Turtle Critical Habitat PBFs ........................174
Table 26.  Johnson's Seagrass Critical Habitat PBFs .................................................176
Table 27.  North Atlantic Right Whale Critical Habitat PBFs ......................................179
Table 28.  Number of Leatherback Sea Turtle Nests in Florida ...................................201
Table 29.  Total Number of Northern Recovery Unit Loggerhead Nests (Georgia Department of Natural Resources, South Carolina Department of Natural Resources, and North Carolina Wildlife Resources Commission nesting datasets compiled at Seaturtle.org) ..................................209
Table 30.  Summary of Calculated Population Estimates based upon the NEAMAP Survey Swept Area, Assuming 50% Efficiency ..........................................................................216
Table 31.  Estimated Atlantic Sturgeon Population in the Southeast ..............................218
Table 32.  Estimates of Effective Population Size by Rivers .........................................220
Table 33.  Projected Temperature Increase in the Southeast and Northeast Under Two Model Projections and Time Series (Hayhoe et al. 2017) ......................................................232
Table 34.  Shortnose Sturgeon Populations and Their Estimated Abundances ................239

**Defendants' Exhibit C**

Table 35.  Projected Temperature Increase in the Southeast Under Two Model Projections and Time Series (Hayhoe et al. 2017) ................................................................................................245
Table 36.  Calculated Annual CPUE for Hopper Dredging ...............................................................326
Table 37.  Estimated Annual Observed and Unobserved Hopper Dredging Take under this Opinion ................................................................................................................................................330
Table 38.  Estimated Shortnose and Atlantic Sturgeon Takes in Cutterhead Dredging, over consecutive 1-year and 3-year periods ...............................................................................336
Table 39.  Capture Relocation Trawling Calculations .......................................................................337
Table 40.  Reported sea turtle captures between 2011-2018 – in the Atlantic Ocean (ATLO) and in the Gulf of Mexico (GOM) ................................................................................................342
Table 41.  Sea Turtle Relocation Trawling Calculations ...................................................................343
Table 42.  Summary of Annual Estimated Sea Turtle Take from Relocation Trawling...................344
Table 43.  Giant Manta Ray Estimated Relocation Trawling Captures.............................................347
Table 44.  Smalltooth Sawfish Historic Captures in Trawling and Similar Nets .............................349
Table 45.  Total Estimated Take of All Mobile ESA-listed Species from Hopper Dredging, Cutterhead Dredging (sturgeon only), and Associated Relocation Trawling ....................351
Table 46.  3-Year Total Estimated Nonlethal and Lethal Take from Hopper Dredging, Cutterhead Dredging, and Relocation Trawling...................................................................................352
Table 47.  ESA-Coral and Hardbottom Information from Previous Beach Nourishment Projects (2008-2017).........................................................................................................................357
Table 48.  Estimated Corals to be Relocated for Pipeline Projects...................................................373
Table 49.  Estimated Nonlethal and Lethal Take of ESA-listed Corals from Beach Nourishment Projects and Associated Pipeline Corridors During 10-years of Activities Covered Under this Opinion. ......................................................................................................................374
Table 50.  3-Year Estimated Take of Green Sea Turtle NA and SA DPS .........................................379
Table 51.  Anticipated Take by DPS Over any Consecutive 3-year Period of the Project...............392
Table 52.  Anticipated Future Take Per 3 Consecutive Year Period .................................................430
Table 53.  Anticipated Future Take Per Other Defined Time Period ................................................431
Table 54.  Channel and Borrow Area Dredging Scenarios Covered under the 2020 SARBO within the Range of ESA-Listed Corals.......................................................................................541
Table 55. Outplanting Ratio if the Coral Relocation Survival Rate was not Met.............................553
Table 56.  Sturgeon River Dredging Restrictions .............................................................................566
Table 57.  Sturgeon River Dredging Restriction Decision Process Based on Available Information ................................................................................................................................................570
Table 58.  Vessel Speed Requirements, if a North Atlantic right whale is spotted or reported within 38 nmi of the vessel: .........................................................................................................595
Table 59.  PSO Handling Guidance ..................................................................................................608

**Defendants' Exhibit C**

**Acronyms and Abbreviations**

| | |
|---|---|
| ATLO | Atlantic Ocean |
| BOEM | Bureau of Ocean Energy Management |
| CI | confidence interval |
| CITES | Convention on International Trade in Endangered Species of Wild Flora and Fauna |
| DDT | dichlorodiphenyltrichloroethane |
| DNA | deoxyribonucleic acid |
| DO | dissolved oxygen |
| DPS | distinct population segment |
| DTRU | Dry Tortugas |
| DWH | Deepwater Horizon oil spill |
| EF | essential feature |
| EPA | Environmental Protection Agency |
| EPR | eggs per recruit |
| ER | Engineering Regulation |
| ERDC | Engineer Research and Development Center |
| ESA | Endangered Species Act |
| EFH | Essential Fish Habitat |
| ETOF | equilibrium toe of fill |
| EWS | early warning system |
| FEMA | Federal Emergency Management Agency |
| G&G | geotechnical and geophysical |
| GIS | geographic information system |
| GOM | Gulf of Mexico |
| GPS | global positioning system |
| HRG | High-Resolution Geophysical |
| ITS | Incidental Take Statement |
| IWW | Intracoastal Waterway |
| JAXBO | Biological Opinion on the authorization of minor in-water activities throughout the geographic area of jurisdiction of the U.S. Army Corps of Engineers Jacksonville District, including Florida and the U.S. Caribbean (JAXBO) |
| MEC | Munitions of Explosive Concern |
| MMPA | Marine Mammal Protection Act |
| MSA | Magnuson-Stevens Fishery Conservation Act |
| NA DPS | North Atlantic DPS |
| NE | no effect |
| NLAA | not likely to adversely affect |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| NCCOS | National Centers for Coastal Ocean Science |
| NP | not present |
| NWA DPS | Northwest Atlantic Distinct Population Segment |
| OCS | Outer Continental Shelf |
| ODESS | Operations and Dredging Endangered Species System |
| ODMDS | Ocean dredged material disposal site |
| Opinion | Biological Opinion |
| PBF | physical biological features |
| PCBs | polychlorinated biphenyls |
| PCE | primary constituent elements |
| PDC | project design criteria |
| PIT | passive integrated transponder |

**Defendants' Exhibit C**

| | |
|---|---|
| Plan | Risk Assessment and Risk Management Plan |
| PSO | protected species observer |
| Psu | practical salinity unit |
| RCP | Representative Concentration Pathway |
| RPM | Reasonable and Prudent Measures |
| S | seconds |
| SA DPS | South Atlantic DPS |
| SAC | USACE Charleston District |
| SAD | USACE South Atlantic Division |
| SAJ | USACE Jacksonville District |
| SARBA | SARBO Biological Assessment |
| SARBO | South Atlantic Regional Biological Opinion |
| SAS | USACE Savannah District |
| SAW | USACE Wilmington District |
| SMA | Southeast Seasonal Management Area |
| SSB/R | spawning stock biomass per recruit |
| T | threatened |
| TED | turtle excluder devices |
| USACE | U.S. Army Corps of Engineers |
| USFWS | U.S. Fish and Wildlife Service |
| UXO | unexploded ordinance |
| WID | Water injection dredging |

**Units of Measurement**

| | |
|---|---|
| °C | degrees Celsius |
| °F | degrees Fahrenheit |
| cm | centimeter(s) |
| $cm^2$ | square centimeter |
| CPUE | catch per unit effort |
| cy | cubic yards |
| dB | decibels referenced to 1 root mean square micropascal |
| ft | foot/feet |
| $ft^2$ | square feet |
| kg | kilogram(s) |
| km | kilometer(s) |
| lb | pound(s) |
| m | meter(s) |
| $m^2$ | square meter(s) |
| mcy | million cubic yards |
| mg/L | milligrams per liter |
| nmi | nautical mile(s) |
| PTS | permanent threshold shifts |
| RKM | river kilometer |
| RM | river mile |
| rms | root mean square |
| SPL | sound pressure level |
| TTS | temporary threshold shifts |
| µPa | micropascal |

**Defendants' Exhibit C**

**Introduction**

Section 7(a)(2) of the Endangered Species Act (ESA) of 1973, as amended (16 U.S.C. §1531 *et seq*.), requires that each federal agency ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of critical habitat of those species. When the action of a federal agency may affect a protected species or its critical habitat, that agency is required to consult with either the National Marine Fisheries Service (NMFS) or the U.S. Fish and Wildlife Service (USFWS), depending upon the protected species or critical habitat that may be affected.

Consultations on most ESA-listed marine species and their designated critical habitat are conducted between the action agency and NMFS.  Consultations are concluded after NMFS determines the action is not likely to adversely affect listed species or critical habitat or issues a Biological Opinion ("Opinion") that determines whether a proposed action is likely to jeopardize the continued existence of a federally listed species, or destroy or adversely modify federally designated critical habitat.  The Opinion also states the amount or extent of listed species incidental take that may occur and develops nondiscretionary measures that the action agency must take to reduce the effects of said anticipated/authorized take.  The Opinion may also recommend discretionary conservation measures.  No destruction or adverse modification of critical habitat may be authorized.  The issuance of an Opinion detailing NMFS's findings concludes ESA Section 7 consultation.

This document represents NMFS's Opinion based on our review of impacts associated with dredging (maintenance dredging, dredging/sand mining in borrow sites, and restoration dredging/muck dredging to improve water quality); dredge material placement (sand placement for beach nourishment, nearshore placement, placement in an ocean dredged material disposal site (ODMDS), upland placement, transportation of materials between dredging and material placement locations); geotechnical and geophysical (G&G) surveys necessary to complete dredging and material placement projects, and monitoring for and handling of ESA-listed species encountered during projects covered under this Opinion.

Activities will be authorized or permitted by the U.S. Army Corps of Engineers (USACE) Civil Works and Regulatory Programs in state waters and by the Bureau of Ocean Energy Management (BOEM) Marine Minerals Program in federal waters, in the Atlantic Ocean, from the North Carolina/ Virginia border south to Key West Florida and including the U.S. Virgin Islands and Puerto Rico.

We analyze the effects of these activities on the endangered (E) and threatened (T) species and designated critical habitat under our jurisdiction, in accordance with Section 7 of the ESA.  This Opinion is based on information provided by USACE South Atlantic Division (SAD); USACE South Atlantic District Offices (Wilmington [SAW], Charleston [SAC], Savannah [SAS], Jacksonville [SAJ]); USACE Engineer Research and development Center, BOEM Marine Minerals Program; state partners from the North Carolina Wildlife Resource Commission, South Carolina Department of Natural Resources, Georgia, Florida Fish and Wildlife Conservation Commission, Florida Department of Environmental Protection; NMFS species and topic experts

**Defendants' Exhibit C**

both within and outside of the NMFS Southeast Regional Office, and the best scientific and commercial data available.

**Programmatic Consultations**

NMFS relies on programmatic consultations as an effective tool to implement ESA Section 7(a)(2).  "Programmatic consultation"[2] is defined as "a consultation addressing an agency's multiple actions on a program, region, or other basis."[3]  Programmatic consultations allow for streamlined review of (1) multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas, or (2) Federal action agency programs, plans, policies, or regulations providing a framework for future proposed actions.[4]  NMFS uses programmatic consultations to evaluate the effects of authorizing certain categories of frequently occurring activities or of agency policy or programs, where the specifics of any individual future project (either of the given category or type of activity, or occurring under the policy or program), such as the specific location, are not definitively known at the time of the programmatic consultation, but where there is a good understanding of the likely effects on resources listed under the Act.  By consulting on the program, plan, policy, regulation, or suite of activities as a whole, NMFS is in a better position to comprehensively analyze the impacts of carrying out the programmatic action on ESA-listed resources.

As is done in this Opinion, a Programmatic Consultation generally identifies project design criteria (PDCs), which are the specific criteria, including the technical and engineering specifications, indicating how an individual project must be sited, constructed, or otherwise carried out both to be covered under this Opinion and to avoid or minimize adverse effects to ESA-listed species or designated critical habitat.  The PDCs serve 2 important purposes.  First, they ensure that the actions under consultation are sufficiently similar that their effects can be analyzed together.  Second, the PDCs help protect species and critical habitat, and ensure that the action agency is meeting its obligation under Section 7(a)(2).  In designing the PDCs, NMFS and the action agencies work to establish conditions that avoid or limit adverse effects on ESA-listed species and designated critical habitat.  Where adverse effects cannot be avoided, the PDCs limit adverse effects to predictable levels that will not jeopardize the continued existence of listed species or destroy or adversely modify critical habitat, either at the individual project level or in aggregate.  The 2020 SARBO includes PDCs that were developed during consultation with the action agencies and NMFS to include the measures that NMFS believes are necessary or appropriate to avoid or minimize impacts to ESA-listed species and designated critical habitat.  The PDCs are considered part of the proposed action and must be followed in order for an activity to be covered under this Opinion.

The Programmatic Consultation evaluates the aggregate effects of categories of related actions or of the agency program.  This includes the amount or extent of incidental take that is expected, if sufficient information exists to estimate take.  Since programmatic consultations evaluate effects

---

[2] Note that the term "programmatic" is defined differently by NMFS in the context of a Programmatic Consultation or Programmatic Biological Opinion than it is by USACE when discussing a Programmatic *General Permit.*
[3] *See* 50 C.F.R. 402.02
[4] *See,* 50 C.F.R. 402.02; Joint Services memorandum, *Alternative Approaches for Streamlining Section 7 Consultation on Hazardous Fuels Treatment Projects,* https://www.fws.gov/endangered/esa-library/pdf/streamlining.pdf; 68 FR 1628 (January 13, 2003).

**Defendants' Exhibit C**

of expected future actions, the action agency must provide projections of the number of activities and the extent of expected effects from the proposed activities. The Programmatic Consultation must demonstrate that, when the PDCs are followed, the aggregate expected effect of all projects is not likely to adversely affect listed species or their critical habitat(s), or will not jeopardize ESA-listed species or destroy or adversely modify their critical habitat(s), as applicable. At the project-specific consultation stage, each proposed action is reviewed by the action agency or joint agencies to determine if it can be implemented according to the PDCs. For example, an action agency may certify that the expected effect of the project to be authorized is consistent with the PDCs and other conditions in the Programmatic Consultation. Adjustments to the project(s) may be necessary to bring the project(s) into compliance with the Programmatic Consultation document. Finally, the project-specific consultation procedures provide contingencies for proposed projects that cannot be implemented in accordance with the PDCs; for example, separate consultations may be performed on these projects if they are too dissimilar from those described in the Programmatic Consultation. In addition, the Programmatic Consultation provides a process for tracking the actual effects of the proposed activities, once implemented, to ensure that the number and scope of the effects do not exceed those analyzed in the consultation or otherwise require reinitiation. The process by which the SARBO Team, consisting of members of the USACE, BOEM, and NMFS, will conduct project and programmatic-level reviews of the actual effects and compliance with the Programmatic Consultation are defined by this Opinion (Section 2.9 of this Opinion).

The following elements, which generally are included in a Programmatic Consultation to ensure its compliance with ESA Section 7 and its implementing regulations, have been included in this Opinion:

1. Description of the proposed action (Section 2) and the PDCs (Appendix A-H) that are designed to avoid or minimize future adverse effects on listed species and critical habitat.

2. Procedures for streamlined project-specific review, and the process for separate consultations for projects that do not meet the requirements of the Opinion (Section 2.9).

3. Procedures for monitoring projects and validating the predicted effects, including the level of take, and for the comprehensive review of the projects authorized in reliance on the Opinion as a whole (Section 2.9).

4. Description of the manner in which the projects, when implemented consistent with the PDCs, may affect listed species and critical habitat and evaluation of expected effects of the covered projects (Sections 3 and Section 6).

The requirements of this Opinion are specific to the ESA-listed species and designated critical habitat units that occur within the action area and are subject to consultation with NMFS under Section 7 of the ESA. The requirements of this Opinion are separate and distinct from any requirement under other applicable law, including the Marine Mammal Protection Act, the Magnuson-Stevens Fishery Conservation Act, and other federal, local, or state requirements. Additional consultation may be required under the Marine Mammal Protection Act (MMPA), which requires authorization for take of marine mammals, and the Magnuson-Stevens Fishery Conservation and Management Act, which requires consultation whenever a federal agency authorizes, funds, or undertakes an activity that will affect essential fish habitat.

**Defendants' Exhibit C**

# 1   CONSULTATION HISTORY

There is a long history of dredging and material placement by the USACE in the southeast United States, and the USACE has consulted with NMFS on these dredging activities for nearly three decades.  The first South Atlantic Regional Biological Opinion (SARBO) consultation on USACE dredging activities in the Southeast was completed in 1991(NMFS 1991), and subsequent Biological Opinions were completed in 1995 and 1997 (NMFS 1995; NMFS 1997).  Previous SARBO consultations initially covered USACE dredging activities and then expanded to also include dredge material placement activities along the Atlantic coast from North Carolina through Florida.  For simplicity, each new consultation or revision to SARBO will be referred to in this Opinion by the year it was completed (i.e., 1991 SARBO, 1995 SARBO, 1997 SARBO), and this new consultation will be referred to as the 2020 SARBO.

The USACE SAD requested to reinitiate consultation on the 1997 SARBO on April 30, 2007.  The Minerals Management Service (reorganized and renamed as BOEM in 2010), was not party to this reinitiation request letter in 2007, but subsequently joined as a joint consulting agency with USACE SAD serving as the lead Agency.  Similar to USACE, BOEM has a long history of engaging in dredging and material placement activities in the southeast.

On September 12, 2008, USACE SAD and BOEM provided a jointly prepared South Atlantic Regional Biological Assessment (SARBA) (USACE and USEPA 2008) to provide new information and analysis for a revised and updated SARBO.  NMFS received the letter on September 15, 2008 and considers this date the official request for consultation.  The conditions that led to reinitiation of consultation in 2007, completion of the 2020 SARBO in the form of a new Programmatic Biological Opinion, and the inclusion of activities in federal waters under the jurisdiction of BOEM in this Opinion, are described in detail in Appendix K.  These decisions led to the USACE SAD and BOEM finalizing the PDCs for this Opinion and we initiated consultation on September 13, 2019.[5]  On October 25, 2019, a draft of the Biological Opinion (NMFS tracking number SERO-2008-00000) was sent to the USACE and BOEM prior to final signature.  Comments received on that draft resulted in additional negotiations completed on January 13, 2020.


## 1.1        Revision History

### 1.1.1        July 21, 2020:  Appendix G, PDC GG.4 was revised to clarify the use of single beam sonar.

See Appendix L Revision History for a summary of the revision.

---

[5] Under the ESA consultation is initiated once NMFS has all information necessary to conclude the consultation. Because the PDCs that are the core of the project description were under development through the entire process, consultation was initiated very close to the issuance of this Opinion.

**Defendants' Exhibit C**

## 2    DESCRIPTION OF THE PROPOSED ACTION AND ACTION AREA

The proposed action for the 2020 SARBO is categorized into 5 types of activities, which are summarized below.  Section 2.1 of this Opinion provides  an estimate of the amount of work that will be completed annually under this Opinion, Section 2.2 discusses the authority under which the action agencies will complete the work, and Sections 2.3- Section 2.7 of this Opinion provide detailed descriptions of the proposed activities and the equipment used to complete these tasks. These activities will be carried out in waters from the North Carolina/Virginia Border through and including Key West, Florida and the Islands of Puerto Rico and the U.S. Virgin Islands, as further described as the action area in Section 2.8 of this Opinion.

1.  Dredging

    - Maintenance dredging

    - Dredging/sand mining in borrow sites

    - Restoration dredging/muck dredging to improve water quality

2.  Dredge material placement

    - Sand placement for beach nourishment

    - Nearshore placement

    - Placement in an ODMDS

    - Upland placement

3.  Transportation of dredge materials between dredging and material placement locations, which is discussed by equipment type and as part of the dredge placement activities since the same equipment is used to transport and place the material.

4.  G&G surveys performed by or authorized by the USACE necessary to complete dredging and material placement projects.[6]

5.  Monitoring for and handling of ESA-listed species encountered during projects covered under this Opinion.

*Use of this Opinion in Combination with other ESA Section 7 Consultations*
Periodically, the USACE and/or BOEM may propose to authorize, fund, or carry out a dredging or nourishment project that is only partially covered by the 2020 SARBO.  For example, activities that are consistent with the scale and scope of the 2020 SARBO, but involve dredging or disposal in areas not considered under the analysis for a particular activity, or construction of a new project, such as channel deepening or widening, that will subsequently be maintained in a manner consistent with the 2020 SARBO PDCs.  These activities may be combined with this

---

[6] BOEM completed separate consultations with NMFS on G&G surveys they conduct as part of their marine minerals program, including those activities within the 2020 SARBO action area NMFS. 2019b. Sand survey activities for BOEM's Marine Minerals Program: Atlantic and Gulf of Mexico. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Greater Atlantic Regional Fisheries Office, NER-2018-15093, Gloucester, MA..  As described in Appendix K (Section 2.5.4), NMFS determined that BOEM's G&G activities, and related effects, are not caused by the proposed action.

Defendants' Exhibit C

Opinion, meaning the use of 1 Opinion (2020 SARBO) by reference to cover a portion of the action considered in a separate Section 7 consultation, and addressing the portions of the action not covered in 2020 SARBO within an additional consultation. Thus, if a project involves new construction (such as channel deepening or widening) in the action area, a separate Section 7 consultation would be completed for the construction of the project, and/or other project elements not considered in 2020 SARBO, while 2020 SARBO would be referenced to cover future maintenance. The additional Opinion would still consider the full scope of effects of the project at issue, to ensure that the entire project being implemented avoids jeopardizing ESA-listed species or destroying or adversely modifying critical habitat. While the additional Opinion must evaluate the full scope of effects associated with an action under separate Section 7 consultation, it would only authorize take not covered by the 2020 SARBO. This approach is intended to ensure that the maintenance activities and associated effects considered in this Opinion are considered and analyzed comprehensively and to avoid authorization of duplicate takes or impacts to ESA-managed resources.

NMFS, Southeast Regional Office, will differentiate between projects that are consistent with the nature and scope of the 2020 SARBO and may be combined in an additional consultation from those projects that are not appropriate to combine. Each consultation relying on 2020 SARBO to cover any portion of a proposed action will describe why it is appropriate to rely on 2020 SARBO.

*Requirements of the Opinion (PDCs, Reasonable and Prudent Measures, or Terms and Conditions)*
The PDCs (Appendices A-H) define the proposed action and provide the limitations of how, where, and when activities must be completed in order to be covered under this Opinion. The PDCs were developed by the SARBO Team as part of the proposed action, with the intent of avoiding or minimizing effects to ESA-listed species and designated critical habitat. All applicable PDCs will be incorporated into projects covered under this Opinion (e.g., as a special condition of a USACE Regulatory project permit or a contract condition for a USACE Civil Works or BOEM project).

This Opinion includes Reasonable and Prudent Measures (RPMs) and Terms and Conditions (T&Cs) (Sections 10.3 and 10.4). The RPMs and T&Cs incorporate those elements of the proposed action that NMFS has determined appropriately minimize the impact of incidental take. Because NMFS has concluded that the PDCs include the measures necessary and appropriate to minimize the impact of incidental take, the RPMs/T&Cs impose no additional requirements beyond those specified by the proposed action/PDCs.

## 2.1         Dredging and Placement Annual Estimates

As described in the Consultation History (Section 1 of this Opinion), both the USACE and BOEM have a long history of engaging in or authorizing dredging and dredge material placement within the action area. The USACE and BOEM provided information about previously completed projects and estimated the quantity of material to be dredged and placed annually under this Opinion to assist in quantifying details and effects of the projects anticipated to be covered under the 2020 SARBO. While it is anticipated that activities covered by this Opinion will continue to occur with the same frequency and volume as they have historically

**Defendants' Exhibit C**

occurred, the ability to precisely quantify all project details was limited by (1) the nature of the reporting requirements in the 1997 SARBO, (2) differences between the proposed action considered in the 2020 SARBO and activities considered in previous SARBO consultations, including measures to minimize and avoid effects to ESA-listed species and designated critical habitat, and (3) the annual variation of both the location and quantity of projects completed as part of the proposed action. As explained in Section 2.9 of this Opinion, USACE/BOEM will provide an annual report of all projects under 2020 SARBO to NMFS as part of an annual review to confirm that the description of the proposed action remains accurate.

*SARBA Appendix M Initial Estimate*
The USACE and BOEM provided an initial estimate of the volume of dredging that will occur under the 2020 SARBO in the 2018 SARBA Appendix M. The estimate they provided was based on previous years of dredging (2014-2016) and anticipated dredging over a 5-year period, based on available data on past projects covered under the 1997 SARBO for routinely maintained Civil Works and larger Regulatory projects. It then considered the amount of work that at the time the USACE anticipated would be covered under the 2020 SARBO with the expansion of the Opinion from the 1997 SARBO, including projects authorized by USACE Regulatory, BOEM, and also projects that will occur in areas not considered under the 1997 SARBO (e.g., sturgeon rivers[7], Johnson's seagrass critical habitat, and the U.S. Caribbean). This initial estimate of the material to be dredged each fiscal year under the 2020 SARBO stated that USACE Civil Works dredges approximately 32 million cubic yards (mcy) of material each year in the SARBO action area. In addition, USACE Regulatory reported dredging approximately 16 mcy each year in the SARBO action area, acknowledging that this may be an overestimate, since USACE Regulatory beach nourishment projects may use materials from a previously reported USACE Civil Works project. The USACE estimated that half of the USACE Regulatory projects will include beach nourishment, resulting in approximately 8 mcy of beach material and nearshore placement each year in the SARBO action area.

USACE estimated in SARBA Appendix M that the maximum that industry could dredge in a year within the action area under this Opinion is approximately 58 mcy, which would include USACE Civil Works and USACE Regulatory projects, either of which might be BOEM-authorized projects, covered under this Opinion. Assuming that most years the dredging industry is only at 85% capacity (less than maximum due to windows, weather and other factor) that would mean up to approximately 49 mcy would be dredged in an average year. The initial estimate in SARBA Appendix M of 32 mcy for USACE Civil Works dredging plus 16 mcy for USACE Regulatory dredging equals 48 mcy per year, which aligns with the 49 mcy per year estimate of volume of dredging for an average year, with a maximum of 58 mcy per year. Since the customers for BOEM, in regards to sand resources, are the USACE or USACE permitted entities, SARBA Appendix M concluded that this estimate of dredging also encompasses BOEM's authorization for use of Outer Continental Shelf (OCS) sand resources.

USACE estimated that about 1/3 of the total amount dredged will be dredged using hopper dredges – approximately 16.3 mcy on average and 19.3 mcy maximum, based on the estimates provided in the SARBA Appendix M.

---

[7] For the purposes of this Opinion, sturgeon rivers are defined as the rivers that support Atlantic and/or shortnose sturgeon in the action area. These rivers are identified in the Sturgeon PDCs in Appendix E.

**Defendants' Exhibit C**

*Updated Estimates*

Since the completion of SARBA Appendix M in 2018, the USACE was able to compile additional information on the volume of dredging that occurred during each year since the 1997 SARBO within the 1997 SARBO action area (Table 1), which provided a more accurate account of past dredging than the initial estimate.  The volumes reported under the 1997 SARBO were still generally limited to only USACE Civil Works projects.  The USACE also provided updated information about the number of projects and volume of dredging estimated to occur in the first 5 years of implementation of the 2020 SARBO including updated estimated for projects in areas not previously covered under the 1997 SARBO such as those in sturgeon rivers, Johnson's seagrass critical habitat, or the U.S. Caribbean and a list of the volume of work routinely dredged for projects authorized by the USACE Regulatory.  As in SARBA Appendix M, we still assume that the volume of material placed is expected to be approximately the same, but somewhat less than the volume dredged, since placement of material dredged under this Opinion may occur in upland disposal sites and on beaches above the mean high water line, meaning that only a portion of the material dredged will also be placed in areas under the jurisdiction of NMFS.

**Table 1.  USACE Civil Works Reported Dredging Totals under 1997 SARBO (1997-2018)**

| Year | Hopper CY | Total CY |
|------|-----------|----------|
| 1997 | 8,662,114 | 29,657,099 |
| 1998 | 5,657,819 | 24,866,920 |
| 1999 | 6,253,794 | 58,352,266 |
| 2000 | 14,821,757 | 28,036,368 |
| 2001 | 2,908,339 | 34,094,017 |
| 2002 | 9,065,303 | 56,295,417 |
| 2003 | 4,816,289 | 15,553,545 |
| 2004 | 4,836,651 | 15,573,907 |
| 2005 | 11,867,599 | 30,624,210 |
| 2006 | 6,875,942 | 28,270,826 |
| 2007 | 7,640,337 | *35,653,012[8]* |
| 2008 | 6,523,530 | *35,653,012* |
| 2009 | 14,382,100 | 65,015,600 |
| 2010 | 8,417,827 | 43,416,100 |
| 2011 | 6,987,091 | *35,653,012* |
| 2012 | 9,808,468 | 38,453,722 |
| 2013 | 7,362,809 | 31,838,422 |
| 2014 | 9,318,799 | 42,681,807 |
| 2015 | 7,120,000 | 40,814,000 |
| 2016 | 12,634,000 | 38,267,000 |
| 2017 | 10,417,000 | 28,752,000 |

[8] In years 2007, 2008, and 2011 (shown in italics), the total volume dredged was not reported, so the average volume of 35,653,012 cy dredged per year was added.

**Defendants' Exhibit C**

| 2018 | 9,102,000 | 26,844,000 |
| Total CY (22 years) | 185,479,568 | 784,366,262 |
| Avg/Yr | 8,430,889 | 35,653,012 |
| Min/Yr | 2,908,339 | 15,553,545 |
| Max/Yr | 14,821,757 | 65,015,600 |

We compared the information provided in Table 1 to the initial dredging volume estimate from the SARBA Appendix M and made the following observations:

- The average dredging volume reported per fiscal year based on a review of 5 years of dredging covered under the 1997 SARBO was 32 mcy, which is less than the 35.65 mcy reported annually under the 1997 SARBO when reviewing the data available for all years since it was completed in 1997 (Table 1).

- The maximum reported dredging in a single year since completion of the 1997 SARBO (Table 1) was 65.01 mcy, which is substantially higher than the SARBA Appendix M estimated maximum of 58 mcy of dredging that could be completed per year.  In fact, 3 of the reported maximum dredging volume years in Table 1 exceeded the SARBA Appendix M estimated annual volume of 49 mcy.

Accordingly, the annual estimated dredge volumes used in this Opinion are based on the revised information of all reported dredging completed annually under the 1997 SARBO (Table 1), additional information provided in the 2018 SARBA Appendix M, additional information provided by the USACE regarding projects and estimated dredge volumes in the next 5 years and in areas not covered under the 1997 SARBO, and information on  projects completed within the action area not previously covered under the 1997 SARBO that will be maintained in the future based on the expanded action area and PDCs.  To complete the revised estimate, we considered the following dredging volumes:

1. Projects covered under the 1997 SARBO: We consider the total volume of USACE Civil Works dredging estimated annually using 1997 SARBO dredging volumes (Table 1) as the most accurate list of projects that will continue to be covered under the 2020 SARBO.  These routine projects are typically associated with USACE Civil Work's projects, but also include some of the larger routine USACE Regulatory Projects.

2. USACE Regulatory Projects: We next considered the addition of USACE Regulatory projects not reported in Table 1; however, similar data available regarding dredging projects completed in the 1997 SARBO action area from 1997 – 2018 is unavailable.  We accordingly rely on SARBA Appendix M to estimate that these projects will have a dredge volume of 16,000,000 cy.  This estimate includes projects similar to the 1997 SARBO such as navigation dredging and beach nourishment, and also accounts for the additional estimated dredging associated with USACE Regulatory projects, including projects in secondary channels, ports, berths, and other areas not required to be maintained under Title 33, as well projects in areas outside of the 1997 SARBO action area.

3. Projects located in areas not covered under the 1997 SARBO: We next estimated the dredging volume for work in the U.S. Caribbean, which was not covered under the 1997 SARBO, and work in Atlantic sturgeon critical habitat and within the range of Johnson's seagrass, which was limited.

**Defendants' Exhibit C**

a. <u>U.S. Caribbean</u>: The USACE projects scheduled for the next 5 years that are expected to be covered under the 2020 SARBO include the 3 biggest and most common locations in the U.S. Caribbean that will require maintenance dredging (San Juan Harbor, Arecibo Harbor, and Mayaguez Harbor) of navigation channels.  The projected dredging volumes for these locations and the dredging frequency are provided below in Table 2 and used to calculate the average dredging volume per location per year.

**Table 2.  New Dredging Areas**

| New Dredge Areas | Annual Dredge Volume (cy) | Frequency (years) | Annual Average |
|---|---|---|---|
| Mayaguez | 1,000,000 | 10 | 100,000 |
| Arecibo | 1,000,000 | 10 | 100,000 |
| San Juan | 2,000,000 | 4 | 500,000 |
| Total | | | 700,000 |

b. <u>Range of Johnson's seagrass</u>: Johnson's seagrass were listed under the ESA in 1998, shortly after the completion of the 1997 SARBO, and work affecting Johnson's seagrass and its critical habitat was accordingly not covered under the 1997 SARBO.  The projects in this region that would have been covered under the 1997 SARBO are limited to maintaining the Atlantic Intracoastal Waterway (referred to locally as the Intracoastal Waterway [ICW or IWW as referenced in this Opinion]), which was later covered under a USACE SAJ Regulatory Division regional general permit (SAJ-93 Maintenance Dredging of the Ports and Intracoastal Waterway within the range of Johnson's Seagrass, NMFS tracking number SER-2000-01199, signed June 4, 2001).  The 2018 SARBA Appendix M estimated that 2.2 mcy of material will be dredged every 5 years within the range of Johnson's seagrass in the IWW (average = 444,000/year).  Maintenance dredging in the IWW will account for the majority of projects within the range of Johnson's seagrass that will be covered under this Opinion, because most other maintenance projects in this area will be covered under another Programmatic Biological Opinion (*Biological Opinion on the authorization of minor in-water activities throughout the geographic area of jurisdiction of the U.S. Army Corps of Engineers Jacksonville District, including Florida and the U.S. Caribbean [JAXBO]*, NMFS Tracking Number SER-2015-17616)(NMFS 2017b).

c. <u>Atlantic sturgeon critical habitat</u>: Larger Civil Works and Regulatory projects in these rivers were covered under the 1997 SARBO prior to the designation of Atlantic sturgeon critical habitat in 2017, and USACE continued to complete projects in these areas under an ESA Section 7(a)(2)/7(d) analysis by the USACE while in reinitiation of consultation for this Opinion. Therefore, these larger projects are counted in the annual reported volumes in Table 1.  Smaller projects, which may not have been covered by the 1997 SARBO, are accounted for in the SARBA Appendix M estimate of 16,000,000 cy. Therefore, no additional dredging volume was added to account for these projects.

d. <u>ESA-listed corals</u>: Projects within the range of ESA-listed corals were completed under the 1997 SARBO, until elkhorn and staghorn corals were listed and *Acropora* critical habitat was designated under the ESA in 2006.  These projects are maintained

**Defendants' Exhibit C**

infrequently and were completed under an ESA Section 7(a)(2)/7(d) analysis by the USACE while in reinitiation of consultation for this Opinion or an individual Section 7 consultation, and are counted in the annual reported volumes in Table 1. Therefore, no additional dredging volume was added to account for these projects.

**Table 3.  Estimated Combined Annual Hopper Dredging in the 2020 SARBO**

| | Minimum dredge volume per year (cy) | Maximum dredge volume per year (cy) | Average dredge volume per year (cy) |
|---|---|---|---|
| Reported USACE Civil Works annual dredging from Table 1 | 15,553,545 | 65,015,600 | 35,653,012 |
| Estimated additional USACE Regulatory annual dredging for the 2020 SARBO (from SARBA Appendix M) | 16,000,000 | 16,000,000 | 16,000,000 |
| New Dredge Areas (USACE Civil Works in U.S.Caribbean) | 700,000* | 700,000* | 700,000 |
| New Dredge Areas (USACE Regulatory within range of Johnson's seagrass) | 444,000* | 444,000* | 444,000 |
| Total estimated volume dredged annually in the 2020 SARBO (Adds the 4 rows above) | 32,697,545 | 82,159,600 | 52,797,012 |
| Total anticipated hopper dredge estimated in the 2020 SARBO (assumes 1/3 of the dredge total is hopper dredging, per SARBA Appendix M) | 10,899,182 | 27,386,533 | 17,599,004 |
| *Where estimated minimum or maximum annual dredge volume is not available, average volume was used* | | | |

To determine the total volume of annual dredging that is estimated to be completed by hopper dredge, the total estimated dredge volumes are combined in Table 3 and then divided by 1/3, based on SARBA Appendix M, which stated that 1/3 of all dredging is completed by hopper.[9] SARBA Appendix M estimated that 16.3 -19 mcy, with an average of 18.9 mcy, of material was expected to be dredged by hopper annually.  *Our calculations, based on the updated estimated annual dredging totals in Table 3 estimate that hopper dredging covered under this Opinion will account for an annual dredge volume of between 10.90 and 27.39 mcy, with an average of 17.60 mcy dredged annually.*  While the annual average estimated volume used for purposes of this

---

[9] The updated annual dredging totals provided by the USACE included a breakdown of the dredging method used for the reported USACE Civil Works projects.  Only the  USACE Civil Works projects reported from 1997-2006, provided a more comprehensive breakdown of the type of equipment used to complete the dredging.  Using this data, hopper dredging made up 24% of all dredging, bucket dredging was 15%, cutterhead/pipeline was 51%, and other methods was 11%.  Although this shows a general breakdown by dredging type for USACE Civil Works projects, these numbers do not account for the frequency of hopper dredging use in USACE Regulatory projects. Therefore, we believe it is still appropriate to use the USACE estimates that 1/3 of all dredging (Civil Works and Regulatory combined) is completed using hopper dredging.  Using the 1/3 estimate is also a conservative approach for species conservation, in that hopper is expected to result in all take directly associated with dredging under the 2019 Opinion and therefore a worst case scenario when calculating future take.

**Defendants' Exhibit C**

Opinion (17.60 mcy) is similar to that provided in SARBA Appendix M (18.9 mcy), the maximum hopper dredging estimated volume is significantly higher than the original dredge volume estimates provided by the USACE and BOEM.

## 2.2        USACE and BOEM Delegation of Authority

The USACE and BOEM requested consultation under the joint consultation provisions of 50 CFR 402.07 for dredging and dredge material placement.  Pursuant to 50 CFR 402.07, USACE is the lead agency for purposes of this Opinion.  Both the USACE and BOEM can satisfy their ESA Section 7 consultation requirements by relying on this Opinion for projects meeting the requirements of this Opinion.

### 2.2.1        USACE

Two USACE Programs, the USACE Regulatory Program and the USACE Civil Works Program, have responsibility for authorizing and/or implementing the dredging and material placement activities evaluated in this Opinion.  USACE Civil Works oversees navigation dredging, coastal storm risk management, and ecosystem restoration.  USACE Civil Works projects are congressionally-authorized and federally-sponsored (i.e. federally-funded or partially federally-funded), meaning that the specific locations for dredging and material placement are congressionally-authorized and the projects are eligible for federal funding.  For the purposes of this Opinion, projects that are managed by the USACE Civil Works Program are referred to as federally-**authorized**.

The USACE Regulatory Program permits dredging and material placement projects in accordance with Section 10 of the Rivers and Harbors act, Section 404 of the Clean Water Act, and Section 103 of the Marine Protection, Research, and Sanctuaries Act of 1972.  The specific location of USACE regulatory projects is not limited to congressionally-authorized locations and can include any in-water location under USACE statutory authority.  However, regulatory projects may occur in areas where USACE Civil Program projects are congressionally-authorized, but not federally-funded, such as the maintenance of a channel or beach that is funded by a local municipality.  For the purposes of this Opinion, projects managed by the USACE Regulatory Program are referred to as federally-**permitted**.

### 2.2.2        BOEM

BOEM is a Bureau within the Department of the Interior responsible for overseeing sand and gravel, oil and gas, alternative energy, and other mineral development on the OCS.  The Outer Continental Shelf Lands Act of 1953 defines the OCS as submerged lands lying seaward of state's seaward boundary which, for states on the Atlantic is 3 nautical miles from the coast line (See 43 U.S.C. 1301, definition of "lands beneath navigable waters," and 43 USC Section 1331, definition of "outer Continental Shelf").  Thus, the use of minerals on OCS submerged lands, including the extraction of sand, is under the jurisdiction of BOEM.  Under Public Law 103-426, if OCS sand resources are to be used for shore protection, beach restoration, or coastal wetlands restoration projects by Federal, State or local government agencies, or use in construction projects authorized by or funded in whole or in part by the Federal Government, BOEM may enter into a negotiated agreement that addresses potential use of OCS sand and gravel resources

**Defendants' Exhibit C**

including with the USACE and other federal agencies.  For purposes of this Opinion, BOEM is serving as a joint consulting agency, with the USACE serving as the lead agency for dredging/sand mining in federal waters.

### 2.2.3        Environmental Protection Agency (EPA)

While EPA has not requested consultation for the proposed action, EPA has jurisdiction over designation of ODMDS locations where dredging material may be placed under this Opinion. EPA and USACE have responsibility for ensuring that ocean dredged material disposal activities will not unreasonably degrade or endanger human health, welfare, amenities, or the marine environment under Sections 102 and 103 of the Marine Protection Research and Sanctuaries Act, as amended (33 U.S.C. 1412), also known as the Ocean Dumping Act.  USACE SAD districts and EPA Region 4 work cooperatively in the management of the Ocean Dredged Material Disposal Program to ensure that each agency's responsibilities are met.  Coordination occurs through formal review processes and informal staff communications.  The specific coordination used by the 2 agencies at the time of the completion of this Opinion is outlined in the *Southeast Regional Implementation Manual for Requirements and Procedures for Evaluation of the Ocean Disposal of Dredged Material in Southeastern U.S. Atlantic and Gulf Coast Waters* (USACE and USEPA 2008).  The purpose of this document is to provide guidance for applicants, permittees, and USACE SAD districts and EPA Region 4 staff evaluating ocean disposal of dredged material in southeastern U.S. coastal waters of the Atlantic Ocean and the Gulf of Mexico.  The process will vary depending on whether the project is a USACE-sponsored Civil Works project or a project requiring a Marine Protection Research and Sanctuaries Act 103 permit.  In those cases, where site designation by the EPA under Section 102 of the Marine Protection Research and Sanctuaries Act is required, the NEPA process applies and leads to the EPA issuing a rulemaking in the Federal Register establishing the site.

NMFS evaluated whether EPA's designation of ODMDS locations, where dredged material will be placed under the proposed action, met the definition for "effects of the action."  "Effects of the action" are defined as effects "caused by the proposed action, including the effects of other activities that are caused by the proposed action.  An effect or activity is caused by the proposed action if it would not occur but for the proposed action and is reasonably certain to occur." (50 C.F.R. § 402.02).  Thus, NMFS' determination regarding whether an effect or activity is caused by the proposed action is governed by a "but for" standard of causation.  Designated ODMD sites are used for disposal from a range of projects in the southeastern United States, including, but not limited to, projects covered by SARBO.  Because these sites are utilized for a range of projects beyond those covered by SARBO, and therefore would continue to be designated and used regardless of the 2020 SARBO proposed action, NMFS does not consider EPA's designation of ODMDS to be a consequence of the 2020 SARBO proposed action.

### 2.3        Categories of Dredging

This section provides a general description of the categories of dredging activities covered under this Opinion, as specified in Appendices A-H.  It also provides a brief description of the limitations to these forms of dredging based on the PDCs of this Opinion.  Some of the forms of dredging and material placement discussed in Section 2.4 of this Opinion have multiple terms used to describe them, which are also explained with reference to other related forms of dredging

**Defendants' Exhibit C**

or material placement.  Information gathered to analyze the effects of placement covered under this Opinion is described in the additional consultation history information provided Section 2 of Appendix K.  Specific techniques and equipment used for dredging are discussed in Section 2.5 of this Opinion.

## 2.3.1       Maintenance dredging

### 2.3.1.1       General description of maintenance dredging allowed under this Opinion

This proposed action includes maintenance dredging areas to the original federally-authorized or federally-permitted dredge template (depth, width, and total area).  This includes maintenance dredging of navigation channels, including (1) federal waterways and channels required to be maintained under Title 33 (Navigation and Navigable Waters); (2) other navigation channels and canals (not required to be maintained under Title 33); and (3) other areas that have been previously federally-authorized or federally-permitted, already dredged or otherwise constructed, and need to be maintenance dredged under this Opinion to maintain the previously dredged template such as ports, berths, marinas, and areas around docks.  The frequency with which an area needs to be maintained varies by the dynamic nature of the area and the need to maintain navigation.  Therefore, a specific time interval/ dredging frequency cannot be specifically defined for each project.

Dredging of navigation channels may also incorporate advanced maintenance or channel realignment, as described below.  The USACE has the authority to make minor modifications to the existing federally-authorized or federally-permitted dredge template of a project, as defined in Section 5 of the Rivers and Harbors Act of 1915 and Engineering Regulation (ER) 1165-2-119.  This limited authority is executed under the Operations and Management program.  These minor modifications are primarily used to improve the safety and efficiencies of existing ship traffic.  All projects covered under this Opinion, are limited by the requirements in this Opinion, even if USACE authority to maintain channels is broader than the PDCs.  Navigation improvements requiring new or amended Congressional authorization for construction are not covered under this Opinion and therefore would require an individual consultation with NMFS.

- Advanced maintenance and overdepth dredging: Dredging templates provide not only the federally-authorized or federally-permitted depth, but may also include an additional allowed dredging limit referred to as overdepth dredging and/or advanced maintenance.  Overdepth dredging is the removal of additional amount of material to account for inaccuracies in the dredging process.  Overdepth dredging is often defined in the original federally-authorized or federally-permitted dredging limit (e.g., a channel is authorized to -10 ft [feet] + 2 ft over depth).  Advanced maintenance is dredging deeper and/or wider than the original dredge template in high shoaling areas that are expected to quickly fill, thereby reducing the dredging frequency in that portion of the navigational waterway.

- Channel modifications, realignments, or bend easing: The USACE has authority under its ER1165-2-119 to modify or realign the channel location.  ER 1165-2-119 states:

   "Modification Under Existing Authority, Navigation Projects.  The Chief of Engineers has but limited discretion with respect to modification of completed navigation projects without new authorization.  The River and Harbor Act of 1909 provides (Section 6) an

**Defendants' Exhibit C**

authority for complete reconstruction of aged or outmoded lock and dam structures on authorized waterways and is permissive to modifications (in the replacements) to better serve navigation.  This permits the USACE to study the need for such replacements with operations and maintenance funding; however, accomplishment of any recommended replacement project requires, as a minimum, the approval of the Secretary of the Army.  Recommendations may, if they embody significant modifications, be submitted by the Secretary to Congress for specific authorization. The River and Harbor Act of 1915 provides (Section 5) an authority to increase channel dimensions, beyond those specified in project authorization documents, at entrances, bends, sidings and turning places as necessary to allow the free movement of vessels. Where not otherwise precluded by project authorization, the location of a completed channel may be altered during the course of the periodic maintenance program if the maintenance can thereby be more economically accomplished and related aids to navigation are readily adjustable to suit the restored channel dimensions at the shifted location."

### 2.3.1.2        Maintenance dredging covered under this Opinion

For the purposes of this Opinion, maintenance dredging is limited to the list of activities provided below that follow all relevant PDCs in this Opinion (see Appendices).  The estimated volume of total dredging expected annually was provided and summarized in Section 2.1 of this Opinion.  Equipment used for maintenance dredging is described in Section 2.5 of this Opinion.

- Maintenance dredging in navigation channels (required to be maintained under Title 33): Maintenance activities will occur at a frequency such that the area remains navigable, barring a sudden change from a storm, and that returning the area to the federally authorized or permitted dredge template does not alter the hydrology of the area.  Maintenance dredging covered under this Opinion will be consistent with the PDCs of this Opinion, to limit effects to ESA-listed species or critical habitat to the effects considered in this Opinion.  For example, dredging a channel that has not been maintained for a significant period of time and has thus returned to the surrounding conditions, is not considered maintenance.

  o Continued maintenance dredging of navigation channels required under Title 33 or provided in SARBA Appendix B, to the dredge template provided, including the defined overdepth and advanced maintenance depth.  A summary list of these channels are provided in Section 2.8.1 of this Opinion.

  o Maintenance of navigation channels or canals where the deepening, widening, or new dredge area was analyzed in a separate ESA Section 7 consultation, dredged, and is maintained under this Opinion to the dredge template analyzed in the consultation including the defined overdepth and advanced maintenance depth.

- Maintenance dredging in navigation channels and canals not required to be maintained under Title 33: Maintenance dredging covered under this Opinion extends to dredging any channel or canal maintained for navigation  within the action area (Section 2.8 of this Opinion) to the previously authorized or permitted dredge template such as those listed below.  These include maintenance dredging in navigation channels such as the channels maintained for navigation that connect to main navigation channel, other smaller channels or canals maintained for

**Defendants' Exhibit C**

All activities and support equipment operation must adhere to the PDCs (Appendix B-Appendix H) of this Opinion and include equipment specific PDCs that were designed to reduce the risk of take of ESA-listed species, to reduce effects from turbidity and sedimentation generated during dredging or material placement based on the type of equipment used, and to preserve the ability for a protected species observer (PSO) to observe take based on different equipment types and modifications. New dredging technologies may be considered under the SARBO Supersede review process outlined in Section 2.9.5 of this Opinion.

- <u>Mechanical dredging</u>: Material dredged using mechanical dredging is scooped or lifted from the sea floor and may be deposited to either a location adjacent to the dredging (e.g., from a berth to the adjacent uplands) or loaded onto a barge and transported to another placement location.

- <u>Hydraulic dredging</u>: Material suctioned up from the sea floor during hydraulic dredging may be relocated by:

  o <u>Pipeline</u>: Pumping the material from a cutterhead or hopper dredge through a pipeline and depositing it to the intended location, such as an upland disposal site, beach placement site, or marsh creation area. Pipelines are used to transport materials either by pumping from a hopper dredge, a cutterhead dredge to a disposal location such as a beach, spoil area, or upland disposal site Figure 1, or hydraulic offloading out of a barge. These pipes can be placed on the sea floor or floated. Pipelines placed on the sea floor must either be of sufficient weight to remain in place or be anchored or weighted. Floating pipelines are anchored to the sea floor and may require booster pumps if the length of the pipeline is too long for the dredge to push the material to the placement location Figure 2. Pipelines are typically placed in the same pipeline corridor for each recurring event to minimize the potential damage to resources in the area. Additional PDC restrictions apply to the placement of pipelines within the range of Johnson's seagrass (Appendix D) and within the range of ESA-listed corals (Appendix C).

  o <u>Split-hull</u>: Emptying of a hopper dredge with a split-hull design where the material drops from the bottom of the vessel, through the water column, and settles in an area such as an ODMDS. An example of a split-hull hopper is shown in Figure 3.

    o <u>Side-cast</u>: Side-casting is used to disperse dredge material adjacent to the dredging site as shown in Figure 4.

- <u>Barges/ scows</u>: Barges or scows may be used to offload material from a barge using mechanical equipment such as a clamshell or bucket dredge to lift the material from the barge and deposit it into the water column to settle in an area such as an ODMDS. Scows are also used to transport dredged material to beach placement location and conveyed to the beach using a hydraulic offloader.

- <u>Agitation Dredging</u>: As described in Section 2.5.3 of this Opinion, agitation dredging such as bed-leveling or water-injection dredging may be used to directly move material out of the dredged location into the surrounding area or into the water column to be naturally transported down current.

- <u>Geophysical surveys</u>: During dredging or placement operations, a survey vessel may also be used to determine the resources present at the site (e.g., presence of hardbottom) or to determine of the appropriate dredge or placement depths are obtained.

**Defendants' Exhibit C**

- <u>Relocation trawling</u>: A trawling vessel may operate either prior to dredging to determine the potential presence of ESA-listed species in the area or prior to and/or concurrently with hopper dredging to intentionally capture ESA-listed species to relocate them out of the dredge area as a minimization measure to reduce take.

- <u>Crew boats</u>: Additional crew boats may also work current with vessels to transport needed crew or supplies to or from other larger vessels such as a hopper or relocation trawling vessel working on a 24-hour operation cycle for long periods of time.



**Figure 1.  Floating pipeline from a cutterhead dredge**
(Image provided on USACE Operations and Dredging Endangered Species System [ODESS] website https://dqm.usace.army.mil/odess/#/home).

**Defendants' Exhibit C**



**Figure 2.  Pipeline from a hopper dredge used for beach nourishment.**
(Image provided by Great Lakes Dredging Company from the Egmont Key, Florida 2015 project).



**Figure 3.  Split Hull Hopper Dredge MURDEN.**
(Image provided by USACE in SARBA)

**Defendants' Exhibit C**



**Figure 4.  Side-casting dredge MERRITT.**
(Image provided by USACE in SARBA)

### 2.5.1          Mechanical Dredging Equipment

Mechanical dredging is a common dredging type that involves smaller, less expensive equipment that uses some form of bucket to excavate and raise the bottom material.  Mechanical dredges remove material by scooping it from the bottom and then placing it onto a waiting barge or scow, or directly into a placement/disposal area.  Mechanical dredges work best in consolidated, or hard-packed, materials and can be used to clear rocks and debris.  Dredging buckets have difficulty retaining loose, fine materials, which can be washed from the bucket as it is raised.  Special buckets have been designed for controlling the flow of water and material from buckets and are used when dredging contaminated sediments.

Mechanical dredges are rugged and can work in tightly confined areas.  They are mounted on a large barge and are towed to the dredging site and secured in place by anchors or spuds.  USACE reports that they are often used in harbors, around docks and piers, and in relatively protected channels, but are not suited for areas of high traffic or rough seas.  These dredges can generate relatively large amounts of turbidity as the bucket traverses the water column.

### 2.5.1.1          Clamshell

Clamshell (aka bucket) dredges, named for the scooping buckets they employ, are the most common types of mechanical dredge (Figure 5).  A clamshell dredge begins the digging operation by dropping the bucket in an open position from a point above the sediment.  The bucket falls through the water and penetrates into the bottom material.  The sides of the bucket are then closed and material is sheared from the bottom and contained in the bucket compartment.  The bucket is raised above the water surface, swung to a point over the barge, and then released into the barge by opening the sides of the bucket.  Usually 2 or more disposal

**Defendants' Exhibit C**

barges, called dump scows, are used in conjunction with the mechanical dredge.  While 1 barge is being filled, another is being towed to the dumpsite by a tug and emptied.  If a diked disposal area is used, the material must be unloaded using mechanical or hydraulic equipment.  Using numerous barges, work can proceed continuously, only interrupted by changing dump scows or moving the dredge.  This makes mechanical clamshell dredges particularly well suited for dredging projects where the disposal site is many miles away.

 

**Figure 5.  Mechanical clamshell dredge.**
Photos provided by the USACE in SARBA.

### 2.5.1.2    Backhoe

Backhoe dredges operate by scooping material from the bottom and placing in a waiting barge or into a disposal area.  The backhoe dredge uses a bucket that is structurally connected to the dredge by the rigid member configuration as shown in Figure 6.  To increase digging power, the dredge barge is moored on powered spuds that transfer the weight of the forward section of the dredge to the bottom to provide reaction forces to the digging-induced forces.  The maximum bucket size that can be used for a specific project depends on the rated capacity of the excavator, sediment characteristics, and water depth.  Bucket sizes generally range from 6 to 25 yards (0.6-19 m).  Larger backhoes can excavate to a maximum depth of approximately 80 ft (24 m).  The density of sediment excavated can almost equal its in situ density but, like other conventional mechanical dredges, it may generate a relatively large amount of sediment resuspension at the dredge site.

**Defendants' Exhibit C**



**Figure 6. Backhoe Dredge NEW YORK.**
Photo courtesy of Great Lakes Dredge and Dock Company, Oak Brook, IL, provided by USACE in SARBA.

## 2.5.2        Hydraulic Dredging Equipment

Hydraulic dredging is characterized by the use of a centrifugal pump to dredge sediment and the transportation of the dredged material slurry and water to identified discharge areas. The ratio of water to sediment within the slurry mixture is controlled to maximize efficiency. Too little water and the dredge will bog down; too much and the dredge won't be efficient in its work and it will take longer to dredge the shoals. These suction type dredging methods result in decreased turbidity and sedimentation concerns, though turbidity can still be a concern from overflow of hopper dredges and scows or improperly sealed pipelines. The types of hydraulic dredges used by USACE and/or BOEM are cutterhead pipeline and hopper dredges discussed below.

### 2.5.2.1        Cutterhead Suction/ Pipeline Dredging

Cutterhead pipeline dredges are designed to handle a wide range of materials including clay, hardpan, silts, sands, gravel, and some types of rock formations without blasting. They are used for new work and maintenance in projects where suitable placement/disposal areas are available and operate in an almost continuous dredging cycle resulting in maximum production, economy, and efficiency. A cutterhead is a mechanical device that has rotating blades or teeth to break up or loosen the bottom material so that it can be sucked through the dredge pipeline (Figure 7).

Cutterhead pipeline dredges are rarely self-propelled, and typically must be transported to and from the dredge site where they are secured in place by special anchor pilings, called spuds. Pipeline dredge size is based on the inside diameter of the discharge pipe which commonly ranges from 6- to 36-inches. Cutterhead pipeline dredges are capable of dredging in shallow or deep water and have accurate bottom and side slope cutting capability. They require an extensive array of support equipment including pipeline (floating, shore, and submerged), boats (crew, work, survey), barges, and pipe handling equipment. Most cutterhead pipeline dredges have a cutterhead on the suction end. Limitations of these dredges include relative lack of mobility, long mobilization and demobilization, inability to work in high wave action and currents, and they are impractical in high traffic areas.

**Defendants' Exhibit C**






**Figure 7.  Cutterhead pipeline dredge schematic shown on the top and 2 representative close-up photographs below to show the variety in size of cutterhead dredges[10].**

During the dredging operation a cutterhead suction dredge is held in position by 2 spuds at the stern of the dredge, only one of which can be on the bottom while the dredge swings.  Some cutterhead pipeline dredges use a system of anchors and winches to hold themselves in place and/or advance forward.  There are 2 swing anchors some distance from either side of the dredge, which are connected by wire rope to the swing winches.  The dredge swings to port and starboard alternately, passing the cutter through the bottom material until the proper depth is achieved.  The dredge advances by "walking" itself forward on the spuds.  This is accomplished by swinging the dredge to the port, using the port spud and appropriate distance, then the starboard spud is dropped and the port spud raised.  The dredge is then swung an equal distance to the starboard and the port spud is dropped and the starboard spud raised.

Cutterhead pipeline dredges work best in large areas with deep shoals, where the cutterhead is buried in the bottom.  A cutterhead removes dredged material through an intake pipe and then pushes it out the discharge pipeline directly to the placement/disposal site.  Most, but not all, pipeline dredging operations involve upland placement/disposal of the dredged material.  Therefore, the discharge end of the pipeline is connected to shore pipe.  When effective pumping

---

[10] The top and bottom left photos provided by the USACE in SARBA and the bottom right photo provided by Nicole Bonine of NMFS from a dredge tour of the Carolina cutterhead in Tampa Bay on November 17, 2018.

**Defendants' Exhibit C**

distances to the placement/disposal site become too long, a booster pump is added to the pipeline to increase the efficiency of the dredging operation.  Though not common, cutterhead pipeline dredges may be used on offshore dredging projects where the placement distance exceeds the capabilities of booster pumps.  Specifically, the cutterhead pipeline dredge is used in combination with a spider barge/scow operation and transported by tugs to a hydraulic off-loader located just offshore of the placement site (e.g. Caminada Headland Project, Gulf of Mexico).

In most cases material is pumped directly from the dredged area to a placement/disposal site including using a pipeline to transport the dredged material to an upland location or a barge for transport to a hydraulic off-load site.  As such, there is no opportunity to monitor for biological material on board the dredge.  Monitoring at the placement/disposal site is also challenging due to the volume of material pumped, often to the uplands, and often unsafe for an observer.  Considering that the cutterhead is typically buried in the sediment to promote operational efficiency; thus, limiting exposure in the water column to the suction field, cutterhead dredging has historically resulted in significantly lower takes of ESA-listed species than hopper dredging.

### 2.5.2.2        Hopper

The hopper dredge, or trailing suction dredge, is a self-propelled ocean-going vessel with a section of the hull compartmented into 1 or more hoppers.  Fitted with powerful pumps, the dredges suck sediment from the surface of the seafloor through long intake pipes, called dragarms, and store it in the hoppers.  Normal hopper dredge configuration has 2 dragarms, one on each side of the vessel.  A dragarm is a pipe suspended over the side of the vessel with a suction opening called a draghead for contact with the bottom (Figure 8).  Depending on the hopper dredge, a slurry of water and sediment is generated from the plowing of the draghead "teeth," the use of high pressure water jets, and the suction velocity of the pumps.  The dredged slurry is distributed within the vessels hopper allowing for solids to settle out and the water portion of the slurry to be discharged from the vessel during operations through its overflow system.  When the hopper attains a full load, dredging stops and the ship travels to either an in-water placement site, where the dredged material is discharged through the bottom of the ship by splitting the hull, or opening doors in the bottom of the hull, or hooks up to an in-water pipeline, where the dredged material is transported to a shore placement site (e.g., beach nourishment).

**Defendants' Exhibit C**



**Figure 8.  Hopper dredge illustration.  Image provided by USACE in SARBA.**

Hopper dredges are well suited to dredging heavy sands.  They can work in relatively rough seas but safety, effectiveness, and costs are a concern.  Because they are mobile, they can be used in high-traffic areas.  They are often used at ocean entrances and offshore, but cannot be used in confined or shallow areas due to their size and draft.

Hopper dredges can move quickly to disposal sites under their own power (maximum speed unloaded $\leq 17$ knots; maximum loaded $\leq 16$ knots), but since the dredging stops during the transit to and from the disposal area, the operation loses efficiency if the haul distance is too far. Based on the review of hopper dredge speed data provided by the USACE Dredging Quality Management program, the average speed for hopper dredges while dredging is between 1-3 knots, with most dredges never exceeding 4 knots (Jay Rosatti, USACE Engineer Research and Development Center [ERDC], personal communication).  PDCs in this Opinion require slower transit speeds to disposal sites when North Atlantic right whale are present in the action area (Appendix F).

Hopper dredges also have several limitations.  Considering their normal operating conditions, hopper dredges cannot dredge continuously unlike other dredge types that continue to work and transfer dredged material to another location.  Hopper dredges must stop dredging while transporting materials to the final destination.  The precision of hopper dredging is lower than other types of dredges; therefore, they have difficulty dredging steep side banks and cannot effectively dredge around structures.  For example, dragheads may "crab" or move under or onto side slopes as a result of bottom conditions, bottom currents, or location of the dredge in or near the side of the channel.  Crabbing may result in dragheads not being maintained on the bottom due to the more frequent need to pick up and realign the dragarms.  Therefore, there is an

**Defendants' Exhibit C**

increased risk of sea turtle entrainment when dredging within environments that may result in a higher risk of crabbing.

Hopper dredges also vary in total size and draghead size.  Smaller "modified" hopper dredges such as the CURRITUCK and MURDEN, have historically not resulted in entrainment of ESA-listed species and hence have had fewer restrictions than larger, traditional hopper dredges. Their small size and operating characteristics including small draghead sizes (2-ft by 2-ft, to 2-ft by 3-ft), small draghead openings (5-inch by 5-inch to 5-inch by 8-inch), small suction intake pipe diameters (10-14 inch), and limited draghead suction (350- 400 horsepower) result in a lower suction force that sea turtles are believed to be able to outswim.  In 1999 NMFS reviewed these CURRITUCK type of hopper dredges and determined that a sea turtle deflector shield, draghead screening, and protected species observers were not needed due to the low probability of entrainment and no reports of take (NMFS 1999).  The USACE confirmed in October 2018, that they still do not have any records of take associated with these smaller draghead and low suction velocity types of hopper dredges.

### 2.5.2.2.1   Draghead Deflectors

In order to minimize the risk of incidental takes of sea turtles, sea turtle deflectors are added to the dragheads used on hopper-dredging projects where the potential for sea turtle interactions exist (discussed as a PDC) and the dredging environment does not reduce the efficacy of the deflector or increase the risk for sea turtle interaction (Figure 9).  The leading edge of the deflector is designed to have a plowing effect of at least 6-inch depth when the drag head is being operated.  Appropriate instrumentation is required on board the vessel to ensure that the critical "approach angle" is attained in order to satisfy the 6-inch plowing depth requirement (USACE 1993).



**Figure 9.  Illustration of a hopper dredge draghead with installed sea turtle deflector.**

**Defendants' Exhibit C**

#### 2.5.2.2.2  Hopper dredging screening

Screening is used during hopper operations to either exclude certain materials from entering the draghead or retain entrained ESA-listed species within the hopper inflow box or overflow screening for observation and reporting by PSOs.  Screening of the draghead, inflow box, and overflow is used for different purposes and may require different specifications as described below:

*Draghead screening*
In areas with the potential for entraining Munitions of Explosive Concern (MEC) or larger sized incompatible material (i.e., shell, rock, etc.), a smaller mesh screening may be installed to the bottom of the draghead to exclude these items from entering the hopper (Figure 10).  Screening used for this purpose is often referred to as MEC or unexploded ordinance (UXO) screening and typically consists of longitudinal bars with opening/ spacing of 1.25 - 1.5 in by 6 in on the dragheads.  The dimensions of the screen bars are designed and constructed in a manner to exclude undesirable material while maximizing the total open area of the suction head through which sand can be dredged and maximize the hydraulic transport efficiency of the draghead.  This smaller screening size may exclude ESA-listed species from entering the inflow box on board the hopper dredge; thus limiting the ability for PSOs to identify and report species that may have been taken by the operation.  Though draghead screening may exclude the ability of PSOs to detect ESA-listed species within inflow and overflow screening, it does not limit the risk of ESA-listed species impingement and mortality.

Draghead screens may clog and require cleaning, which can be completed by raising the dragarm so that the flow of water removes items or by raising the dragarm to the deck of the vessel to be manually cleaned.  The PDCs of this Opinion prohibit cleaning of the dragarm by rinsing the draghead in the water while running the pumps as this may increase the risk of entrainment.



**Figure 10.  Draghead with (left) and without (right) UXO Screening[11]**

---

[11] Image on left shows a draghead with UXO screening [photo from a USACE presentation on Beach Replenishment Operational Challenges by Paul Green, USACE Baltimore District].  The image on the right shows a draghead without USXO screening [provided by Karla Reece of NMFS from a dredge tour of the Terrapin Island hopper dredge in Tampa Bay on November 17, 2018]

**Defendants' Exhibit C**

*Inflow screening*

Once material enters the drag head by suction generated at the pump positioned along the draghead arm, a slurry of water and sediment material passes through a screened inflow box on its way to the hopper (Figure 11).  Generally, screening has 4-inch by 4-inch openings to optimize the inflow of material while still ensuring accountability of entrained species.  The purpose of the inflow screening is for PSOs to monitor for entrained protected species and bycatch; however, other debris (i.e., rock, clay, wood, trash, etc.) larger than the screen size may also be captured resulting in the potential for clogging the boxes.  For example, dredging projects in Wilmington Harbor have frequently encountered large debris requiring the temporary increase in screening size or removal of screening altogether until the debris of concern has been removed from the channel.  Changing the size of screening requires welding on a new screen and takes time so limiting the number of changes in screen sizes is important.



**Figure 11.  Images of various inflow boxes that shows the variety in size and screening**[12]

*Overflow screening*

The dredged material slurry that collects in the hopper is dewatered by allowing for the water to overflow out of the hopper while coarser sediment is retained (Figure 12).  Before the overflow water is released, it passes through an overflow screen to ensure additional observation and reporting of entrained species.  This overflow may or may not be screened depending on the hopper dredge.

---

[12] The left 2 images were provided by Mark Dodd of the Department of Natural Resources Wildlife Resource Division and the third image was provided by Nicole Bonine of NMFS from a dredge tour of the Terrapin Island_ hopper dredging in Tampa Bay on November 17, 2018.

**Defendants' Exhibit C**



**Figure 12. 2 examples of overflow screening[13]**

**2.5.3        Agitation Dredging**

**2.5.3.1        General Description of Agitation Dredging**

Agitation dredging is a process that intentionally discharges dredged material into the water column instead of using another piece of equipment to move it out of the dredging location under the assumption that a major portion of the sediments will be transported and permanently deposited outside the channel prism by tidal, river, or littoral currents.  Agitation dredging is typically used only when there are currents in the surrounding water to carry the sediments from the channel, and when the risk to environmental resources is low.  Favorable conditions may exist at a particular project only at certain times of the day, such as at ebb tides, or only at such periods when the stream-flow is high.  To use agitation dredging effectively requires extensive studies of the project conditions and definitive environmental assessments of the effects. Agitation dredging is not typically performed in slack water or when prevailing currents permit redeposit of substantial quantities of the dredged material in the project area or in any other area where future excavation may be required.  For the purpose of this Opinion, agitation dredging includes bed-leveling or water injection dredging described below and limited by the PDCs in Appendix B.

---

[13] The left image was provided by Mark Dodd of the Department of Natural Resources Wildlife Resource Division and the right image provided by Nicole Bonine of NMFS from a dredge tour of the Terrapin Island hopper dredging in Tampa Bay on November 17, 2018

**Defendants' Exhibit C**

#### 2.5.3.1.1  Bed-leveling

A "bed-leveler" is considered to be any type of dragged device used to smooth sediment bottom irregularities left by a dredge (Figure 13). It is also referred to as a "mechanical leveling device or drag bar". In various parts of the United States this process is known as "barring" or "knockdown" (Engineer Research and Development Center 2003). Use of bed-levelers can be documented as far back as 1565 (van der Graaf 1987). Typically, a bed-leveler consists of a large customized plow, I-beam, or old spud that is slowly dragged across the sediment. It can be used either to smooth out peaks and trenches during the final cleanup phase of the dredging activity or as the primary form of dredging used to redistribute sediments to maintain navigable depths rather than removing them by dredging with conventional methods.

Bed-leveling used during the final/clean up phase of dredging, is done by dragging the drag bar to knock down and even out the bottom sediment caused by other forms of dredging. Bed-leveling is sometimes also used as the primary form of dredging to drag a thin layers of material out of the project area or to knock down high points in a project area in between dredging cycles. For example, material that has accumulated in a berth along a river may use bed-leveling to move the material back into the main channel of the river. Another example is to level out the high points within an in-water disposal area so that more material can be placed while remaining within the approved height of the disposal area.

The design of a bed-leveler, and how it connects to the chains used to drag it, can create pinch points where an animal can be impinged, as shown in Figure 14. Also shown in Figure 14 is how modifications to the bed-leveler can reduce that risk. All bed-leveling covered under this Opinion must follow the PDCs, including the bed-leveling specific PDCs in Section 3.4 of Appendix B that addresses concerns about pinch points. Bed levelers used under this Opinion must also be of a design that creates a "sand wave," which is understood to cause ESA-listed species to move away from the equipment.



**Figure 13.  Example bed-levelers (USACE 2015a)**

**Defendants' Exhibit C**

Aerial surveys conducted to detect presence of North Atlantic right whales are detailed in the North Atlantic Right Whale Conservation Plan in Appendix F, and include continuing to fly the aerial survey used as part of the Early Warning System and expanding the area in which surveys will be flown, by adding 2 additional survey teams.

## 2.8     Action Area

The action area is defined by regulation as "all areas to be affected directly or indirectly by the federal action and not merely the immediate area involved in the action" (50 CFR 402.02). Effects of the action include "all consequences to listed species or critical habitat that are caused by the proposed action," including effects that "may occur later in time and may include consequences occurring outside of the immediate area involving the action" (50 C.F.R. 402.02).

The action area for this programmatic Opinion ("2020 SARBO action area") includes waters off of the Atlantic coast, from the North Carolina/Virginia border south to the tip of Florida including the Florida Keys, and waters off of the Islands of Puerto Rico and the U.S. Virgin Islands (Figure 22). The area evaluated for a specific project covered under this Opinion is limited to the area where direct and indirect effects from that project will occur (the "project action area"). The areas where projects can occur within the broader action area are limited by the PDCs of this Opinion. For projects occurring within the range of ESA-listed corals or Johnson's seagrass, the project action area is defined as including both (1) the project footprint where equipment is located and/or work is occurring and (2) the required survey areas surrounding that work (Appendix C defines those areas within the range of ESA-listed corals and Appendix D defines those areas within the range of Johnson's seagrass).

**Defendants' Exhibit C**




**Figure 22. General Action Area for SARBO[16].**

The USACE and BOEM have jurisdiction over project locations and activities that meet the PDCs of this Opinion, as described below:

- The USACE has jurisdiction over the activities occurring in state waters within the action area (0-3 nautical miles). Figure 23 shows a map of the USACE jurisdictional boundaries for areas covered under this Opinion, with 4 District offices (SAW, SAC, SAS, and SAJ) operating under the direction of the USACE SAD. Coordination of this Opinion is through the USACE SAD, which oversees the applicability of the 2020 SARBO in the district offices.

- The BOEM has jurisdiction over dredging of sediment from sand lease sites in federal waters (3 – 200 nm) used to nourish beaches coordinated with the USACE. BOEM maintains a website (https://mmis.doi.gov/BOEMMMIS/) that provides up to date data regarding executed leases associated with BOEM's Marine Minerals Program.

- EPA has jurisdiction over designation of ODMDS locations where dredging material may be placed. EPA is not an action agency for purposes of this consultation. EPA and other third party action agencies are encouraged to carefully review this document in making

---

[16] The red line in the image on the left identifies the states on the Atlantic Ocean that are part of the action area from North Carolina to the Florida Keys. The image on the right shows the U.S. Caribbean also included in the action area including Puerto Rico and the U.S. Virgin Islands.

**Defendants' Exhibit C**

their determinations regarding consultation requirements under the Endangered Species Act.



**Figure 23.  Map of the USACE SAD jurisdictional boundaries.**

### 2.8.1    Navigation Dredging Locations

As needed and as funding is available, USACE Civil Works conducts maintenance dredging in the navigation channels required to be maintained under Title 33 (Navigation and Navigable Waters) listed below.  Maintenance dredging other channels and canals used for navigation that are not required to be maintained under Title 33 are also covered under this Opinion, if the original dredging was federally authorized or permitted, occurs in areas covered under this Opinion, and meets the PDCs of this Opinion.  Dredging projects outside of navigation channel maintenance are also covered under this Opinion including maintenance dredging in non-federal channels, ports, berths, marinas, boat ramps, and around docks, as described in Section 2.3 of this Opinion.  SARBA Appendix B provides detailed descriptions of the routinely maintained navigation channels organized by District.  Sections 2.8.1.1 – Section 2.8.1.4 of this Opinion also lists the routinely maintained navigation channels.

**Defendants' Exhibit C**

*Alternative review: Note that in limited instances, projects that deviate from this Opinion's PDCs in a minor way, including location, may be covered under the Supersede process outlined in Section 2.9.5 of this Opinion.*

### 2.8.1.1         USACE SAW Civil Works Maintenance Dredging Projects

The IWW (from Virginia state line to South Carolina state line), Manteo (Shallowbag) Bay, Stumpy Point Bay, Channel to Rodanthe and Rodanthe Harbor, Channel to Avon and Avon Harbor, Swanquarter Harbor, Rollinson Channel, including Channel from Hatteras Inlet to Hatteras, Channel to Silver Lake Harbor (including Big Foot Slough), Ocracoke Inlet, Carteret County Harbors of Refuge, Waterway Connecting Pamlico Sound and Beaufort Harbor, Channel from Back Sound to Lookout Bight, Morehead City Harbor, Beaufort Harbor and Morgan Creek, Atlantic Beach Channels, Peletier Creek, Bogue Inlet, New River Inlet, Channel to Jacksonville, New Topsail Inlet, New Topsail Inlet Connecting Channels, Wrightsville Beach Connecting Channels, Masonboro Inlet, Carolina Beach Inlet, Wilmington Harbor, Cape Fear River above Wilmington, Lockwoods Folly Inlet, Lockwoods Folly River, and Shallotte River.

### 2.8.1.2         USACE SAC Civil Works Maintenance Dredging Projects

Little River, Murrells Inlet, Georgetown, Jeremy Creek (turning basin inland), Town Creek (McClellanville), Charleston Harbor, Ashley River, Folly River, IWW (from North Carolina state line to Port Royal Sound, South Carolina), and Port Royal.

### 2.8.1.3         USACE SAS Civil Works Maintenance Dredging Projects

Savannah Harbor, Brunswick Harbor and the IWW (from Port Royal Sound, South Carolina to Cumberland Sound, Georgia).

### 2.8.1.4         USACE SAJ Civil Works Maintenance Dredging Projects

IWW (from Fernandina Harbor, Florida to Miami, Florida), Okeechobee Waterway from the IWW to the St. Lucie Lock and Dam, Kings Bay Entrance Channel/Inner Channel, Jacksonville Harbor, St. Augustine Harbor, Ponce De Leon Inlet, Canaveral Harbor, Fort Pierce Harbor, St. Lucie Inlet, Palm Beach Harbor, Hillsboro Inlet, Port Everglades, Bakers Haulover Inlet, Miami Harbor, and Key West Harbor in Florida; San Juan Harbor, Arecibo Harbor, Mayagüez Harbor, Ponce Harbor, Yabucoa Harbor, Guavanes Harbor, and Fajardo Harbor in Puerto Rico; St. Thomas Harbor, St. Thomas, and Christiansted Harbor, St. Croix, in the U.S. Virgin Islands.

### 2.8.2         USACE and BOEM Borrow Area/ Sand Lease Areas

The USACE uses numerous borrow areas including sand acquired during dredging, especially in inlets and passes. Borrow areas can also be offshore in state waters under the jurisdiction of the USACE or in federal waters under the jurisdiction of BOEM. The borrow areas used for specific beach nourishment projects are identified in SARBA Appendix B. As stated earlier, the BOEM website (https://mmis.doi.gov/BOEMMMIS/) provides up to date data regarding executed leases associated with BOEM's Marine Minerals Program including borrow sites covered under this

**Defendants' Exhibit C**

Opinion (Table 5).  New borrow areas are also allowed under the 2020 SARBO if they meet the requirements of the PDCs.

*Alternative review: Note that in limited instances, projects that deviate from this Opinion's PDCs in a minor way, including location, may be covered under the Supersede process outlined in Section 2.9.5 of this Opinion.*

**Table 5.  BOEM Borrow Sites**

| Lease Status | State | Lease Number | Project Name | Borrow Area | Total Sand Allocated (cy) | Effective Date | Expiration Date | Size (acres) |
|---|---|---|---|---|---|---|---|---|
| Active | North Carolina | OCS-A-0523 | Carteret County 2019 - Bogue Banks | Morehead City ODMDS | 2,000,000 | 2/21/2019 | 2/21/2021 | 218 |
| Active | South Carolina | OCS-A-0477 | Port Charleston 2010 | East Excavation, West Excavation | 6,000,000 | 3/23/2010 | 7/20/2019 | 808 |
| Active | South Carolina | OCS-A-0514 | Myrtle Beach 2016 | Surfside | 1,600,000 | 9/12/2016 | 10/17/2020 | 426 |
| Proposed | Florida | | Flagler County (Proposed 2014) | | | | | 4,845 |
| Proposed | Florida | | Miami-Dade County (Proposed 2015) | | 5,200,000 | | | 2,614 |
| Proposed | Florida | | St. Johns County (Proposed 2016) | | | | | 13,419 |
| Proposed | Florida | | St. Lucie County (Proposed 2012) | | | | | 170 |
| Proposed | Florida | | Brevard County (Proposed 2016) - Mid Reach | | 900,000 | | | 1,469 |
| Proposed | South Carolina | | Folly Beach (Proposed 2016) | Borrow Area C, Borrow Area D | | | | 142 |

## 2.8.3        ODMDS

U.S. Environmental Protection Agency ODMDS sites currently federally-authorized include the list below.  A list of the ODMDS locations is included in Table 6 below.  This list includes the current ODMDS sites within the action area as of July 2019, according to the EPA website (https://www.epa.gov/ocean-dumping/ocean-disposal-map).  Only designated ODMDS locations are covered under this Opinion.  Therefore, ODMDS locations authorized after the completion of 2020 SARBO may be covered by this Opinion if a separate Section 7 consultation has been completed or through the Supersede review process outlined in Section 2.9.5 of this Opinion.

*Alternative review: Note that in limited instances, projects that deviate from this Opinion's PDCs in a minor way, including location, may be covered under the Supersede process outlined in Section 2.9.5 of this Opinion.*

**Defendants' Exhibit C**

**Table 6.  EPA ODMDS Sites**

| Site Name | Location | EPA Region | Date of Site Designation | Site Area (nmi$^2$) | Average Site Depth (ft) |
|---|---|---|---|---|---|
| Canaveral Harbor | Florida | 4 | 10/22/1990 | 4 | 51 |
| Fernandina Beach | Florida | 4 | 3/25/1987 | 4 | 52 |
| Fort Pierce Harbor | Florida | 4 | 10/4/1993 | 1 | 47 |
| Miami | Florida | 4 | 2/29/1996 | 1 | 607 |
| Palm Beach Harbor | Florida | 4 | 2/17/2005 | 1 | 575 |
| Port Everglades Harbor | Florida | 4 | 2/17/2005 | 1 | 673 |
| Jacksonville | Florida | 4 | 7/5/1984 | 4.56 | 45 |
| Brunswick Harbor | Georgia | 4 | 1/23/1989 | 2 | 30 |
| Savannah | Georgia | 4 | 8/3/1987 | 4.26 | 37 |
| Morehead City | North Carolina | 4 | 9/14/1987 | 8 | 39 |
| New Wilmington | North Carolina | 4 | 8/5/2002 | 9.4 | 44 |
| Wilmington | North Carolina | 4 | 8/3/1987 | 2.3 | 43 |
| Arecibo Harbor | Puerto Rico | 2 | 10/20/1988 | 1 | 850 |
| Mayaguez Harbor | Puerto Rico | 2 | 10/20/1988 | 1 | 1,206 |
| Ponce Harbor | Puerto Rico | 2 | 10/20/1988 | 1 | 1,289 |
| San Juan Harbor | Puerto Rico | 2 | 4/22/1988 | 0.98 | 958 |
| Yabucoa Harbor | Puerto Rico | 2 | 10/20/1988 | 1 | 2,400 |
| Charleston | South Carolina | 4 | 8/3/1987 | 7.4 | 38 |
| Georgetown Harbor | South Carolina | 4 | 10/27/1988 | 1 | 28 |
| Port Royal | South Carolina | 4 | 10/24/2005 | 1 | 36 |

## 2.8.4          Beach Nourishment Locations

Beach nourishment projects covered under the 2020 SARBO are limited to nourishment in areas defined in SARBA Appendix B and new locations outside of the range of ESA-listed corals that meet the PDCs of this Opinion.

Current federal Coastal Storm Risk Management (i.e., beach nourishment) and/or ecosystem restoration projects are included in the list below.  SARBA Appendix B provides a detailed description of current Coastal Storm Risk Management projects as well as other federally permitted beach nourishment projects.

- Wilmington District Projects: Carolina Beach, Kure Beach, Ocean Isle, Wrightsville Beach

- Charleston District Projects: Edisto Beach, Folly Beach, Myrtle Beach, Pawleys Island, Hunting Island

- Savannah District Projects: Tybee Island

**Defendants' Exhibit C**

- <u>Jacksonville District Projects</u>: Brevard County, Broward County, Dade County, Duval County, Flagler County, Indian River County, Martin County, Miami-Dade, Nassau County, Palm Beach County (Lake Worth Inlet to South Lake Worth Inlet), Palm Beach County (Martin County Line to Lake Worth Inlet & South Lake Worth Inlet to Broward County Line), St. Johns County, Volusia County, St. Lucie County.

*Alternative review: Note that in limited instances, projects that deviate from this Opinion's PDCs in a minor way, including location, may be covered under the Supersede process outlined in Section 2.9.5 of this Opinion.*

## 2.8.5      Pipeline Corridors

The USACE uses designated pipeline corridors to place sand for beach nourishment projects. Previously designated and/or used corridors for particular projects are defined in SARBA Appendix B by beach location.  New pipeline locations are also allowed under this Opinion outside of the range of ESA-listed corals.  Existing and new pipeline corridors are limited by the PDCs in this Opinion, with increased protections provided for existing corridors within the range of ESA-listed corals.

*Alternative review: Note that in limited instances, projects that deviate from this Opinion's PDCs in a minor way, including location, may be covered under the Supersede process outlined in Section 2.9.5 of this Opinion.*

## 2.9      Programmatic Implementation, Tracking, and Reporting

This section outlines the process used to determine if covering a project under this Opinion is appropriate; how projects covered by this Opinion are reported and tracked; how coordination will continue between NMFS, USACE, and BOEM; and how the aggregate effects of all activities occurring during a year will be reviewed to determine if the effects of the proposed activities, including the level of take or loss of critical habitat, exceeded the amount analyzed in this Opinion.  Most of the processes outlined in this section are a continuation of how coordination between the USACE and NMFS has been handled for many years, with some modifications and additional specific reporting requirements.  The USACE has successfully managed its dredging program throughout the Southeast for many decades in a manner that minimizes impacts to ESA-listed species and critical habitat.  Protective measures used by USACE have included evaluating the risk to ESA-listed species that may be associated with construction of a specific project prior to construction, applying risk minimization measures when and where they were deemed appropriate, re-evaluating the risk to ESA-listed species following each take, tracking all take in real time (first on the Sea Turtle Data Warehouse, now reported in the Operations and Dredging Endangered Species System [ODESS][17]), and continuing to coordinate with NMFS when questions or issues arise.  The addition of BOEM to this consultation is limited to dredging activities in federal waters and the inter-connected material placement activities, as described in Section 2.2 of the Opinion.  As part of the SARBO

---

[17] https://dqm.usace.army.mil/odess/#/home

**Defendants' Exhibit C**

Team (consisting of members of the USACE, BOEM, and NMFS), the USACE and BOEM helped develop and have agreed to all of the measures of this Opinion including the PDCs provided in Appendix A-H and the processes and requirements outlined in Section 2.9 of this Opinion that formalizes how all projects covered under this Opinion will be implemented, tracked, and reported.

### 2.9.1    USACE and/or BOEM Project-Specific Review for a Project to be Covered under SARBO

Before the USACE and/or BOEM authorize an activity covered under this Opinion, they must conduct a project-specific review of all project details to ensure compliance with all applicable PDCs.  If the PDCs are met, then the project qualifies for coverage under this Opinion.  If staff determines that some portion of the project would require a deviation from the PDCs, but the project would still have substantially similar effects to those considered in this Opinion, USACE/BOEM will contact NMFS to determine if coverage would be appropriate under the 2020 SARBO alternative review processes outlined in Section 2.9.5 of this Opinion (Alternative Project Implementation and Programmatic Modification through the Superseding Process of Review).

Projects that can be covered under this Opinion may be authorized either individually by the USACE or BOEM or may be authorized jointly if a project includes components occurring in both state and federal waters.  The federal authorization process by these agencies is briefly outlined below:

- For projects authorized solely by the USACE: This Opinion was developed in coordination with the USACE SAD and will be overseen at the Division level for both Civil Works and Regulatory projects.  If the USACE Districts within the action area (SAW, SAC, SAS, and SAJ) have questions about the adherence to PDCs or reporting requirements, they will contact the USACE SAD Office point of contact (as designated by the USACE SAD Operations and Regulatory Division Chief) for guidance and coordination with NMFS.  While projects may be evaluated for coverage under this Opinion at the USACE District level, the USACE SAD remains responsible for all compliance and reporting requirements.  As stated under Programmatic Review (Section 2.9.4 of this Opinion), the USACE SAD (Operations) will conduct an internal review of the projects authorized under SARBO each year to ensure that all USACE project managers permitting projects covered under this Opinion are applying SARBO appropriately.

- For projects authorized solely by the BOEM: In rare instances, BOEM may authorize dredging/ sand mining in federal waters for a project that does not require USACE coordination (e.g., if the sand is placed on a beach above mean high water).  In those instances, BOEM will be independently responsible for all implementation and reporting requirements of the 2020 SARBO and notify the USACE in advance of the application of the SARBO.  BOEM will send completed reports to the USACE SAD for inclusion in the SARBO annual review and report, as stated under Programmatic Review (Section 2.9.4 of this Opinion).

- For projects jointly authorized by the USACE and BOEM: For projects where portions of the project occur within both USACE and BOEM's jurisdiction, the USACE and BOEM will determine the appropriate lead action agency for the project.  The lead action agency will be

**Defendants' Exhibit C**

responsible for ensuring work is carried out in accordance with this Opinion in coordination with the other agency. As described above, the USACE SAD remains the primary point of contact within the USACE for questions of applicability of this Opinion to a project. All reports completed will be provided to the USACE SAD according to the tracking and reporting requirements outlined in Section 2.9.3 of this Opinion.

- For projects jointly authorized with another Federal agency: There may be projects where USACE or BOEM is an action agency, the proposed project is in the action area and consistent with the 2020 SARBO PDCs, and portions of the project are coordinated with or completed by another Federal agency (e.g., USACE authorizing maintenance dredging by the U.S. Air Force in waters off of a military base, or EPA authorizing USACE use of an ODMDS). These partner agencies are encouraged to carefully review this document in making their determinations regarding their consultation requirements under the Endangered Species Act and to consider whether their action results in any additional or different effects not addressed herein. In the event that such a late-arriving partner action agency requests consultation on an action consistent with the PDCs of this Opinion in the action area, NMFS will evaluate what further steps may be required to meet the requirements the Endangered Species Act.

## 2.9.2   Risk-based Adaptive Project Management

The proposed action as analyzed in this Opinion allows some flexibility in the timing of project completion through the use of a risk assessment and risk management process, outlined below in Section 2.9.2.2 of this Opinion. Using this risk-based decision-making process, dredging will be allowed outside of the previously established seasonal dredging windows required in the 1997 SARBO.

### 2.9.2.1   History of Adaptive Management

Under the 1997 SARBO, the USACE retained flexibility, within defined seasonal dredging windows, to decide when and where projects would occur and the equipment type used for a particular project. The USACE SAD developed a *Risk Assessment and Risk Management Plan*[18] (Plan), to help guide their decision-making process and to address circumstances which may have contributed to an incidental take. The Plan included documenting how required hopper dredging conditions were met, including the use of measures like turtle deflecting dragheads, proper inflow and overflow screening and ensuring that dredge pumps were disengaged when the draghead was not firmly planted in the sediment. This Plan also outlined procedures to follow when take occurred to reduce the risk of further take. The USACE's practice has been to update this Plan annually to minimize risk to ESA-listed species.

Utilizing adaptive management in this manner allowed the USACE to consider the anticipated risk of harm to ESA-listed species in the context of shifting variables (e.g., environmental, financial, regulatory, etc.). Subsequent decisions made regarding project timing and equipment use maximized the ability to complete dredging and material placement projects, while minimizing the risk of incidental take. The USACE has a proven history of using this process to

---

[18] https://dqm.usace.army.mil/odess/documents/GuidelinesRiskAssessmentsRiskMgmtPlans.pdf

**Defendants' Exhibit C**

further reduce the likelihood of incidental take, and will continue to do so under the 2020 SARBO.

## 2.9.2.2        SARBO Risk Assessment and Risk Management Process

This Opinion formalizes and expands the risk assessment process to include BOEM and to include coordination and input from the SARBO Team (consisting of members of the USACE, BOEM, and NMFS), throughout the life of this Opinion (e.g., until reinitiation triggers are met as outlined in Section 12 of this Opinion).

The risk-based adaptive project-management process involves the consideration of institutional knowledge of particular project sites, the potential effects to ESA-listed species and designated critical habitat, and the use of any current or new best available information.  The SARBO team will coordinate as appropriate to discuss project specific issues and meet at least once annually to discuss the projects proposed to be covered under this Opinion for the upcoming year and associated minimization measures that may be considered to reduce take for particular projects.

The SARBO Risk Assessment and Risk Management Process will consider the steps outlined below and detailed in Appendix J.  Each step outlines the general process used to evaluate risk from projects and how minimization measures will be selected to reduce the risk of lethal take. This process will continue to be refined by the SARBO Team as this Programmatic Opinion is implemented.

- Assessment Step 1.  Determine the list of upcoming projects expected and pre-construction risk assessment
  Each fiscal year, the USACE and/or BOEM will compile a list of projects proposed for the next year and beyond (e.g., projects proposed for the next 1-5 years), including relevant minimization measures based on the pre-construction risk assessment results.  The final project timing and risk assessment will be developed and maintained by the USACE and/or BOEM.  Timing of upcoming projects will minimize the risk of impacts to ESA-listed species by considering the risk to ESA-listed species posed by particular projects based on project-specific timing, location, and equipment used, as appropriate.  This assessment will involve considering the presence of ESA-listed species at project locations/times, known equipment interactions with species expected to be present, and the history of interactions at a particular project site.[19]  These suggested minimization measures consider when, where, and what equipment could be used to reduce take based species use of an area.  This information combined with past experience by the USACE and BOEM of problems encountered working in the same or similar areas will continue to be incorporated into the pre-construction risk assessment.

  Individual projects that were not reviewed during the annual review (e.g., USACE Regulatory project that are proposed after the annual review and will be implemented before the next annual review) will be reviewed using the same approach and discussion with NMFS.  Before permitting any activities analyzed under the 2020 SARBO, conformance with the PDCs in the 2020 SARBO must be confirmed.

---

[19] NMFS has provided an initial list of specific suggested items to consider when determining how to reduce take from an upcoming project (Appendix J); however, the project-specific considerations used are expected to evolve for each equipment type and project area, as USACE and BOEM continue to engage in projects in the action area.

**Defendants' Exhibit C**

- Assessment Step 2.  Post-take Risk Assessment
  This process will be completed by USACE and/or BOEM after any take occurs to determine what factors lead to the adverse effect and if additional measures can be used to prevent it from occurring again.

- Assessment Step 3.  Post-Project Review and Reporting
  This process will be used to document what happened during the project and any lessons learned that can be applied to future projects to reduce the risk of incidental take.

- Assessment Step 4.  Annual Review and Reporting
  This process will be used to document what happened during the year and any lessons learned that can be applied to future projects to reduce the risk of incidental take.

## 2.9.3　　　SARBO Team Communication and Reporting

The USACE in coordination with BOEM will inform NMFS of upcoming projects covered under this Opinion, track, and report issues that arise during construction, and track and report relevant details of the project evaluated under this Opinion.  NOTE – Reporting is not just for Hopper dredging – information from all types of dredging and placement covered under this Opinion must be reported.

### 2.9.3.1　　　Digital Reporting

All reporting requirements of this Opinion will be provided digitally (e.g., ODESS, emailed to NMFS at **SERO.Dredge@noaa.gov**, or using any other communication method agreed upon by the SARBO Team) in a format that NMFS can review, edit, sort by the information categories listed below, and manipulate the data for the purposes of calculations and comparisons (e.g., digital spreadsheet or compatible format, not a scanned pdf).  Currently, ODESS is the primary reporting system used by the USACE to store and monitor dredging project data including information associated with encounters with ESA-listed species.  If the USACE in coordination with BOEM develop a different web-based tracking system or update ODESS, the reporting requirements outlined in Section 2.9 of this Opinion will still apply and the system will be accessible to NMFS staff for review and downloading of all required information.  ODESS will continue to be developed as needed, based on funding availability, to support priority data needs identified by the SARBO team.  NMFS encourages the use of public data sharing formats such as ODESS to the maximum extent possible so that necessary information is accessible in one location for monitoring convenience by the SARBO Team, concerned public citizens, and entities that must be provided information as a condition of this Opinion (e.g., state sea turtle coordinator notifications required by PDC REPORT.1).  If a public website like ODESS is used to meet the reporting requirements, a notification still needs to be sent to **SERO.Dredge@noaa.gov** alerting NMFS that take has occurred or that new project information has been added to the website.

**Defendants' Exhibit C**

**2.9.3.2          Meetings**

The SARBO Team will conduct at least 1 annual meeting as part of the programmatic annual review described in Section 2.9.4 of this Opinion and will conduct calls throughout the year as needed to discuss how this Opinion is being implemented.  It is anticipated that quarterly calls may be needed to discuss issues as they arise or to specifically address other reporting requirements including (1) pre-construction notification as part of a kick-off meeting for the dredging year, risk-based assessment concerns, or the annual review.  However, the number and frequency of the meetings may be adjusted by the SARBO Team.

**2.9.3.3          Pre-Construction Notification:**

NMFS will be notified at least 2 weeks prior to construction of any project covered under this Opinion by the USACE and/or BOEM so that NMFS is aware of current and upcoming projects in the region.  The notification will include the required project information provided in Section 2.9.3.5 of this Opinion that explains what the project is, where it will be happening, how it will be completed, and when work is expected to occur.  All information will be reported according to the digital reporting requirements provided in Section 2.9.3.1 of this Opinion.  The pre-construction notification will be provided in a manner that creates a searchable compiled list of all projects planned to begin within the fiscal year, which could be transmitted by emailing a spreadsheet that is updated with each new project, a list maintained on a publicly available website such as ODESS, or other method approved by the SARBO Team.  The pre-construction notification (sent to **SERO.Dredge@noaa.gov**) will include a statement that the applicable PDCs have been reviewed and will be requirements of the project.

**2.9.3.4          During and Post-Construction Reporting**

Important project details will be reported to NMFS digitally, according to the digital reporting requirements provided in Section 2.9.3.1 of this Opinion.  This includes:

- All lethal and nonlethal take associated with a project covered under this Opinion will be reported within 48 hours.  Project details related to take that will be reported as detailed in Section 2.9.3.5.2 of this Opinion.

- All observations of North Atlantic right whales observed while completing a project (aerial survey reporting is outlined separately in Appendix F) be reported within 24 hours of the observation.  The process to report a North Atlantic right whale observation is outlined in the North Atlantic Right Whale Plan (Appendix F) and applies to all work covered under this Opinion.

- Any reporting requirements outlined in the PDCs including surveys conducted under the Coral PDCs (Appendix C), surveys conducted under the Johnson's seagrass PDCs (Appendix D), and PSO responsibilities outlined in Appendix H.

The SARBO Team must be able to access and track relevant project details to verify compliance with the PDCs of this Opinion including the ability to monitor the accumulating total take of ESA-listed species and any loss of designated critical habitat features for the year, though loss of

**Defendants' Exhibit C**

critical habitat is not anticipated.  Project details that will be reported for all projects (regardless of if take occurred) are detailed in Section 2.9.3.5.1 of this Opinion.

**2.9.3.5       Required Project Information:**

Project details listed below apply to all projects covered under this Opinion, even if the project did not include hopper dredging, resulted in no take of an ESA-listed species, or resulted in no adverse effects to critical habitat.  All required information will be digitally accessible to NMFS prior to work commencing and reported according to the digital reporting requirements provided in Section 2.9.3.1 of this Opinion.  Information initially provided as estimated project details, such as the start date and the total volume of material dredged, will be updated with accurate final information and digitally available to NMFS within 30 days of project completion.

This information required is intended to provide the basic details that were needed to complete the analysis in this Opinion and are needed to confirm that the effects evaluated in this Opinion are still accurate.  These details will be reviewed during the programmatic annual review (Section 2.9.4.1 of this Opinion), may be incorporated in the risk-based adaptive management process for future projects occurring in the general area of a completed project (Section 2.9.2.2 of this Opinion), and may be used to inform future consultations on similar actions analyzed in this Opinion.

**2.9.3.5.1  Required Project Information for All Projects**

The required project details listed below are grouped by the questions they answer with an explanation of why the reported information is important to the implementation of the 2020 SARBO and future similar consultations.

**Who is in Charge of the Project?**
It is important to track which action agency (e.g., USACE or BOEM) and point of contact is overseeing the project and if another action agency involved.  Knowing who is in charge of the project and how the project was authorized (e.g., request for SARBO Supersede review for a modification) is important for project tracking and consistency under this Opinion, and if there are questions later about the rationale behind decisions made.  If the project includes a PSO, the PSO and PSO company name and contact information is important if there are questions about take.  The following information will be provided to NMFS:

1. USACE and/or BOEM Project Manager (point of contact and contact information)

2. Protected Species Observer/s: Observer company, if a PSO was used, and contact information

3. Each federal action agency associated with project (e.g., USACE SAD, SAW, SAC, SAS, SAJ, BOEM, other agency consultation on the project such as the U.S. Air Force and/or Federal Emergency Management Agency [FEMA])

4. All federal action agency project tracking numbers associated with the project, if applicable (e.g., USACE Regulatory tracking number, e.g., SAW-2018-xxxxx)

**Defendants' Exhibit C**

5.  Biological Opinion(s) used to authorize the work (i.e., SARBO and any other Opinion used to cover a proposed project, if combined)

**When is the Project Occurring?**

The estimated start and end date will be provided in the pre-construction notification (Section 2.9.3.3 of this Opinion) and then updated to the actual start and end date.  Knowing when a project occurs is important in understanding the risk of the activity to ESA-listed species since it may or may not be present in the area when work is proposed or may be using the area for a specific life function in that location during that time of year, such as the presence of the North Atlantic right whale during calving season.  The following information will be provided to NMFS:

1.  Project start date (Estimated dates must be updated with actual dates)

2.  Project end date (Estimated dates must be updated with actual dates)

**Where is the Project Occurring?**

Knowing the project overall location and the specific area where within the project area where work occurred is important to be able to determine how the project spatially relates to other factors.  This could include being able to overlay how many projects occurred in a critical habitat unit or an area that required additional PDCs (e.g., within the range of ESA-listed corals) to see if the effects analyzed in this Opinion are accurate.  Tracking which projects are occurring in sensitive areas is important to ensuring the effects analyzed in this Opinion are accurate.  Knowing where a project occurs could also be used to determine if reported strandings in an area could be linked to work occurring under this Opinion.

If the extent of the project footprint (e.g., the entire extent of ABC Borrow area) has already been provided to NMFS or is available for download from a specified public website, referring to the location in a manner that is quantifiable is sufficient (XYZ Beach from mile marker X-Y).  If it is a new location, the geographic limits of the project footprint need to be provided as a shapefile.  The following information will be provided to NMFS:

1.  Project name (Typically projects are referred to by the name of the area.  If the area has more than one common name, all common names should be provided).

2.  Project location for both dredging AND placement.  For regularly occurring projects with an easily referenced named location, a central location may be sufficient (e.g., latitude and longitude in decimal degree format [xx.xxxx, -xx.xxxx]).  Project spatiolocation (i.e., shapefile/Keyhole Markup language Zipped (commonly referred to as KMZ)/ geographic information system (commonly referred to as GIS) layer to show the complete action area is needed if this information has not been previously provided to NMFS such as a USACE regulatory project that provided during the completion of this Opinion or the area of a channel realignment covered under this Opinion.

3.  Is the project occurring in an area identified in this Opinion that requires additional protection, such as within the range of ESA-listed coral (Appendix C), Johnson's seagrass (Appendix D), sturgeon rivers (Appendix E), or when and where North Atlantic right whales may be present (Appendix F)?

**Defendants' Exhibit C**

4. Is the project occurring within the geographic limits of a designated critical habitat, even if features are not impacted?  For example, Johnson's seagrass critical habitat Unit J or loggerhead critical habitat unit LOGG-N-19.

5. Total area of the project that occurs within the geographic area of one or more critical habitat units, if applicable.  For example, 1,000 ft² of dredging occurred within North Atlantic right whale critical habitat.

**What Type of Project and Equipment?**
In order to track if the effects analyzed in this Opinion are accurate and to know if the number of each species estimated to be captured based on the amount of anticipated dredging estimated to occur annually under this Opinion (catch per unit effort [CPUE]) is accurate, tracking the types of projects covered under this Opinion and the types of equipment used is needed.

This information may start to show trends that can be used for future projects and/or future dredging consultations to reduce take of ESA-listed species.  One example would be if take is reduced when bed-leveling is used during the clean-up phase of hopper dredging in most locations, but not in certain other locations or for specific bed-leveling designs, this information could be investigated further and used in future risk-based assessments regarding the type of equipment that could be used in a specific location to reduce take.  The following information will be provided to NMFS:

1. Project type/s
   a) Maintenance Dredging
   b) Minor channel modification/realignment
   c) Borrow site
   d) Muck dredging
   e) Beach nourishment
   f) Nearshore placement
   g) ODMDS
   h) G&G survey
   i) New placement location
   j) Other

2. Pre-project proposed dredge and placement total volume in cubic yards.

3.  Post-project actual dredge and placement total volume in cubic yards.

4. Confirmation (yes/no) that dredging does not exceed the previously federally-approved or federally-authorized dredge template including previously considered overdepth and/or advanced maintenance.  If it does exceed (yes), an explanation will be provided (e.g., approved through supersede, unintentional/unusual event and lesson learned).

5. Vessels and specific equipment used on project.  A single project may include more than 1 category of equipment listed below for a portion or all of a project.  The equipment types

**Defendants' Exhibit C**

expected to be used and listed with the pre-construction notification (Section 2.9.3.3 of this Opinion) will be updated at the end of the project if modifications were necessary.

a) Hopper dredge

    (1) Used UXO/MEC screening.  Note that projects that the use of UXO/MEC screening is only allowed if reviewed through the Alternative review/ Supersede process outlined in Section 2.9.5 of this Opinion.

    (2) Screening size used for the project.  If the project required an increase or removal of inflow screen size (according to PDC HOPPER.1, Appendix B), the sizes used and volume dredged with screens larger than 4 x 4-inch must be recorded and reported.

    (3) If inflow screening is removed, the USACE and/or BOEM will track the start and end date of dredging that occurred without inflow screening and the number of loads, which will be reported in the annual report.

    (4) Bycatch captured

b) Modified hopper (as defined in Section 2.5.2.2 of the Opinion such as the CURRITUCK and MURDEN).

c) Non-hopper dredging equipment (e.g., bucket, clamshell, cutterhead, water-injection, bed-leveling to complete project)

d) Bed-leveling (used as the sole form of material movement or just during clean-up phase of hopper dredging).

e) Name and automatic identification system tracking number of any support vessels over 33-ft in length in areas and during times that required adherence to the North Atlantic Right Whale Conservation Plan (Appendix F).

f) Geophysical survey

    (1) Include the equipment type (e.g., multibeam, boomer), frequency at which the equipment was operated, maximum source/power level it was operated at (that will be used during the annual review to determine the dB limits in the PDCs were not exceeded), location used, and total time used.

g) Relocation trawling

    (1) Total number of tows for the project.

    (2) Total number of days.

    (3) Relocation trawling start date.

    (4) Relocation trawling end date.

    (5) Bycatch captured (i.e., other species captured during trawling by species and estimated number of captures).

h) New Equipment or construction method approved through the SARBO Supersede 2 process outlined in Section 2.9.5.2 of this Opinion.

**Defendants' Exhibit C**

**2.9.3.5.2   Required Project Information When Take Occurs**

The following details will be reported when take occurs associated with a project covered under this Opinion.  This required information applies to lethal and nonlethal take of mobile species (i.e., all species listed in Table 8 of this Opinion, except ESA-listed corals and Johnson's seagrass).  Information collected provides details on the type of species captured including the size and age of the animal based on the measurements taken.  Environmental conditions recorded at the time of take (e.g., Beaufort state, water and air temperature, and notes provided in the comments section) may help to better understand where and when take may occur at future similar projects and may be incorporated into the risk-assessment process.  For example, the number of sea turtle takes increases when the water temperature is above or below a certain threshold and after a major cold snap.  Tracking this information aids in the risk assessments for future projects.  Knowing the Beaufort state also helps to understand how visible animals may be in the area, especially if a vessel strike occurs.  The following information will be provided to NMFS:

1. Location of take (latitude and longitude if possible or estimated based on the portion of project where work is occurring such as a specific portion of an entrance channel, pass, or borrow site)

2. Tow number when take occurred during relocation trawling or dredge load number if take occurred during hopper dredging.

3. Protected Species Observer/s that observed and handled the take: Observer name/company and contact information

4. Species take must be tracked by total number (e.g., 3 loggerhead sea turtles).  Atlantic sturgeon must be reported by District Population Segment (DPS).  Project take details can initially state Atlantic sturgeon DPS unknown, but must be updated to known DPS when the genetic sample is processed, which will occur within 1 year of take (Appendix H).  All samples must be processed in time to provide DPS information in the annual report.  If the observed remains of a sea turtle cannot be identified by species, recording the take as unknown sea turtle is appropriate.  Unknown sturgeon will require genetic testing to determine if it was an identifiable DPS of Atlantic sturgeon.

5. Previous animal identification/tracking tag information (internal and external tags), if any

6. New passive integrated transponder (PIT) Tag information, if inserted according to the PSO PDCs in Appendix H

7. Genetic sample collected, if applicable under PSO PDCs in Appendix H

8. Age class of species take based on size (e.g., juvenile, adult)

9. Specimen Condition (e.g., alive, fresh dead, or decomposed as described in the PSO PDCs in 0 Section 4).  While decomposed animals are not counted as take associated with the project, they will still be recorded and reported with the project take.

10. Final disposition (e.g., released at site, relocated, rehabilitation and outcome once known, necropsy, disposal)

11. Species gender (if known)

**Defendants' Exhibit C**

12. Species size/length (measurement details are provided by species in the PSO PDCs, in Appendix H).

13. Beaufort state at the time of take.

14. Water temperature at the time of take-recorded at the water's surface in marine environments and at the bottom in estuarine and riverine environments.

15. Notes about species condition: Any additional relevant information regarding take of ESA-listed species including turtles with Fibropapillomatosis disease, previous wounds, or multiple ESA-listed species captured in same net.

16. Notes about site condition anomalies: Any observations by PSO or crew that may lead to increased captures or deposition of capture including presence of other species like cannonball jelly fish or regional conditions such as large storm or dramatic change in temperature like a recent cold snap.

17. If the take occurred during hopper dredging:

    a) List the location where take was identified (e.g., draghead, inflow box, overflow box).

    b) Provide the screening in place at the time of take.  Were both inflow and overflow screening used?  List the size of screening used for both.

    c) State if UXO/MEC screening was installed at time of take

## 2.9.4        Annual Programmatic Review

The USACE SAD in coordination with BOEM is responsible for implementation, management, and administration of the proposed action for all projects covered under this Opinion and the SARBO Team will continue to coordinate and communicate for the life of this Opinion to ensure its success.  This includes an annual review of all activities covered under this Opinion as described in this section.  The annual programmatic review will include the discussions outlined in this Section that may be combined or expanded, as deemed appropriate by the SARBO Team.

The annual programmatic review assesses all projects covered under this Opinion to ensure that the Opinion is being implemented in the manner intended and that the effects considered in this Opinion are still accurate.  In order to complete the programmatic annual review, the USACE SAD will need to report the necessary details for each project outlined in Section 2.9.3.5 of this Opinion and ensure that the information is accurate and complete.  The combined information for all projects covered under the Opinion from the previous fiscal year will then be used to determine if the use of this Opinion to cover a project was appropriate.  From NMFS's experience working with other Programmatic Biological Opinions in this region, we suggest that the following items be checked before submitting the programmatic annual review to NMFS:

- Randomly select and review projects covered under this Opinion by staff other than those on the SARBO Team to confirm compliance with the requirements of this Opinion including all applicable PDCs.

- Map all project locations to determine how many occurred in critical habitat.

**Defendants' Exhibit C**

- Map all project locations to determine how many occurred in areas that required additional PDCs such as those within the range of ESA-listed corals and ensure the additional protective measures were followed.

- Review the compiled spreadsheet to ensure that all information is reported.  Certain details may be provided as an estimate during the pre-construction notification and then will need to be updated once work is complete such as the total dredge volume or start and end date.

### 2.9.4.1        Annual Programmatic Report

Each fiscal year, the USACE SAD in coordination with BOEM will provide an annual programmatic report that includes all information outlined below.  The annual review will be completed and provided to NMFS as soon as possible after the end of the fiscal year.  The first annual review for the 2020 SARBO implementation will determine how soon an annual review can be accurately and reasonably completed.  In addition, the USACE SAD will host an annual meeting for the SARBO Team to discuss the annual report.  The SARBO Team will be provided the annual programmatic report with sufficient time to review the information prior to the annual programmatic review meeting.  The SARBO Team will work to resolve any outstanding questions or concerns and document the results of these discussions.

The reporting requirements in this section are meant to ensure that this Opinion is protective of ESA-listed species.  These requirements may be adapted by agreement between NMFS, USACE, and BOEM, as this Opinion is implemented, in order to ensure accuracy, validity, and utility of data collected and to ensure protection of the species discussed in the Opinion.  This will allow maximum flexibility and protectiveness of the species while ensuring operations occur in the safest manner.

Following the annual review, the SARBO Team may jointly determine that revisions to the Opinion or the PDCs may be necessary.  If the SARBO team believes that PDCs require minor modification or correction, the process established below for changing PDCs may be initiated (Section 2.9.5.3 of this Opinion).  If revisions exceed those that are deemed appropriate for minor modifications to the PDCs, re-initiation of consultation may be required as appropriate as provided in 50 CFR Section 402.16, and detailed further in Section 12 of this Opinion.

The annual programmatic report must include all of the information identified in Section 2.9.4.2 of this Opinion, if relevant to the project covered under this Opinion.

### 2.9.4.2        Data Required for the Programmatic Annual Review Report

The following information will be reported in a digital compiled and sortable summary spreadsheet or narrative, as appropriate, according to the reporting guidelines provided in Section 2.9.3.1 of this Opinion.

1) This report will include a master spreadsheet compiling all of the required information from Section 2.9.3.5 of this Opinion, for all projects covered by this Opinion during the year.  The spreadsheet must provide a tally of at least the number of nonlethal and lethal take by species/DPS, any loss of critical habitat features by critical habitat unit and quantifying any

**Defendants' Exhibit C**

loss of each feature by the area of loss (acres or square feet),[20] and total volume dredged during the year.

2) In addition to, or as part of, the master spreadsheet identified in item 1 above, identify and tally all projects:

    a) Located within a critical habitat unit or species-specific range that required additional protection, as appropriate:

        i) In sturgeon rivers (Sturgeon PDCs, Appendix E)

        ii) In the range of Johnson's seagrass (Johnson's seagrass PDCs, Appendix D)

        iii) In the range of ESA-listed corals (Coral PDCs, Appendix C)

        iv) In the range and during the time when North Atlantic right whales may be present (Appendix F)

    b) Using an equipment type that required additional reporting, such as:

        i) geophysical surveys

3) Hopper dredging with modified or removed inflow screening.

4) Project activities located within the range of ESA-listed corals that required a survey. Survey reports are submitted according to the Coral PDCs (Appendix C).

5) Requiring relocation of ESA-listed corals. The tally of these projects will include the total number and type of ESA-listed corals relocated by species and a summary of the survival rates for the year, according to the Coral PDCs (Appendix C).

6) Project activities located within the range of Johnson's seagrass that required a survey. The tally of these projects will include a summary of the results of the post-construction surveys.

### 2.9.4.3 Lessons Learned

The annual programmatic review and report will include feedback on the unique situations encountered for projects covered under this Opinion and how they were resolved. These lessons learned are valuable to understanding if minimization measures worked, predicating the likelihood of encounters or take of ESA-listed species in specific areas depending on variables such as time of year or site conditions, and identifying where clarification or training may be necessary for issues related to this Opinion. The format in which these comments provided is at the discretion of the USACE in coordination with BOEM and can be as simple as adding comments fields to a spreadsheet tracking all projects covered under this Opinion. Some of this information may be gathered while the project is active or comments about information discovered while reviewing all projects completed and compiled for the programmatic annual review. Important information includes:

1) Corrective action taken during construction of a project.

---

[20] Note that adverse effects to designated critical habitat are not anticipated as a result of the proposed action; however, this reporting requirement ensures that NMFS will be notified in the event that adverse effects to critical habitat have occurred.

**Defendants' Exhibit C**

2) Information gathered during the risk-based adaptive management process including species trends and use of an area; especially if it resulted in more or less take than expected at a specific project location.

3) Lessons learned based on site-specific conditions observed during a project that may be relevant to future projects (e.g., difficulty keeping the hopper dredge dragarm firmly embedded due to site conditions).

4) A summary of successes and challenges encountered during projects conducted under the alternative review process (Section 2.9.5 of this Opinion).

5) Discrepancies observed between USACE Districts on the interpretation of PDCs to determine if a project should be covered under SARBO and the corrective action taken to resolve the inconsistency.

### 2.9.5    Alternative Project Implementation and Programmatic Modification through the Superseding Process of Review

While NMFS, USACE, and BOEM have worked to collaboratively develop the PDCs in this Opinion, instances may arise where a project, methodology, or equipment type does not exactly fit in the scope or scale of work defined by the PDCs, where the PDCs require modification to operate as intended, or where project-specific review by NMFS is required under the PDCs.

This Opinion considers limited flexibility in the implementation of projects covered under this Opinion, as well as for revisions to the PDCs.  In these instances, the USACE and/or BOEM may propose to use new materials or equipment methods not considered in this Opinion or propose a project that may deviate from the PDCs in a minor fashion.  The USACE or BOEM must first determine that the modification will have effects on ESA-listed species or designated critical habitat that are "substantially similar" to the effects considered in this Opinion, and submit its determination to NMFS.  NMFS will consider effects to be "substantially similar" if the effects of the proposed project are consistent with the effects analyzed in this Opinion (i.e. does not result in effects to an ESA-listed species or critical habitat not considered in the Opinion).  NMFS will not approve any project under this alternative review process that the agency determines may have effects greater in magnitude or scale than those analyzed in this Opinion, or where reinitiation is warranted.  Elements of PDCs which minimize the impacts of take of ESA-listed species may not be modified to diminish the minimization of the impacts of such take.  This alternative review process is intended to allow limited modifications, while ensuring that effects remain consistent with those analyzed in this Opinion.

Through the processes described in this section, USACE and/or BOEM may request NMFS review and approval of:

1. Individual projects that deviate slightly from the PDCs (provided in Appendix B - Appendix H) (as outlined in Section 2.9.5.1 of this Opinion – *SARBO Supersede 1.  Superseding Process for Review and Inclusion of Substantially Similar Projects or Projects with Substantially Similar Effects*), or require project-specific review under the PDCs.

2. New methods of conducting activities or equipment types that deviate from the proposed action in this Opinion (as outlined in Section 2.9.5.2 of this Opinion –*SARBO Supersede 2.*

**Defendants' Exhibit C**

*Superseding Process for Review and Inclusion of New Construction Methodologies or Equipment Types with Substantially Similar Effects).*

3.  Minor modifications to specific existing PDCs for future projects covered under this Opinion (as outlined in the Section 2.9.5.3 of this Opinion - *Adaptive Changes to PDCs*).

4.  Project-specific review for relocation of ESA-listed corals

### 2.9.5.1      SARBO Supersede 1.  Superseding Process for Review and Inclusion of Projects with Substantially Similar Effects

If the USACE or BOEM makes the preliminary determination that a proposed project deviates from the PDCs, but the effects would be substantially similar to the effects considered in this Opinion, it may provide the rationale to NMFS and request permission to rely on the Opinion to satisfy its ESA Section 7 consultation obligations.  The request to use the procedures in this Section must be accompanied by supporting documentation explaining the project, including:

1)  Project description and rationale why the effects of the proposed action are substantially similar to the analysis in this Opinion, as shown in the examples in Table 7.

2)  Relevant construction drawings, benthic surveys, survey data, or other information supporting the determination.

3)  For use of an equipment type or construction methodology not considered in this Opinion, for a specific project, documentation (e.g., reports or studies) supporting the conclusion that the effects from the proposed modification would be consistent with or less than those evaluated in this Opinion.

When requesting consideration of a project under the alternative review process, the USACE and BOEM will email the request to SERO.dredge@noaa.gov and must await written approval from NMFS (email) before authorizing the project.  These projects will be listed in the annual report including documentation from the USACE and/or BOEM on the successes and lessons learned from the completion of these projects.  For consistency and to better track the types of requests for an alternative review process, requests from USACE District Offices will be coordinated through the USACE SAD according to their procedures, unless modified overtime by the USACE SAD.

NMFS will provide its determination that that the effects of a specific proposed project under modified PDCs are or are not substantially similar to the effects discussed and found in this Opinion, to the lead action agency (e.g., USACE or BOEM) for that specific project.

**Defendants' Exhibit C**

When requesting consideration of a project under the project-specific review process, the USACE will email the request to **SERO.dredge@noaa.gov** and await written approval from NMFS (email) before authorizing the project. NMFS will provide its determination of whether relocation is an appropriate minimization measure and consistent with the effects considered in this Opinion to the lead action agency (e.g., USACE or BOEM) for that specific project. These projects will be listed in the annual report including documentation from the USACE and/or BOEM on the successes and lessons learned from the completion of these projects. For consistency and to better track the types of requests for an alternative review process, requests from USACE District Offices will be coordinated through the USACE SAD according to their procedures, unless modified overtime by the USACE SAD.

## 3    Potential Routes of Effect to ESA-listed Species and Critical Habitat

Section 3 identifies each route of effect that we believe will occur as a result of the activities covered under this Opinion, as described and limited by the PDCs in Appendix B-Appendix H. Section 3.1 of this Opinion discusses the potential routes of effects to mobile ESA-listed species; Section 3.2 of this Opinion discusses potential routes of effects to non-mobile ESA-listed species, and Section 3.3 of this Opinion discusses the potential routes of effects to designated critical habitat. Each route of effect is described in Section 3 and includes our determination of whether the effect to each identified ESA-listed species and designated critical habitat is: no effect; may affect, not likely to adversely affect; or may affect, likely to adversely affect. No effect (NE) or may affect, not likely to be adversely affect (NLAA) determinations are not analyzed beyond Section 3 of this Opinion. We believe that none of the activities covered under this Opinion will result in adverse effects to designated critical habitat and therefore designated critical habitat is not discussed beyond Section 3 of this Opinion. Effects that we believe may affect and are likely to adversely affect (LAA) ESA-listed species are analyzed further in Section 6.

Table 8 and Table 9 provide the USACE and BOEM's final effects determinations for ESA-listed species and designated critical habitat, respectively, based on their evaluation of the activities occurring within the action area. The USACE and BOEM initially provided different determinations with their request for consultation, but revised those determinations after completing the PDCs and re-evaluating the effects to ESA-listed species. The USACE and BOEM divided their effects determinations for each species into 3 categories (hopper dredging effects, relocation trawling effects, and effects from all other activities) for all ESA-listed species, except corals and whales, as shown in Table 8.

Table 8 and Table 9 also provide NMFS' final effects determination for each ESA-listed species and designated critical habitat. NMFS effects determinations in Table 8 and Table 9 reflect our overall determination for all effects analyzed in the Opinion. For example, if we believe that an activity may have no effect on a species and another activity may affect that species, but is not likely to adversely affect it, the NMFS final effects determination is that the proposed action may affect, but is not likely to adversely affect that species.

**Defendants' Exhibit C**

**Table 8.  Effects Determination(s) for Species the Action Agencies and/or NMFS Believe May Be Affected by the Proposed Action**

| ESA-listed Species | ESA Listing Status[21] | USACE/BOEM[22] Hopper Dredging (HD) Relocation Trawling (RT) All Other (OT) | NMFS (Final) |
|---|---|---|---|
| **Sea Turtles** | | | |
| Green (North Atlantic [NA] DPS) | T | LAA$^{HD, RT}$, NLAA$^{OT}$ | LAA |
| Green (South Atlantic [SA] DPS) | T | LAA$^{HD, RT}$, NLAA$^{OT}$ | LAA |
| Hawksbill | E | LAA$^{HD, RT}$, NLAA$^{OT}$ | NLAA |
| Kemp's ridley | E | LAA$^{HD, RT}$, NLAA$^{OT}$ | LAA |
| Leatherback | E | LAA$^{RT}$, NLAA$^{HD, OT}$ | LAA |
| Loggerhead (Northwest Atlantic [NWA] DPS) | T | LAA$^{HD, RT}$, NLAA$^{OT}$ | LAA |
| **Fish** | | | |
| Atlantic sturgeon (Carolina DPS) | E | LAA$^{HD, RT}$, NLAA$^{OT}$ | LAA |
| Atlantic sturgeon (SA DPS) | E | LAA$^{HD, RT}$, NLAA$^{OT}$ | LAA |
| Atlantic sturgeon (Gulf of Maine DPS) | T | LAA$^{HD, RT}$, NLAA$^{OT}$ | LAA |
| Atlantic sturgeon (New York Bight DPS) | E | LAA$^{HD, RT}$, NLAA$^{OT}$ | LAA |
| Atlantic sturgeon (Chesapeake Bay DPS) | E | LAA$^{HD, RT}$, NLAA$^{OT}$ | LAA |
| Shortnose sturgeon | E | LAA$^{HD, RT}$, NLAA$^{OT}$ | LAA |
| Nassau grouper | T | NLAA$^{OT, HD, RT}$ | NLAA |
| **Elasmobranchs** | | | |
| Giant manta ray | T | LAA$^{RT}$, NLAA$^{HD, OT}$ | LAA |
| Scalloped hammerhead shark (Central and Southwest Atlantic DPS) | T | LAA$^{RT}$, NLAA$^{HD, OT}$ | NLAA |
| Smalltooth sawfish (U.S. DPS) | E | LAA$^{RT}$, NLAA$^{HD, OT}$ | LAA |
| Oceanic whitetip shark | T | NE | NE |
| **Whales** | | | |
| Blue whale | E | NE | NLAA |
| Fin whale | E | NE | NLAA |
| North Atlantic right whale | E | NLAA | NLAA |
| Sei whale | E | NE | NLAA |
| Sperm whale | E | NE | NLAA |
| **Non-Mobile Species (corals and marine plants)** | | | |
| Boulder star coral (*Orbicella franksi*) | T | LAA | LAA |
| Elkhorn coral (*Acropora palmata*) | T | LAA | LAA |
| Lobed star coral (*Orbicella annularis*) | T | LAA | LAA |
| Mountainous star coral (*Orbicella faveolata*) | T | LAA | LAA |
| Pillar coral (*Dendrogyra cylindrus*) | T | LAA | NLAA |
| Rough cactus coral (*Mycetophyllia ferox*) | T | LAA | NLAA |
| Staghorn coral (*Acropora cervicornis*) | T | LAA | LAA |
| Johnson's seagrass | T | LAA | LAA |

[21] E= endangered; T= threatened; NE = no effect

[22] USACE/BOEM used MALAA (may affect, likely to adversely affect) and MANLAA (may affect, not likely to adversely affect), shortened to LAA and NLAA to match NMFS acronyms.

**Defendants' Exhibit C**

fish.  This Opinion also limits work in sturgeon rivers to areas where smaller larval stages or sturgeon are not expected to occur, so injury of these smaller fish is not expected.

### 3.1.1.4.3  Nassau Grouper

As stated above, we believe that only larval and small juvenile Nassau grouper may be small enough to be unable to outswim the suction generated by a cutterhead dredging.  Nassau grouper is a demersal (bottom-dwelling) fish that associates with habitat types where work will not be occurring under this Opinion such as hardbottom, reef, and other hard structures in South Florida and nearshore lagoon habitat with seagrass and mangrove habitat in the U.S. Caribbean.  The General PDCs in Section 2.2 of Appendix B limit the proximity and duration of work on or near hardbottom, reef, and seagrass habitats.  In addition, the Coral PDCs protect hardbottom and reef habitat within the range of ESA-listed corals which overlaps with the range of this species (Coral PDCs in Appendix C).  Therefore, cutterhead dredging will not occur in areas where larval or small juvenile Nassau grouper are expected to be present.  In the U.S. Caribbean and Florida Keys, Nassau grouper (19 cm fork length and larger) could occur over corals, reefs, and other hardbottom habitat, including channels and canals cut through the limestone hardbottom like those that where maintenance dredging covered under this Opinion can occur.  However, Nassau grouper at this size are considered larger juveniles that are highly mobile and are expected to be large enough that they could outswim the suction generated by a cutterhead dredging and that the risk of entrainment would be extremely low, such that we consider this route of effect to be discountable.

### 3.1.1.5      Hopper Dredging

Hopper dredges are known to cause mortality to sea turtles (Green, Hawksbill, Kemp's ridley, and Loggerhead) and sturgeon (Atlantic and shortnose), based on monitoring for sea turtle takes since 1980, by entrainment and impingement.  We therefore believe that hopper dredging is likely to continue to adversely affect these species, as described below and discussed in Section 6 of this Opinion.  Species can become entrained in hopper dredges as the draghead moves along the bottom.  Entrainment occurs when the species cannot escape from the suction of the dredge and they are sucked into the dredge draghead, pumped through the intake pipe, and then killed as they cycle through the centrifugal pump and into the hopper.  Because entrainment is believed to occur primarily while the draghead is operating on the bottom, it is likely that only those species feeding or resting on or near the bottom would be vulnerable to entrainment.  They can also be entrained if suction is created in the draghead by current flow while the device is being placed or removed, or if the dredge is operating on an uneven or rocky substrate and rises off the bottom.  Recent information from the USACE suggests that the risk of entrainment is highest when the bottom terrain is uneven or when the dredge is conducting "cleanup" operations at the end of a dredge cycle when the bottom is trenched and the dredge is working to level out the bottom.  In these instances, it is difficult for the dredge operator to keep the draghead buried in the sand, thus species near the bottom may be more vulnerable to entrainment.  Sea turtles or sturgeon resting in deeper waters or holes in the channel may be at an increased risk of take from dredging activities conducted there.  Species can also be crushed on the bottom by the moving draghead and not entrained.

**Defendants' Exhibit C**

The USACE has been hopper dredging, and authorizing hopper dredging since the 1980s. However, the issuance of the 1997 SARBO resulted in significant changes to dredging practice, such as the requirement to have a PSO present and the use of draghead deflectors during hopper dredging.  These protective measures resulted in reduced take from hopper dredging activities; therefore, hopper dredging take reported before the 1997 SARBO is not representative of take expected under this Opinion and is not used for estimating future take.  We reviewed all takes that occurred in the 21 years since the issuance of the 1997 SARBO (fiscal year 1998-2018, which is the last complete year of data available), as shown in Table 12,  Reported Takes from Hopper Dredging per year since 1997 SARBO.  All hopper dredging take associated with the 1997 SARBO and other major USACE dredging projects are documented on the ODESS from 1998 to present.

**Table 12.  Reported Takes from Hopper Dredging per year since 1997 SARBO[27].**

| Fiscal Year | Green sea turtle | Kemp's ridley sea turtle | Loggerhead sea turtle | Unknown sea turtle | Atlantic sturgeon | Unknown sturgeon | Hopper Volume (cy) |
|---|---|---|---|---|---|---|---|
| 1998 | 1 | 0 | 9 | 0 | 0 | 0 | 5,657,819 |
| 1999 | 1 | 1 | 13 | 0 | 1 | 0 | 6,253,794 |
| 2000 | 1 | 2 | 18 | 0 | 2 | 0 | 14,821,757 |
| 2001 | 2 | 0 | 3 | 0 | 0 | 0 | 2,908,339 |
| 2002 | 0 | 7 | 12 | 0 | 1 | 0 | 9,065,303 |
| 2003 | 0 | 0 | 5 | 0 | 0 | 0 | 4,816,289 |
| 2004 | 4 | 2 | 7 | 0 | 0 | 0 | 4,836,651 |
| 2005 | 0 | 0 | 6 | 0 | 2 | 0 | 11,867,599 |
| 2006 | 0 | 6 | 5 | 0 | 0 | 0 | 6,875,942 |
| 2007 | 1 | 1 | 7 | 0 | 1 | 0 | 7,640,337 |
| 2008 | 1 | 3 | 6 | 0 | 1 | 0 | 6,523,530 |
| 2009 | 5 | 0 | 7 | 0 | 0 | 0 | 14,382,100 |
| 2010 | 0 | 1 | 4 | 0 | 4 | 0 | 8,417,827 |
| 2011 | 9 | 0 | 12 | 0 | 1 | 0 | 6,987,091 |
| 2012 | 8 | 7 | 17 | 1 | 1 | 0 | 9,808,468 |
| 2013 | 2 | 1 | 6 | 0 | 0 | 0 | 7,362,809 |
| 2014 | 1 | 1 | 5 | 0 | 0 | 0 | 9,318,799 |
| 2015 | 1 | 3 | 10 | 0 | 2 | 1 | 7,120,000 |
| 2016 | 9 | 8 | 10 | 0 | 6 | 1 | 12,634,000 |
| 2017 | 22 | 16 | 28 | 0 | 17 | 1 | 10,417,000 |
| 2018 | 2 | 5 | 8 | 4 | 14 | 0 | 9,102,000 |
| **Total** | **70** | **64** | **198** | **5** | **53** | **3** | **176,817,454** |

[27] Note: Years that take of a specific species exceeded the annual number allowed under the 1997 SARBO (shaded grey in the table.  Take reported as (+ number) represent channel deepening projects at Savannah, Jacksonville, and Charleston Harbor and Bogue Bank.  These projects are in the action area and will continue to be maintained under this Opinion. Atlantic sturgeon were not listed under the ESA until 2012.  Reports in this table prior to 2012 are for information only and to aid in future take estimates.

**Defendants' Exhibit C**

#### 3.1.1.5.1   Sea Turtles and Sturgeon

To date, only green, Kemp's ridley, and loggerhead sea turtles and Atlantic and shortnose sturgeon have been reported as taken by hopper dredging in the South Atlantic, as shown in Table 12.  As a result, we believe that there will be adverse effects to green (NA and SA DPSs), Kemp's ridley, and loggerhead sea turtles, and Atlantic and shortnose sturgeon from entrainment or impingement due to hopper dredging.  The adverse effects of hopper dredging, anticipated take, and all minimization measures required in this Opinion are discussed further in Section 6 of this Opinion.

We believe hopper dredging will not affect leatherback or hawksbill sea turtles.  There are no reports of take of leatherback or hawksbill sea turtles from hopper dredging in the action area. Hawksbill sea turtles are generally not vulnerable to entrainment due to their association with reef habitat where hopper dredging will not occur under this Opinion.  Leatherback sea turtles are generally not vulnerable to entrainment due to their large size and generally pelagic habits. While there are 3 reported captures of leatherback sea turtles in 2017 and 2 in 2018 in the action area (Table 12), these reports were not considered to be a hopper dredge take.  The 3 reported leatherback sea turtle takes in 2017 occurred in Brunswick Harbor and were observed in the hopper dredge already severely decomposed and assumed to be parts of potentially the same or 2 different turtles, which accordingly were not attributable to dredging.  The 2 turtles were reported entangled in floating buoy lines associated with the project, but not a result of dredging. Based on the lack of reported interactions, and these species expected avoidance of hopper dredging activities, we believe that hopper dredging will have no effect on leatherback or hawksbill sea turtles.

No water quality effects that may adversely affect sturgeon or sea turtles are anticipated. Overflow from hopper dredging or from other equipment such as barges and scows could increase turbidity in the area, and would likely cause a decrease in DO concentrations.  However, hopper dredging covered under this Opinion is limited by the PDCs to times of year in sturgeon rivers when water quality is not seasonally degraded in (e.g., winter).  Additionally, as explained in Section 3.1.1.3.1, sturgeon and sea turtles will be able to avoid localized areas of turbidity in open water environments, if needed.  Further, any turbidity will be temporary, lasting only for the duration of the proposed project.  We therefore do not anticipate any adverse effects to sturgeon or sea turtles from changes in water quality or the associated decrease in DO concentration associated with these activities.

#### 3.1.1.5.2   Nassau Grouper

We believe that entrainment and impingement from hopper dredging of Nassau grouper is extremely unlikely to occur.  We therefore believe that this route of effect is discountable. Nassau grouper are not expected to be present in many areas where hopper dredging occurs under the proposed action.  Larval and juvenile Nassau grouper are not expected to be encountered due to their association with nearshore lagoon habitat with seagrass and mangrove habitat in the U.S. Caribbean, because hopper dredging will not occur in this environments.  The General PDCs in Section 2.2 of Appendix B limit work where adult Nassau grouper are expected to be present within portions of the action area, including on or near hardbottom, reef, and seagrass habitats.  In addition, the Coral PDCs protect hardbottom and reef habitat within the range of ESA-listed corals which overlaps with the range of this species (Coral PDCs in

**Defendants' Exhibit C**

state that lazy lines will be designed according to the design specifications in Appendix I , which provide options to make the lazy line taught to minimize the risk of entanglement with captured species.  This lazy line guidance was developed to minimize the risk of entanglement to dolphins, which are not addressed in this Opinion, but we believe that these measures will also reduce the risk of entanglement to ESA-listed species.  Relocation trawling is closely monitored by a PSO with limited amounts of time that the lines are in the water, as defined by the PSO PDCs in Appendix H and the Relocation trawling PDCs in Section 3.5 of Appendix B.  We believe that this further reduces the likelihood of entanglement in lines attached to relocation trawling nets.

Effects to any ESA-listed species that may be entangled in a relocation trawling net as part of a relocation trawling capture are analyzed separately in Section 3.1.1 and Section 6.1.4 of this Opinion.

### 3.1.3        Capture and Relocation from Relocation and Abundance Trawling

Relocation trawling is method used to minimize the risk of lethal hopper dredging take by sweeping the area around a hopper dredge using a modified shrimp trawl nets to capture and relocate ESA-listed species that may be in the dredging area.  While relocation trawling is intended to reduce the occurrence of lethal take from hopper dredging, the process of relocating ESA-listed species is, in and of itself, a form of take under the ESA for those species that are caught.  Relocation trawling covered under this Opinion will be monitored by PSOs based on the guidance provided in the PDCs, especially the PSO PDCs in Appendix H that provide handling and reporting guidance for ESA-listed species captured during relocation trawling.  Additional PDCs regarding the time and locations where relocation trawling can occur are provided in the General PDCs in Section 3.5 of Appendix B, which limit tow times to 42 minutes to minimize the risk of adverse effects on ESA-listed species, primarily mortality of sea turtles due to forced submergence (National Research Council 1990a) (Epperly et al. 2002).  Relocation trawling in the Caribbean is not covered under this Opinion.

Relocation trawling began in the 1980's in Cape Canaveral, Florida.  However, relocation trawling has only been used in the action area in limited circumstances.  Relocation trawling in the U.S. Caribbean has not previously occurred and is not covered under this Opinion.  We reviewed previous projects that used relocation trawling in the action area to evaluate the potential for effects to ESA-listed species.  All of the known projects that occurred in the action area that used relocation trawling are provided in Table 13 for reference.

**Defendants' Exhibit C**

**Table 13.  Capture Relocation Data within the Action Area**

| Location | Start Date | End Date | Total Trawling Days | Total Trawling Tows | Atlantic Sturgeon | Green Sea Turtle | Kemp's Ridley Sea Turtles | Leatherback Sea Turtles | Loggerhead Sea Turtle | Total Turtles | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Charleston Harbor | 3/28/97 | 5/16/97 | 49 | 1,176 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| Morehead City | 4/25/97 | 5/15/97 | 20 | 480 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| Myrtle Beach | 5/8/97 | 5/13/97 | 7 | 168 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| Canaveral Harbor | 10/1/02 | 10/7/02 | 7 | 168 | 0 | 14 | 0 | 0 | 55 | 69 | 69 |
| Kings Bay | 1/24/04 | 3/18/04 | 30 | 544 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Canaveral Harbor | 9/12/04 | 10/6/04 | 24 | 576 | 0 | 29 | 0 | 0 | 90 | 119 | 119 |
| Broward County Beach Nourishment | 5/4/05 | 5/14/05 | 10 | 240 | 0 | 0 | 1 | 0 | 24 | 25 | 25 |
| Martin County Shore Protection | 3/27/05 | 4/23/05 | 27 | 31 | 0 | 0 | 0 | 0 | 10 | 10 | 10 |
| Ft Pierce Beach Shore Project | 4/28/05 | 6/4/05 | 37 | 22 | 0 | 0 | 0 | 0 | 3 | 3 | 3 |
| Charleston Harbor | 12/15/05 | 1/22/06 | 38 | 912 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| Savannah Harbor | 3/26/06 | 4/4/06 | 9 | 159 | 2 | 0 | 1 | 0 | 0 | 1 | 3 |
| Brunswick | 12/30/06 | 1/11/07 | 12 | 325 | 0 | 0 | 3 | 0 | 3 | 6 | 6 |
| Brunswick | 3/15/07 | 3/24/07 | 9 | 207 | 1 | 0 | 14 | 0 | 17 | 31 | 32 |
| Savannah Harbor | 1/13/07 | 2/5/07 | 53 | 530 | 8 | 0 | 0 | 0 | 0 | 0 | 8 |
| Hurricane Ophelia- FEMA sand replacement | 3/27/07 | 3/28/07 | 1 | 41 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kings Bay Channel | 1/11/08 | 2/23/08 | 44 | 1,031 | 0 | 0 | 2 | 0 | 1 | 3 | 3 |
| Jacksonville Harbor | 11/27/07 | 12/10/07 | 14 | 353 | 0 | 0 | 1 | 0 | 3 | 4 | 4 |
| Brunswick | 1/14/08 | 1/27/08 | 13 | 279 | 10 | 0 | 1 | 0 | 1 | 2 | 12 |
| Brunswick | 2/28/08 | 3/6/08 | 8 | 150 | 0 | 0 | 4 | 0 | 4 | 8 | 8 |
| Brunswick | 1/2/09 | 1/5/09 | 4 | 81 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Brevard County Beach Nourishment | 4/1/10 | 4/17/10 | 17 | 419 | 0 | 0 | 0 | 2 | 16 | 18 | 18 |
| Kings Bay Channel | 1/4/10 | 2/11/10 | 39 | 992 | 29 | 0 | 0 | 0 | 0 | 0 | 29 |
| Brunswick- Bed-leveling study (SER-2013-12117) | 3/30/14 | 4/15/14 | 20 | 396 | 0 | 0 | 8 | 1 | 8 | 17 | 17 |
| Savannah Harbor (SER-2010-05579) | 1/7/16 | 3/31/16 | 76 | 1,812 | 17 | 0 | 1 | 1 | 0 | 2 | 19 |
| Savannah Harbor (SER-2010-05579) | 12/2/16 | 3/31/17 | 128 | 3,143 | 78 | 2 | 7 | 0 | 10 | 19 | 97 |
| Kings Bay | 12/4/18 | 3/31/19 | 27 | 305 | 0 | 0 | 2 | 3 | 3 | 8 | 8 |

117

**Defendants' Exhibit C**

| Location | Start Date | End Date | Total Trawling Days | Total Trawling Tows | Atlantic Sturgeon | Green Sea Turtle | Kemp's Ridley Sea Turtles | Leatherback Sea Turtles | Loggerhead Sea Turtle | Total Turtles | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Savannah Harbor (SER-2010-05579) | 11/30/17 | 4/1/18 | 204 | 5,001 | 41 | 2 | 19 | 1 | 30 | 52 | 93 |
| Brunswick | 1/18/18 | 3/18/18 | 59 | 1,153 | 79 | 1 | 17 | 1 | 3 | 22 | 101 |
| Savannah Harbor | 3/15/18 | 3/24/18 | 10 | 210 | 0 | 0 | 1 | 1 | 0 | 2 | 2 |
| Dare County (SER-2015-15988) | 5/22/17 | 10/21/17 | 199 | 4,599 | 0 | 0 | 2 | 10 | 62 | 74 | 74 |
| Post 45 Charleston (SER-2014-15433) | 1/11/19 | 4/14/19 | 92 | 2,463 | 12 | 0 | 3 | 4 | 4 | 11 | 23 |
| Bogue Banks (SER-2017-18882) | 3/8/19 | 4/25/19 | 48 | 1,493 | 11 | 5 | 3 | 1 | 8 | 17 | 28 |
| Kings Bay | 1/30/19 | 3/18/19 | 47 | 1,128 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| Morehead City | 2/28/19 | 4/11/19 | 42 | 1,008 | 2 | 0 | 1 | 0 | 0 | 1 | 3 |
| **All Reports (Fiscal Year 1997-2019)** | | | **1,424** | **31,595** | **297** | **53** | **91** | **25** | **358** | **527** | **824** |

**Defendants' Exhibit C**

A study of the effects of relocation trawling as a mitigation tool to minimize the risk of take from hopper dredging (Dickerson et al. 2008) and data provided by the USACE on relocation trawling take ODESS demonstrate both the risk and benefits of this method. The risks to ESA-listed species of directed take are the stress endured by these species in the process of being trawled and relocated including any potential physical harm during this process and stress that may result in reduced fitness in the form of reduced foraging and reproductive success. Relocation trawling may also have varying levels of effectiveness as a minimization of take with hopper dredging depending on the timing, trawling effort, and project location features. In Section 6.1.4 of this Opinion, we consider these effects to species relocated in the action area.

### 3.1.3.1        Sea Turtles

Reports show that predominately loggerhead, Kemp's ridley, and green sea turtles are captured during relocation trawling in the Southeast within the action area (listed from highest to lowest reported captures), though there are also limited reports of leatherback sea turtle captures in the action area (ODESS). Therefore, we believe that relocation trawling is likely to adversely affect green (NA and SA DPS), Kemp's ridley, leatherback, and loggerhead sea turtles, which is discussed further in Section 6 of this Opinion.

We believe that there will be no effect to hawksbill sea turtles from relocation trawling. While there have been limited reports of hawksbill sea turtles in relocation trawling (Dickerson et al. 2008) outside of the action area, we do not believe that they will be entrained by hopper dredging covered under this Opinion. Hawksbill sea turtles are closely associated with reef habitat and most prevalent in the action area in South Florida and the U.S. Caribbean. This Opinion does not cover relocation trawling in the U.S. Caribbean. In South Florida, relocation trawling is not covered if coral or coral hardbottom are present to protect ESA-listed corals and Acropora critical habitat (Appendix B, Section ,3.5, Relocate.4) and therefore would also not occur in areas where hawksbill sea turtles occur.

### 3.1.3.2        Fish

Atlantic sturgeon have been captured in relocation trawling in the South Atlantic portion of the action area, and we expect that shortnose sturgeon, given their life history similarities, may also be captured in relocation trawling as relocation trawling is expanded under the 2020 SARBO (relative to the 1997 SARBO). Therefore, we believe that relocation trawling is likely to adversely affect Atlantic and shortnose sturgeon, which is discussed further in Section 6 of this Opinion.

Nassau grouper may be caught by relocation trawling based on their range and the habitats where they are found within the action area. However, we believe that this route of effect is extremely unlikely and therefore discountable. Since relocation trawling in the U.S. Caribbean is not covered under this Opinion, areas where relocation trawling could occur within the range of this species are limited to South Florida. In South Florida, adult Nassau grouper are associate with reef habitats where relocation trawling will not occur. In nearshore waters where maintenance dredging in navigation channels occurs, Nassau grouper are limited to locations south of (not including) Government Cut in Miami, Florida. We believe that in the Florida Keys, Nassau grouper would be

**Defendants' Exhibit C**

associated with nearshore lagoon habitat with seagrass and mangrove habitat as juveniles and with reef habitat as adults, and therefore would not be in the navigation channel.

### 3.1.3.3        Elasmobranchs

Smalltooth sawfish and giant manta ray have been reported captured in relocation trawling in areas outside of the action area. While no smalltooth sawfish have been reported captured during relocation trawling in the SARBO action area, 5 smalltooth sawfish were captured in Tampa Bay in 2019 (outside of the SARBO action area). Since relocation trawling in the action area has been limited, these captures indicate that smalltooth sawfish captures are also possible within the SARBO action area, and is discussed further in Section 6 of the Opinion.

We have anecdotal records of giant manta ray captures in relocation trawling associated with dredging in the Gulf of Mexico prior to listing of this species. As relocation trawling in the action area has been limited over the last 15 years, we believe that relocation trawling captures of this species may also occur in the future as a result of the proposed action. Therefore, we believe that relocation trawling is likely to adversely affect smalltooth sawfish and giant manta ray, which is discussed further in Section 6 of this Opinion.

We believe there will be no effect to scalloped hammerhead shark from relocation trawling. This Opinion does not cover relocation trawling in the U.S. Caribbean, which is the only area where the ESA-listed DPS occurs within the action area.

### 3.1.3.4        ESA-listed Whales

We are unaware of relocation trawling captures of, or other interactions with, ESA-listed whales, from relocation trawling and believe there will be no effect to these species from relocation trawling activities analyzed under this Opinion beyond the potential for vessel strikes (discussed at Section 3.1.4 of this Opinion), or entanglement with other loose lines in the water (discussed in at Section 3.1.2).

### 3.1.4        Vessel Strike

Mobile ESA listed species may be struck by vessels transiting or working within the action area, as analyzed below for each species. The previous analysis in Section 3.1.1 of this Opinion considered the risk of interaction with equipment as it is dredging and moving material. This section considers the risk of a vessel strike as the vessels and equipment travel within the action area.

### 3.1.4.1        Sea Turtles

Sea turtles (green, Kemp's ridley, hawksbill, leatherback, and loggerhead) may be physically injured if struck by transiting vessels working on a project. Sea turtles are susceptible to vessel collisions and propeller strikes because they regularly surface to breathe and may spend a considerable amount of time on or near the surface of the water. However, we believe a sea turtle being struck by a vessel operating for a project covered under this Opinion is extremely unlikely and therefore believe that this route of effect is discountable.

120

**Defendants' Exhibit C**

Dredging and placement activities and relocation trawling covered under this Opinion will be done by vessels that are slow moving or generally stationary while working, such as barge-mounted equipment, or hopper dredging vessels that are actively dredging or transporting a load of material to a disposal site. We expect that sea turtles would avoid interactions with these slow moving vessels and equipment. The vessels associated with activities covered under this Opinion that are likely to be moving faster are limited to support vessels like crew boats and survey vessels. All vessel operators and crew are required to monitor for the presence of ESA-listed species and follow guidance on distances to avoid them or shut down operations if they are in close proximity (PSO PDCs Section 1 of Appendix H). Vessels used for these activities are the same vessels used for all dredging and placement projects and, although particular projects may result in localized traffic increases while a project is underway, will not result in an increase in vessel traffic within the overall action area. At this time, we are unaware of any sea turtles identified with a vessel strike injury that have been directly related to activities associated with activities that will now be included in the 2020 SARBO proposed action.

### 3.1.4.1.1  Sturgeon

Sturgeon (Atlantic and shortnose) are susceptible to vessel strike if a deep draft vessel encounters the animals at the sea floor or if the sturgeon moves up into the water column or is sucked into the propeller. We believe that a sturgeon being struck by a vessel associated with a project covered under this Opinion is extremely unlikely. We therefore believe that this route of effect is discountable. NMFS Greater Atlantic Region has stated that reported strandings in the Northeast seem to be related to the large shipping vessels traversing narrow waterways over areas where sturgeon seem to be aggregating. Large vessels have typically been implicated because of their deep draft relative to smaller vessels, which increases the probability of vessel collision with demersal fishes like sturgeon, even in deep water (Brown and Murphy 2010). Also, Miranda and Kilgore (2013) estimated that the large towboats on the Mississippi River, which have a propeller diameter of 2.5 m, a draft of up to 9 ft., and travel at approximately the same speed as tugboats (less than ten knots), kill a large number of fish by drawing them into the propellers. They indicated that shovelnose sturgeon (*Scaphirhynchus platorynchus*), a small sturgeon (~50-85 cm in length) with a similar life history to shortnose sturgeon, were being killed at a rate of 0.02 individuals per kilometer traveled by the towboats.

Historically, vessel strike strandings in the action area have been rare, which was assumed to be because the channels in the action area are wider than those in NMFS Greater Atlantic Region and sturgeon were able to move out of the way of vessel traffic. However, NMFS Southeast Region began dispersing "Report Sturgeon" signage in North Carolina in July 2018, with a particular focus on the Cape Fear River. Since those signs were deployed, 5 sturgeon strandings, showing evidence of a vessel strikes, were reported from Cape Fear River. The increase in reporting may be due to the placement of signs asking citizens to report that were posted June 2018 and the designation of Atlantic sturgeon critical habitat (82 FR 39160, Publication Date August 17, 2017). Additional reports of sturgeon strandings showing signs of vessel strikes have been reported in sturgeon rivers. There is no directed survey for sturgeon strandings and all records are opportunistically reported by the public or resource managers that happen to find an animal, usually on a beach or river bank. A number of the rivers in the Southeast where sturgeon are present are bounded by areas not easily accessible to the public. Thus, a number of sturgeon strandings/carcasses may go unreported simply because they are not detected. We are working with researchers and action

**Defendants' Exhibit C**

agencies to determine which monitoring regimes provide accurate attribution of sturgeon carcasses/strandings to dredge-related activities.

We believe that vessel traffic associated with projects covered under this Opinion are not likely to result in a vessel strike. The rivers in the Southeast tend to be wider than those in the Northeast where vessel strikes occurred and likely provide more room for sturgeon to escape a strike. Sturgeon in the Southeast also generally appear to aggregate in areas outside of heavily trafficked shipping channels, unlikely areas commonly reporting sturgeon vessel strikes in the Northeast. There is currently no evidence that sturgeon are struck by vessels outside rivers. NMFS continues to review available information on strandings to determine if slow moving vessels in sturgeon rivers could result in a sturgeon vessel strike. Currently, we have no reports of vessel strikes by dredge or transit vessels in the action area, and, as stated above, the activities covered under this Opinion will not increase vessel traffic in the action area. In addition, the continued maintenance of navigation channels may allow these areas to maintain clearance between the river bottom where sturgeon are likely to occur and vessels traveling these channels thereby reducing the risk of vessel strikes from all vessels.

### 3.1.4.1.2  Nassau Grouper

Vessel traffic/boat strikes will not affect Nassau grouper as they are demersal (bottom-dwelling) fish that associate with habitat types where work will not be occurring under this Opinion such as hardbottom and reef habitat in South Florida and nearshore lagoon habitat with seagrass and mangrove habitat in the U.S. Caribbean. We believe that their association with these habitats where work covered under this Opinion will not occur, coupled with their demersal life history lead to a no effect determination. In addition, the General PDCs in Section 2.2 of Appendix B limit work on or near hardbottom, reef, and seagrass habitats  and the Coral PDCs protect hardbottom and reef habitat within the range of ESA-listed corals which overlaps with the range of this species (Coral PDCs in Appendix C).

### 3.1.4.1.3  Elasmobranchs

While both recreational and commercial vessel traffic have been documented to adversely affect protected species, little information exists on vessel interactions with smalltooth sawfish, and scalloped hammerhead shark. Giant manta rays are a recently-listed species (83 FR 2916, Publication Date January 22, 2018) and information is still being collected on the risk of vessel strikes, as discussed below.

- Based on our review of the best available scientific information, we believe that the a vessel strike with a giant manta ray is extremely unlikely, and therefore we believe that this route of effect is discountable. As discussed in the giant manta ray status of the species in Section 4.1.4 of this Opinion, vessel strikes can injure or kill giant manta rays, decreasing fitness or contributing to non-natural mortality (Couturier et al. 2012; Deakos et al. 2011). Giant manta rays can be frequently observed traveling just below the surface and will often approach or show little fear toward humans or vessels (Coles 1916b), which may also make them vulnerable to vessel strikes (Deakos 2010). However, information about interactions between vessels and giant manta rays is limited. We have at least some reports of vessel strike, including a report of five giant manta rays struck by vessels from 2016 through 2018; individuals had injuries (i.e., fresh or healed dorsal surface propeller scars) consistent with a

**Defendants' Exhibit C**

vessel strike.  These interactions were observed by researchers conducting surveys from Boynton Beach to Jupiter, Florida (J. Pate, Florida Manta Project, pers. comm. to M. Miller, NMFS OPR, 2018) and it is unknown where the manta was at the time of the vessel strike.  The giant manta ray is frequently observed in nearshore coastal waters and feeding at inlets along the east coast of Florida.  As recreational vessel traffic is concentrated in and around inlets and nearshore waters, this overlap exposes the giant manta ray in these locations to an increased likelihood of potential vessel strike injury especially from faster moving recreational vessels.  Yet, few instances of confirmed or suspected strandings of giant manta ray are attributed to vessel strike injury.  This lack of documented mortalities could also be the result of other factors that influence carcass detection (i.e., wind, currents, scavenging, decomposition etc.); however, giant manta rays appear to be able to be fast and agile enough to avoid most moving vessels, as anecdotally evidenced by videos showing rays avoiding interactions with high speed vessels.  Some vessel traffic associated with this Opinion will occur in inlets and passes where this species may be found in higher concentrations when dredging these channels; however, vessels involved with relocation trawling or transiting for work covered under this Opinion will be traveling slowly while working in these areas and giant manta rays are mobile species that appear to be able to be responsive to activity in the area and able to move out of the way of at least slow moving equipment.  All other, and faster moving, vessel traffic will occur in areas where giant manta rays are expected to be present in much lower concentrations.  Due to the expected low concentration of animals in areas where high speed vessel traffic will occur, very limited reports of vessel interactions, and this species' ability to avoid moving vessel traffic outside of confined spaces, we expect that it is extremely unlikely that vessels outside of nearshore inlets and passes will encounter giant manta rays.

- We believe that a vessel strike to smalltooth sawfish is extremely unlikely and therefore conclude that this route of effect is discountable.  Smalltooth sawfish are primarily demersal and rarely would be at risk from moving vessels.  As vessels need sufficient water to navigate without encountering the bottom, vessels typically transit shoal areas with marginal clearance cautiously (i.e., slowly).  Accordingly, we would expect smalltooth sawfish to move out of the way if a vessel came close, and impacts with these species are not anticipated.

- We believe that the risk of a vessel strike to scalloped hammerhead sharks is so low that we expect no effect.  The only area that the scalloped hammerhead shark is listed within the action area is in U.S. Caribbean.  While there is anecdotal information indicating vessel strikes on shark species do occur, such as when sharks are basking are cruising near the surface, strikes on these particular shark species are not expected due to their preference for offshore pelagic waters outside of the action area, limited time they spend at or near the surface, that they would likely to be seen if at the surface by their large dorsal fin protruding above the water's surface, and due to the limited work about of work expected to be covered under this Opinion in the U.S. Caribbean.

### 3.1.4.1.4   ESA-listed Whales

ESA-listed whales (blue, fin, Sei, sperm, and North Atlantic right whale) are known to be susceptible to vessel strike collisions that can lead to death; however, we believe that a vessel strike is extremely unlikely and that this route of effect will be discountable based on the PDCs of this Opinion.

**Defendants' Exhibit C**

North Atlantic right whales are particularly susceptible to vessel strikes due to their cryptic coloring and the lack of a dorsal fin, which make them hard to spot when at the surface. Unlike other whale species in the area, they spend their lives close to shore, often within less than 30 m of water depth where vessel traffic is most prevalent earning them the title of an "urban whale." To address this risk, NMFS published a rule in 2008 (73 FR 60173, Publication Date October 10, 2008) that established vessel speed restrictions to reduce the likelihood of fatal collisions with right whales. Speed restrictions apply in specific locations, primarily at key port entrances, and in certain times in seasonal management areas. The restrictions apply to vessels 65 ft and greater in length. NMFS also established a Dynamic Management Area program whereby vessels are requested, but not required, to either travel 10 knots or less or route around locations when certain aggregations of right whales are detected outside seasonal management areas (73 FR-60173, Publication Date October 10, 2008). Vessels owned or operated by, or under contract to, Federal agencies are exempt from the mandatory application of this rule as a consideration for national security, navigational and human safety missions. As acknowledged in the Final Rule implementing speed restrictions, Federal agencies have an obligation to consult under Section 7 of the ESA regarding how their activities may affect listed species. As provided for in the PDCs of this Opinion, all vessel operations related to projects authorized under this Opinion will follow all of the requirements set forth in this Opinion.

We have numerous reports of vessels strikes on North Atlantic right whales. In 2009, a vessel operator of a 33-ft cruiser vessel reported striking a right whale off New South Wales, Australia. The Australia Department of Environment and Climate Change's Marine Wildlife Situation Report reported that a dead Southern right whale was found a week later 20 km from the collision site and concluded that "it is likely the incidents are linked"(Wiley 2016). This vessel strike report is the smallest vessel known to have killed a right whale and is the reason that NMFS considers all vessels over 33 ft in length to be at risk of a lethal interaction with a right whale. Other reports have been received of vessels that have resulted in lethal vessel strikes to North Atlantic right whale for vessels between 33-65 ft in length (33 ft being the smallest reported lethal strike and 65 ft being the size in which speed restrictions are required under the rule for vessels traveling in designated areas in the United States (73 FR 60173, Publication Date October 10, 2008).

We also have reports of vessel collisions with North Atlantic right whales from vessels similar in size and design as those used by the USACE for surveying dredging operations under this Opinion. In April 2009, the *R/V Auk* struck a right whale while traveling at approximately 20 kts off the coast of Massachusetts (42°11.2'N, 70°33.7'W) (SBNMS 2009; Wiley 2016). Both the *R/V Auk* and *Florida II* (the survey vessel currently operated by the USACE in the action area) are hydrofoil-assisted catamaran vessels with the *R/V Auk* being a 50-ft vessel, while the Florida II is a 62-ft vessel. At the time of the *R/V Auk* strike, 3 experienced whale watch observers were on the fly bridge, the mate was at port side of bridge, and the Captain was at the helm in the cabin. The mate saw the whale roughly 30 ft ahead of the *R/V Auk* and said "whale," but the Captain could not pull back throttles in time to avoid a strike. Whale watch observers saw the whale when it was about 4 ft in front of the *R/V Auk*. The observers noted a fresh wound of multiple (7-8) lacerations and fresh bleeding on the left ventral fluke. They also noted that the whale exhibited abnormal behavior after being struck: the whale was rolling on its left flank while keeping the right fluke tip above the water and exhibiting stressful behavior.

**Defendants' Exhibit C**

The *R/V Auk* ship strike incident demonstrates that even with well-trained marine mammal observers and vessel operators, all vessels, even research vessels, have the potential to strike cetaceans.  In this particular instance, there were 3 dedicated marine mammal observers, but no indication of the animal's presence prior to the initial sighting within 30 ft of the vessel by the mate.  The vessel was traveling at approximately 20 knots, which, while not required for a vessel of its size (50 ft), is well above the 10 knots restrictions that were active at the time within the area for larger vessels (greater than 65 ft), and the restrictions that will apply under the PDCs of this Opinion.  Winds were 20-23 knots out of the northeast, and wave heights were approximately 4.3 ft, which is not ideal for spotting marine mammals.  This is 1 of only 2 instances of research vessel ship strikes ever been reported over the years of cetacean research under MMPA permits.  Neither incident appeared to be lethal (Wiley 2016).

We are aware of 2 reports of a hopper dredge collision with a right whale.  One report occurred in South Africa in 1984 involving a Southern right whale and the other report occurred in Brunswick Harbor (within the action area) in 2005, though the report is contested by the USACE.  The 1984 report stated that a hopper dredge approaching the river-mouth entrance of East London Harbour, South Africa, had report of the presence of a cow-calf pair at the harbor entrance and had been warned to be on the lookout.  As the dredge entered the harbor, a Southern Right whale and calf surfaced directly in front of the ship's bow.  The calf took the full brunt of the impact and had the full length of the vessel pass over it before the propeller caught it.  After attempts by the mother to support the bleeding calf, it made its way across the river to a small sandy beach where it stranded and died shortly afterwards.  Photographs of the dead calf show at least 3 separate curved incisions through the dorsal blubber.  The mother whale stayed in the area for several hours, and a large crowd of workers had to 'shout and do everything they could' to stop the cow from beaching herself (Daily Dispatch, 17 October 1984).  It is unknown the speed at which this vessel was traveling at the time of the incident.

The information available on the 2005 incident in Brunswick Harbor was gathered by NMFS as described below (C. Slay, Coastwise Consulting, pers. comm. to B. Zoodsma, NMFS Southeast Region, February 24, 2005) (M. Zani, New England Aquarium, pers. comm. B. Zoodsma, NMFS Southeast Region, February 24, 2005).  On February 24, 2005[28], observers and crew aboard the bridge of the dredge W450 *RN Weeks* felt a "bump" while the dredge was transiting to the Brunswick Harbor Entrance Channel from the offshore dredged material disposal site.  The bump or slight shudder was reportedly similar to what might be expected if the vessel had hit something.  The ship was moving at 8 kts, on a magnetic heading of 005, at 31° 03.3'N and 81° 16.6'W when this occurred.  The observers on the bridge began scanning the water surface as the mate on watch immediately "pulled back" on the controls.  What was believed to be the pectoral flipper of a right whale was seen and initially reported as "300-400 ft astern of the ship"[29].  The pectoral flipper made a waving motion above the surface for approximately 5 seconds before the whale submerged.  The dredge had coasted to near full stop, but 3-4 ship lengths had been covered (900-1,200 ft).  The observers continued to scan with binoculars for 15 minutes, but nothing could be seen at the surface: no whale, no discoloration of the water and no ripples or disturbance.  Observers aboard the *BE Lindholm* (another dredge working in the area) reported seeing a whale's blow in the same

---

[28] Four right whale aerial surveys were being flown during the 2004/2005 right whale calving season.  The 2 closest in proximity to the Brunswick Harbor were not flying at the time due to "fog and required pilot down time" (P. Naessig 2/24/2005 email) and "fog and forecasted rain and thunderstorms" (M. Zani 2/24/2005 email).
[29] The distance was later modified to 500 ft (C. Slay 2005 unpub. report).

**Defendants' Exhibit C**

general area.  The central early warning system (EWS) aerial survey team was dispatched to search for a potentially injured whale.  The survey team searched for just over 2 hours - they reported unfavorable sighting conditions with light rain and patchy fog during the first hour.  During the second hour, the team detected a mother/calf pair at 31.06°N, -81.21°W and within the vicinity of the collision.  No other in-water objects that may have caused the dredge to shudder were reported by the aerial survey team.

We believe that the risk of a vessel strike occurring during a project analyzed under this Opinion is very low,[30] since we are only aware of 2 reported interactions with vessels related to dredging, worldwide with North Atlantic or the closely related South Atlantic right whales despite decades of dredging both within the action area and globally.  However, the consequences of potential take of a North Atlantic right whale to the small population of the species is high.  While we do not normally discuss the status of a species when evaluating effects to a species if the effects from the action are not likely to adversely affect the species, the risk of vessel strikes and potential outcome of a strike to a North Atlantic right whale is unique due to the critical status of the population of this species.  Key factors that affect the status of this species include an already low population size that is declining, a decline in the number of calves born annually with none born during the 2017-2018 calving season, an increasing number of years between calving cycles for reproductive females, and evidence of declined health of the reproductive females of this species.  Additionally, the action area for this Opinion also includes the only calving grounds for North Atlantic right whales, meaning that smaller calves may be present.  Due to their smaller size, calves are at an increased risk of mortality from vessel strikes.

With the considerations outlined above for North Atlantic right whales, the *North Atlantic Right Whale Conservation Plan* (Appendix F) was developed cooperatively by NMFS, USACE, and BOEM and for a project to operate under the 2020 SARBO, the conservation measures outlined in this plan must be followed.  Specifically, the Plan provides funding for aerial surveys with the portions of the action area where North Atlantic right whales may be present, which includes an expansion of current aerial survey coverage area.  The SARBO 1997 survey area was limited to portions of northeast Florida and Georgia during times when this species may be present.  The expanded area will extend north of the SARBO 1997 survey area to cover the remaining portions of the action area where this species may be present.  The *North Atlantic Right Whale Conservation Plan* in Appendix F describes how, when, and where surveys will be completed by continuing the existing aerial survey and adding up to 2 additional survey teams focused on detecting North Atlantic right whales migrate from their northern feeding areas outside of the action area to the southern calving area in the action area.  The *North Atlantic Right Whale Conservation Plan* also details how notification of the presence of these whales will be communicated.  Reports of North Atlantic right whale presence from both the aerial surveys and reports from crew working on projects covered under this Opinion if this species is observed will then be broadcast to other commercial mariners in the area triggering speed restrictions for vessels associated with the projects covered under this Opinion within a specified distance of the whale sighting and will be sent as an alert to commercial vessels in the area to be on the lookout for their presence.  Increasing the surveyed area also increases the probability of observing all whales and

---

[30] For discussion about some of the background of the approach to North Atlantic right whales, see Section 1.2.5 of this appendix.

**Defendants' Exhibit C**

calves that enter the southeast, which adds increased confidence in total population numbers and calves born each year.

The *North Atlantic Right Whale Conservation Plan* (Appendix F) also requires that a PSO trained to identify ESA-listed species be aboard all hopper dredges to observe for ESA-listed species and alert the captain of their presence to minimize the risk of a vessel strike.  If a North Atlantic right whale is identified, whether by shipboard observation or aerial survey, all vessels within 38 nautical miles (nmi) and over 33 ft in length that are associated with a project covered under this Opinion will be required to slow to 10 knots, as required in the North Atlantic Right Whale Plan (Appendix F) when working when and where North Atlantic right whales may be present in the action area.  The distance of 38 nmi was chosen based on the distance that the vast majority of North Atlantic right whales travel in 24 hours.  To determine the appropriate distance, 177 pairs of North Atlantic right whale sightings in the Southeast calving area that were 24 hours apart were reviewed.  The average distance between sightings 24 hours apart was 14.56 nmi (standard deviation of 12.32 nmi), 95th percentile was 38 nmi, and the maximum recorded distance was 85 nmi in 24 hours (Gowan 2014 unpublished analysis).  The 10 knot speed restriction is based on the information presented in NMFS's *Final Rule to Implement Speed Restrictions to Reduce the Threat of Ship collisions with North Atlantic Right Whales* (73 FR 60173, Publication Date October 10, 2008) that determined that 10 knots was the appropriate speed to reduce mortality resulting from a ship strike.  The rule also noted that the strike risk posed by a conventional ship moving 20-25 knots could be reduced by 30% by slowing to 12 or 13 knots, and by 40% at 10 knots, due to the whales' increased ability to detect and avoid approaching vessels.

Because there are so few North Atlantic right whales, and much of the vessel traffic associated with the proposed action will take place outside of areas and times when North Atlantic right whales may be present, the likelihood of collisions is already very rare.  We believe that the implementation of these additional protective measures in the PDCs further reduces the possibility of a vessel strike.  When the rarity of occurrence is combined with the requirements of the *North Atlantic Right Whale Conservation Plan*, we believe a vessel strike is extremely unlikely to occur.

We believe that a vessel strike to the other ESA-listed whales in the action area (blue, fin, Sei, and sperm) is also extremely unlikely to occur.  Therefore, we believe that this route of effect is discountable.  These whales tend to be deeper water species typically found off the continental shelf in waters deeper than where work covered under this Opinion will generally occur, except placement in ODMDS and borrow material dredging.  Additionally, while the PDCs in the *North Atlantic Right Whale Conservation Plan* are specifically designed for the protection of that species, the PDC requirement for slower speed vessels and observers on dredging vessels provide protection to all whale species, if present, by improving awareness of the potential presence of North Atlantic right whale in the area by aerial surveys and imposing speed restrictions when and where they may be present.

### 3.1.5       Species Interaction with the Placement of Material

This Opinion covers placement of material by multiple types of equipment, including side-cast, split/hull hopper placement, and pipeline placement described in Section 2 of this Opinion.  Generally, all of these methods are used to deposit material through the water column to the sea floor or to place it on land for upland disposal or beach nourishment.  Placement may occur in a

**Defendants' Exhibit C**

nourishment projects are not covered under this Opinion in the U.S. Caribbean where these critical habitat units occur.

### 3.3.4        Loggerhead Sea Turtle Critical Habitat

Loggerhead sea turtle critical habitat was designated along the southeast Atlantic coast of the United States, around the Florida peninsula, and through the Gulf of Mexico to Texas (79 FR 39855, Publication Date July 10, 2014), of which the portions off of North Carolina, South Carolina, Georgia, and the east coast of Florida and the Florida Keys are within the action area of this Opinion.  Loggerhead critical habitat is divided into 5 different units: nearshore reproductive habitat, winter habitat, breeding areas, constricted migratory habitat, and *Sargassum* habitat.  All of the features of these habitat units are provided in Table 25.  For loggerhead sea turtle critical habitat, additional information about the PBF was provided to explain the PBF, referred to in Table 25 as the PCE.

**Defendants' Exhibit C**

**Table 25.  NWA DPS of Loggerhead Sea Turtle Critical Habitat PBFs**

| Habitat Type | Units | State | PBF | PCE |
|---|---|---|---|---|
| Nearshore Reproductive Habitat | LOGG-N-3 through N-6<br><br>LOGG-N-7 through N-11<br><br>LOGG-N-12 and N-13<br><br>LOGG-N-14 through N-32<br><br>LOGG-N-33<br><br>LOGG-N-34 through N-36 | North Carolina<br><br>South Carolina<br><br>Georgia<br><br>Florida<br><br>Florida, Alabama<br><br>Alabama, Mississippi | Portion of nearshore waters adjacent to nesting beaches that hatchlings use as egress to the open-water environment. Also used by nesting females to transit between beach and open water during the nesting season. | 1.  Nearshore waters with direct proximity to nesting beaches that support critical aggregations of nesting turtles (e.g., highest density nesting beaches) to 1.6 km (1 mile) offshore<br><br>2.  Waters sufficiently free of obstructions or artificial lighting to allow transit through the surf zone and outward toward open water<br><br>3.  Waters with minimal man-made structures that could promote predators (i.e., nearshore predator concentration caused by submerged and emergent offshore structures), disrupt wave patterns necessary for orientation, and/or create excessive longshore currents |
| Winter Habitat | LOGG-N-1 and N-2 | North Carolina | Warm water habitat south of Cape Hatteras, near the western edge of the Gulf Stream, which supports meaningful aggregations of juveniles and adults | 1.  Water temperatures above 10°C during the colder months of November through April<br><br>2.  Continental shelf waters in proximity to the western boundary of the Gulf Stream<br><br>3.  Water depths between 20-100 m) |
| Concentrated Breeding Habitat | LOGG-N-17 and N-19 | Florida | Sites that support meaningful aggregations of both male and female adult individuals | 1.  Meaningful concentrations of reproductive male and female loggerheads<br><br>2.  Proximity to primary Florida migratory corridor<br><br>3.  Proximity to Florida nesting grounds |
| Constricted Migratory Corridor Habitat | LOGG-N-1<br><br>LOGG-N-17 through N-19 | North Carolina<br><br>Florida | High-use migratory corridors that are constricted (limited in width) by land on one side and the edge of the continental shelf and Gulf Stream on the other side | 1.  Constricted continental shelf area relative to nearby continental shelf waters that concentrate migratory pathways<br><br>2.  Passage conditions to allow for migration to and from nesting, breeding, and/or foraging areas |

### 3.3.4.1        Nearshore reproductive habitat

Nearshore reproductive habitat is located within 1 mile from shore in areas with sea turtle nesting beaches and found within the action area from North Carolina to south Florida.  We believe that dredging or the placement of materials and the transportation of materials may affect, but is not likely to adversely affect the waters sufficiently free of obstructions or artificial lighting to allow transit through the surf zone and outward toward open water feature of loggerhead sea turtle critical habitat.  We believe the effects to this feature will be insignificant. The General PDCs in Section 1.2 in Appendix B describe beach nourishment covered under this Opinion and the General PDCs in Section 2.2 in Appendix B provide conditions that limit how and where material is placed and minimize lighting on construction equipment.  Based on the

**Defendants' Exhibit C**

PDCs, lighting on construction equipment near nesting beaches will be turtle friendly so as not to disorient hatchlings returning to the ocean. The PDCs also state that material placement and equipment will be staged in a manner that would not block access of ESA-listed species, including the access of nesting sea turtles to the beach or of hatchlings returning to the water. This includes the placement of sand in a manner that would not mound or block access to sea turtle nesting beaches, except for the temporary placement of sand berms during beach nourishment projects designed to minimize turbidity during placement of sand. In addition, beach placement covered under this Opinion, if any, will be limited to activities that follow all PDCs in this Opinion such as those designed to ensure project activities and equipment do not obstruct species movement such as that of sea turtles entering or exiting the beach when nesting or species moving along the shoreline (General PDC Section 2.2 in Appendix B).

Nearshore reproductive habitat only extends 1 mile from shore and most borrow sites and all ODMDS sites occur outside of this range. A few limited borrow sites associated with entrance channel dredging or a specific beach nourishment project occur within this range, but would only be used when work in the associated channel or beach is completed. Since projects during nesting season would require additional review and permitting outside of NMFS purview, we anticipate the dredging or placement of materials in these areas will be limited. If these areas are used during nesting season, activities will need to follow the same in-water PDCs discussed above for beach nourishment projects designed to ensure placement of material does not obstruct species movement such as that of sea turtles entering or exiting the beach when nesting or species moving along the shoreline.

### 3.3.4.2        Winter habitat

Winter habitat is restricted to waters off of North Carolina. Dredging or material placement in this location would be limited to ODMDS or borrow sites due to its distance of over 4 miles from shore. We believe that dredging or material placement, transportation of materials, or geophysical surveys would have no effect on the features of loggerhead sea turtle critical habitat, specifically the water temperature, proximity to the Gulf Stream, or availability of water depths between 20-100m. Even minor changes in depth from dredging, placement, or geophysical surveys would not change the depth range defined in the critical habitat feature.

### 3.3.4.3        Concentrated Breeding Habitat

Breeding areas within the action area are limited to 2 sections off the central and south Florida coast. We believe that placement of materials, transportation or materials, or geotechnical surveys will have no effect on the features of loggerhead sea turtle critical habitat breeding areas due to the PDCs restricting placement of equipment and materials that block access to nesting beaches.

The features are related to density of reproductive loggerheads and their proximity to the migratory corridors and nesting grounds. None of these activities will adversely affect the density of turtles or change migratory pathways.

Dredging of materials by hopper dredging or relocation of turtles may affect, but is not likely to adversely affect the high densities of reproductive male and female loggerheads feature of

**Defendants' Exhibit C**

loggerhead sea turtle critical habitat breeding areas.  We believe that a potential minor changes in numbers from hopper dredge take or temporarily relocating of turtles (adverse effects to the species) during discrete projects would have a temporary and therefore insignificant effect on the "high density" feature.  Relocation trawling temporarily relocates turtles approximately 3 miles away, and therefore within the same general breeding area. Relocation accordingly does not significantly change the density of reproductive loggerheads in the area.  The potential take of a small number of turtles by dredging in a limited area would not meaningfully change the high density feature.

### 3.3.4.4        Constricted migratory habitat

Constricted migratory habitat within the action area is located along the portion of the North Carolina shoreline and from central Florida to the Keys.  We believe that dredging, placement of materials, transportation or materials, or geotechnical surveys will have no effect on the features of loggerhead sea turtle critical habitat constricted migratory areas.  The features of this habitat are related to the geographic features of the area allowing passage along the continental shelf and migration to and from nesting, breeding, and foraging areas.  None of these maintenance activities are large enough in scope or scale to affect the migratory pathways and would therefore have no effect to this feature.

### 3.3.4.5        Sargassum habitat

*Sargassum* habitat is located offshore in the action area along the coast from North Carolina to the Florida Keys.  The critical habitat area nears shore along a portion of the Florida coast and includes 2 identified ODMDS sites.  We believe that dredging, placement of materials, transportation of materials, or geotechnical surveys will have no effect on the features of loggerhead sea turtle critical habitat *Sargassum* habitat.  The features of this habitat are the currents and temperatures that support floating communities accumulating floating mats of *Sargassum* and associated flora and fauna.  These mats are used by loggerhead sea turtle hatchlings for foraging and refuge.  None of the activities in this Opinion are large enough in scope or scale to damage these floating mats.  Transportation through the area may temporarily separate these mats, but will not remove, destroy, or pollute them allowing them to continue to function for the purposes of hatching development.

### 3.3.5        Johnson's Seagrass Critical Habitat

The action area of this Opinion encompasses all areas designated as Johnson's seagrass critical habitat, which is located in 10 separate areas in the coastal lagoon system of southeast Florida. The Johnson's seagrass critical habitat PBFs are provided in Table 26 below.

**Table 26.  Johnson's Seagrass Critical Habitat PBFs**

| Johnson's seagrass (65 FR 17786, Publication Date: April 5, 2000) | Based on the best available information, general physical and biological features of the critical habitat areas include adequate water quality, salinity levels, water transparency, and stable, unconsolidated sediments that are free from physical disturbance. |
|---|---|

**Defendants' Exhibit C**

As discussed in Section 1.1.1 of the Johnson's Seagrass PDCs in Appendix D, the following areas are not considered critical habitat (items 1-3 below) or are areas that we believe are not functioning as critical habitat (items 4-7 below) and activities occurring in these areas will have no effect on critical habitat.  It is important to note that areas not considered critical habitat (items 1-3 below) may still have effects to the species if it occurs in this area, as was discussed in Section 3.2.1 of this Opinion.

1. Areas within the geographic boundary of critical habitat that do not support all 4 physical and biological features listed above.  This is the only designated critical habitat within the SARBO action area that requires the presence of all of the physical and biological features to be functioning critical habitat.

    a.  Areas deeper than 13 ft are assumed to be too deep to support adequate water transparency for Johnson's seagrass growth.  Studies show that Johnson's seagrass occurs in waters shallower than 10-13 ft (3-4 m) (NMFS 2007a).  Water depths greater than 13 ft are not believed to provide the water transparency necessary for sufficient sunlight to reach the sea floor to support Johnson's seagrass growth.  Therefore, we consider the water transparency PBF of Johnson's seagrass critical habitat not to be present in waters deeper than 13 ft.  All areas within the critical habitat designation, but in waters deeper than 13 ft, are accordingly not considered to be functioning critical habitat for the analysis in 2020 SARBO.

    b. Consolidated sediments (e.g., hardbottom).

    c. Areas with accumulated material that precludes seagrass growth (e.g., thick muck).

2. The 18.5–km-long portion of the navigation channel within the Intracoastal Waterway that occurs within the geographical limits of Johnson's seagrass is excluded from critical habitat (65 FR 17786, Publication Date April, 5, 2000,  page 17791, item 4).

3. A portion of northern Biscayne Bay.  The geographic limits of Johnson's seagrass critical habitat align with the boundaries of the Biscayne Bay Aquatic Preserve.  The USACE and NMFS have interpreted this to mean that some of the man-made canals in this area are not in Johnson's seagrass critical habitat, because they are not part of the Biscayne Bay Aquatic Preserve.  A GIS layer is available as a tool to clarify whether a particular project is located inside or outside of critical habitat based on the Aquatic Preserve geographic boundary (https://sero.nmfs.noaa.gov/maps_gis_data/index.html).

We believe activities covered under this Opinion will have either no effect or an insignificant effect on Johnson's seagrass critical habitat.

- Maintenance dredging within the IWW: Approximately 11.5 miles (~18.5 km) of the IWW run through Johnson's seagrass critical habitat; however, this federal navigation channel was excluded from designated Johnson's seagrass critical habitat (65 FR 17786, Publication Date April 5, 2000) and therefore activities in the IWW channel will have no effect to Johnson's seagrass critical habitat.  Any Johnson's seagrass growing within the channel is addressed separately in the effects to the species analysis in this Opinion.  Effects from turbidity and sedimentation to adjacent areas of critical habitat are considered separately, below.

**Defendants' Exhibit C**

- Borrow sites: Dredging in borrow areas in Johnson's seagrass critical habitat is limited to only the borrow site located at the entrance of Jupiter Inlet where the inlet meets the IWW, which creates a shoal that is frequently dredged for sand used for beach nourishment projects. This 20.56 acre borrow site referred to as Baker's Haulover is in a dynamic shoal area that lacks seagrasses and is frequently dredged and therefore does not support the "stable, unconsolidated sediments that are free from physical disturbance" feature of critical habitat and is therefore not functioning as critical habitat.

- Geotechnical surveys: Geotechnical surveys are prohibited in areas where Johnson's seagrass is present and where the features that support Johnson's seagrass are present (defined in Johnson's Seagrass PDC Section 1.2) and therefore there will be no effect to critical habitat from this activity.

- In-water placement: The Johnson's seagrass PDCs do not cover projects that would have in-water placement of dredged materials in Johnson's seagrass critical habitat and therefore there will be no effect to critical habitat from this activity.

- Dredging and in-water placement deeper than 13 ft: The Johnson's Seagrass PDCs (Johnson's seagrass PDC Section 3 in Appendix D) limit material placement within the range of Johnson's seagrass to only areas that are deeper than 13 ft and therefore not expected to support the PBFs of Johnson's seagrass. Studies show that Johnson's seagrass occurs in waters shallower than 10-13 ft (3-4 m) (NMFS 2007a). Areas deeper than 13 ft are assumed to be too deep to support adequate water transparency for Johnson's seagrass growth, which is a PBF of critical habitat and if it is not present then the area is not functioning as Johnson's seagrass critical habitat. Because these areas are not functioning critical habitat, dredging or material placement in these deeper water areas will have no effect to Johnson's seagrass critical habitat.

- Placement of equipment: We believe that the placement of equipment and the transportation of materials by pipeline, hopper dredge, barge, or scowl, may temporarily affect the PBFs of water quality, transparency and stable unconsolidated sediments. These activities would not be expected to impact salinity. Placement of equipment in Johnson's seagrass critical habitat may result in turbidity, decreased water quality, and destabilization of sediments. However, we expect any effects will be insignificant. Placement of equipment in Johnson's seagrass critical habitat would only temporarily impact its availability to the species, and the habitat would return to being fully functional following removal of the equipment. Additionally, the Johnson's seagrass PDCs in Section 2 in Appendix D state that placement of equipment and materials will avoid areas with any seagrasses, which we would expect to also be areas with functioning critical habitat. In cases where pipeline placement cannot avoid seagrass, floating pipelines will be used instead of anchored pipelines. We expect any effects associated with equipment placement in functioning critical habitat to be insignificant as they will be temporary and limited in geographic extent, and the critical habitat would remain fully functional upon removal.

- Turbidity and Sedimentation: Dredging and material placement may temporarily affect the water transparency PBF in the areas surrounding these activities, such as the areas adjacent to maintenance dredging in the IWW, or other dredging near the boundary of critical habitat. The Johnson's seagrass PDCs (Johnson's seagrass PDCs in Section 2 in Appendix D) limit the type of dredging equipment that can be used within the range of Johnson's seagrass, to

Defendants' Exhibit C

minimize turbidity generated that could affect the adequate water quality and water transparency PBF in surrounding areas and to minimize that turbidity from resulting in sedimentation that could affect the stable, unconsolidated sediments that are free from physical disturbance PBF in areas surrounding dredging, as discussed above.  We believe that these minimization measures will ensure that turbidity and sedimentation generated during dredging covered under this Opinion will have an insignificant effect on critical habitat in the areas surrounding dredging.

### 3.3.6         North Atlantic Right Whale Critical Habitat

North Atlantic right whale critical habitat was designated in 2 areas along the Atlantic coast of the United States, of which the entire portion of the Southeast U.S. Calving Area (Unit 2) occurs within the action area of this Opinion.  The North Atlantic right whale critical habitat PBFs are provided in Table 27 below.

**Table 27.  North Atlantic Right Whale Critical Habitat PBFs**

| North Atlantic right whale (81 FR 4837, Publication Date: January 27, 2016) | Critical habitat includes 2 areas (Units) located in the Gulf of Maine and Georges Bank Region (Unit 1) and off the coast of North Carolina, South Carolina, Georgia and Florida (Unit 2).<br>Unit 2: The physical features essential to the conservation of the North Atlantic right whale, which provide calving area functions in Unit 2, are:<br>• Sea surface conditions associated with Force 4 or less on the Beaufort Scale<br><br>• Sea surface temperatures of 7°C to 17°C<br><br>• Water depths of 6 to 28 m, where these features simultaneously co-occur over contiguous areas of at least 231 nmi² of ocean waters during the months of November through April.  When these features are available, they are selected by right whale cows and calves in dynamic combinations that are suitable for calving, nursing, and rearing, and which vary, within the ranges specified, depending on factors such as weather and age of the calves. |
|---|---|

We believe that there will be no effect to North Atlantic right whale critical habitat from any of the activities analyzed under this Opinion.  The features of North Atlantic right whale critical habitat were designated to provide calving areas, which include specific sea surface conditions, sea surface temperatures, and water depth needed to be available for calving, nursing, and rearing North Atlantic right whale calves.  Maintenance dredging, transportation of dredged materials, material placement, or dredging surveys allowed under this Opinion will have no effect on the sea state or temperature and will not change the availability of waters 20-92 ft deep, as defined to be the depth needed in the critical habitat rule.  Specifically, dredging must maintain previously existing depths and open water material placement in areas where whales may co-occur will not change the water depth feature in a way that is perceptible to whales.

**Defendants' Exhibit C**

**4    Status of Species Likely to be Adversely Affected**

**4.1        Status of Species Likely to be Adversely Affected**

**4.1.1        Sea Turtles**

There are 5 sea turtles (green [NA and SA DPSs], hawksbill, Kemp's ridley, leatherback, and loggerhead) that travel widely throughout the South Atlantic, Gulf of Mexico and the Caribbean, and may be adversely affected by the proposed action. Section 4.1.1.1 of this Opinion will address the general threats that confront all sea turtle species. The remainder of Section 4.1.1 (Sections 4.1.1.2 –4.1.1.5) will address information on the distribution, life history, population structure, abundance, population trends, and unique threats to each species of sea turtle.

**4.1.1.1        General Threats Faced by All Sea Turtle Species**

Sea turtles face numerous natural and man-made threats that shape their status and affect their ability to recover. Many of the threats are either the same or similar in nature for all listed sea turtle species, those identified in this section are discussed in a general sense for all sea turtles. Threat information specific to a particular species are then discussed in the corresponding status sections where appropriate.

**4.1.1.1.1 Fisheries**

Incidental bycatch in commercial fisheries is identified as a major contributor to past declines, and threat to future recovery, for all of the sea turtle species (NMFS et al. 2011; NMFS and USFWS 1991; NMFS and USFWS 1992; NMFS and USFWS 1993; NMFS and USFWS 2008). Domestic fisheries often capture, injure, and kill sea turtles at various life stages. Sea turtles in the pelagic environment are exposed to U.S. Atlantic pelagic longline fisheries. Sea turtles in the benthic environment in waters off the coastal United States are exposed to a suite of other fisheries in federal and state waters. These fishing methods include trawls, gillnets, purse seines, hook-and-line gear (including bottom longlines and vertical lines [e.g., bandit gear, handlines, and rod-reel]), pound nets, and trap fisheries. Refer to the Environmental Baseline section of this Opinion for more specific information regarding federal and state managed fisheries affecting sea turtles within the action area). The Southeast U.S. shrimp fisheries have historically been the largest fishery threat to benthic sea turtles in the southeastern United States, and continue to interact with and kill large numbers of sea turtles each year.

In addition to domestic fisheries, sea turtles are subject to direct as well as incidental capture in numerous foreign fisheries, further impeding the ability of sea turtles to survive and recover on a global scale. For example, pelagic stage sea turtles, especially loggerheads and leatherbacks, circumnavigating the Atlantic are susceptible to international longline fisheries including the Azorean, Spanish, and various other fleets (Aguilar et al. 1995; Bolten et al. 1994). Bottom longlines and gillnet fishing is known to occur in many foreign waters, including (but not limited to) the northwest Atlantic, western Mediterranean, South America, West Africa, Central America, and the Caribbean. Shrimp trawl fisheries are also occurring off the shores of numerous foreign countries and pose a significant threat to sea turtles similar to the impacts seen in U.S. waters. Many unreported takes or incomplete records by foreign fleets make it difficult

**Defendants' Exhibit C**

ingestion of plastic may not cause death outright, but could cause the animal to absorb fewer nutrients from food, eat less in general, etc.– factors which could cause other adverse effects. The presence of plastic in the digestive tract suggests that leatherbacks might not be able to distinguish between prey items and forms of debris such a plastic bags (Mrosovsky et al. 2009). Balazs (1985) speculated that the plastic object might resemble a food item by its shape, color, size, or even movement as it drifts about, and therefore induce a feeding response in leatherbacks.

As discussed in Section 4.1.1.1 of this Opinion, global climate change can be expected to have various impacts on all sea turtles, including leatherbacks. Global climate change is likely to also influence the distribution and abundance of jellyfish, the primary prey item of leatherbacks (NMFS and USFWS 2007c). Several studies have shown leatherback distribution is influenced by jellyfish abundance (Houghton et al. 2006; Witt et al. 2007; Witt et al. 2006); however, more studies need to be done to monitor how changes to prey items affect distribution and foraging success of leatherbacks so population-level effects can be determined.

While oil spill impacts are discussed generally for all species in Section 4.1.1.1 of this Opinion, specific impacts of the DWH oil spill on leatherback sea turtles are considered here. Available information indicates leatherback sea turtles (along with hawksbill turtles) were likely directly affected by the oil spill. Leatherbacks were documented in the spill area, but the number of affected leatherbacks was not estimated due to a lack of information compared to other species. But given that the northern Gulf of Mexico is important habitat for leatherback migration and foraging (Turtle Expert Working Group 2007), and documentation of leatherbacks in the DWH oil spill zone during the spill period, it was concluded that leatherbacks were exposed to DWH oil, and some portion of those exposed leatherbacks likely died. Potential DWH-related impacts to leatherback sea turtles include direct oiling or contact with dispersants from surface and subsurface oil and dispersants, inhalation of volatile compounds, disruption of foraging or migratory movements due to surface or subsurface oil, ingestion of prey species contaminated with oil and/or dispersants, and loss of foraging resources which could lead to compromised growth and/or reproductive potential. There is no information currently available to determine the extent of those impacts, if they occurred. Although adverse impacts likely occurred to leatherbacks, the relative proportion of the population that is expected to have been exposed to and directly impacted by the DWH event may be relatively low. Thus, a population-level impact may not have occurred due to the widespread distribution and nesting location outside of the Gulf of Mexico for this species.

### 4.1.1.5          Loggerhead Sea Turtle – Northwest Atlantic DPS

The loggerhead sea turtle was listed as a threatened species throughout its global range on July 28, 1978. NMFS and USFWS subsequently published a Final Rule which designated 9 DPSs for loggerhead sea turtles (76 FR 58868, Publication Date September 22, 2011). This rule listed the following DPSs: (1) Northwest Atlantic Ocean (threatened), (2) Northeast Atlantic Ocean (endangered), (3) South Atlantic Ocean (threatened), (4) Mediterranean Sea (endangered), (5) North Pacific Ocean (endangered), (6) South Pacific Ocean (endangered), (7) North Indian Ocean (endangered), (8) Southeast Indo-Pacific Ocean (endangered), and (9) Southwest Indian Ocean (threatened). The NWA DPS is the only one that occurs within the action area, and therefore it is the only one considered in this Opinion.

**Defendants' Exhibit C**

#### 4.1.1.5.1  Species Description and Distribution

Loggerheads are large sea turtles.  Adults in the southeast United States average about 3 ft (92 cm) long, measured as a straight carapace length, and weigh approximately 255 lb (116 kg) (Ehrhart and Yoder 1978).  Adult and subadult loggerhead sea turtles typically have a light yellow plastron and a reddish brown carapace covered by non-overlapping scutes that meet along seam lines.  They typically have 11 or 12 pairs of marginal scutes, 5 pairs of costals, 5 vertebrals, and a nuchal (precentral) scute that is in contact with the first pair of costal scutes (Dodd Jr. 1988).

The loggerhead sea turtle inhabits continental shelf and estuarine environments throughout the temperate and tropical regions of the Atlantic, Pacific, and Indian Oceans (Dodd Jr. 1988).  Habitat uses within these areas vary by life stage.  Juveniles are omnivorous and forage on crabs, mollusks, jellyfish, and vegetation at or near the surface (Dodd Jr. 1988).  Subadult and adult loggerheads are primarily found in coastal waters and eat benthic invertebrates such as mollusks and decapod crustaceans in hardbottom habitats.

The majority of loggerhead nesting occurs at the western rims of the Atlantic and Indian Oceans concentrated in the north and south temperate zones and subtropics (National Research Council 1990a).  For the NWA DPS, most nesting occurs along the coast of the United States, from southern Virginia to Alabama.  Additional nesting beaches for this DPS are found along the northern and western Gulf of Mexico, eastern Yucatán Peninsula, at Cay Sal Bank in the eastern Bahamas (Addison 1997; Addison and Morford 1996), off the southwestern coast of Cuba (Moncada-Gavilán 2001), and along the coasts of Central America, Colombia, Venezuela, and the eastern Caribbean Islands.

Non-nesting, adult female loggerheads are reported throughout the U.S. Atlantic, Gulf of Mexico, and Caribbean Sea.  Little is known about the distribution of adult males who are seasonally abundant near nesting beaches.  Aerial surveys suggest that loggerheads as a whole are distributed in U.S. waters as follows: 54% off the southeast U.S. coast, 29% off the northeast U.S. coast, 12% in the eastern Gulf of Mexico, and 5% in the western Gulf of Mexico (Turtle Expert Working Group 1998).

Within the NWA DPS, most loggerhead sea turtles nest from North Carolina to Florida and along the Gulf Coast of Florida.  Previous Section 7 analyses have recognized at least 5 western Atlantic subpopulations, divided geographically as follows: (1) a Northern nesting subpopulation, occurring from North Carolina to northeast Florida at about 29ºN; (2) a South Florida nesting subpopulation, occurring from 29°N on the east coast of the state to Sarasota on the west coast; (3) a Florida Panhandle nesting subpopulation, occurring at Eglin Air Force Base and the beaches near Panama City, Florida; (4) a Yucatán nesting subpopulation, occurring on the eastern Yucatán Peninsula, Mexico (Márquez M. 1990; Turtle Expert Working Group 2000); and (5) a Dry Tortugas nesting subpopulation, occurring in the islands of the Dry Tortugas, near Key West, Florida (NMFS 2001b).

The recovery plan for the Northwest Atlantic population of loggerhead sea turtles concluded that there is no genetic distinction between loggerheads nesting on adjacent beaches along the Florida

**Defendants' Exhibit C**

Peninsula.  It also concluded that specific boundaries for subpopulations could not be designated based on genetic differences alone.  Thus, the recovery plan uses a combination of geographic distribution of nesting densities, geographic separation, and geopolitical boundaries, in addition to genetic differences, to identify recovery units.  The recovery units are as follows: (1) the Northern Recovery Unit (Florida/Georgia border north through southern Virginia), (2) the Peninsular Florida Recovery Unit (Florida/Georgia border through Pinellas County, Florida), (3) the Dry Tortugas Recovery Unit (islands located west of Key West, Florida), (4) the Northern Gulf of Mexico Recovery Unit (Franklin County, Florida, through Texas), and (5) the Greater Caribbean Recovery Unit (Mexico through French Guiana, the Bahamas, Lesser Antilles, and Greater Antilles) (NMFS and USFWS 2008).  The recovery plan concluded that all recovery units are essential to the recovery of the species.  Although the recovery plan was written prior to the listing of the NWA DPS, the recovery units for what was then termed the Northwest Atlantic population apply to the NWA DPS.

### 4.1.1.5.2  Life History Information

The Northwest Atlantic Loggerhead Recovery Team defined the following 8 life stages for the loggerhead life cycle, which include the ecosystems those stages generally use: (1) egg (terrestrial zone), (2) hatchling stage (terrestrial zone), (3) hatchling swim frenzy and transitional stage (neritic zone[44]), (4) juvenile stage (oceanic zone), (5) juvenile stage (neritic zone), (6) adult stage (oceanic zone), (7) adult stage (neritic zone), and (8) nesting female (terrestrial zone) (NMFS and USFWS 2008).  Loggerheads are long-lived animals.  They reach sexual maturity between 20-38 years of age, although age of maturity varies widely among populations (Frazer and Ehrhart 1985; NMFS 2001b).  The annual mating season occurs from late March to early June, and female turtles lay eggs throughout the summer months.  Females deposit an average of 4.1 nests within a nesting season (Murphy and Hopkins 1984), but an individual female only nests every 3.7 years on average (Tucker 2010).  Each nest contains an average of 100-126 eggs (Dodd Jr. 1988) which incubate for 42-75 days before hatching (NMFS and USFWS 2008).  Loggerhead hatchlings are 1.5-2 inches long and weigh about 0.7 ounces (20 grams).

As post-hatchlings, loggerheads hatched on U.S. beaches enter the "oceanic juvenile" life stage, migrating offshore and becoming associated with *Sargassum* habitats, driftlines, and other convergence zones (Carr 1986; Conant et al. 2009; Witherington 2002).  Oceanic juveniles grow at rates of 1-2 inches (2.9-5.4 cm) per year (Bjorndal et al. 2003; Snover 2002) over a period as long as 7-12 years (Bolten et al. 1998) before moving to more coastal habitats.  Studies have suggested that not all loggerhead sea turtles follow the model of circumnavigating the North Atlantic Gyre as pelagic juveniles, followed by permanent settlement into benthic environments (Bolten and Witherington 2003; Laurent et al. 1998).  These studies suggest some turtles may either remain in the oceanic habitat in the North Atlantic longer than hypothesized, or they move back and forth between oceanic and coastal habitats interchangeably (Witzell 2002).  Stranding records indicate that when immature loggerheads reach 15-24 in (40-60 cm) straight carapace length, they begin to reside in coastal inshore waters of the continental shelf throughout the U.S. Atlantic and Gulf of Mexico (Witzell 2002).

---

[44] Neritic refers to the nearshore marine environment from the surface to the sea floor where water depths do not exceed 200 m.

**Defendants' Exhibit C**

After departing the oceanic zone, neritic juvenile loggerheads in the Northwest Atlantic inhabit continental shelf waters from Cape Cod Bay, Massachusetts, south through Florida, The Bahamas, Cuba, and the Gulf of Mexico.  Estuarine waters of the United States, including areas such as Long Island Sound, Chesapeake Bay, Pamlico and Core Sounds, Mosquito and Indian River Lagoons, Biscayne Bay, Florida Bay, as well as numerous embayments fringing the Gulf of Mexico, comprise important inshore habitat.  Along the Atlantic and Gulf of Mexico shoreline, essentially all shelf waters are inhabited by loggerheads (Conant et al. 2009).

Like juveniles, non-nesting adult loggerheads also use the neritic zone.  However, these adult loggerheads do not use the relatively enclosed shallow-water estuarine habitats with limited ocean access as frequently as juveniles.  Areas such as Pamlico Sound, North Carolina, and the Indian River Lagoon, Florida, are regularly used by juveniles but not by adult loggerheads. Adult loggerheads do tend to use estuarine areas with more open ocean access, such as the Chesapeake Bay in the U.S. mid-Atlantic.  Shallow-water habitats with large expanses of open ocean access, such as Florida Bay, provide year-round resident foraging areas for significant numbers of male and female adult loggerheads (Conant et al. 2009).

Offshore, adults primarily inhabit continental shelf waters, from New York south through Florida, The Bahamas, Cuba, and the Gulf of Mexico.  Seasonal use of mid-Atlantic shelf waters, especially offshore New Jersey, Delaware, and Virginia during summer months, and offshore shelf waters, such as Onslow Bay (off the North Carolina coast), during winter months has also been documented (Hawkes et al. 2007) Georgia Department of Natural Resources, unpublished data; South Carolina Department of Natural Resources, unpublished data). Satellite telemetry has identified the shelf waters along the west Florida coast, The Bahamas, Cuba, and the Yucatán Peninsula as important resident areas for adult female loggerheads that nest in Florida (Foley et al. 2008; Girard et al. 2009; Hart et al. 2012).  The southern edge of the Grand Bahama Bank is important habitat for loggerheads nesting on the Cay Sal Bank in The Bahamas, but nesting females are also resident in the bights of Eleuthera, Long Island, and Ragged Islands.  They also reside in Florida Bay in the United States, and along the north coast of Cuba (A. Bolten and K. Bjorndal, University of Florida, unpublished data).  Moncada et al. (2010) report the recapture of 5 adult female loggerheads in Cuban waters originally flipper-tagged in Quintana Roo, Mexico, which indicates that Cuban shelf waters likely also provide foraging habitat for adult females that nest in Mexico.

*Status and Population Dynamics*
A number of stock assessments and similar reviews (Conant et al. 2009; Heppell et al. 2003a; NMFS 2001b; NMFS 2009a; NMFS and USFWS 2008; Turtle Expert Working Group 1998; Turtle Expert Working Group 2000; Turtle Expert Working Group 2009) have examined the stock status of loggerheads in the Atlantic Ocean, but none have been able to develop a reliable estimate of absolute population size.

Numbers of nests and nesting females can vary widely from year to year.  Nesting beach surveys, though, can provide a reliable assessment of trends in the adult female population, due to the strong nest site fidelity of female loggerhead sea turtles, as long as such studies are sufficiently long and survey effort and methods are standardized (e.g., (NMFS and USFWS 2008).  NMFS and USFWS (2008) concluded that the lack of change in 2 important demographic parameters of

**Defendants' Exhibit C**

loggerheads, remigration interval and clutch frequency, indicate that time series on numbers of nests can provide reliable information on trends in the female population.

*Peninsular Florida Recovery Unit*

The Peninsular Florida Recovery Unit is the largest loggerhead nesting assemblage in the Northwest Atlantic. A near-complete nest census (all beaches including index nesting beaches) undertaken from 1989 to 2007 showed an average of 64,513 loggerhead nests per year, representing approximately 15,735 nesting females per year (NMFS and USFWS 2008). The statewide estimated total for 2017 was 96,912 nests (Florida Fish and Wildlife Research Institute nesting database).

In addition to the total nest count estimates, the Florida Fish and Wildlife Research Institute uses an index nesting beach survey method. The index survey uses standardized data-collection criteria to measure seasonal nesting and allow accurate comparisons between beaches and between years. This provides a better tool for understanding the nesting trends (Figure 28). Florida Fish and Wildlife Research Institute performed a detailed analysis of the long-term loggerhead index nesting data (1989-2017; http://myfwc.com/research/wildlife/sea-turtles/nesting/loggerhead-trend/). Over that time period, 3 distinct trends were identified. From 1989-1998, there was a 24% increase that was followed by a sharp decline over the subsequent 9 years. A large increase in loggerhead nesting has occurred since, as indicated by the 71% increase in nesting over the 10-year period from 2007 and 2016. Nesting in 2016 also represented a new record for loggerheads on the core index beaches. Florida Fish and Wildlife Research Institute examined the trend from the 1998 nesting high through 2016 and found that the decade-long post-1998 decline was replaced with a slight but nonsignificant increasing trend. Looking at the data from 1989 through 2016, Florida Fish and Wildlife Research Institute concluded that there was an overall positive change in the nest counts although it was not statistically significant due to the wide variability between 2012-2016 resulting in widening confidence intervals (http://myfwc.com/research/wildlife/sea-turtles/nesting/loggerhead-trend/). Nesting at the core index beaches declined in 2017 to 48,033, which is still the 4th highest total since 2001.

**Defendants' Exhibit C**



**Figure 28.  Loggerhead sea turtle nesting at Florida index beaches since 1989**

*Northern Recovery Unit*
Annual nest totals from beaches within the Northern Recovery Unit averaged 5,215 nests from 1989-2008, a period of near-complete surveys of Northern Recovery Unit nesting beaches (Georgia Department of Natural Resources unpublished data, North Carolina Wildlife Resources Commission unpublished data, South Carolina Department of Natural Resources unpublished data), and represent approximately 1,272 nesting females per year, assuming 4.1 nests per female (Murphy and Hopkins 1984).  The loggerhead nesting trend from daily beach surveys showed a significant decline of 1.3% annually from 1989-2008.  Nest totals from aerial surveys conducted by South Carolina Department of Natural Resources showed a 1.9% annual decline in nesting in South Carolina from 1980-2008.  Overall, there are strong statistical data to suggest the Northern Recovery Unit had experienced a long-term decline over that period of time.

Data since that analysis (Table 29) are showing improved nesting numbers and a departure from the declining trend.  Georgia nesting has rebounded to show the first statistically significant increasing trend since comprehensive nesting surveys began in 1989 (Mark Dodd, Georgia Department of Natural Resources press release, http://www.georgiawildlife.com/node/3139).  South Carolina and North Carolina nesting have also begun to shift away from the past declining trend.  Loggerhead nesting in Georgia, South Carolina, and North Carolina all broke records in 2015 and then topped those records again in 2016.  Nesting in 2017 declined relative to 2016, back to levels seen in 2013 and 2015.

**Defendants' Exhibit C**

**Table 29.  Total Number of Northern Recovery Unit Loggerhead Nests (Georgia Department of Natural Resources, South Carolina Department of Natural Resources, and North Carolina Wildlife Resources Commission nesting datasets compiled at Seaturtle.org)**

| Nests Recorded | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Georgia | 1,649 | 998 | 1,760 | 1,992 | 2,241 | 2,289 | 1,196 | 2,319 | 3,265 | 2,155 |
| South Carolina | 4,500 | 2,182 | 3,141 | 4,015 | 4,615 | 5,193 | 2,083 | 5,104 | 6,443 | 5,232 |
| North Carolina | 841 | 302 | 856 | 950 | 1,074 | 1,260 | 542 | 1,254 | 1,612 | 1,195 |
| Total | 6,990 | 3,472 | 5,757 | 6,957 | 7,930 | 8,742 | 3,821 | 8,677 | 11,320 | 8,582 |

South Carolina also conducts an index beach nesting survey similar to the one described for Florida.  Although the survey only includes a subset of nesting, the standardized effort and locations allow for a better representation of the nesting trend over time.  Increases in nesting were seen for the period from 2009-2013, with a subsequent steep drop in 2014.  Nesting then rebounded in 2015 and 2016, setting new highs each of those years.  Nesting in 2017 dropped back down from the 2016 high, but was still the second highest on record (Figure 29).



**Figure 29.  South Carolina index nesting beach counts for loggerhead sea turtles**
Figure from the South Carolina Department of Natural Resources website:
http://www.dnr.sc.gov/seaturtle/nest.htm)

**Defendants' Exhibit C**

*Other Northwest Atlantic DPS Recovery Units*

The remaining 3 recovery units—Dry Tortugas, Northern Gulf of Mexico, and Greater Caribbean—are much smaller nesting assemblages, but they are still considered essential to the continued existence of the species.  Nesting surveys for the Dry Tortugus recovery unit are conducted as part of Florida's statewide survey program.  Survey effort was relatively stable during the 9-year period from 1995-2004, although the 2002 year was missed.  Nest counts ranged from 168-270, with a mean of 246, but there was no detectable trend during this period (NMFS and USFWS 2008).  Nest counts for the Northern Gulf of Mexico recovery unit are focused on index beaches rather than all beaches where nesting occurs.  Analysis of the 12-year dataset (1997-2008) of index nesting beaches in the area shows a statistically significant declining trend of 4.7% annually.  Nesting on the Florida Panhandle index beaches, which represents the majority of Northern Gulf of Mexico recovery unit nesting, had shown a large increase in 2008, but then declined again in 2009 and 2010 before rising back to a level similar to the 2003-2007 average in 2011.  Nesting survey effort has been inconsistent among the Greater Caribbean recovery unit nesting beaches, and no trend can be determined for this subpopulation (NMFS and USFWS 2008).  Zurita et al. (2003) found a statistically significant increase in the number of nests on 7 of the beaches on Quintana Roo, Mexico, from 1987-2001, where survey effort was consistent during the period.  Nonetheless, nesting has declined since 2001, and the previously reported increasing trend appears to not have been sustained (NMFS and USFWS 2008).

*In-water Trends*

Nesting data are the best current indicator of sea turtle population trends, but in-water data also provide some insight.  In-water research suggests the abundance of neritic juvenile loggerheads is steady or increasing.  Although Ehrhart et al. (2007) found no significant regression-line trend in a long-term dataset, researchers have observed notable increases in CPUE (Arendt et al. 2009; Ehrhart et al. 2007; Epperly et al. 2007).  Researchers believe that this increase in CPUE is likely linked to an increase in juvenile abundance, although it is unclear whether this increase in abundance represents a true population increase among juveniles or merely a shift in spatial occurrence.  Bjorndal et al. (2005), cited in NMFS and USFWS (2008), caution about extrapolating localized in-water trends to the broader population and relating localized trends in neritic sites to population trends at nesting beaches.  The apparent overall increase in the abundance of neritic loggerheads in the southeastern United States may be due to increased abundance of the largest oceanic/neritic juveniles (historically referred to as small benthic juveniles), which could indicate a relatively large number of individuals around the same age may mature in the near future (Turtle Expert Working Group 2009).  In-water studies throughout the eastern United States, however, indicate a substantial decrease in the abundance of the smallest oceanic/neritic juvenile loggerheads, a pattern corroborated by stranding data (Turtle Expert Working Group 2009).

### 4.1.1.5.3  Population Estimate

The NMFS Southeast Fisheries Science Center developed a preliminary stage/age demographic model to help determine the estimated impacts of mortality reductions on loggerhead sea turtle population dynamics (NMFS 2009a).  The model uses the range of published information for the various parameters including mortality by stage, stage duration (years in a stage), and fecundity parameters such as eggs per nest, nests per nesting female, hatchling emergence success, sex

**Defendants' Exhibit C**

ratio, and remigration interval.  Resulting trajectories of model runs for each individual recovery unit, and the western North Atlantic population as a whole, were found to be very similar.  The model run estimates from the adult female population size for the western North Atlantic (from the 2004-2008 time frame), suggest the adult female population size is approximately 20,000-40,000 individuals, with a low likelihood of females' numbering up to 70,000 (NMFS 2009a).  A less robust estimate for total benthic females in the western North Atlantic was also obtained, yielding approximately 30,000-300,000 individuals, up to less than 1 million (NMFS 2009a).  A preliminary regional abundance survey of loggerheads within the northwestern Atlantic continental shelf for positively identified loggerhead in all strata estimated about 588,000 loggerheads (interquartile range of 382,000-817,000).  When correcting for unidentified turtles in proportion to the ratio of identified turtles, the estimate increased to about 801,000 loggerheads (interquartile range of 521,000-1,111,000) (NMFS 2011c).

### 4.1.1.5.4   Threats (Specific to Loggerhead Sea Turtles)

The threats faced by loggerhead sea turtles are well summarized in the general discussion of threats in Section 4.1.1.1 of this Opinion.  Yet the impact of fishery interactions is a point of further emphasis for this species.  The joint NMFS and USFWS Loggerhead Biological Review Team determined that the greatest threats to the NWA DPS of loggerheads result from cumulative fishery bycatch in neritic and oceanic habitats (Conant et al. 2009).

Regarding the impacts of pollution, loggerheads may be particularly affected by organochlorine contaminants; they have the highest organochlorine concentrations (Storelli et al. 2008) and metal loads (D'Ilio et al. 2011) in sampled tissues among the sea turtle species.  It is thought that dietary preferences were likely to be the main differentiating factor among sea turtle species.  Storelli et al. (2008) analyzed tissues from stranded loggerhead sea turtles and found that mercury accumulates in sea turtle livers while cadmium accumulates in their kidneys, as has been reported for other marine organisms like dolphins, seals, and porpoises (Law et al. 1991).

While oil spill impacts are discussed generally for all species in Section 4.1.1.1 of this Opinion, specific impacts of the DWH oil spill event on loggerhead sea turtles are considered here.  Impacts to loggerhead sea turtles occurred to offshore small juveniles as well as large juveniles and adults.  A total of 30,800 small juvenile loggerheads (7.3% of the total small juvenile sea turtle exposures to oil from the spill) were estimated to have been exposed to oil.  Of those exposed, 10,700 small juveniles are estimated to have died as a result of the exposure.  In contrast to small juveniles, loggerheads represented a large proportion of the adults and large juveniles exposed to and killed by the oil.  There were 30,000 exposures (almost 52% of all exposures for those age/size classes) and 3,600 estimated mortalities.  A total of 265 nests (27,618 eggs) were also translocated during response efforts, with 14,216 hatchlings released, the fate of which is unknown (Deepwater Horizon Natural Resource Damage Assessment Trustees 2016).  Additional unquantified effects may have included inhalation of volatile compounds, disruption of foraging or migratory movements due to surface or subsurface oil, ingestion of prey species contaminated with oil and/or dispersants, and loss of foraging resources which could lead to compromised growth and/or reproductive potential.  There is no information currently available to determine the extent of those impacts, if they occurred.

Defendants' Exhibit C

Unlike Kemp's ridleys, the majority of nesting for the Northwest Atlantic Ocean loggerhead DPS occurs on the Atlantic coast, and thus loggerheads were impacted to a relatively lesser degree. However, it is likely that impacts to the Northern Gulf of Mexico recovery unit of the NWA loggerhead DPS would be proportionally much greater than the impacts occurring to other recovery units. Impacts to nesting and oiling effects on a large proportion of the Northern Gulf of Mexico recovery unit recovery unit, especially mating and nesting adults likely had an impact on the Northern Gulf of Mexico recovery unit. Based on the response injury evaluations for Florida Panhandle and Alabama nesting beaches (which fall under the Northern Gulf of Mexico recovery unit), the Trustees estimated that approximately 20,000 loggerhead hatchlings were lost due to DWH oil spill response activities on nesting beaches. Although the long-term effects remain unknown, the DWH oil spill event impacts to the Northern Gulf of Mexico Recovery Unit may result in some nesting declines in the future due to a large reduction of oceanic age classes during the DWH oil spill event. Although adverse impacts occurred to loggerheads, the proportion of the population that is expected to have been exposed to and directly impacted by the DWH oil spill event is relatively low. Thus we do not believe a population-level impact occurred due to the widespread distribution and nesting location outside of the Gulf of Mexico for this species.

Specific information regarding potential climate change impacts on loggerheads is also available. Modeling suggests an increase of 2°C in air temperature would result in a sex ratio of over 80% female offspring for loggerheads nesting near Southport, North Carolina. The same increase in air temperatures at nesting beaches in Cape Canaveral, Florida, would result in close to 100% female offspring. Such highly skewed sex ratios could undermine the reproductive capacity of the species. More ominously, an air temperature increase of 3°C is likely to exceed the thermal threshold of most nests, leading to egg mortality (Hawkes et al. 2007). Warmer sea surface temperatures have also been correlated with an earlier onset of loggerhead nesting in the spring (Hawkes et al. 2007; Weishampel et al. 2004), short inter-nesting intervals (Hays et al. 2002), and shorter nesting seasons (Pike et al. 2006).

## 4.1.2        Atlantic Sturgeon

Five separate DPSs of Atlantic sturgeon were listed under the ESA by NMFS effective April 6, 2012 (77 FR 5880 and 5914, Publication Date February 6, 2012). The New York Bight, Chesapeake Bay, Carolina, and SA DPSs were listed as endangered. The Gulf of Maine DPS was listed as threatened. Because adult and subadult Atlantic sturgeon from all DPSs mix extensively in marine waters, we expect fish from all DPSs to be found in the action area.

### 4.1.2.1        Species Descriptions and Distributions

Atlantic sturgeon are long-lived, late-maturing, estuarine-dependent, anadromous fish distributed along the eastern coast of North America (Waldman and Wirgin 1998). Historically, sightings have been reported from Hamilton Inlet, Labrador, Canada, south to the St. Johns River, Florida (Murawski and Pacheco 1977; Smith and Clugston 1997). Atlantic sturgeon may live up to 60 years, reach lengths up to 14 ft, and weigh over 800 lbs (Atlantic Sturgeon Status Review Team 2007; Collette and Klein-MacPhee (editors) 2002). They are distinguished by armor-like plates (called scutes) and a long protruding snout that has 4 barbels (slender, whisker-like feelers extending from the lower jaw used for touch and taste). Adult Atlantic sturgeon spend the

Defendants' Exhibit C

is preventing their recovery.  However, it is also possible that their populations are at such low levels that even when the species' primary threats are removed, the species may not be able to achieve recovery.  At small population sizes, species may experience phenomena such as demographic stochasticity, inbreeding depression, and Allee effects, among others, that cause their limited population size to become a threat in and of itself.  A thorough review of the status and trends of each ESA-listed species likely to be adversely affected by the proposed action is discussed in Section 4 of this Opinion.

# 6   EFFECTS OF THE ACTION

Section 3 of this Opinion discussed routes of effects expected to occur from activities covered under by Opinion, and identified those activities that are likely to cause adverse effects.  We believe that the only activities covered under this Opinion that will result in adverse effects are those listed below, which will be analyzed further in this section:

- Hopper dredging will result in take of sea turtles (green, Kemp's ridley, and loggerhead) and sturgeon (Atlantic and shortnose).

- Cutterhead dredging will result in take of Atlantic and shortnose sturgeon in rivers

- Relocation trawling will result in take of sea turtles (green, Kemp's ridley, leatherback, and loggerhead), sturgeon (Atlantic and shortnose), and elasmobranchs (smalltooth sawfish and giant manta ray).

- Dredging will result in the removal of Johnson's seagrass.

- Beach nourishment, pipeline placement, and the associated relocation of ESA-listed corals will result in take of ESA-listed corals (elkhorn, staghorn, boulder star, lobed star, and mountainous star coral).

All activities must comply with the PDCs in Appendix B-Appendix H to be covered under this Opinion.

## 6.1        Effects to Mobile Species from Hopper Dredging, Cutterhead Dredging, and Relocation Trawling

To evaluate the effects and calculate take from hopper dredging, cutterhead dredging, and relocation trawling covered under this Opinion, we reviewed historical records of take of mobile species reported from these activities, as discussed in Section 3.1.1.4 for cutterhead dredging, Section 3.1.1.5 for hopper dredging, and Section 3.1.3 for relocation trawling.

### 6.1.1        Risk-based assessment

Timing of particular activities under SARBO will be determined using a risk-based assessment process, as described in Section 2.9.2.2 of this Opinion.  Information gathered as part of the risk-based assessment process may reduce take by providing adaptability in when, where, and how dredging is completed so that the USACE and BOEM can continue to meet their dredging needs, while minimizing the risk of take of ESA-listed species.  While these measures are intended to

**Defendants' Exhibit C**

reduce the risk of take, the take estimated for cutterhead dredging, hopper dredging, and relocation trawling covered under this Opinion is still based on the historic reported take, as it is not possible to calculate the degree to which these efforts may in fact reduce take. Examples of types of considerations that the risk-based assessment will incorporate are below.

*Equipment Choice*
The 2020 SARBO allows options of equipment choice to complete work. Allowing the use of relocation trawling (discussed in Section 6.1.4,of this Opinion) is intended to reduce the lethal take expected from hopper dredging. Also the use of bed-leveling as an alternative to continued hopper dredging during the clean-up phase of dredging is expected to reduce lethal take, as the clean-up phase of hopper dredging can increase the risk of take by dredging in areas with uneven surfaces where the draghead may struggle to stay buried in the sediment.

*Project timing*
Seasonal variation and water temperature play an important role in the potential density of species in an area and the risk of entrainment, and USACE has indicated that it will consider seasonal variation when considering project timing, which may reduce the risk of take. For example, sea turtles use thermoregulation resulting in less movement when water temperatures drop, which may result in an increased risk of take during these times when they are less able to avoid dredging. This concern was discussed in a recent paper by BOEM (BOEM 2017), which discussed that lethal temperatures for sea turtles can be around 8 degrees C or below (Ogren and McVea Jr. 1982), but sublethal effects for low temperatures during overwintering (between 8 and 15 degrees C) can include immobilization, lethargy, lowered feeding rates, and starvation (Schwartz 1978) (Milton and Lutz 2003; Spotila et al. 1996). According to the NOAA (https://www.fisheries.noaa.gov/feature-story/cold-snaps-and-stunned-sea-turtles), cold stunning regularly occurs on the Atlantic coast in the Indian River Lagoon complex. In January 2018, more than 1,000 turtles, mainly juvenile greens, were rescued after becoming cold-stunned in St. Joseph Bay. The largest cold stunning event recorded in Florida occurred in 2010, with more than 4,500 sea turtles rescued within the state.

Turtles become "cold-stunned," or torpid and floating at the surface (Schwartz 1978), which may make them at greater risk to any activities at the surface or throughout the water column, such as fishing gear, vessel strikes, or hopper dredging operations with pumps engaged while dragheads are off the bottom to clear the lines. There have also been rare incidents suggesting that cold-stunned turtles may be taken by cutterhead dredges while they are lethargic or dying and unable to move away from the cutterhead, as discussed in Section 3.1.1.4.1 of this Opinion. Temperature will be considered as part of the risk assessment outlined in Appendix J, that dredging cease if water temperature drops below 11ºC to avoid the risk of encountering cold-stunned sea turtles that are at higher risk of take.

A study released by the USACE (Dickerson et al. 2007), also evaluated the risk of sea turtle entrainment and capture in relocation trawling during different times of the year. This study concluded that sea turtle entrainment is higher during the spring and fall within the action area and concluded this may be a result of a higher number of turtles in the area as they migrate up and down the coast. It was also noted that entrainment decreased during the summer (July-September) and was comparable to those observed during cold winter months, though the

**Defendants' Exhibit C**

summer dredging sample size was significantly smaller.  The study stated that the decrease in entrainment in the summer may be linked to an increase in activity of sea turtles during months were they are nesting and that they may spend more time moving through the water column, which would result in a lower risk of entrainment by the draghead operating at the sea floor.

Another example of a way the risk based assessment will be used is the determination to use hopper dredging in certain areas during warmer months than was covered under the 1997 SARBO.  The USACE has stated that they plan to dredge some navigation channels during warmer months, outside of the North Atlantic right whale migration season, since navigation channels require the use of high speed survey vessels that are of greatest risk of a vessel strike to North Atlantic right whales.  These locations do not have beach quality sand and therefore placement of the dredged material would not be used for beach nourishment projects during sea turtle nesting season.  Therefore, the risk based assessment is used to weigh the risk of a vessel strike to a whale during months that these whales are present in the action area vs the risk of a sea turtle take by hopper dredging during months when sea turtles may be more abundant in the area, and if the material dredged would need to be placed when sea turtles are nesting.  The decision of where and when to dredge will continue to be adjusted using the risk-based assessment process, which may include adjustments to this list of warmer month dredging locations.  The navigation channels currently proposed to be dredged in warmer months include Brunswick Harbor, Savannah Harbor, Charleston Harbor, Wilmington Harbor Entrance/Inner Ocean Bar, Morehead City, and Manteo Entrance Channel, any additional locations will be evaluated using the risk-based assessment process.

*Species habitat use*
As more information about where and when other species use an area within the action area becomes available, this information will be incorporated into the risk assessment as well and may reduce the risk of take.  For example, new information indicates that giant manta ray are being found in increased density in shallow waters off the east coast of Florida, particularly around St. Augustine.  As we refine our understanding of their use of particular areas, this information will be shared with the USACE and BOEM as part of the annual review process and an evaluation of the best times and equipment types to use in projects, such as avoiding trawling during times and areas where the giant manta may be likely to be found in greater densities.  Similarly, Atlantic sturgeon take reports indicate that more takes seem to occur more frequently at the mouths of certain rivers during winter months.  This information is already being considered as part of the USACE internal risk assessment for continued maintenance dredging in these areas.

A BOEM study[62] also concluded that the risk of entrainment of sea turtles from hopper dredging in borrow sites in federal waters under their jurisdiction is historically lower than in navigation channels.  The study stated that reported take was lower in borrow areas and concluded that this may be related to the fact that borrow sites in federal waters have a lower density of sea turtles.  We support this assessment since sea turtle foraging and refuge habitat is not likely to occur in the sandy offshore areas selected for borrow sites and that these open water areas are easier for sea turtles to avoid construction than confined channels and that this information can be used as part of the risk assessment process when scheduling work.  The BOEM study stated that between

---

[62] http://photoscience.maps.arcgis.com/apps/MapJournal/index.html?appid=6f8672c77ca94976aab12bd290e1fafd

**Defendants' Exhibit C**

1995 and 2017, only 25 sea turtles have been entrained while dredging OCS sand sources in federal waters. When compared to the 342 takes reported in the 2020 SARBO action area in Table 12 during nearly the same time period (1998-2018) that includes those reported in federal waters, it demonstrates that reported take in borrow areas in federal waters is lower than those reported in state waters. We believe that take in borrow sites in state waters are also lower than other nearshore projects for the same reasons.

*Tracking information gathered*

Compiling the species information gathered to use as part of the risk-based assessment is another challenge. However, new decision-making tools are being developed to aid in this process. For example, BOEM has developed such a tool that incorporates the available data on sea turtle use of areas in federal waters. Sea turtle tracking data is being uploaded into their analysis program, referred to as the Analyzing Sea Turtle Entrainment Risk (ASTER) decision support tool. Technical insight was gathered from both sea turtle and dredge expert communities who have a broad knowledge base and understanding of the relationship of dredging entrainment risk relative to sea turtle distribution and behavior, dredge operational parameters, and the implementation of existing mitigation measures. This information was used to inform the development of a standardized geographically and temporally based decision support tool for use by practitioners in the Atlantic and Gulf region to assess project-specific dredging entrainment risk within a common framework. BOEM's goal is that having more informed decisions may minimize impacts to sea turtle species while also decreasing dredging costs. We believe that the use of tools such as ASTER as part of the risk based assessment will aid in meeting BOEM's goal of improving decision making that will reduce take. We look forward to continued investments in sea turtle telemetry and the development of other similar tools that will help predict the likelihood of a species presence in a specific area at a set time of year.

For projects covered under this Opinion, PSO's will monitor the activities for evidence of take, according to the requirements of the PDCs (General PDC in Appendix B Section 3.1). When hopper dredging a particular section is complete, the PSO visually examines the draghead to determine if an ESA-listed species was impinged in the draghead. The ability to detect take at these locations is only partially effective and observed interactions likely provide only partial estimates of total mortality. NMFS believes that some proportion of ESA-listed species killed by hopper dredging go undetected. Mortalities are only observed and documented when body parts are impinged in the draghead, entrained in the inflow or overflow screening, or are viewed floating in the hopper. Body parts that are forced through the suction draghead and inflow screens by the suction-pump pressure and that do not float in the hopper are unlikely to be observed, since they will sink to the bottom of the hopper and not be detected by the overflow screening. The majority of sea turtles killed by hopper dredges are immediately crushed or dismembered by the heavy suction dragheads and/or by the force of the hopper dredges' powerful, high-velocity dredge pumps. Very few sea turtles (over the years, a fraction of a percent) survive entrainment in hopper dredges and those that do survive are typically smaller juveniles that are likely sucked through the pumps without being dismembered or badly injured. While those turtles that make it through a hopper dredge alive appear uninjured, they often die later of unknown internal injuries while in rehabilitation. The PSO PDCs in Appendix H Section 3.1 require that all sea turtles entrained alive be evaluated prior to release to determine if they can be safely rehabilitated or if their injuries are too severe. For the purposes of this Opinion,

**Defendants' Exhibit C**

turtles entrained alive will be assumed to be lethal take until after they are evaluated by a sea turtle rehabilitation specialist, deemed healthy, and then released back into the wild.

## 6.1.2          Estimated Take from Hopper Dredging

As discussed in Section 3.1.1.5 of this Opinion, hopper dredging associated with the proposed action will result in take of sea turtles (green, Kemp's ridley, and loggerhead) and sturgeon (Atlantic and shortnose) from entrainment in the hopper dredge or impingement on the draghead. Based on the PSO PDCs in Appendix H Section 4, all observed take will be considered lethal even if the animal retrieved is alive and sent to rehabilitation until such time as it can be returned alive and healthy to the wild population.

To estimate take from hopper dredging covered under this Opinion, we reviewed the reported take of ESA-listed species from projects in the action area provided in Table 12 and compared it to the reported volume of material dredged (effort) by those projects to calculate a hopper dredging CPUE for each species[63]. We reviewed all reported lethal takes that occurred in the 21 years since the issuance of the 1997 SARBO (fiscal years 1998-2018, which is the last complete year of data available), as shown in Table 12. The number of reported observed takes from hopper dredging was gathered from information provided by the USACE from their public tracking website ODESS.[64] The reported total volume of material dredged per fiscal year in Table 12 was gathered from multiple sources provided by and/or verified by the USACE, but still may not precisely reflect the volumes dredged. At this time, it is the best available information and will be used for the analysis of take for this Opinion.

These historic records demonstrate that  the number of take reported annually can fluctuate significantly. Some of the reasons for interannual variability include, but are not limited to, the location and type of projects, volume dredged, environmental conditions, changes in populations size and the density of animals in the area. A few examples of this variability are highlighted in the list below:

- Sturgeon spawn in rivers and therefore the range for this species extends further upriver than any other species in the action area. Within these rivers, areas of higher concentrations of sturgeon have been identified (i.e., seasonal aggregation areas) during certain times of year. In addition, recent dredging and relocation projects occurring at the mouth of spawning rivers have also resulted in an increased number of Atlantic sturgeon take in areas that did not previously have sturgeon take. It is unknown if the increased take was the result of an

---

[63] CPUE is calculated by comparing the number of observed reported takes (catch) to the cubic yards of material dredged (unit of effort).

[64] The numbers in Table 12 are calculated from a complete dataset provided by the USACE and not from the information available for download from ODESS by the general public. The version of ODESS available at the time of completion of this Opinion was a beta test and errors were discovered in the way that take was calculated on some of the available website pages (e.g., not all species with take are shown on different platforms reported take such as a table or pie chart, take reporting was inconsistent with some reports providing information by calendar year and others by fiscal year, and the volume of material reported dredged per year was incomplete and therefore inaccurate). NMFS is coordinating with the USACE on reporting requirements and quality control of the information reported and awaits the release of a new version of ODESS that resolves these errors, expected in the near future.

**Defendants' Exhibit C**

unusual event or if this is an area which sturgeon use consistently. Based on this information, projects occurring in any of these areas may result in a higher risk of take and based on the site conditions and season, the probability of encountering sturgeon may vary. The Sturgeon PDCs in Appendix E are designed to minimize risk by not allowing dredging to occur in known sturgeon aggregation areas at times of year when environmental conditions result in additional stress to sturgeon (referred to as the Sturgeon Summer Dredging Windows in the Sturgeon PDCs in Appendix E). The Sturgeon PDCs in Appendix E will continue to be updated as new information on sturgeon aggregation areas, high occupancy areas, and water quality data is acquired in order to minimize the risk of take.

- Areas near high density sea turtle nesting beach may also have an increased number of turtles in the area that are at increased risk of take. The 2020 SARBO considers dredging in channels near or adjacent to nesting beaches during warmer months than were allowed under the 1997 SARBO, which could result in a higher probability of encountering turtles during dredging and/or relocation trawling. Again, work occurring in these areas will be evaluated in the risk assessment process outlined in Section 2.9.2 of this Opinion to further minimize the risk of sea turtle take.

- Not all areas of potentially high density of a species are known. For example, information is still being actively gathered on where and when newly listed species like the giant manta ray occur within the action area. As information is gathered, it will be considered and minor modifications to protective measures may be made during the risk assessment process for future projects to further minimize the risk of take.

Variability in reported take from year to year may also be a result of environmental conditions. For example:

- Work may be scheduled during an unseasonably warmer or colder period that may change the risk of take. For example, sea turtles are known to be more vulnerable after a cold snap and may not actively avoid dredging leading to an increase in take, which will be discussed further in Section 6.1.1 of this Opinion.

- There may be changes in the species composition in an area that results in changes in density of ESA-listed species. For instance, a project in Dare County, North Carolina in 2017, resulted in the capture of 10 leatherback sea turtles in relocation trawling, which typically are rarely captured in trawling. This particular event was attributed to a high concentration of cannonball jellyfish in the area that the leatherback sea turtles had presumably followed to nearshore waters for foraging where trawling was occurring.

- The 2010 Louisiana Emergency Berm Project (outside of the action area) captured an unprecedented number of sea turtles during relocation trawling that may have been the result of the ongoing DWH oil spill event that resulted in an unprecedented amount of trawling and that the spill and recovery efforts may have modified turtle behavior and use of the area.

- Stochastic events such as major hurricanes may also change the density of species in the area as they respond to either the upcoming storm or changes in the environment following the storm.

We believe that estimating reported take that is expected to occur annually based on a 1 year estimated total would not adequately account for the annual variability in take from hopper

**Defendants' Exhibit C**

dredging, cutterhead dredging, and relocation trawling (discussed below).  For this reason, and based on our experience monitoring fisheries, we believe a 3-year time period is appropriate for meaningful monitoring, where possible.  The triennial takes are set as 3-year running sums (total for any consecutive 3-year period) and not for static 3-year periods (i.e., fiscal year 2020-2022, 2021-2023, 2022-2024 and so on).  This approach accounts for the inherent variability in take levels, while still allowing for an accurate assessment of how the proposed actions are performing versus our expectations.  As noted by species in the analysis that follows, we diverge from this approach where very small take numbers are projected.

Due to the fluctuation in take reported, we compared the hopper dredge CPUE based on all 21 years of reported data since the issuance of the 1997 SARBO, as well as just the last 5 years (Table 36), to determine if take levels in recent years may better represent anticipated effects under 2020 SARBO.  Table 36 provides the CPUE calculated for these periods of reported take relative to the reported volume of dredged material for the same time period.  We then calculated the estimated number of take that may occur from hopper dredging annually under the 2020 SARBO based on the estimated average, minimum, and maximum volume of material that may be dredged annually.  Dredging volumes are based on the information provided by the USACE and BOEM provided in Section 2.1 of this Opinion, which estimates that hopper dredging covered under this Opinion will account for an estimated annual dredge volume of between 10,899,182 and 27,386,533 cy, with an average of 17,599,004 cy dredged annually.

We compared the authorized take and reported observed annual take under the 1997 SARBO in Table 12 to see if, when, and how often take was exceeded and  compared this information to the estimated take in Table 36 for 2020 SARBO and the following observations were made:

- The 1997 SARBO includes a take estimate for shortnose sturgeon; however, no take was reported for this species likely due to the limited amount of work that occurred in sturgeon spawning rivers where this species spend the majority of its life.  However, the expanded action area for the 2020 SARBO includes more areas in sturgeon rivers and therefore consideration of these effects under the 2020 SARBO is warranted.

- The annual take observed under the 1997 SARBO was exceeded multiple times for green and Kemp's ridley sea turtles in the last 8 years.  When this was compared to the nesting trends for green sea turtles (Figure 25) and Kemp's ridley sea turtles (Figure 26), it is clear that the number of reported nests per season, and therefore likely the population for these species, has also increased in recent years.  Therefore, looking at take for sea turtles based on recent years reported seems warranted, to account for population trends.

- The 1997 SARBO also did not provide take for Atlantic sturgeon, which were listed after the completion of that Opinion.  However, reported take in Table 12 includes all takes observed after the listing of the 5 DPSs in 2012.  Therefore, reviewing take that has occurred more recently, as opposed to since 1997, will more accurately account for potential take of Atlantic sturgeon.  The USACE previously considered the potential for these species to be jeopardized by the continued dredging operations occurring under the 1997 SARBO while in reinitiation of the 2020 SARBO under a 7(a)27(d) analysis under the ESA.

**Defendants' Exhibit C**

**Table 36.  Calculated Annual CPUE for Hopper Dredging[65]**

| | Dredge volume (cy) | Green sea turtle | Kemp's ridley sea turtle | Loggerhead sea turtle | Unknown sea turtle | Atlantic sturgeon | Unknown sturgeon |
|---|---|---|---|---|---|---|---|
| **1997 SARBO Annual Take limit** | | 7 | 7 | 35 | 0 | 0 | 0 |
| **Average annual take** | | 3 | 3 | 9 | 0 | 2 | 0 |
| **Minimum annual take** | | 0 | 0 | 3 | 0 | 0 | 1 |
| **Maximum annual take** | | 10 | 8 | 18 | 4 | 14 | 0 |
| **Number of Years Take Exceeded** (Table 12) | | 4 | 1 | 0 | NA | 5 | NA |
| **Total Reported (21 year total, 1997-2018)** | 176,817,454 | 53 | 54 | 183 | 5 | 39 | 3 |
| **Total Reported (5 year total, 2014-2018)** | 48,591,799 | 18 | 23 | 46 | 4 | 25 | 3 |
| **Additional projects** (Table 12) | | 17 | 10 | 15 | | 14 | |
| **Total** | | 35 | 33 | 61 | 4 | 39 | 3 |
| **Calculated CPUE (5 year total, 2014-2018)** | | 7.20286E-07 | 6.79127E-07 | 1.25536E-06 | 8.23184E-08 | 8.02605E-07 | 6.17388E-08 |
| **Total Annual Estimated Take (based on average dredged volume from** Table 3) | 17,599,004 | 12.68 | 11.95 | 22.09 | 1.45 | 14.13 | 1.09 |
| **Total Annual Estimated Take (based on maximum dredged volume from Table 3)** | 27,386,533 | 19.73 | 18.60 | 34.38 | 2.25 | 21.98 | 1.69 |

---

[65] CPUE calculated by dividing the number of reported takes per time period by the total volume dredged during the same time period.  Estimated take calculated by multiplying the CPUE by the estimated dredge volumes provided in the second column.  All take reported is lethal.

**Defendants' Exhibit C**

Based on a review of the reported take in Table 12, estimated take by the time periods shown in Table 36, and a review of the species population trends discussed in Section 4 of this Opinion, we estimate the level of take that will be observed annually from hopper dredging covered under this Opinion discussed by species, below.

While the average estimated volume dredged calculated in the Proposed Action is 17,599,004 cy we believe that the take associated with this estimated average annual hopper dredge volume (as calculated Table 36) results in an underestimate of the actual impacts of hopper dredging associated with the proposed action, for the following reasons:

1. Dredging will occur in areas and at times when certain ESA-listed species are expected to occur with higher concentrations than projects completed under the 1997 SARBO. As discussed in Section 2.5.2 of this Opinion and as part of the additional consultation history in Appendix K, the USACE plans to dredge some navigation channels during warmer months, outside of the North Atlantic right whale migration season, since navigation channels require the use of high speed survey vessels (which pose a higher threat of striking whales). The expanded ability under this Opinion to hopper dredge during summer months when sea turtle concentrations are expected to be higher will mean that there may be a higher chance of take, due to increased numbers of animals. The decision of where and when to conduct hopper dredging will continue to be adjusted using the risk-based assessment process outlined in Section 2.9.2 of this Opinion, which may include dredging of more locations during sea turtle nesting season. The navigation channels currently proposed to be dredged in warmer months (including sea turtle nesting season) include Brunswick Harbor, Savannah Harbor, Charleston Harbor, Wilmington Harbor Entrance/Inner Ocean Bar, Morehead City, and Manteo Entrance Channel. Other channels will be reviewed through the risk-based assessment process. The Kings Bay entrance may occur during any month, if deemed appropriate based on the initial risk-assessment analysis. Cape Canaveral also has not been dredged by hopper dredging since the late 1980's. Cape Canaveral is known to have a high density of green sea turtles and work in this area would result in a disproportionate number of take for this species. We therefore believe that the expansion of areas and times in which dredging may occur, will increase the number of reported takes, beyond those estimated in Table 36 by applying the 1997 SARBO CPUE to the annual average hopper dredge volume anticipated under the 2020 SARBO.

2. An increase in sea turtle populations is expected to be encountered over the lifetime of this Opinion. Green (NA and SA DPS), Kemp's ridley, and loggerhead sea turtle populations are increasing based on the information provided in the Status of the Species in Section 4.1.1 of this Opinion and discussed further in the Jeopardy Analysis in Section 8 of this Opinion.

3. An increase in the accuracy of take reports under the 2020 SARBO is expected, and therefore the amount of reported take, based on the new PSO guidance provided in Appendix H. This guidance is expected improved observations and therefore reported interactions with listed species. The PSO PDCs provide detailed guidance on how to detect and handle ESA-listed species that may be found in the action area. The USACE and BOEM provided their expertise on the operational issues encountered on dredging vessels and relocation trawlers and the USACE provided NMFS staff the opportunity to visit a hopper dredge, cutterhead dredge, and relocation trawler in operation. This provided a better understanding of the equipment operations and allowed NMFS to observe a PSO working on these projects to

**Defendants' Exhibit C**

understand their work challenges and limitations.  We also coordinated with other NMFS regions to better describe the training necessary to complete work as a PSO (separate from this Opinion), which is expected to improve the quality of trained PSOs that will work on future projects covered under this Opinion.  We believe that by improving the guidance provided to PSOs on how to observe take, and ensuring that hopper dredge intake and overflow areas are accessible to the PSO, the number of observed takes reported will increase on hopper dredging projects.

4.  For sturgeon, projects covered under this Opinion will occur in more areas of sturgeon rivers than previously covered by the 1997 SARBO and may result in more interactions with both Atlantic and shortnose sturgeon.

Given the changes in the proposed action and action area from the 1997 SARBO, increasing population trends for sea turtle species that are susceptible to entrainment by hopper dredging, and improved accuracy of take monitoring and reporting under this Opinion, we believe that the 1997 SARBO CPUE applied to the estimated annual amount dredged under the 2020 SARBO results in an underestimate of take.  However, the best data available to estimate future hopper take within the action area is from 1997 SARBO and previous projects in the action area.  Therefore, we believe that it is most accurate to base the future estimated observed take on the hopper dredge CPUE during the last 5 years (Table 32), and then multiplying the CPUE by the maximum volume of hopper dredging estimated to occur annually under the 2020 SARBO (27,386,533 cy).  Relying on this maximum estimated annual hopper dredge volume, solely for the purpose of estimating take from hopper dredging under this Opinion, is intended to ensure that the projected level of take is consistent with the range of dredging that is expected occur as a result of the proposed action, while also accounting for the expected increased rate of both the amount of take and accuracy of take reporting, for the reasons identified above.

We believe that the last 5 years of data represents the best available information to estimate take for these species, despite the limitations acknowledged above, because it most accurately captures recent abundance trends and is most reflective of USACE's expected activities in the future, as further explained below by species.

- Green, Kemp's ridley sea turtle, loggerhead sea turtle, and Atlantic sturgeon: As stated above, the last 5 years of data represents the best available information to estimate take for sea turtle species, because these populations have generally be increasing.  We do not have similar trend data for Atlantic sturgeon, which were not listed until 2012.  However, the increased captures of Atlantic sturgeon by both hopper dredging and relocation trawling, discussed later in this Opinion, indicate that using the most recent set of data from the last 5 years is warranted.

- Unknown sea turtles: Hopper dredging take of turtles can result in observed parts that cannot be identified to the species as has been reported in previous years and is expected to continue to occur under 2020 SARBO.  Therefore, we assume that 2.25 turtles may be captured annually that cannot be identified from Table 36.  For each sea turtle species we break out the expected take based on the percentage of lethal take expected for each (Green = 27.13%, Kemp's ridley = 25.58%, and Loggerhead = 47.29%).  We then applied that percentage to the anticipated unidentified turtle take to estimate which species would comprise the unidentified takes.  This analysis calculated annual take of up to 0.61 green, 0.58 Kemp's ridley, and 1.06

**Defendants' Exhibit C**

loggerhead sea turtles, as unidentified. For the Jeopardy analysis, we will assume that the 2.25 observed annual captures will equate to 3-year lethal take of up to 1.83 green, 1.73 Kemp's ridley, and 3.19 loggerhead sea turtles.

- Shortnose and Unknown sturgeon: Since dredging in sturgeon rivers was limited under the 1997 SARBO, we believe that it is appropriate to attribute the 1.69 annual takes calculated for unknown sturgeon in Table 36 to be considered shortnose sturgeon since this species is more likely to be encountered in sturgeon rivers once work begins in these areas. A limited number of projects have occurred in sturgeon rivers and did not report take of shortnose sturgeon. However, we still think it is likely that this species will be encountered since they co-exist with Atlantic sturgeon in rivers where Atlantic sturgeon take has been reported and shortnose sturgeon takes are reported in similar rivers in the northeast. We believe that hopper dredging will also continue to capture sturgeon parts that cannot be identified to the species as has been reported in previous years and is expected to continue under this Opinion. However, Atlantic sturgeon will be genetically tested to determine the DPS of the take and therefore unknown sturgeon will also need to be tested to determine if they are Atlantic sturgeon of a specific DPS. Hence, all sturgeon take will be identified using genetic testing and no unknown sturgeon will be considered for this Opinion.

- Hopper dredging in the U.S. Caribbean: The dredging volumes provided by USACE for anticipated hopper dredging projects in the U.S. Caribbean are included in the hopper dredge estimate for the proposed action. Species distributions in the U.S. Caribbean, and therefore hopper dredge take, may differ from the better known Atlantic waters from North Carolina – Florida. However, dredging projects off of the continental U.S. are the best available information available regarding levels of take of ESA-listed species by hopper dredge, as hopper dredging has not previously occurred in the U.S. Caribbean. Therefore, we consider the calculations in this section to incorporate the limited number of hopper dredging projects expected in the U.S. Caribbean.

While the final estimated take covered under this Opinion will be rounded to a whole number, rounding of take estimates will occur later in this analysis once all estimated take is calculated and combined in Section 6.1.5 of this Opinion. The final estimated take will also consider 3-year take average estimate discussed in Section 6.1 of this Opinion to account to variability, which will be calculated in combined take estimate in Section 6.1.5. As explained in Section 2.9.3.1 of this Opinion, USACE will report annual take to NMFS, but take levels will be tracked against the ITS in longer intervals (identified by species below), to better account for annual variability.

### 6.1.2.1        Ability to observe take in hopper dredging

It is not known how many sea turtles or sturgeon are taken by hopper dredging, but not observed. Historically, NMFS has estimated that only 50% of the take that occurs during hopper dredging is observed, and we have no new information to modify this estimate. Thus, our jeopardy analysis accounts for total take (observed take plus unobserved take), calculated in Table 37. We also assume that the 2.25 sea turtles will be observed captured that cannot be identified to the species.

**Defendants' Exhibit C**

**Table 37.  Estimated Annual Observed and Unobserved Hopper Dredging Take under this Opinion**

|  | Hopper Dredging Observed | Hopper Dredging Unobserved | Hopper Dredging Total |
|---|---|---|---|
| **Green sea turtle** | 19.73 | 19.73 | 39.45 |
| **Kemp's ridley sea turtle** | 18.60 | 18.60 | 37.20 |
| **Loggerhead sea turtle** | 34.38 | 34.38 | 68.76 |
| **Unknown sea turtle** | 2.25 | 2.25 | 4.51 |
| **Atlantic sturgeon** | 21.98 | 21.98 | 43.96 |
| **Shortnose Sturgeon** | 1.69 | 1.69 | 3.38 |

The estimated 50% of hopper dredging take assumed to be unobserved accounts for takes which may not be visually seen by a PSO due to pieces of the animal sinking to the bottom of the hopper, and not being caught by inflow/outflow screening, and also for the variability of observation effectiveness, such as if the ability to observe take is reduced based on the need to adjust screening on hopper dredges.  For instance, the inflow and/or overflow screen size may need to be adjusted in certain situations to account for the amount of debris in the area being dredged or the composition of the material dredged.  For example, dredging in Wilmington Harbor frequently results in the need to increase screening mesh size or remove the inflow screening to accommodate large woody debris or mud in the area, which clog the inflow screens rendering them ineffective to monitor for take.  In limited instances, MEC/UXO screens are also needed to be placed on the draghead to exclude materials in the area such as rocks encountered as a borrow area is dredged to the rock below the sand intended to be removed.  In these instances, MEC/UXO screening may be used as a safety precaution to protect the dredge from damage resulting from suctioning up damaging materials or potentially even unexploded munitions.  In all of these scenarios, the ability to observe potential take is decreased.  If inflow screens are increased in size, larger pieces of species may pass through undetected.  If inflow screens are removed entirely, take of species cannot be observed in the inflow and observation of take is limited to only overflow screening.  Overflow screening varies by hopper dredge vessel and may not as effectively capture species parts to monitor take.  Overflow also only captures parts that float to the surface of the hopper and are entrained as water collected in the hopper is overflowed to make room for more dredged sediment to be held in the hopper for transport to the disposal location.  While it is believed that species parts generally float, we assume that at least a portion are buried in the sediment contained in the hopper and are undetected.  If MEC/UXO screening is placed on the draghead of the hopper, the screening is so small that it is assumed that take is not entrained through the draghead into the hopper and is therefore not observed.  In limited instances, species have been reported impinged on the MEC/UXO screening, but it is assumed that most take is excluded and unobserved.

The USACE estimated that the need for MEC/UXO screening will be limited and all instances where this screening is used on a project covered under this Opinion will be reviewed by NMFS under the Supersede procedures outlined in Section 2.9.5 of this Opinion.  This secondary review of projects requiring MEC/UXO screening will be considered on a case-by-case basis to ensure that the use of the screening is truly limited and that unobserved take is not expected to rise

**Defendants' Exhibit C**

above the estimated 50%. Other considerations that will be reviewed include the likelihood of take based on the site conditions, likelihood of take based on expected species presence depending on the location and time of year, and length of time that MEC/UXO screening will be needed. In addition, NMFS will be notified when inflow screening is increased or removed and these scenarios will be considered as part of the annual review process.

Based on information provided by the USACE on how and when these scenarios occur and a review of previous projects that required these changes, we believe that the 50% unobserved take estimate will continue to account for even these instances where the ability to monitor for take is decreased.

### 6.1.3        Effects of Cutterhead Dredging

As discussed in Section 3.1.1.4.2 of this Opinion, we believe that cutterhead dredging in sturgeon rivers may result in sturgeon take. We anticipate no other ESA-listed species may be incidentally taken by cutterhead dredging, for the reasons discussed in Section 3.1.1.4 of this Opinion. Because of the specific requirements establish for monitoring take by cutterhead dredging in the Sturgeon PDCs (e.g., twice daily monitoring of the disposal pond), we do not anticipate sturgeon takes will go unobserved.

We anticipate sturgeon takes may occur when water quality in certain river reaches is poor. We identified these areas and times with the letters "B" or "C" in Table 56 in the Sturgeon PDCs in Appendix E. In the areas and times identified as "B" in Table 56 in the Sturgeon PDCs in Appendix E, water quality is poor, the section of the river has been surveyed, and no seasonal aggregation areas were identified. However, some of the rivers with poor water quality still support areas with higher densities of sturgeon. Unlike the discrete seasonal aggregation areas that appear to be associated with a physical feature, these "B" river reaches have relatively high sturgeon densities over a larger area without association to an obvious physical feature. These reaches are also used for longer durations than seasonal aggregations areas. Instead, these areas of high occupancy are likely preferentially selected by the animals because they provide beneficial environmental (e.g., appropriate temperature and DO concentrations) or resource (e.g., prey) conditions.

For example, telemetry data obtained in the Cape Fear River, North Carolina, indicate high occupancy levels of sturgeon along a relatively long stretch river (River Mile [RM] 18.75-37.5; River Kilometer [RKM] 30-60), from May-October. Based on the available bathymetry of this area, the area they are using does not appear to have a unique/specific physical feature (e.g., no deep holes), unlike aggregation areas observed  in other rivers (e.g., Savannah River, Georgia/South Carolina). Because of the size and relative homogeneity of the river bottom in these areas of high occupancy, we anticipate that water quality changes caused by dredge-related activities would not cause adverse effects by forcing sturgeon from areas of refuge into surrounding environments that are unable to support their physiological needs. However, even though these animals may not ultimately be forced from areas of refuge, they may still be at greater risk of injury from equipment because they occur in relatively higher densities, and could suffer from reduced fitness because of low DO concentrations. In these circumstances, we believe there is an elevated risk of incidentally taking those animals by cutterhead dredging. As

**Defendants' Exhibit C**

Savannah River – Atlantic sturgeon:  As with our other rivers, estimates of adult populations of Atlantic sturgeon in the Savannah River are not available.  The Atlantic sturgeon final listing rule estimates no more than 300 spawning adults are likely in the Savannah River (77 FR 5914; February 6, 2012).  Thus, we anticipate the population of adult Atlantic sturgeon (300) in the Savannah River is approximately 16% of the adult shortnose sturgeon population in the river. The South Carolina Department of Natural Resources information on "straying" indicates 23.97% of telemetered Atlantic sturgeon were detected outside the defined time and area of the seasonal aggregation, less than shortnose sturgeon.  Using the shortnose sturgeon CPUE for the Savannah River, but scaled to the likely smaller adult Atlantic sturgeon population in the river, and the South Carolina Department of Natural Resources straying rate, we estimated cutterhead takes of 0.06 Atlantic sturgeon every year in the Savannah River, or 0.18 over consecutive 3-year periods.[73]  Because of the nature of cutterhead dredging, we anticipate these takes will be lethal.

**Table 38.  Estimated Shortnose and Atlantic Sturgeon Takes in Cutterhead Dredging, over consecutive 1-year and 3-year periods**

| River (Atlantic Sturgeon DPS) | Shortnose sturgeon – 1 Year | Shortnose sturgeon – 3 Years | Atlantic sturgeon – 1 Year | Atlantic sturgeon – 3 Years |
|---|---|---|---|---|
| Cooper River (Carolina DPS) | 0 | 0 | 0.012 | 0.035 |
| Cape Fear River (Carolina DPS) | 0 | 0 | 0.012 | 0.035 |
| Savannah River (SA DPS) | 0.45 | 1.35 | 0.06 | 0.18 |

### 6.1.4        Effects of Relocation Trawling

As discussed in Section 3.1.3 of this Opinion, relocation trawling is covered under this Opinion. While relocation trawling is intended to reduce lethal take from hopper dredging, the process of relocating ESA-listed species is, in and of itself, a form of take under the ESA.  Relocation trawling is monitored by PSOs trained to handle these species to minimize the risk of harm to them during relocation.  The  PSO PDCs in Appendix H  provide handling and reporting guidance for ESA-listed species captured during relocation trawling.  Additional PDCs regarding the time and locations where relocation trawling can occur are provided in the General PDCs in Section 3.5 of Appendix B, which limit tow times to 42 minutes to minimize the risk of adverse effects on ESA-listed species, primarily mortality of sea turtles due to forced submergence (National Research Council 1990a) (Epperly et al. 2002).  Relocation trawling in the Caribbean is not covered under this Opinion.

Based on the historic records of relocation trawling in the action area (Table 13), 34 projects have used relocation trawling.  This information was then used to determine that relocation trawling projects had an average of 929 tows per project and a maximum of 5,001 tows in a single project (Table 39).  The USACE provided a list of projects anticipated in the next 5 years, which is representative of typical activities under the proposed action, of which an average of 31 projects are scheduled to be completed by hopper dredging and may use relocation trawling

---

[73] 2,712,329 cy dredged material in Savannah River during seasonal aggregation period x shortnose sturgeon Savannah River-specific CPUE 0.00000057 sturgeon/1 cy dredged material x 16% Atlantic sturgeon population relative to shortnose x 23.97% straying rate x 3 years = 0.18 Atlantic sturgeon.

**Defendants' Exhibit C**

annually.  For the analysis in this section, we will accordingly assume that 31 projects a year will
implement relocation trawling that will be covered under this Opinion.  The average and
maximum trawling effort that may occur each fiscal year is calculated by multiplying the average
(929) and maximum (5,001) tows reported per project in  by an estimated 31 projects that may
need relocation trawling annually under this Opinion.  Based on this data, we calculated an
average of 28,779 (929 x 31 = 28,779) tows may be completed annually under this Opinion with
a maximum of 155,031 tows (5,001 x 31 = 155,031) each fiscal year.  This information is used to
calculate the number of ESA-listed species that may be captured using relocation trawling under
this Opinion (Table 41).  For sea turtles and sturgeon, the estimated reported take is included in
Table 40.  Though there were no reported captures of giant manta ray and smalltooth sawfish, the
potential for relocation trawling captures under this Opinion is possible as discussed for each
species in this section.

**Table 39.  Capture Relocation Trawling Calculations**

| Location | Total Trawling Tows | Atlantic Sturgeon | Green Sea Turtle | Kemp's Ridley Sea Turtles | Leatherback Sea Turtles | Loggerhead Sea Turtle | Total Turtles | Total |
|---|---|---|---|---|---|---|---|---|
| All Reports (fiscal years 1997-2019) | 31,595 | 297 | 53 | 91 | 25 | 358 | 527 | 824 |
| Average per Project | 929 | 10 | 2 | 3 | 1 | 11 | | |
| Minimum per Project | 22 | 0 | 0 | 0 | 0 | 0 | | |
| Maximum per Project | 5,001 | 79 | 29 | 19 | 10 | 90 | | |
| Percent sturgeon and turtles relocated | 22 | 100% | 10.06% | 17.27% | 4.74% | 67.93% | | |
| Percent of total captures | 5,001 | 36% | 6.43% | 11.04% | 3.03% | 43.45% | 56.55% | 100% |

### 6.1.4.1        Effects to Sea Turtles from Relocation Trawling

As turtles rest, forage, or swim on or near the bottom, trawls pulled across the bottom at 1.5 to 3
knots can sweep over them.  Trawl nets typically have an overhanging head rope to prevent fish
and shrimp from jumping over the mouth of the net when they are hit by the tickler chain or
footrope.  This overhang also prevents most sea turtles from escaping the trawl by heading for
the surface.  In clear water (e.g., during TED testing when videoed), some turtles may be able to
determine an evasive tactic and swim forward, as documented in video.  Also, turtles released at
the mouth of the net during testing will behave differently than naturally encountered turtles,
which could be resting/sleeping on the bottom and would quickly fall back into the net.  Because
of the trawl's greater speed or the sea turtles' eventually tiring, the sea turtles gradually drop
back toward the rear of the net where they fall into the cod end and are caught.  Captured sea
turtles upon retrieval of trawl gear may be found dead, comatose, or alive and otherwise
seemingly healthy, depending on the extent of forced submergence effects.  Due to the 42-minute

**Defendants' Exhibit C**

tow time limit of relocation trawling under this Opinion, however, we expect most sea turtles to avoid drowning or other serious consequences of forced submergence.  The relocation trawling time limit has remained 42 minutes for all Section 7 dredging consultations, dating back at least to the 1997 SARBO.  According to a study conducted by the USACE ERDC (Dickerson et al. 2007) on relocation trawling, it stated that the average tow time was 35 minutes, which the USACE has stated is to ensure that the maximum allowed time is not exceeded.  The dredging consultation covering maintenance dredging and material placement in the Gulf of Mexico (NMFS 2007b), described the history of the 42-minute tow time as follows: "The  National Research Council (1990a) report "Decline of the Sea Turtles: Causes and Prevention" suggested that limiting tow durations to 40 minutes in summer and 60 minutes in winter would yield sea turtle survival rates that approximate those required for the approval of new TED designs, i.e., 97%."  We continue to believe that the 42-minute trawling limit will result in nonlethal (as opposed to lethal) take in the vast majority of instances, as discussed further below.

### 6.1.4.1.1   Effects of Forced Submergence

Sea turtles are air-breathing reptiles; thus they need to be able to reach the surface to breathe.  Although they are able to conduct lengthy dives, most voluntary dives by sea turtles appear to be an aerobic metabolic process, showing little if any increases in blood lactate and only minor changes in acid-base status (i.e., pH level of the blood).  In contrast, sea turtles that are stressed as a result of being forcibly submerged in trawls maintain a high level of oxygen consumption, which can rapidly consume their oxygen stores and can result in large, potentially harmful internal changes.  Those changes include a substantial increase in blood carbon dioxide, increases in epinephrine and other hormones associated with stress, and severe metabolic acidosis caused by high lactic acid levels.  The rapid oxygen consumption triggers anaerobic glycolysis, which can significantly alter their acid-base balance (i.e., pH level of the blood), sometimes to lethal levels (Lutcavage and Lutz 1997).  Recovery to pre-submergence lactate levels can take several hours (Stabenau and Vietti 2003) to as many as 20 hours (Lutz and Dunbar-Cooper 1987).  The rate of acid-base stabilization depends on the physiological condition of the turtle (e.g., overall health, age, size), time of last breath, time of submergence, environmental conditions (e.g., water temperature, wave action, etc.), and the nature of any injuries sustained at the time of submergence (National Research Council 1990a).

It is likely that the rapidity and extent of the physiological changes that occur during forced submergence are functions of the intensity of struggling underwater, as well as submergence time (Lutcavage and Lutz 1997).  Other factors potentially influencing the severity of effects from forced submergence include the size, activity level, and condition of the sea turtle; the ambient water temperature; and if multiple forced submergences have recently occurred.  Disease factors and hormonal status may also influence survival during forced submergence.  Because thyroid hormones appear to have a role in setting metabolic rate, they too may play a role in increasing or reducing the survival rate of a captured sea turtle (Lutcavage and Lutz 1997).

In the worst scenario, sea turtles drown from being forcibly submerged.  Such drowning may be either "wet" or "dry."  With wet drowning, water enters the lungs, causing damage to the organs and/or causing asphyxiation, leading to death.  In the case of dry drowning, a reflex spasm seals the lungs from both air and water.  Before drowning occurs, sea turtles may become comatose or

**Defendants' Exhibit C**

unconscious, generally unresponsive, and with a drastically suppressed heart and respiration rate–indicative of at least a physiological injury.

While observers have documented the majority of sea turtles captured by relocation trawlers as alive and otherwise seemingly healthy, there have been instances of sea turtle mortalities listed below:

- In June 2010, several relocation trawlers working on an emergency dredging project in Louisiana related to the DWH oil spill event captured 194 sea turtles in just 15 days. There were 3 lethal takes, as well as one unresponsive sea turtle capture (later rehabilitated), that resulted in a 2.06% observed mortality rate, though this project could be considered anomalous due to the ongoing and potentially related offshore DWH oil spill event.

- Of all of the reported relocation trawling in Table 13, only 2 sea turtles were reported as lethal captures, resulting in a 0.38% observed mortality rate of sea turtles during relocation trawling.

- A USACE study (Dickerson et al. 2007) evaluating the effectiveness of relocation trawling stated that of the 1,239 sea turtles relocated between 1980-2006 throughout the action area, the northeast Atlantic coast, and the Gulf of Mexico, only 4 lethal takes (1 green, 2 loggerheads, 1 leatherback) resulted from injuries sustained during trawling capture and not dredging. The green turtle and one of the loggerhead deaths occurred as a result of injuries sustained when they became entangled in the net webbing. One loggerhead appeared to have drowned. The leatherback death occurred when the trawl net became caught on a sunken boat and the net remained submerged for several hours before the trawl rigging could be released. That would equate to 0.32% observed mortality in all reported relocation trawling considered in the study.

We determined that the estimated lethal captures during the DWH spill response is not appropriate to use as a comparison to normal trawling operations, due to the extenuating circumstances of a large oil spill. We believe that the average of the lethal take information that we reviewed in  is the most accurate estimate of mortality associated with the proposed action. The rate of mortality observed in Table 13 (.38%) is based on actions that have previously occurred within the action area and is also similar to the observed mortality in the USACE study that evaluated a larger data set of relocation trawling including areas outside the action area of this Opinion. Therefore, we will assume that 0.38% of relocation trawling captures may result in lethal take. This seems to be an appropriate mortality estimate based on the available data reporting that most projects had no reported lethal take associated with relocation trawling, and that the 2020 SARBO provides additional PSO handling guidance in Section 5 of Appendix H, which is designed to further reduce lethal take and includes information on how to handle unresponsive sea turtles including resuscitation per the sea turtle conservation regulations (50 CFR 223.206(d)(1)(B)).

### 6.1.4.1.2   Effects to Gravid Female Sea Turtles

In addition to respiratory and metabolic stress, sea turtles can also exhibit dynamic hormonal/endocrine responses to stress (Jessop et al. 2002). Of particular concerns for relocation trawling, are the effects to sea turtles during important life stages such as gravid (i.e., pregnant, carrying eggs) female sea turtles approaching nesting beaches during the summer

**Defendants' Exhibit C**

months that may be relocated as part of a project covered under this Opinion. Studies showed that female green turtles during the breeding season exhibited a limited adrenocortical stress response when exposed to ecological stressors and when captured and restrained. Other information indicates stress and exertion from forced submergence on gravid females could result in nonlethal reproductive loss. Forced submergence from relocation trawling can cause nonlethal reproductive loss (i.e., loss of a clutch of sea turtle eggs), which could result in partial or complete disruption of nesting. A partial loss can be treated as the loss of a nesting female sea turtle's single clutch (without effect on development and the ability to lay eggs in subsequent clutches for the year), while a complete disruption would be considered as the loss of all further nesting for that year. Beyond specific reproductive effects are the behavioral alterations and energetic losses resulting from displacement as turtles are relocated from the dredging area and potentially away from desired foraging areas and the nesting beach itself. In contrast, some sea turtles have been observed to exhibit continuation of nesting despite significant events, such as severe injury.

Some sea turtles captured during relocation trawling operations may return to the dredge site and could be subsequently recaptured. Captured sea turtles are typically relocated a significant distance from the dredge area (e.g., historically 2-5 miles), and past documented return times of recaptured sea turtles has been on the order of days. We believe that there is sufficient time to allow a sea turtle to recover fully from the effects of a previous capture. The 2020 SARBO PDCs describe how far sea turtles will be relocated depending on species (PSO PDCs, Appendix H), and if followed, we do not expect any significant forced submergence effects stemming from repeat captures. However, we will consider the effects to gravid sea turtles that may be more susceptible to stress and harm from relocation trawling.

For this Opinion, we will consider post-interaction mortality due to stress and exertion on nesting females, as well as the potential loss of clutch, due to the effects of relocation trawling in the warmer, summer months. We adopted a procedural directive (NMFS 2017e) to determine post-interaction mortality of sea turtles captured in trawl, net, and pot/trap fisheries. This directive specifically excludes directed trawl captures authorized under NMFS Section 10(a)(1)(A) permits or Biological Opinions (e.g., relocation trawling), based on required protective measures intended to maximize survival under these circumstances. However, the directive did not consider potential discrete effects on gravid female sea turtles. Subsequent examination and expert opinion on the issue indicate that there should be additional consideration of the effects of relocation trawling occurring in the summer months, which may affect nesting sea turtles. Capture in relocation trawls can subject gravid female sea turtles to physiological and traumatic effects such as stress, over-exertion, and internal injury (Harms et al. 2003; Phillips et al. 2015; Snoddy et al. 2009; Snoddy and Williard 2010; Stabenau et al. 1991; Stabenau and Vietti 2003; Stacy et al. 2016; Wilson et al. 2014). Although strict adherence to short tow times, availability of veterinary consultation, and other protective measures used during relocation trawling are intended to reduce the effects of capture, the additional concerns related to gravidity are not necessarily addressed by these measures. Therefore, we believe applying assumptions of the policy directive to gravid females subject to summer relocation trawling be a logical, risk-averse approach given the concerns and uncertainty related to the effects of capture on gravid females. Specifically, we will apply the directive's 10% post-interaction mortality rate for all female sea turtle captures in summer months in areas where they nest. Loggerhead sea turtles are the most

340

**Defendants' Exhibit C**

likely gravid female sea turtles that will be encountered based on both the higher numbers of this species that nest in the action area and the higher numbers of this species that are reported captured in the action area.  However, green and leatherback gravid females may also be captured.  Kemp's ridley sea turtle nesting in the action area is very rare and will not be considered.

There is a general absence of data; however, on the number of female sea turtles captured by relocation trawlers in the action area due to the lack of relocation trawling during the summer months when nesting females may be present.  Furthermore, relocation trawlers may also capture subadult and adult male sea turtles during any given project.  Numerous studies have examined sex ratios of loggerhead sea turtle hatchlings, subadults, and adults, which demonstrate variance between year/study and region (Turtle Expert Working Group 2009); however, information on adult sex ratios is generally lacking for all regions in the Atlantic.  The percentage of subadult female loggerheads ranges between 65-80% in various locations or assumed subpopulations, though this percentage apparently decreases between the immature and mature stages (Turtle Expert Working Group 2009).  This information indicates that a large number of captures may not be mature turtles that could be gravid females.  For comparison, we reviewed information provided by a private consulting firm (Coastwise Consulting) that performs relocation trawling both the action area for this Opinion and in the Gulf of Mexico.  The reports provided from 2011-2018 included the size of turtles captured, which was compared to the size each species is expected to reach sexual maturity.  Due to the lack of data on the estimated percent of adult females that may be in the action area, the review of relocation data considered all available projects and was not limited to only those occurring during summer nesting months.  We believe that the information provided for the relocation trawling captures within the action area are the most appropriate to use to estimate future captures under the 2020 SARBO, except for green sea turtles.  While no adult green sea turtles were captured in the projects reviewed, green sea turtles do nest within the action area and female green sea turtles may be encountered.  Therefore, we will use the percent of adult green sea turtles captured in the Gulf of Mexico as a proxy.  As discussed in Section 4.1.1.2 of this Opinion, green sea turtles in both the action area and the Gulf of Mexico belong to the same DPSs.  Green sea turtle nesting occurs on sandy beaches throughout the southeastern United States between Texas and North Carolina, as well as Puerto Rico (Dow et al. 2007; NMFS and USFWS 1991).  The percent of adults that may be captured are highlighted in Table 40.  For the purposes of this Opinion, we assume that half of all adults captured are female since we do not have adequate information to determine the breakdown of the sex of turtles captured.

**Defendants' Exhibit C**

**Table 40.  Reported sea turtle captures between 2011-2018 – in the Atlantic Ocean (ATLO) and in the Gulf of Mexico (GOM)**

| Sea Turtles | ATLO Subadult Captures | ATLO Adult Captures | ATLO Total Captures By Species | ATLO Percent Adult | GOM Subadult Captures | GOM Adult Captures | GOM Total Captures By Species | GOM Percent Adult |
|---|---|---|---|---|---|---|---|---|
| Green | 4 | 0 | 4 | 0.00% | 41 | 8 | 49 | 16.33% |
| Kemp's ridley | 39 | 1 | 40 | 2.50% | 286 | 253 | 539 | 46.94% |
| Leatherback | 0 | 12 | 12 | 100.00% | 0 | 20 | 20 | 100.00% |
| Loggerhead | 31 | 95 | 126 | 75.40% | 68 | 551 | 619 | 89.01% |
| Total | 74 | 108 | 182 | 59.34% | 395 | 832 | 1227 | 67.81% |

### 6.1.4.1.3  Estimated Relocation Trawling Take of Sea Turtles Under the 2020 SARBO

Similar to the analysis on the number of captures estimated to occur annually by hopper dredging discussed in Section 6.1 of this Opinion, we reviewed the total captures by species that occurred in the action area in the last 5 years and the last 21 years since the issuance of the 1997 SARBO. Since relocation trawling under the 1997 SARBO was limited, we also reviewed relocation trawling that occurred within the action area covered under separate Section 7 consultations, including areas dredged that will be maintained under the 2020 SARBO such as Savannah Harbor.  Relocation has not occurred in the U.S. Caribbean and is not covered under this Opinion.  Table 41 provides the information used to calculate the CPUE for relocation trawling based on the reported captures divided by the number of trawling tows completed during the same time period.  The relocation trawling CPUE is then multiplied by the number of tows expected under this Opinion, as discussed in at the beginning of Section 6.1.4 of this Opinion, to estimate the number of reported captures that may occur annually under this Opinion.  We determined that if the CPUE should be calculated on the full 21-year data set, due to the limited number of projects that had relocation trawling in the last 21 years, to most accurately estimate future relocation trawling take that may occur under the 2020 SARBO.  Only 12 projects used relocation trawling within the action area in the past 5 years, in limited areas of the action area. We accordingly believe that relying on this limited number of projects, in limited parts of the action area, would not as accurately predict CPUE for relocation trawling as a result of the proposed action in the 2020 SARBO action area.

Since relocation trawling under the 1997 SARBO and other consultations completed in the action area was more limited than what will be implemented through the 2020 SARBO, we believe that the maximum amount of relocation trawling is a more accurate estimate of relocation trawling under the 2020 SARBO proposed action, and therefore of associated sea turtle take. Relying on the maximum trawling number is intended to account for the expected increase in relocation trawling in marine environments and the potential to catch higher numbers of species working in areas and at times not previously trawled, as well as increasing sea turtle populations. While 5,001 tows for a single project shown in Table 41 is higher than the rest of the trawling effort shown in Table 41, it is comparable to relocation trawling occurring in other areas outside of the action area.  For example, in Mississippi, a single project conducted 563 days of relocation trawling using 2 relocation trawling vessels for a combined total of 14,762 tows (MisCIP). While this project was not a maintenance project, it does demonstrate the tow effort may increase

**Defendants' Exhibit C**

if a project has a high density of ESA-listed species in the area and requires more than one relocation trawling vessel to operate at the same time.  It should also be noted that of the relocation trawling that occurred in the action area (Table 13), both of the projects with the highest number of tows per project occurred in the last 2 years, and the number of relocation trawling tows per project appear to be generally increasing, indicating future projects are also likely to require additional tows to adequately relocate ESA-listed species in the area. The decision of where and when to dredge will continue to be adjusted using the risk-based assessment process, which may include adjustments to this list of dredging locations to maximize the amount of dredging that can be completed while minimizing take based on lessons learned for dredging and trawling at these locations.  For example, the USACE plans to dredge some navigation channels outside of the North Atlantic right whale migration season (i.e., summer months), when sea turtles are expected to be present in greater densities.  The navigation channels that the USACE intends to dredge in the summer months include Brunswick Harbor, Savannah Harbor, Charleston Harbor, Wilmington Harbor Entrance/Inner Ocean Bar, Morehead City, and the Manteo Entrance Channel.  Dredging in the summer in these channels is expected to increase the number of tows needed and the estimated sea turtle captures that will be reported from relocation trawling.  Because summer relocation trawling has been very limited historically, we do not have reliable information regarding the extent to which towing may be increased, but note that the number of tows at MisCIP included summer dredging that resulted in a high number of turtles being relocated during that time period.  Thus, we believe that it is most appropriate to consider the trawling effort based on the maximum number of reported tows and maximum captures that may occur under this Opinion for estimating relocation trawling take of sea turtles, to account for the expected increase in relocation trawling tows associated with summer dredging, in areas where more sea turtles are expected to be present in higher densities, increased use of relocation trawling as a measure to minimize the impact of take, and increasing sea turtle populations.  Therefore, we estimate the number of captures by relocation trawling based on the maximum towing effort expected under the 2020 SARBO and the species captured since the issuance of the 1997 SARBO shown highlighted in Table 41.

**Table 41.  Sea Turtle Relocation Trawling Calculations**

| | Total Tows | Green | Kemp's Ridley | Leatherback | Loggerhead |
|---|---|---|---|---|---|
| All Reports in Action Area (fiscal years 1997-2019) | 31,595 | 53 | 91 | 25 | 358 |
| Maximum per Project | 5,001 | 29 | 19 | 10 | 90 |
| CPUE (reported take/ total tows) | | 0.00168 | 0.00288 | 0.00079 | 0.01133 |
| Maximum annual estimated take (CPUE x 155,031 tows) | | 260.06 | 446.52 | 122.67 | 1,756.64 |

While we expect the vast majority of relocation trawling captures to be nonlethal take, past projects have observed mortality associated with this activity.  Therefore, we will assume a 0.38% mortality rate for captured sea turtles, as discussed in Section 6.1.4.1.1 of this Opinion, for all sea turtle captures in relocating trawling.  Also, as discussed in Section 6.1.4.1.2 of this Opinion, we are including 10% post-interaction mortality for gravid females and the loss of a clutch by adult female turtles captured during the summer months associated with nesting

**Defendants' Exhibit C**

season.  The USACE stated that 6 channels (Brunswick Harbor, Savannah Harbor, Charleston Harbor, Wilmington Harbor Entrance/Inner Ocean Bar, Morehead City, and the Manteo Entrance Channel) may be dredged in the summer by hopper dredging that may also use relocation trawling to minimize the risk of lethal take, though other areas may also be included if they meet the PDCs of this Opinion.  Based on limited availability of hopper dredges and the short timeframe (warmer months), no more than half of these 6 would be dredged in the summer in a single year.  Therefore, we expect summer dredging to require relocation trawling equivalent to 15,003 tows (3 projects x 5001 maximum effort tows).  Using all of this information, Table 42 calculates the estimated total annual lethal and nonlethal take estimated to occur for projects covered under this Opinion.

As discussed in this section, Kemp's ridley and hawksbill sea turtle nesting in the action area is rare and therefore we do not expect gravid females to be relocated that could result in post-interaction mortality or the loss of an egg clutch.

As discussed when estimating take from hopper dredging, the final estimated take covered under this Opinion for relocation trawling will be rounded to a whole number.  However, rounding of take estimates will occur later in this analysis once all estimated take is calculated and combined in Section 6.1.5 of this Opinion.  The final estimated take will also consider 3-year take average estimate discussed in Section 6 of this Opinion to account to variability, which will be calculated in a combined take estimate in Section 6.1.5.  The annual take estimate will still be used to track take overall, but exceedance of take that would result in a need to reinitiate consultation will be based on the 3-year take average.

**Table 42.  Summary of Annual Estimated Sea Turtle Take from Relocation Trawling[74]**

| Row | Calculation | Green | Kemp's Ridley | Leatherback | Loggerhead |
|---|---|---|---|---|---|
| 1 | Annual estimated captures by species (Table 41) | 260.06 | 446.52 | 122.67 | 1,756.64 |
| 2 | Estimated CPUE (Table 36) | 0.00168 | 0.00288 | 0.00079 | 0.01133 |
| 3 | Estimated annual summer captures (Row 2 x 15,003 summer tows) | 25.21 | 43.21 | 11.85 | 169.98 |
| 4 | Estimated annual summer adult sea turtle captures (Row 3 x percent adult in Table 40) | 4.12 | 1.08 | 11.85 | 128.17 |
| 5 | Estimated annual adult female sea turtles captured in summer ( Row 4 x 50%) | 2.06 | 0.54 | 5.93 | 64.08 |
| 6 | Annual post-interaction mortality of adult female sea turtles that may be gravid (Row 5 x 10% post-interaction mortality) | 0.21 | 0.05 | 0.59 | 6.41 |

---

[74] As discussed in this section, Kemp's ridley and hawksbill sea turtle nesting in the action area is rare and therefore we do not expect gravid females to be relocated that could result in post-interaction mortality or the loss of an egg clutch.

**Defendants' Exhibit C**

| Row | Calculation | Green | Kemp's Ridley | Leatherback | Loggerhead |
|-----|-------------|-------|---------------|-------------|------------|
| 7 | Estimated sea turtles captured that are not adult female sea turtles that may be gravid in summer (Row 1 - Row 5) | 258.00 | 445.98 | 116.74 | 1692.56 |
| 8 | Annual post-interaction mortality of other sea turtles that are not gravid adult females(Row 7 x 0.38% post-interaction mortality) | 0.98 | 1.69 | 0.44 | 6.43 |
| 9 | Total annual estimated lethal take (Row 6 + Row 8) | 1.19 | 1.75 | 1.04 | 12.84 |
| 10 | Total annual estimated nonlethal take (Row 1 – Row 9) | 258.87 | 444.77 | 121.63 | 1743.80 |
| 10 | Total annual lost clutch (total female turtles captured in summer assumed to each lose 1 clutch- rounded up from row 5) | 3 | 1 | 6 | 65 |

### 6.1.4.2      Effects to Sturgeon from Relocation Trawling

*Atlantic Sturgeon*

As previously discussed, 5 DPSs of Atlantic sturgeon were listed in 2012.  While the reports in include Atlantic sturgeon captures prior to listing, these reports may not account for all captures as reporting the capture of this species was not required.  In recent years, the number of reported Atlantic sturgeon captures in relocation trawling has increased, especially during winter months at the mouth of rivers where sturgeon are present (identified as sturgeon rivers in Appendix E).  Because the 5 DPSs of Atlantic sturgeon were not listed until 2012, and reports of Atlantic sturgeon have been increasing over that time, we believe that the using the relocation trawling records since 2012 is the best available information for CPUE for this species.  Though the risk-based assessment process will be used to try to minimize the number of take of ESA-listed species, relocation trawling will be used as a reasonable minimization measure to continue projects in these areas when sturgeon presence may be high, depending on the project and the anticipated risk to other ESA-listed species.  While relocation trawling is done in conjunction with hopper dredging, trawling is not always necessary or appropriate depending on the location of the activity.  Hopper dredging outside of sturgeon rivers is common; however, as work continues up into sturgeon rivers, the risk of take of sea turtles decreases, which may reduce the use of relocation trawling unless specifically needed to relocate sturgeon.  Relocation trawling can also be harder to implement in these areas due to debris snags and the limited space to maneuver multiple pieces of equipment for projects in rivers.  Reported sturgeon captures in were generally at projects located near the mouth of sturgeon rivers and the associated estuaries, rather than occurring further up in the rivers themselves where sturgeon are likely to be present in greater number.  For these reasons, we believe that relocation trawling in sturgeon rivers is not likely to increase significantly, and it is more appropriate to consider the average number of relocation trawling tows as opposed to the maximum number of relocation trawling tows, for the purposes of calculating take.  Therefore, we believe that 314.90 captures of Atlantic sturgeon

**Defendants' Exhibit C**

| Date | Location | Number Captured | Disposition | Notes |
|---|---|---|---|---|
| 5/17/19-6/30/19 | Relocation trawling, Tampa Bay Entrance Channel Dredging | 4 | Released alive | Four relocation trawling captures (6/12/19, 6/24/19, and 2 on 6/26/19). All were entangled in net, but released by cutting the net and not bringing the animal aboard. One retrieved with a broken rostrum. |

## 6.1.5 Total Estimated Captures of ESA-listed Species by Hopper Dredging, Cutterhead Dredging, and Relocation Trawling

As discussed earlier, relocation trawling is used as a measure to reduce the lethal take associated with hopper dredging, thereby minimizing the impact of take by the proposed action. However, this measure does also result in take of those animals captured. We have evaluated the effects of relocation trawling and determined that use of relocation trawling will result in nonlethal and, in limited instances, lethal take. This section combines the estimated nonlethal and lethal take associated with both hopper dredging and relocation trawling by species estimated to occur both annually and on a 3-year rolling average to account for variability in captures, discussed in Section 2.9.3.1 of this Opinion. Table 45 summarizes the take estimate by species discussed in Section 6.1 of this Opinion for hopper dredging and in Section 6.1.4 of this Opinion for relocation trawling, including the estimated observed and unobserved take estimated to occur annually and the proportion of take that is expected to be lethal and nonlethal. The estimated take is then rounded to the next whole number since a fraction of a species cannot be captured. Rounding up also provides an estimate that is conservative towards the species to evaluate the risk of these actions jeopardizing the species, which will be evaluated in Section 8 of this Opinion.

Table 46 combines both hopper dredging and relocation trawling take estimates from Table 45 by those that are will be observed, unobserved, lethal, and nonlethal take both annually and on a 3-year basis. As stated earlier in this section, a 3-year rolling average of observed take will be used to determine if the effects analyzed in this Opinion are accurate, and if reinitiation of consultation is necessary on the basis of exceeding the ITS, to account for the expected variability in take annual levels discussed earlier in this section.

We believe that even though relocation trawling used as a minimization measure to reduce lethal take associated with hopper dredging will in and of itself result in lethal take in limited instances, the use of relocation trawling minimizes the risk of harm from hopper dredging and is an appropriate minimization measure. The PDCs in this Opinion are designed to maximize the observability of take associated with hopper dredging and to minimize the risk of lethal take, from relocation trawling and hopper dredging, including providing PSO guidance on how to perform their role on both hopper dredges and relocation trawlers. We believe that adherence to the PSO PDCs will continue to reduce harm from relocation trawling by ensuring PSOs understand the requirements of how to properly handle species captures. The PSO PDCs also will be updated as needed to ensure that the handling guidance continues to include the best available methods to reduce harm to listed species.

**Defendants' Exhibit C**

**Table 45. Total Estimated Take of All Mobile ESA-listed Species from Hopper Dredging, Cutterhead Dredging (sturgeon only), and Associated Relocation Trawling**

| Species | Annual Non-Lethal Observed Take | 3-Year Non-Lethal Observed Take | 3-Year Non-Lethal Observed Take (Rounded Up) | Annual Lethal Observed Take | 3-Year Lethal Observed Take | 3-Year Lethal Observed Take (Rounded Up) | Annual Lethal Unobserved Take | 3-Year Lethal Unobserved Take | 3-Year Lethal Unobserved Take (Rounded Up) |
|---|---|---|---|---|---|---|---|---|---|
| **Relocation trawling** | | | | | | | | | |
| Green sea turtle | 260.06 | 780.18 | 781 | 0 | 0 | 0 | 1.19 | 3.57 | 4 |
| Kemp's ridley sea turtle | 446.52 | 1,339.56 | 1,340 | 0 | 0 | 0 | 1.75 | 5.25 | 6 |
| Leatherback sea turtle | 122.67 | 368.01 | 369 | 0 | 0 | 0 | 1.04 | 3.12 | 4 |
| Loggerhead sea turtle | 1,756.64 | 5,269.92 | 5,270 | 0 | 0 | 0 | 12.84 | 38.52 | 39 |
| Atlantic sturgeon | 313.83 | 941.49 | 942 | 1.07 | 3.21 | 4 | 0 | 0 | 0 |
| Shortnose sturgeon | 1.68 | 5.04 | 6 | 0 | 0 | 0 | 0 | 0 | 0 |
| Giant manta ray | 29.49 | 88.47 | 89 | 0 | 0 | 0 | 0 | 0 | 0 |
| Smalltooth sawfish | 0 | 1 | 1[75] | 0 | 0 | 0 | 0 | 0 | 0 |
| **Hopper Dredging** | | | | | | | | | 0 |
| Green sea turtle | 0 | 0 | 0 | 19.73 | 59.18 | 60 | 19.73 | 59.18 | 60 |
| Kemp's ridley sea turtle | 0 | 0 | 0 | 18.60 | 55.80 | 56 | 18.60 | 55.80 | 56 |
| Leatherback sea turtle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loggerhead sea turtle | 0 | 0 | 0 | 34.38 | 103.14 | 104 | 34.38 | 103.14 | 104 |
| Unidentified sea turtle | 0 | 0 | 0 | 2.25 | 6.76 | 7 | 2.25 | 6.76 | 7 |
| Atlantic sturgeon | 0 | 0 | 0 | 21.98 | 65.94 | 66 | 21.98 | 65.94 | 66 |
| Shortnose sturgeon | 0 | 0 | 0 | 1.69 | 5.07 | 6 | 1.69 | 5.07 | 6 |
| Giant manta ray | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Smalltooth sawfish | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Cutterhead Dredging** | | | | | | | | | |
| Atlantic sturgeon | 0 | 0 | 0 | 0.08 | 0.24 | 1 | 0 | 0 | 0 |
| Shortnose sturgeon | 0 | 0 | 0 | 0.45 | 1.35 | 2 | 0 | 0 | 0 |

[75] 1 total per 9 year period (observed injuries during relocation trawling assumed to result in post-interaction mortality),

**Defendants' Exhibit C**

**Table 46.  3-Year Total Estimated Nonlethal and Lethal Take from Hopper Dredging, Cutterhead Dredging, and Relocation Trawling.**

| Species | 3-Year Non-Lethal Observed Take | 3-Year Lethal Observed Take | 3 Year Lethal Observed Unidentified Sea Turtles Total[76] | 3-Year Lethal Observed Total (Identified + Unidentified [sea turtles]) | 3-Year Lethal Observed Total (Rounded Up) | 3-Year Lethal unobserved Total (Identified + Unidentified [sea turtles]) | 3-Year Lethal Unobserved Take (Rounded Up) | 3-Year Lethal Observed + unobserved | 3-Year Sea Turtle Lost Egg Clutch |
|---|---|---|---|---|---|---|---|---|---|
| Green sea turtle | 781 | 59.18 | 1.83 | 61.01 | 62 | 61.01 | 62 | 124 | 3 |
| Kemp's ridley sea turtle | 1340 | 55.80 | 1.73 | 57.52 | 58 | 57.52 | 58 | 116 | 1 |
| Leatherback sea turtle | 369 | 0 | 0 | 0 | 0 | 3.12 | 4 | 4 | 6 |
| Loggerhead sea turtle | 5270 | 103.14 | 3.19 | 106.33 | 107 | 106.33 | 107 | 214 | 65 |
| Atlantic sturgeon | 942 | 71 | N/A | 71 | 71 | 65.58 | 66 | 137 | N/A |
| Shortnose sturgeon | 6 | 8 | N/A | 8 | 8 | 6 | 6 | 14 | N/A |
| Giant manta ray | 89 | 0 | N/A | N/A | 0 | 0 | 0 | 0 | N/A |
| Smalltooth sawfish | 1 | 0 | N/A | N/A | 1[77] | N/A | 0 | N/A | N/A |

---

[76] Section 6.1.2 includes a discussion outlining how the unidentified sea turtle (Table 36) allocation was determined.

[77] 1 total per 9 year period (includes observed injuries during relocation trawling assumed to result in post-interaction mortality.

**Defendants' Exhibit C**

## 8   Jeopardy Analysis

The analyses conducted in the previous sections of this Opinion provide the basis on which we determine whether the proposed action would be likely to jeopardize the continued existence of the following species: green sea turtle (NA & SA DPSs), Kemp's ridley sea turtle, leatherback sea turtles, loggerhead sea turtle (NWA DPS), smalltooth sawfish (U.S. DPS), shortnose sturgeon, Atlantic sturgeon (New York Bight, Chesapeake Bay, Gulf of Maine, Carolina, and SA DPS), giant manta ray, Johnson's seagrass, elkhorn coral, staghorn coral, boulder star coral, mountainous star coral, and lobed star coral.

In the effects of the action (Section 6 of this Opinion), we outlined how the proposed action would affect these species at the individual level and the magnitude of those effects based on the best available data.  Now, we assess each of these species' response to the effects of the proposed action in terms of overall population effects and whether those effects when considered in the context of the status of the species, the environmental baseline, and the cumulative effects, are likely to jeopardize their continued existence in the wild.

It is the responsibility of the action agency to "insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species…" (ESA Section 7(a)(2)).  Action agencies must consult with and seek assistance from the NMFS to meet this responsibility.  NMFS must ultimately determine in a Biological Opinion whether the action jeopardizes listed species.  To *jeopardize the continued existence of* is defined as "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species" (50 CFR 402.02).  Thus, in making this determination for each species, we must look at whether the proposed actions directly or indirectly reduce the reproduction, numbers, or distribution of a listed species.  Then, if there is a reduction in 1 or more of these elements, we evaluate whether it would be expected to cause an appreciable reduction in the likelihood of both the survival and the recovery of the species.

The actions considered in this Opinion that we believe are likely to result in take are primarily actions that have been occurring in the action area for many decades and are expected to continue to occur.  This Opinion considers the cumulative effects of the continued maintenance of these activities that were previously considered under multiple Opinions, and includes, via the PDCs, minimization measures that are expected to reduce both the likelihood and impact of take from the proposed action.  This Opinion will remain in effect until the reinitiation triggers outlined in Section 12 are met and accordingly does not have a specific length of time in which activities will be covered.  Therefore, we considered it appropriate to consider the effects of take to the species analyzed in this section based on the number of take estimated over any consecutive 3-year period for species with take estimated to occur annually (as described in Section 6) and over longer periods of time for those species that are not estimated to have take annually (i.e. ESA-listed corals and smalltooth sawfish).  The loss of individuals over the period of time specified in the analysis for each species is a reduction in numbers and the cumulative effects are analyzed in this section.  We acknowledge that the loss of these species over the length of the Opinion will result in loss over multiple consecutive periods of the time period

**Defendants' Exhibit C**

specified (e.g., over multiple consecutive 3-year periods).  However, since these activities are a largely a continuation of activities that are already occurring, we believe that the take considered in this Opinion will result in impacts that are similar to those that have been occurring to the populations of these species over decades, while these maintenance activities have been ongoing in the action area.  Therefore, and given our experience monitoring ITSs based on consecutive time periods, we believe that it is appropriate to monitor and analyze take and the impact of take on this basis.  We believe that basing the jeopardy analysis on consecutive time periods accurately accounts for impacts resulting from continued maintenance of activities covered under this Opinion that may, directly or indirectly, reduce appreciably the likelihood of survival or recovery of the listed species in the wild, even when considered over the life of the Opinion.  Since work will occur throughout the expansive action area, the reduction in numbers of each species will also be distributed as discussed for each species below.

## 8.1        Green Sea Turtle (NA and SA DPSs)

Mixed-stock analyses of foraging grounds show that green sea turtles from multiple nesting beaches commonly mix at feeding areas across the Caribbean and Gulf of Mexico, with higher contributions from nearby large nesting sites and some contribution estimated from nesting populations outside the DPS (Bass et al. 1998; Bass and Witzell 2000; Bjorndal and Bolten 2008; Bolker et al. 2007).  In other words, the proportion of animals on the foraging grounds from a given nesting beach is proportional to the overall importance of that nesting beach to the entire DPS.  For example, Tortuguero, Costa Rica, is the largest nesting beach in the North Atlantic DPS and the number of animals from that nesting beach on foraging grounds were higher than from any other nesting beach.  More specifically, Lahanas et al. (1998) showed that juvenile green sea turtles in the Bahamas originate mainly from the western Caribbean (Tortuguero, Costa Rica) (79.5%) (North Atlantic DPS) but that a significant proportion may be coming from the eastern Caribbean (Aves Island/Suriname; 12.9%) (SA DPS).

Flipper tagging studies provide additional information on the co-mingling of turtles from the North Atlantic DPS and South Atlantic DPS.  Flipper tagging studies on foraging grounds and/or nesting beaches have been conducted in Bermuda (Meylan et al. 2011), Costa Rica (Troëng and Rankin 2005), Cuba (Moncada et al. 2006), Florida (Johnson and Ehrhart 1996; Kubis et al. 2009), Mexico (Zurita et al. 2003; Zurita et al. 1994), Panama (Meylan et al. 2011), Puerto Rico (Collazo et al. 1992; Patrício et al. 2011), and Texas (Shaver 1994; Shaver 2002).  Nesters have been satellite tracked from Florida, Cuba, Cayman Islands, Mexico, and Costa Rica.  Troëng and Rankin (2005) report that while there is some crossover of adult female nesters from North Atlantic DPS into the South Atlantic DPS, particularly in the equatorial region where the DPS boundaries are in closer proximity to each other, North Atlantic DPS nesters primarily use the foraging grounds within the North Atlantic DPS.

Since this action area includes projects from the southeast continental United States as well as projects in the U.S. Caribbean (i.e., Puerto Rico and U.S. Virgin Islands), green sea turtles from both the North Atlantic and South Atlantic DPSs can be found within the action area.  While there are currently no in-depth studies available to determine the percent of North Atlantic and South Atlantic DPS individuals in any given location, an analysis of cold-stunned green turtles in St. Joseph Bay, Florida (northern Gulf of Mexico) found approximately 4% of individuals came from nesting stocks in the SA DPS.  On the Atlantic coast of Florida, a study on the foraging

Defendants' Exhibit C

in this Opinion, we believe the proposed action is not reasonably expected to cause an appreciable reduction in the likelihood of survival of the leatherback sea turtle in the wild.

Since we do not anticipate the proposed action will have any detectable impact on the population overall, or current nesting trends, we do not believe the proposed action will cause an appreciable reduction in the likelihood of survival of this species in the wild.

### 8.3.2        Recovery

The Atlantic recovery plan for the U.S. population of the leatherback sea turtles (NMFS and USFWS 1992) lists the following relevant recovery objective:

> *Objective*: The adult female population increases over the next 25 years, as evidenced by a statistically significant trend in the number of nests at Culebra, Puerto Rico; St. Croix, U.S. Virgin Islands; and along the east coast of Florida.

We believe that the potential loss of up to 4 leatherback sea turtles, and the loss of 6 egg clutches, every 3 years is not likely to have any detectable effect on these nesting trends, we do not believe the proposed action is impeding the progress toward achieving this recovery objective.  We also believe that the non-lethal take of 369 leatherback turtles during any consecutive three year period will impact nesting or population trends, as this nonlethal take is not expected to impact these individuals' ability to reproduce.  We believe the proposed action is not likely to impede the recovery objective above and will not result in an appreciable reduction in the likelihood of leatherback sea turtles' recovery in the wild.  Thus, we believe the proposed action will not result in an appreciable reduction in the likelihood of leatherback sea turtles' recovery in the wild.

### 8.3.3        Conclusion

The lethal take of 4 and nonlethal take of 369 leatherback sea turtles plus the loss of 6 egg clutches associated with activities covered under this Opinion over any consecutive 3-year period is not expected to cause an appreciable reduction in the likelihood of either the survival or recovery of leatherback sea turtles in the wild.

### 8.4        Loggerhead NWA DPS

The proposed actions covered under this Opinion may result in the following take of loggerhead sea turtles (NWA DPS) over any consecutive 3-year period (Table 46):

- Non-lethal take= 5,270 observed.

- Lethal take= 107 observed and 107 unobserved for a total of 214 lethal takes.  The estimated 214 lethal loggerhead sea turtle take include 3.19 sea turtles estimated to be captured during any consecutive three year period that will not be able to be identified when retrieved dismembered.

- 65 lost egg clutches.

**Defendants' Exhibit C**

### 8.4.1         Survival

The nonlethal capture of 5,270 NWA DPS loggerhead sea turtles over any consecutive 3-year period is not expected to have any measurable impact on the reproduction, numbers, or distribution of this species.  The individuals are expected to fully recover such that no reductions in reproduction or numbers of this species are anticipated.  Since these captures may occur at any of the discrete project areas within the SARBO action area and would be released within the general area where caught, no change in the distribution of NWA DPS loggerhead sea turtles is anticipated.

The lethal take of 214 loggerhead sea turtles from the NWA DPS over any consecutive 3-year period of the project is a reduction in numbers.  As discussed above, lethal interactions would also result in a potential reduction in future reproduction, assuming the individual would be female and would have survived otherwise to reproduce.  For this Opinion, we also considered the likelihood of post-interaction mortality to female sea turtles captured during relocation trawling and the likelihood of those females to each loose a single clutch of eggs (65 total for loggerhead sea turtle from the NWA DPS per 3-year period) due to the stress of being captured in a relocation trawling net while gravid (Section 6.1.4.1.2 of this Opinion).  While the loss of one clutch would result in the loss of an average of 112.4 eggs, loggerhead sea turtles nest multiple times in a season and therefore would be expected to still lay hundreds of eggs in the same nesting season.  The anticipated lethal take of loggerhead sea turtle from the NWA DPS from dredging and relocation trawling, including captures of gravid females in the summer, are expected to occur at discrete project locations within the SARBO action area (i.e., where work will occur) and loggerhead sea turtles generally have large ranges; thus, no reduction in the distribution is expected from the take of these individuals.

Whether or not the reductions in loggerhead sea turtle numbers and reproduction attributed to the proposed action would appreciably reduce the likelihood of survival depends on what effect these reductions in numbers and reproduction would have on overall population sizes and trends (i.e., whether the estimated reductions, when viewed within the context of the environmental baseline and status of the species, are of such an extent that adverse effects on population dynamics are appreciable).  In Section 4.1.1.5 of this Opinion, we reviewed the status of this species in terms of nesting and female population trends and several recent assessments based on population modeling (i.e., (Conant et al. 2009; NMFS 2009a).  Below we synthesize what that information means both in general terms and the more specific context of the proposed action.

Loggerhead sea turtles are a slow growing, late-maturing species.  Because of their longevity, loggerhead sea turtles require high survival rates throughout their life to maintain a population.  In other words, late-maturing species cannot tolerate much anthropogenic mortality without going into decline.  Conant et al. (2009) concluded loggerhead natural growth rates are small, natural survival needs to be high, and even low- to moderate mortality can drive the population into decline.  Because recruitment to the adult population is slow, population modeling studies suggest even small increased mortality rates in adults and subadults could substantially impact population numbers and viability (Crouse et al. 1987; Crowder et al. 1994; Heppell et al. 1995) (Chaloupka and Musick 1997).

**Defendants' Exhibit C**

NMFS (2009a) estimated the minimum adult female population size for the NWA DPS in the 2004-2008 timeframe to likely be between approximately 20,000-40,000 individuals (median 30,050), with a low likelihood of being as many as 70,000 individuals.  Another estimate for the entire western North Atlantic population was a mean of 38,334 adult females using data from 2001-2010 (Richards et al. 2011).  A much less robust estimate for total benthic females in the western North Atlantic was also obtained, with a likely range of approximately 30,000-300,000 individuals, up to less than 1 million.

NMFS (2011c) preliminarily estimated the loggerhead population in the Northwestern Atlantic Ocean along the continental shelf of the Eastern Seaboard during the summer of 2010 at 588,439 individuals (estimate ranged from 382,000 to 817,000) based on positively identified individuals. The NMFS's point estimate increased to approximately 801,000 individuals when including data on unidentified sea turtles that were likely loggerheads.  The NMFS (2011c) underestimates the total population of loggerheads since it did not include Florida's east coast south of Cape Canaveral or the Gulf of Mexico, which are areas where large numbers of loggerheads are also expected.  In other words, it provides an estimate of a subset of the entire population.

Florida accounts for more than 90% of U.S. loggerhead nesting.  The Florida Fish and Wildlife Conservation Commission conducted a detailed analysis of Florida's long-term loggerhead nesting data (1989-2018).  The Florida nesting data shown in Figure 28 shows a decline in the number of nests reported annually in the last decade with the lowest reported year occurring in 2007 (28,074 nests), though the number of reported nests has continued to increase since then. Since 1989, all nesting years have reported over nearly 40,000 nests annually except 6 years between 2004-2009 that reported lower numbers of nests.  While nest abundance estimates account for only a subset of the entire loggerhead sea turtle population, numbers in the western North Atlantic indicate the population is large (i.e., several hundred thousand individuals). Nesting trends have been significantly increasing over several years against the background of the past and ongoing human and natural factors (as contemplated in the Status of the Species and Environmental Baseline) that have contributed to the current status of the species.

Activities covered under this Opinion could result in the lethal  take of 214 loggerhead sea turtles (144 observed, 103 unobserved, and 2.24 observed that cannot be identified to species) and the nonlethal take of 5,270 loggerhead sea turtles and the loss of 65 egg clutches over any consecutive 3-year period of the project; however, we do not expect this loss to result in a detectable change to the population numbers or increasing trends.  After analyzing the magnitude of the effects of the proposed action, in combination with the past, present, and future expected impacts to the DPS discussed in this Opinion, we believe the proposed action is not reasonably expected to cause an appreciable reduction in the likelihood of survival of the loggerhead sea turtle NWA DPS in the wild.

## 8.4.2       Recovery

The loggerhead recovery plan defines the recovery goal as "…ensur[ing] that each recovery unit meets its Recovery Criteria alleviating threats to the species so that protection under the ESA is no longer necessary" (NMFS and USFWS 2008).  The plan then identifies 13 recovery objectives needed to achieve that goal.  We do not believe the proposed action impedes the progress of the recovery program or achieving the overall recovery strategy.

Defendants' Exhibit C

The recovery plan for the Northwest Atlantic population of loggerhead sea turtles (NMFS and USFWS 2008) lists the following recovery objectives that are relevant to the effects of the proposed action:

> Objective: Ensure that the number of nests in each recovery unit is increasing and that this increase corresponds to an increase in the number of nesting females.

> Objective: Ensure the in-water abundance of juveniles in both neritic and oceanic habitats is increasing and is increasing at a greater rate than strandings of similar age classes.

Recovery is the process of removing threats so self-sustaining populations persist in the wild. The proposed action would not impede progress on carrying out any aspect of the recovery program or achieving the overall recovery strategy. The recovery plan estimates that the population will reach recovery in 50-150 years following implementation of recovery actions. The minimum end of the range assumes a rapid reversal of the current declining trends; the higher end assumes that additional time will be needed for recovery actions to bring about population growth.

Nesting trends have been increasing since 2007, and take associated with projects covered under this Opinion, especially from hopper dredging, have been and will continue to occur in the action area. While the lethal take of up to 214 loggerhead sea turtles, and the loss of 65 egg clutches over any consecutive 3-year period for projects covered under this Opinion will result in a reduction in numbers and reproduction, it is unlikely to have any detectable influence on the nesting trends noted above. We believe that the non-lethal take of 5,270 loggerhead sea turtles will not impact nesting trends, as non-lethal capture would not impact these individuals' reproduction. Given nesting populations are steadily increasing, the projected take is not expected to have any discernable impact to the species.

### 8.4.3        Conclusion

The lethal take of 214 and nonlethal take of 5,270 loggerhead sea turtles plus the loss of 65 egg clutches associated with activities covered under this Opinion over any consecutive 3-year period is not expected to cause an appreciable reduction in the likelihood of either the survival or recovery of loggerhead sea turtles in the wild.

### 8.5        Atlantic Sturgeon (All 5 DPSs)

The proposed actions covered under this Opinion may result in the following take of Atlantic sturgeon over any consecutive 3-year period (Table 51):

- Nonlethal take= 942 observed.

- Lethal take= 71 observed and 66 unobserved for a total of 137 lethal take.

Because subadult and adult Atlantic sturgeon mix extensively in the marine and estuarine environments, individuals from all 5 Atlantic sturgeon DPSs could occur within the action area.

**Defendants' Exhibit C**

# 9   CONCLUSION

NMFS analyzed the best available data, the status of the species, environmental baseline, effects of the proposed action, and cumulative effects to determine whether the proposed action is likely to jeopardize the continued existence of the following species.

*Sea Turtles*

The proposed action is not expected to appreciably reduce the likelihood of survival or recovery of these species in the wild.  Therefore, it is NMFS' Opinion that the proposed action is not likely to jeopardize the continued existence of, NA DPS green, SA DPS green, Kemp's ridley, leatherback, and the NWA DPS loggerhead sea turtles.

*Sturgeon*

The proposed action is not expected to appreciably reduce the likelihood of survival or recovery of the 5 DPSs of Atlantic sturgeon and shortnose sturgeon.  Therefore, it is NMFS' Opinion that the proposed action is not likely to jeopardize the continued existence of the Gulf of Maine, New York Bight, Chesapeake Bay, Carolina, and SA DPSs of Atlantic sturgeon, or shortnose sturgeon.

*Giant Manta Ray*

The proposed action is not expected to appreciably reduce the likelihood of survival or recovery of this species in the wild.  Therefore, it is NMFS' Opinion the proposed action is not likely to jeopardize the continued existence of the giant manta ray.

*Smalltooth Sawfish*

The proposed action is not expected to appreciably reduce the likelihood of survival or recovery of this species in the wild.  Therefore, it is NMFS' Opinion that the proposed action is not likely to jeopardize the continued existence of the U.S. DPS of smalltooth sawfish.

*Johnson's seagrass*

The proposed action is not expected to appreciably reduce the likelihood of survival or recovery of this species in the wild.  Therefore, it is NMFS' Opinion the proposed action is not likely to jeopardize the continued existence of Johnson's seagrass.

*Coral*

The proposed action is not expected to appreciably reduce the likelihood of survival or recovery of these species in the wild.  Therefore, it is NMFS' Opinion the proposed action is not likely to jeopardize the continued existence of elkhorn, staghorn, lobed star, mountainous star, or boulder star coral.

# 10   INCIDENTAL TAKE STATEMENT

Section 9 of the ESA and protective regulations issued pursuant to Section 4(d) of the ESA prohibit the take of endangered and threatened species, respectively, without a special exemption.

**Defendants' Exhibit C**

*Take* is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in any such conduct. *Incidental take* is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of Section 7(b)(4) and Section 7(o)(2), taking that would otherwise be considered prohibited under Section 9 or Section 4(d), but which is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the ESA provided that such taking is in compliance with the RPMs and the terms and conditions of the ITS of the Opinion.

The take of giant manta ray and ESA-listed corals by the proposed action is not prohibited, as no Section 4(d) Rules for the species have been promulgated. However, at least one circuit court case has held that non-prohibited incidental take must be included in the ITS.[82] Providing an exemption from Section 9 liability is not the only important purpose of specifying take in an ITS. Specifying incidental take ensures we have a metric against which we can measure whether or not reinitiation of consultation is required. It also ensures that we identify reasonable and prudent measures we believe are necessary or appropriate to minimize the impact of such incidental take.

Section 7(b)(4)(C) of the ESA specifies that to provide an ITS for an endangered or threatened species of marine mammal, the taking must be authorized under Section 101(a)(5) of the MMPA. No incidental take of marine mammals is anticipated as a result of the proposed action, and no incidental take of listed marine mammals has been authorized under Section 101(a)(5) of the MMPA. Therefore, no statement on incidental take of protected marine mammals is provided and no take is authorized. Nevertheless, the USACE and/or BOEM must immediately notify (within 24 hours, if communication is possible) NMFS' Office of Protected Resources if a take of a listed marine mammal occurs.

## 10.1 Anticipated Incidental Take

NMFS anticipates the following incidental takes of sea turtles, sturgeon, giant manta ray, smalltooth sawfish, and corals may occur in the future because of the proposed action.[83] The level of take occurring annually is highly variable and influenced by sea temperatures, species abundances, and other factors that cannot be predicted. Because of this variability, it is unlikely that all species evaluated in this Opinion will be consistently impacted year after year. For example, some years may have no observed interactions and thus no estimated take. As a result, monitoring take using 1-year estimated take levels is largely impractical. For these reasons, and based on our experience monitoring fisheries, we believe a 3-year time period is appropriate for meaningful monitoring for sea turtles and sturgeon that are expected to have take occur every year. The triennial takes are set as 3-year running sums (total for any 3-year period)

---

[82] *CBD v. Salazar*, 695 F.3d 893 (9th Cir. 2012). Though the *Salazar* case is not a binding precedent for this action outside of the 9th Circuit, NMFS Southeast Region finds the reasoning persuasive and is following the case out of an abundance of caution and anticipation the ruling will be more broadly followed in future cases.

[83] Johnson's seagrass is not included in the Incidental Take Statement, as Incidental Take Statements are not provided for plants, only for fish and wildlife species USFWS and NMFS. 1998. Endangered Species Act consultation handbook. Procedures for Conducting Section 7 Consultations and Conferences. U.S. Fish and Wildlife, National Marine Fisheries Service.. *See, e.g., Ctr. for Biological Diversity v. Bureau of Land Mgmt.,* 833 F.3d 1136, 1145 (9th Cir. 2016)

**Defendants' Exhibit C**

and not for static 3-year periods (i.e., 2018-2021, 2019-2022, 2020-2023 and so on, as opposed to 2017-2020, 2021-2024, 2025-2028, etc.).  This approach will allow us to incorporate the inherent variability in take levels, but still allow for an accurate assessment of how the proposed action is performing versus our expectations.  For species that are estimated to take occur less frequently (i.e., ESA-listed coral, smalltooth sawfish, and giant manta ray), the take is estimated by a longer period of time provided in Table 52, but is still estimated on a consecutive number of years to account for variability in species presence and projects completed.  These limits set thresholds that, if exceeded, would be the basis for reinitiating consultation.

**Defendants' Exhibit C**

**Table 52.  Anticipated Future Take Per 3 Consecutive Year Period**

| Species | Nonlethal Take-Observed | Lethal Take-Observed | Lethal Take-Unobserved | Total Lethal Observed + Unobserved Take | Sea Turtle Lost Egg Clutch |
|---|---|---|---|---|---|
| **Green Sea Turtle NA DPS** | 742 | 59 | 59 | 118 | 3 |
| **Green Sea Turtle SA DPS** | 40 | 4 | 4 | 8 | 0 |
| **Kemp's Ridley Sea Turtle** | 1,340 | 58 | 58 | 116 | 1 |
| **Leatherback Sea Turtle** | 369 | 0 | 4 | 4 | 6 |
| **Loggerhead Sea Turtle NWA DPS** | 5,270 | 107 | 107 | 214 | 65 |
| **Atlantic Sturgeon South Atlantic DPS** | 499 | 73 | 0 | 73 | N/A |
| **Atlantic Sturgeon Carolina DPS** | 319 | 47 | 0 | 47 | N/A |
| **Atlantic sturgeon Chesapeake Bay DPS** | 91 | 14 | 0 | 14 | N/A |
| **Atlantic Sturgeon New York Bight DPS** | 34 | 5 | 0 | 5 | N/A |
| **Atlantic Sturgeon Gulf of Maine DPS** | 1 | 1 | 0 | 1 | N/A |
| **Shortnose sturgeon** | 6 | 8 | 6 | 14 | N/A |
| **Giant manta ray** | 89 | 0 | 0 | 0 | N/A |

**Defendants' Exhibit C**

**Table 53.  Anticipated Future Take Per Other Defined Time Period**

| Species | Nonlethal Take- Observed | Lethal Take- Observed | Lethal Take- Unobserved |
|---|---|---|---|
| Smalltooth sawfish (U.S. DPS) | 1 total per 3 year period | 1 total per 9 year period[84] | |
| Elkhorn Coral | 2 total per 10 year period | 1 total per 10 year period | Monitoring required = no unobserved |
| Staghorn coral | 1,105 total per 10 year period | 195 total per 10 year period | Monitoring required = no unobserved |
| Lobed star coral | 43 total per 10 year period | 8 total per 10 year period | Monitoring required = no unobserved |
| Mountainous star coral | 136 total per 10 year period | 25 total per 10 year period | Monitoring required = no unobserved |
| Boulder star coral | 63 total per 10 year period | 11 total per 10 year period | Monitoring required = no unobserved |

---

[84] For smalltooth sawfish, a total of 3 takes in authorized every 9 years, with up to 1 lethal take.

**Defendants' Exhibit C**

## 10.2        Effect of the Take

NMFS has determined the level of anticipated take specified in Section 10.1 of this Opinion is not likely to jeopardize the continued existence of the following ESA-listed species or DPS: Northwest Atlantic DPS of loggerhead sea turtles, green sea turtles (South and North Atlantic DPSs), leatherback sea turtles, Kemp's ridley sea turtles, smalltooth sawfish (U.S. DPS), Atlantic sturgeon (the Gulf of Maine, Chesapeake, New York Bight, Carolina and the SA DPSs), shortnose sturgeon, giant manta ray, smalltooth sawfish, Johnson's seagrass, and corals (elkhorn, staghorn, lobed star, mountainous star, and boulder star corals).

## 10.3        Reasonable and Prudent Measures

Section 7(b)(4) of the ESA requires NMFS to issue a statement specifying the impact of any incidental take on listed species, which results from an agency action otherwise found to comply with Section 7(a)(2) of the ESA.  It also states that the RPMs necessary to minimize the impacts of take and the terms and conditions to implement those measures must be provided and must be followed to minimize those impacts.  Only incidental taking by the federal agency or applicant that complies with the specified terms and conditions is consistent with this Opinion and authorized.

The RPMs and terms and conditions are specified as required by 50 CFR 402.14 (i)(1)(ii) and (iv) to document the incidental take by the proposed action and to minimize the impact of that take on ESA-listed species.  These measures and terms and conditions are nondiscretionary, and must be implemented by the USACE and/or BOEM or the applicants (in regulatory actions) in order for the protection of Section 7(o)(2) to apply.  The USACE and/or BOEM has a continuing duty to regulate the activity covered by this ITS.  If the USACE and/or BOEM or the applicants fail to adhere to the terms and conditions of the ITS through enforceable terms, and/or fails to retain oversight to ensure compliance with these terms and conditions, the protective coverage of Section 7(o)(2) may lapse.  To monitor the impact of the incidental take, the USACE and/or BOEM or the applicant must report the progress of the action and its impact on the species to NMFS as specified in the ITS [50 CFR 402.14(i)(3)].  All reports required under this Opinion will be sent to **SERO.Dredge@noaa.gov**.

The PDCs of this Opinion are designed to minimize take including those provided to increase the ability to observe take by hopper dredging in the General PDCs in Appendix B and the PSO PDCs in Appendix H.  The PDCs area also designed to minimize or remove the risk of take of ESA-listed corals (Appendix C), Johnson's seagrass (Appendix D), Atlantic and shortnose sturgeon (Appendix E), and North Atlantic right whales (Appendix F).  In light of these protections, NMFS concludes that the PDCs include the measures necessary and appropriate to minimize the impact of incidental take.  Therefore, we include as RPMs/T&Cs those elements of the proposed action that are necessary and appropriate to minimize the impact of take.  The RPMs/T&Cs impose no additional requirements beyond those specified by the proposed action. Only incidental takes that occur while these measures are in full implementation are authorized. These restrictions remain valid until reinitiation and conclusion of any subsequent Section 7 consultation.

**Defendants' Exhibit C**

NMFS has identified the following measures that must be implemented by the USACE and BOEM (directly or through mandatory conditions of its authorization for the action) to minimize the impact of take from the proposed action.

1. The USACE and BOEM will have measures in place to minimize and avoid interactions with any protected species resulting from the proposed action, as appropriate.

2. Relocation trawling is authorized and will be used in reasonable circumstances  to reduce lethal take from hopper dredging.

3. Relocation of ESA-listed corals will be used as a minimization measure to reduce lethal take from pipeline placement and beach nourishment.

   4. All handling of ESA-listed species will be monitored for and handled by a NMFS-approved PSO.

## 10.4        Terms and Conditions

In order to be exempt from liability for take prohibited by Section 9 of the ESA, the USACE and/or BOEM or their applicants must comply with all of the conditions of this Opinion outlined in the proposed action and PDCs, specifically those required to minimize or prevent incidental take outlined in the RPMs in Section 10.3 of this Opinion.

1. All equipment will be operated according to the requirements in the PDCs relating to direct efforts to monitor, minimize, or avoid impacts on ESA-listed species, including those applicable: generally to projects covered by SARBO 2020 (Appendix B), by equipment type (Appendix B and Appendix G), and by location (Appendix C for projects within the range of ESA-listed corals and Appendix E for projects in sturgeon rivers).

2. All personnel associated with projects authorized under the 2020 SARBO will be educated regarding the requirements to avoid and minimize effects to ESA-listed species and critical habitat, consistent with Appendix B (RPM 1).

3. Reporting requirements necessary to document take of ESA-listed species will be met by following the reporting requirements outlined in Section 2.9 of this Opinion (RPM 1).

4. Relocation trawling will be conducted according to the PDC requirements in Appendix B and Appendix I (RPM 2).

5. Relocation of corals will be done if NMFS determines that relocation would minimize the impact of lethal take, following a project-specific review.  Relocation of corals will be done in accordance with the requirements of the PDCs, in Appendix C (RPM3).

6. A PSO will monitor for the presence of ESA-listed species on hopper dredges and relocation trawling vessels and will be responsible for handling, tagging, collecting genetic samples, and recording the details of the capture in accordance with Appendix B, Appendix H, and Section 2.9 of this Opinion (RPM 4).

**Defendants' Exhibit C**

## 12   REINITIATION OF CONSULTATION

This concludes NMFS's formal consultation on the proposed action.  As provided in 50 CFR 402.16, reinitiation of formal consultation is required where discretionary federal action agency involvement or control over the action has been retained, or is authorized by law, and if (1) the amount or extent of incidental take is exceeded, (2) new information reveals effects of the agency action on listed species or designated critical habitat in a manner or to an extent not considered in this Opinion, (3) the agency action is subsequently modified in a manner that causes an effect on the listed species or critical habitat not considered in this Opinion, or (4) a new species is listed or critical habitat designated that may be affected by the action.

**Defendants' Exhibit C**

**Appendix A.       South Atlantic Regional Biological Opinion (2020 SARBO) Project Design Criteria (PDCs) Overview and General PDCs**

The 2020 SARBO PDCs are part of the proposed action and are nondiscretionary, meaning that a project authorized under 2020 SARBO must adhere to all applicable PDCs.  PDCs minimizing the impact of take associated with the proposed action are also explicitly stated as a requirement of the RPMs/Terms and Conditions in Section 10.3 and 10.4.  Projects must be designed to meet all PDC requirements based on project activity type, location, species or critical habitat in the project area, and equipment type(s) that will be used.  However, not all PDCs will be applicable to all projects.  For example, if a project does not include the use of relocation trawling, then compliance with relocation trawling PDCs would not be required.

Alternative review: In limited instances, a project may be authorized under the 2020 SARBO if it does not strictly adhere to all applicable PDCs, under the Alternative Process for Project Specific Review and Inclusion of Substantially Similar Projects or Projects with Substantially Similar Effects outlined in Section 2.9.5 of the 2020 SARBO.  As described in the 2020 SARBO, projects that do not strictly comply with all applicable PDCs, but are substantially similar, or projects with substantially similar effects, may be authorized under 2020 SARBO if the project undergoes separate review and approval by National Marine Fisheries Service (NMFS) prior to beginning work.  Projects that cannot meet all relevant PDC requirements or that do not fit under the alternative review process outlined in Section 2.9.5 of the 2020 SARBO, will require individual Section 7 consultation.  In addition, any area previously authorized or permitted to be dredged or have material placed in a separate individual Section 7 consultation may be maintained to the same dredge or fill template under this Opinion if it meets all of the PDCs of this Opinion.

All PDCs were developed jointly with the U.S. Army Corps of Engineers (USACE) and Bureau of Ocean Energy Management (BOEM) and are designed to avoid or minimize impacts on Endangered Species Act (ESA)-listed species and critical habitat under NMFS purview where appropriate.  Many of the terms used are standard to the industry or regulatory-specific (e.g., maintenance dredging, advanced maintenance).  These terms are explained in the Project Description (Section 2 of the 2020 SARBO) and defined below for purposes of compliance with the PDCs.

The PDCs are divided as follows:

General PDCs (Appendix B)
A list of all of the general PDCs that apply to all projects.  These are further divided as follows:

- Eligibility Criteria PDCs: PDCs that define if an activity meets the criteria to be covered under the 2020 SARBO (Appendix B Section 1)

- Standard/General PDCs: PDC requirements that apply to all projects covered under the 2020 SARBO (Appendix B Section 2)

- Equipment-Specific PDCs: PDCs that apply to specific equipment types covered under the 2020 SARBO (Appendix B Section 3).  These include PDCs specific to hopper dredging (Section 3.1), munitions of explosive concern (MEC)/ unexploded ordinance (UXO)

**Defendants' Exhibit C**

screening (Section 3.2), cutterhead dredging (Section 3.3), bed-leveling (Section 3.4), and relocation trawling (Section 3.5).

Appendix C- Appendix H are topic specific PDCs that apply in addition to the PDCs in Appendix B as described below

- Appendix C.  Coral PDCs
  PDCs that apply to projects occurring within the range of corals (as defined in this appendix).

- Appendix D.  Johnson's seagrass PDCs
  PDCs that apply to projects occurring within the range of Johnson's seagrass (as defined in this appendix).

- Appendix E.  Sturgeon PDCs
  PDCs that apply to projects occurring within rivers where sturgeon occur (as defined in this appendix).

- Appendix F.  North Atlantic Right Whale Plan
  PDCs that apply to projects occurring within the range of North Atlantic right whales during the time they may be present (as defined in this appendix).

- Appendix G.  Geophysical and Geotechnical (G&G) Survey PDCs
  PDCs that apply if a USACE project uses geophysical or geotechnical survey equipment.

- Appendix H.  Protected Species Observer (PSO) PDCs
  PDCs that apply to work conducted by the Protected Species Observer handling ESA-listed species.

- Appendix I.  Relocation trawling lazy line guidance.  This is information provided to support PDC RELOCATE.3 in the General PDCs in Appendix B.

- Appendix J.  Risk assessment guidance.  This guidance is a living document that will be updated as new information is learned that can help guide the risk assessment process.

Project timing: The USACE and/or BOEM will determine project timing and necessary minimization measures to reduce the risk of take of ESA-listed species through the Risk Based Adaptive Management process outlined in Section 2.9.2.2 of the 2020 SARBO and Appendix J. Additional timing requirements apply within the range of certain species, as outlined in the North Atlantic Right Whale Conservation Plan (Appendix F) and sturgeon PDCs (Appendix E).

Additional regulations that may apply: Note that additional state and federal requirements may apply to projects covered under the 2020 SARBO.  This may include, but is not limited to, requirements under the Magnuson–Stevens Fishery Conservation and Management Act, Marine Mammal Protection Act, Clean Water Act, National Marine Sanctuaries Act, and/or state-specific regulations.

**Defendants' Exhibit C**

**Appendix B.      2020 SARBO General PDCs**

**1     Eligibility Criteria PDCs: PDCs that Define if an Activity Meets the Criteria to be Covered under the 2020 SARBO**

The Eligibility PDCs in this section define the criteria that must be met for different types of activities to be covered under the 2020 SARBO.  All activities must follow the 2020 SARBO PDCs to be covered under this Opinion.  Section 2 of the 2020 SARBO provides additional information, definitions, and images to help explain each of these types of projects.

*Alternative review: In limited instances, a project may be authorized under the 2020 SARBO if it does not adhere to all applicable PDCs, under the Alternative Process for Project Specific Review and Inclusion of Substantially Similar Projects or Projects with Substantially Similar Effects outlined in Section 2.9.5 of the 2020 SARBO.  As described in the 2020 SARBO, projects that do not strictly comply with all applicable PDCs, but are substantially similar, or projects with substantially similar effects, may be authorized under 2020 SARBO if the project undergoes separate review and approval by NMFS prior to beginning work.  Projects that cannot meet all relevant PDC requirements or that do not fit under the alternative review process outlined in Section 2.9.5 of the Opinion, will require individual Section 7 consultation.  In addition, any area previously authorized or permitted to be dredged or have material placed in a separate individual Section 7 consultation may be maintained to the same dredge or fill template under this Opinion if it meets all of the PDCs of this Opinion.*

**1.1          Dredging and dredging related activities covered under the 2020 SARBO**

DREDGE.1     Maintenance dredging covered under this Opinion includes the list below, as described in 2.3.1 of the 2020 SARBO.

- Maintenance dredging in navigation waterways and channels required to be maintained under Title 33 (Navigation and navigable waters): Maintenance to the dredge template provided in Title 33 or the deeper or wider template provided in the SARBO Biological Assessment (SARBA) Appendix B (provided on the NMFS dredging website at https://www.fisheries.noaa.gov/content/southeast-dredging) or analyzed in an individual Section 7 consultation, including the defined overdepth and advanced maintenance depth.

- Maintenance dredging in navigation channels (not required to be maintained under Title 33): Maintenance to the dredge template provided in in SARBA Appendix B or to the dredge template federally authorized or permitted and previously dredged.  The dredging template includes the overdepth and advanced maintenance depth analyzed in a consultation during the evaluation of the previous dredging event.

  - Maintenance activities should occur at a frequency such that the area is navigable, barring a sudden change from a storm, and that returning the area to the authorized or permitted dredge template does not alter the hydrology of the area.  For example, dredging a channel that has not been

**Defendants' Exhibit C**

     maintained and gradually returned to the surrounding conditions, is not considered maintenance.

    o Maintenance dredging in navigation channels other than the main federal channels, such as the secondary channel sections of a braided river that is not part of the main channel, or a channel/canal that connects the main navigation channel to coastal communities and/or coastal neighborhoods.

     o If another programmatic exists that covers this action, the other regional programmatic will be used, such as the programmatic the *Biological Opinion on the authorization of minor in-water activities throughout the geographic area of jurisdiction of the U.S. Army Corps of Engineers Jacksonville District, including Florida and the U.S. Caribbean (JAXBO)* (NMFS tracking number SER-2015-17616) that covers minor and maintenance dredging in Florida.[85]

- <u>Maintenance dredging areas other than navigation channels</u>: Maintenance dredging of an area to the previously authorized dredge template, as further specified below.  Maintenance dredging in areas other than navigation channels may include:

  o Maintenance dredging ports and berths along maintained navigation channels including those not owned and operated by a Port Authority.

  o Maintenance dredging in smaller areas such as public and private marinas, boat ramps, and around docks.

- <u>Maintenance of sediment traps</u>: Maintenance of existing sediment traps to the previous dredge template.

- <u>Minor channel modifications, realignment, or bend easing</u>: Minor channel modifications considered under this Opinion are limited to minor realignments that follow the naturally shifting deep water channel to the same depth and width as the previously maintained channel or realignment of an existing channel that shifted.  Intentional minor realignment (e.g. bend easing) is not covered.

DREDGE.2  Borrow area dredging covered under this Opinion includes existing sites and new borrow sites that meet the conditions listed below and described in Section 2.3.2 of the 2020 SARBO.  Borrow area dredging is limited to a depth that does not result in hypoxic or anoxic conditions in the area.  Hypoxic conditions are those with reduced dissolved oxygen (DO) and anoxic refers to areas with little to no remaining DO needed for most aquatic life to survive.  Examples of dredging that may result in these conditions include the digging of step banked, deep holes that prevent water exchange.  This will be determined by the USACE and/or BOEM based on modeling and past experience dredging in the area.

---

[85] https://www.fisheries.noaa.gov/webdam/download/91825944

**Defendants' Exhibit C**

DREDGE.3    Agitation dredging covered under this Opinion includes bed-leveling and water-injection dredging used as a form of maintenance dredging as described in 2.5.3 of the 2020 SARBO.

DREDGE.4    Environmental Restoration (e.g., Muck) Dredging.  Muck dredging is covered under this Opinion to the dredging depths necessary to remove the organic/muck layer down to natural sediments and does not remove the natural (non-muck) sediments below, to the maximum extent practical based on dredging precision. It cannot be used to increase water depths to support navigation, access, or vessel mooring.

## 1.2    Dredged material placement covered under the 2020 SARBO

The following categories of in-water placement are included and described in Section 2.4 of the 2020 SARBO.

PLACE.1    Beneficial use (e.g., beach nourishment, nearshore placement, or muck dredging considered under 2020 SARBO or marsh creation locations analyzed under a separate ESA Section 7 consultation, but filled with material dredged under 2020 SARBO)

- Beach nourishment described in Section 2.4.1 2020 SARBO and PDC PLACE.2.

- Nearshore placement described in Section 2.4.2 2020 SARBO and PDC PLACE.3.

- Beneficial use placement of material where the dredging of the material is covered under this Opinion and placement of material in a specific location was analyzed under an individual Section 7 consultation (e.g., placement of material used in marsh creation).

- Beneficial use activities not covered include thin-layer placement (e.g., used for marsh creation or other disposal method), filling of holes to improve water quality, filling of holes or minor depressions to restore the appropriate depth for habitat restoration, or other similar placement activities.

PLACE.2    Beach nourishment projects are covered under this Opinion if they meet the conditions listed below and described in Section 2.4.1 of the 2020 SARBO.

- Beach nourishment in the locations and defined beach sand placement template described in SARBA Appendix B.

- Beach nourishment in areas that has been previously analyzed in a Separate Section 7 consultation, filled, and is being nourished again to the same beach sand placement template.

- Placement on the uplands for activities with no intended equilibrium to occur in water (e.g., dune restoration) is outside of the jurisdiction of NMFS.

- No beach nourishment projects are covered in the U.S. Caribbean.

- New beach nourishment and placement is allowed outside the range of corals (as defined in the Coral PDCs in Appendix C) if it meets the conditions

**Defendants' Exhibit C**

below.  For the purposes of this Opinion, new beach placement is defined as placement of sand on an existing beach that has not been previously nourished.

o Placement of beach sand outside of Florida will be compatible with the native beach sediment composition to minimize turbidity in the surrounding in-water environment.

o New beach placement is allowed if the design profile is similar/consistent to adjacent beaches.  This does not include non-traditional beach nourishment designs such as those that protrude and may obstruct species movement along the shore.

o All new beach nourishment is limited to placement in areas lacking hardbottom (e.g., worm-rock or other forms of non-coral hardbottom) and seagrasses that may be used as foraging or refuge habitat for ESA-listed species.

PLACE.3        Nearshore placement is covered under this Opinion that meet the conditions listed below and described in Section 2.4.2 of the 2020 SARBO.

- Nearshore placement described in SARBA Appendix B, which is generally related to beach nourishment projects.

- Nearshore placement in areas that have undergone an individual Section 7 consultation and require repeat placement within the same area.

- New nearshore placement adjacent to beaches, through the use of side-casting material adjacent to a dredge location, or any other placement in water is allowed outside the range of Johnson's seagrass (Johnson's Seagrass PCDs, Appendix D), outside the range of ESA-listed corals (Coral PDCs, Appendix C), and outside of sturgeon rivers (Sturgeon PDCs, Appendix E).

PLACE.4        Ocean dredged material disposal site (ODMDS) is limited to the locations provided in SARBA Appendix B or ODMDS locations that have been analyzed under an individual ESA Section 7 consultation prior to construction.  New ODMDS locations are not otherwise covered.

PLACE.5        Temporary offshore staging area for the purpose of future use of the placement material, typically occurring within an existing ODMDS or within a location previously approved for offshore placement of dredged material.

PLACE.6        Upland Placement, which is defined as placement not occurring in a natural body of water and outside of NMFS purview, must meet the following criteria:

- Upland placement projects with return/discharge water to waters under NMFS purview will be designed to assure that turbidity generated by the discharge waters has returned to ambient levels before reaching any nearby ESA-listed coral or Johnson's seagrass.

- Discharge flow will be maintained to prevent scour or erosion.

**Defendants' Exhibit C**

## 1.3        Transportation of dredge material

Materials that are dredged or placed during activities that are covered under this Opinion can be transported using the equipment described in Section 2 of the 2020 SARBO.  Equipment specific and location specific PDCs are provided in the 2020 SARBO PDCs.

## 1.4        Geophysical and Geotechnical (G&G) Surveys

G&G surveys, as described in Section 2.6 of 2020 SARBO, may be used to determine sediment composition and depth in areas where dredging or material placement can occur under 2020 SARBO.  G&G surveys may also be used to identify sensitive resources in areas surrounding the areas proposed for dredging, or material placement such as hardbottom habitat within the range of ESA-listed corals (Coral PDCs, Appendix C), or areas of seagrass within the range of Johnson's seagrass (Johnson's seagrass PDCs, Appendix D).

## 2    Standard/General PDCs: PDC Requirements that Apply to All Projects Covered under the 2020 SARBO

This section provides general PDCs that apply to all projects covered under the 2020 SARBO.

## 2.1        Education and observation requirements

These PDCs are designed to educate all on-site personnel including the vessel captain, crew, and PSO of the requirements to avoid and minimize effects to ESA-listed species and critical habitat. All personnel must be made aware of and adhere to them.

EDUCATE.1   The USACE and BOEM must ensure that all personnel associated with projects authorized under 2020 SARBO are instructed about the potential presence of species protected under the ESA and MMPA and the appropriate protocols if they are encountered including those in the PSO PDCs in Appendix H.

EDUCATE.2   All on-site project personnel are responsible for observing water-related activities for the presence of ESA-listed species.

EDUCATE.3   All on-site project personnel will be informed of all ESA-listed species that may be present in the area and advised that there are civil and criminal penalties for harming, harassing, or killing ESA-listed species or marine mammals.

EDUCATE.4   All on-site project personnel will be briefed that the disposal of waste materials into the marine environment is prohibited.  All crew will attempt to remove and properly dispose of all marine debris discovered during dredging operations, to the maximum extent possible.

## 2.2        In-water dredging and material placement requirements

The PDCs in this section apply to all in-water activates, if applicable.

**Defendants' Exhibit C**

INWATER.1   Species Movement: All work, including equipment, staging areas, and placement of materials, will be done in a manner that does not block access of ESA-listed species from moving around or past construction.

- Sand placed on the beach or in the nearshore littoral areas will be placed in a manner that does not create mounds or berms that could prevent nesting sea turtles or hatchings from entering or exiting the beach from nearshore waters.

- All placement, including ODMDS placement, will not create an obstruction of species movement in the area (e.g., does not create a mound that would deter or prevent species from moving through the area).

INWATER.2   Equipment placement: Equipment will be staged, placed, and moved in areas and ways that minimize effects to species and resources in the area, to the maximum extent possible.  Specifically:

- All vessels will preferentially follow deep-water routes (e.g., marked channels) to avoid potential groundings or damaging bottom resources whenever possible and practicable.

- If barges, scows, and other similar support equipment are used, they will be positioned away from areas with sensitive bottom resources such as non-ESA-listed seagrasses, corals, and hardbottom, to the maximum extent possible.

- If pipelines are used, they will be placed in areas away from bottom resources and of sufficient size or weight to prevent movement or anchored to prevent movement or the pipeline will be floated over sensitive areas.

INWATER.3   Turbidity control: All work that may generate turbidity will be completed in a way that minimizes the risk of turbidity and sedimentation reaching non-mobile ESA-listed species (i.e., ESA listed corals and Johnson's seagrasses) as well as other non-ESA-listed non-mobile species (e.g., non-ESA-listed corals, sponges, and other natural resources) to the maximum extent practicable.  This may include selecting equipment types that minimize turbidity and positioning equipment away or downstream of non-mobile species.

INWATER.4   Turbidity curtains: Turbidity curtains may be used to maintain water quality standards where appropriate and practicable with consideration given to ambient turbidity and if the curtains are practical based on current, wave action, or other factors.

- If turbidity curtains are used, barriers will be positioned in a way that does not block species' entry to or exit from designated critical habitat and does not entrap species within the construction area or block access for them to navigate around the construction area.

- Project personnel must take measures to monitor for entrapped species in areas contained by turbidity curtains and allow access for them to escape if spotted.

**Defendants' Exhibit C**

- Beach nourishment projects will be designed to minimize turbidity in nearshore waters by using methods that promote settlement before water returns to the water body (i.e., shore parallel dikes). Turbidity and marine sedimentation will be further controlled using land-based erosion and sediment control measures to the maximum extent practicable. Land-based erosion and sediment control measures will (1) be inspected regularly to remove excess material that could be an entanglement risk, (2) be removed promptly upon project completion, (3) and will not block entry to or exit from designated critical habitat for ESA-listed species.

INWATER.5    Entanglement: If lines or cables are used (e.g., to mark floating buoys, lines connecting pickup buoy lines, or for turbidity curtains):

- In-water lines (rope, chain, and cable) will be stiff, taut, non-looping. Examples of such lines are heavy metal chains or heavy cables that do not readily loop and tangle. Flexible in-water lines, such as nylon rope or any lines that could loop or tangle, will be enclosed in a plastic or rubber sleeve/tube to add rigidity and to prevent the line from looping or tangling. In all instances, no excess line is allowed in the water. Requirements for lines associated with relocation trawling are handled separately in Appendix B Section 3.5.

- All lines or cables will be immediately removed upon project completion.

- All in-water line and materials will be monitored regularly to ensure nothing has become entangled.

- Cables or lines with loops used to move pipelines or buoys will not be left in the water unattended.

INWATER.7    Dredging or material placement in areas not previously used for dredging or placement are allowed under this Opinion for borrow sites, side-cast dredging, beach nourishment, nearshore placement associated with beach nourishment, if they meet all of the PDCs in this Opinion, including those listed below:

- Within the range of ESA-listed corals (Coral PDCs in Appendix C), within the range of Johnson's seagrass (Johnson's Seagrass PDCs in Appendix D), and in sturgeon rivers (Sturgeon PDCs in Appendix E): Additional PDCs apply to these activities.

- Within the range of Cape Canaveral to Miami-Dade, Florida and in the U.S. Caribbean: Areas not previously dredged or areas where in-water material placement has not previously occurred will not remove or place materials on nearshore or surf-zone, low-profile hardbottom outcroppings (e.g., worm-rock reef [sabellariid worm reefs] and eolianite, granodiorite). This habitat can be persistent or ephemeral, cycling through periods of exposure and cover by sand. Continued maintenance of existing beach nourishment projects must have already considered protection of this habitat when calculating the equilibrium toe of fill (ETOF).

**Defendants' Exhibit C**

- Within 400 ft of any significant non-coral hardbottom areas or bottom structures that serve as attractants to sea turtles for foraging or shelter: For purposes of the 2020 SARBO, NMFS considers significant non-coral hardbottom to be an area with a horizontal distance of 150 ft that has an average elevation above the sand of 1.5 ft or greater and has algae growing on it. BOEM and USACE Districts will identify any non-coral hardbottom prior to commencing work to ensure that all sand removal projects provide a 400 ft buffer from all equipment. If BOEM and/or the USACE is uncertain as to what constitutes significance, it/they will coordinate with NMFS Southeast Region Habitat Conservation Division (727-824-5317) and NMFS' Protected Resources Division (727-824-5312) for clarification and guidance. Walls of federally-maintained navigation channels (i.e., jetties and other such man-made structures) are not considered hardbottom for the purpose of this 2020 Opinion.

- In areas with seagrass: Dredging and placement in new areas will avoid areas with non-listed seagrasses to the maximum extent practicable.

INWATER.8   Lighting near sea turtle nesting beaches: For dredges and any support vessels operating at night in front of nesting beaches, lighting will be limited to the minimal lighting necessary to comply with U.S. Coast Guard and Occupational Safety and Health Administration requirements (most up-to-date version of Engineering Manual 385-1-1). Lighting associated with beach nourishment construction activities will be minimized through reduction, shielding, lowering, and/or use of turtle friendly lights, to the extent practicable without compromising safety, to reduce potential disorientation effects on female sea turtles approaching the nesting beaches and sea turtle hatchlings making their way seaward from their natal beaches. As technology changes, so do turtle friendly lighting options. New information/technology should be used as soon as published guidance for types of appropriate lights and appropriate shielding and positioning of lights is available that is protective of sea turtles (e.g., those outlined by the Florida Fish and Wildlife Conservation Commission's website http://myfwc.com/wildlifehabitats/managed/sea-turtles/lighting/).

**Defendants' Exhibit C**

## 3    Equipment-Specific PDCs for Projects Covered under the 2020 SARBO

This section provides equipment-specific PDCs including requirements that must be met when designing a project with work occurring using the equipment types discussed in Section 2.5 of the 2020 SARBO.  All on-site project personnel, including the vessel captain, crew, and PSO, must be aware of and adhere to these requirements.

### 3.1        Hopper dredge requirements

HOPPER.1    During all hopper dredging operations, NMFS-approved PSOs will monitor for the presence of ESA-listed species.  The dredge operator will maintain a safe working environment for the PSO to access and effectively monitor inflow screening, overflow screening, and dragheads for incidental take of ESA-listed species and associated bycatch after every load.  All new hopper dredge vessels or modifications made to existing vessels must be designed to allow safe access to and/or visibility of all collected material in both the inflow box and overflow screening areas so that the PSO is able to inspect the contents after every load for evidence of ESA-listed species.  The appointed contact (e.g., Quality Assurance Representative or the Contractor) will immediately notify the USACE who will notify the SARBO Team if conditions limit the ability to safely monitor dredging operations.

**Draghead Observation**:
Upon completion of each load cycle, dragheads will be monitored as the draghead is lifted from the sea floor and placed on the saddle in order to assure that ESA-listed species that may be impinged within the draghead are observed and accounted for.  The PSO, or designated dredge crew member under the guidance and supervision of the PSO when safety is of concern, must physically inspect dragheads for evidence of ESA-listed species take after every load.

**Inflow screening Observation**:
- Inflow screening must be designed to capture and retain material for the PSO to monitor for the presence of ESA-listed species.  The screened area must be accessible to the PSO to ensure 100% observer coverage.  The PSO must inspect the contents of all inflow screening boxes after every load, including opening the box (where applicable and safely accessible) and looking inside at all contents for evidence of ESA-listed species entrainment.  If the contents are not clearly visible and identifiable from a location outside of the box, then in limited instances, the PSO may be required to enter the inflow box to identify contents for evidence of ESA-listed species take.

- All hopper dredges are required to have 100% inflow screening unless they must be removed for safety due to clogging as outlined below.

  o    Inflow screening size will start at 4-inch by 4-inch, but may be gradually adjusted to a larger screen size if clogging reduces the ability for the PSO to monitor the inflow for the presence of ESA-listed species or if clogging reduces dredging production and thereby expands the time dredging is

**Defendants' Exhibit C**

required.  Scenarios that may result in the clogging of inflow and overflow screens are dredge and project specific.

o   All modifications will be made in close coordination with the dredging contractor, PSO, appropriate USACE and/or BOEM project managers, and NMFS.  The USACE and/or BOEM will provide NMFS with a notification when screen sizes are increased or inflow screens are removed that will include an explanation of what attempts were made to reduce the clogging problem, how long the problem may persist, and how effective overflow screening will be achieved.

o   If inflow screens are increased to be larger than 4-inch by 4-inch or are removed due to clogging, the USACE and/or BOEM will continue to re-evaluate the risk of clogging on a load by load basis and the inflow screens will be reinstated when clogging is no longer occurring.  The USACE will track the number of loads that inflow screens were removed as part of the reporting requirements in Section 2.9.3.5 of the 2020 SARBO.

- Hopper dredge operators will not open the hydraulic doors on the inflow boxes prior to inspection by the PSO for evidence of ESA-listed take.

- If the inflow box cannot be observed due to clogging, the box contents cannot be dumped or flushed unless overflow screening that captures contents for observation by the PSO is operational and monitored for evidence of take.  Once overflow screening is operational, PSOs shall also visually monitor box contents as they are dumped or flushed into the hopper.

**Overflow Screening Observations**
- All hopper dredges are recommended to have operational overflow screening and monitor for take after each load.  Overflow screening is required to be installed and monitored after each load if the inflow screening is removed or bypassed due to clogging.

- Overflow screening must be designed to capture and retain material larger than the screen size for the PSO to monitor for the presence of ESA-listed species.  The screened area must be accessible to the PSO to inspect for evidence of ESA-listed species take.

- Screen size will start at 4-inch by 4-inch, but may be adjusted to a larger screen size if clogging reduces the ability for the PSO to monitor the screen for the presence of ESA-listed species or if clogging reduces dredging production and thereby expands the time dredging is required.  All modifications will be made in close coordination with the dredging contractor, PSO, appropriate USACE and/or BOEM project managers, and NMFS.  If screen sizes are increased due to clogging, the risk of clogging will be re-evaluated weekly and the overflow screens will be reinstated using the smallest screen size that can be effectively used (preferably 4 inch by 4 inch) when clogging is no longer occurring.

HOPPER.2   To prevent impingement or entrainment of ESA-listed species within the water column, dredging pumps will be disengaged by the operator when the dragheads are not actively dredging and therefore working to keep the draghead firmly on

**Defendants' Exhibit C**

the bottom.  Pumps will be disengaged when lowering dragheads to the bottom to start dredging, turning, or lifting dragheads off the bottom at the completion of dredging.  Hopper dredges may utilize a bypass or other system that would allow pumps to remain engaged, but result in no suction passing through the draghead. This dredge modification (when employed) is commonly referred to as a turtle bypass valve.  This precaution is especially important during the cleanup phase of navigation dredging operations to remove remaining high spots or when a shallow veneer of compatible sediment remains within a borrow area; thus limiting overdepth dredging and plowing efficacy of the turtle deflector.  In these example circumstances, the draghead may frequently come off the bottom and can suck in turtles/sturgeon resting or foraging in shallow depressions.

HOPPER.3   Pumping water through the dragheads is not allowed while maneuvering or during travel to/from the disposal or pumpout area.  The dredge operator will ensure the draghead is embedded in sediment when pumps are operational, to the maximum extent practicable.

HOPPER.4   All waterport or other openings on the hopper dredge are required to be screened to prevent ESA-listed species from entering the dredge.

HOPPER.5   A state-of-the-art solid-faced deflector that is attached to the draghead must be used on all hopper dredges at all times.

## 3.2   Munitions and explosives (MEC)/ unexploded ordinance (USO) screening on a draghead requirements

MEC screening is used in areas where munitions may be present, but may also be used for other purposes such as handling areas with rock.  If MEC screening is used, the following PDCs apply:

MEC.1   Prior to any use of MEC/ UXO screens on a project, the  use of this screening will be reviewed by NMFS through the alternative review/ supersede process outlined in Section 2.9.5 of the 2020 SARBO.

MEC.2   The PSO will be required to inspect the draghead MEC screens after every load to verify that no ESA-listed species are impinged on the screening.

MEC.3   If MEC screening is used on a beach nourishment outflow, screening will be monitored and USACE and/or BOEM will be notified of any potential ESA-listed species takes identified in the beach outflow screening box.

**Defendants' Exhibit C**

**Appendix F.       2020 SARBO USACE and BOEM North Atlantic Right Whale
Conservation Plan**

The Conservation Plan for the North Atlantic right whale includes "Avoidance Measures", which act as PDCs that apply to all projects that occur where and when North Atlantic right whales may be present (as defined in the Plan).  The Plan is hereby incorporated into the 2020 SARBO and is included in this Appendix.  The avoidance measurements are in addition to any other applicable PDCs outlined in Appendix B-H and the requirements outlined in the 2020 SARBO.

*Alternative review:  In limited instances, a project may be authorized under the 2020 SARBO if it does not adhere to all applicable PDCs, under the Alternative Process for Project Specific Review and Inclusion of Projects with Substantially Similar Effects outlined in Section 2.9.5 of the 2020 SARBO.  As described in the 2020 SARBO, projects that do not strictly comply with all applicable PDCs, but have substantially similar effects, may be authorized under 2020 SARBO if the project undergoes separate review and approval by NMFS prior to beginning work.  Projects that cannot meet all relevant PDC requirements or that do not fit under the alternative review process outlined in Section 2.9.5 of the Opinion, will require individual Section 7 consultation. Any area previously authorized or permitted to be dredged or have material placed within the action area and analyzed in a separate individual Section 7 consultation may be maintained to the same dredge or fill template under this Opinion if it meets all of the PDCs of this Opinion.*

# 1    Introduction

## 1.1        Background

Section 7(a)(1) of the ESA requires all federal agencies to use their authority as appropriate to carry out programs for the conservation (i.e., recovery) of threatened and endangered species. For about 3 decades, the USACE has worked with NMFS and state conservation agencies to identify and resolve endangered species and ecosystem management concerns resulting from dredging in the Southeastern United States.  The endangered North Atlantic right whale has been a particular focus of conservation efforts in the Southeastern United States, where the species has its only known calving habitat.  The North Atlantic right whale Conservation Plan outlines management measures that the USACE SAD and BOEM (where applicable) will implement within its area of responsibility to create an ESA Section 7(a)(1) conservation program for North Atlantic right whales.  The USACE SAD developed this program through consultation with the NMFS Southeast Regional Office.  The North Atlantic Right Whale Conservation Plan complies with USACE Environmental Operating Principles, Civil Works Ecosystem Restoration Policy (ER 1165-2-501), and supports the conservation intent of the Marine Mammal Protection Act (16 U.S. Code Chapter 31).

## 1.2        Purpose and Scope

This Conservation Plan (Plan) is prepared pursuant to Section 7(a)(1) of the Endangered Species Act, as amended, which requires all federal agencies to use their authority to carry out programs for the conservation (i.e., recovery) of endangered and threatened species.  The purpose of the Plan is to describe USACE and BOEM (where applicable) management measures to conserve the North Atlantic right whale within the action area.  The geographic area (action area) covered

**Defendants' Exhibit C**

by this plan includes the coastal waters of the Atlantic Ocean from the Virginia/North Carolina border south to Cape Canaveral, Florida – referred to in the rest of this document as "the range of North Atlantic right whale".

This plan includes systems to detect the presence of whales, alert vessels operating in the area, and avoidance and minimization measures for projects covered under the 2020 SARBO that reduce the risk of a vessel strike if a whale is detected in the area. Implementation of these management measures will minimize the risk of North Atlantic right whale/dredge vessel interactions and will contribute to North Atlantic right whale recovery.  Funding for management measures will be provided by USACE and is contingent upon annual appropriations.  These measures will be executed in order for USACE and BOEM projects to be covered under the 2020 SARBO, especially if the project occurs within the range of North Atlantic right whale during the timeframe they are expected to present, as outlined in this Plan.  If USACE funding is not available to execute one or more of the conservation measures, then USACE and BOEM will confer with NMFS on the appropriate next steps.

## 2   Conservation Measures

### 2.1        Established Right Whale Early Warning System (EWS)

The USACE has entered into an agreement with the U.S. Navy, U.S. Coast Guard, and NMFS over 2 decades ago that sets forth a framework for implementing North Atlantic right whale EWS aerial surveys.  BOEM is not party to this agreement but will leverage the data accordingly. The EWS surveys are flown on days with suitable weather (good visibility and sea state of not more than Beaufort sea state 3)[90], from December 1 through March 31.  East-west transects spaced 3 nautical miles apart are flown to visually detect North Atlantic right whale in the vicinity of the commercial shipping ports of Brunswick, Georgia, and Fernandina Beach and Jacksonville, Florida (Figure 73).  Submarine Base Kings Bay and Naval Station Mayport are also located within the survey area.  Transect locations may be altered, as necessary, to maximize North Atlantic right whale detection.  The EWS has likely decreased the number of vessel and whale interactions for not only federal vessels, but also commercial vessels.  The use of current technology to notify vessels in the area of whale presence enables vessel operators to either avoid the area, increase their vigilance, or decrease their speed based on the known presence of right whales.  While the number of vessels associated with USACE dredging is not significant, USACE is willing to minimize the amount of activity in an area either when whales are known to be present or in areas when whales are likely to be present in order to decrease the probability of interactions between whales and vessels.  Adding to the information about North Atlantic right whale – through aerial surveys (or other appropriate survey techniques) – adds to the overall knowledge about their behavior and their temporal and spatial distribution.  Marine species location information will be contributed to established databases (e.g. North Atlantic Right Whale Consortium, Ocean Biogeographical Information System, etc.) and thereby be made available to managers and researchers (e.g. for inclusion in modeling efforts like (Gowan and Ortega-Ortiz 2014; Roberts et al. 2016).  Relevant new/ongoing BOEM North Atlantic right whale research will also be made available as appropriate.

---

[90] Details of Beaufort Wind Scale can be found at https://www.spc.noaa.gov/faq/tornado/beaufort.html

**Defendants' Exhibit C**

During EWS surveys and other relevant BOEM research activities (where applicable), locations of detected North Atlantic right whales are relayed in near real time to subscribers of geographic-specific listservs to which Whale Alerts are issued.  Prior to each dredge project, funding agency personnel and commercial and marine users may subscribe to geographic-specific listservs to receive Whale Alerts.  Whale Alerts are distributed via text messages and emails to subscribers. Other means for distributing sighting information includes VHF radio, minimum storage regeneration  return messages, NAVigational TEleX, and internet websites, etc.  In addition to ship collision avoidance and population monitoring, these surveys collect important data on population status, calf production, distribution, and habitat use.

Aerial surveys and other relevant BOEM research will also include reported sightings of all observed notable species including other ESA-listed species observed (e.g., giant manta ray and leatherback sea turtles), as long as it does not detract from the main purpose of reporting North Atlantic right whale.  Reporting on other species allows for a better understanding of their temporal and spatial distribution as well.

Detailed EWS reports and North Atlantic right whale sighting information can be found at: http://sero.nmfs.noaa.gov/protected_resources/right_whale/seus_sightings/index.html

**Defendants' Exhibit C**



**Figure 73.  An Example of the Early Warning System Tracklines (blue lines).**

**2.2       Expanded Data Collection on Temporal and Spatial Distribution of North Atlantic right whale**

The USACE will fund additional aerial survey to learn more about the temporal and spatial distribution of North Atlantic right whales off the Southeast Atlantic coast.  This additional investment will expand the footprint of aerial survey coverage Brunswick, Georgia through from North Carolina from 15 November through 15 April, annually.  This additional aerial support will be on par with 860 aerial survey hours; however, detection methods may change contingent upon new information and consultation with species experts, including NMFS.  This will supplement work that is already being accomplished.  As in the North Atlantic Right Whale Conservation Plan, locations of detected North Atlantic right whales are relayed in near real time to subscribers of geographic-specific listservs to which Whale Alerts are issued (as described above).  In addition to ship collision avoidance and population monitoring, these surveys will

**Defendants' Exhibit C**

collect important data about migration, distribution, and habitat use, and contribute to long term databases.  They will also provide information about whale presence to aid in implementation of the avoidance measures below.  Aerial surveys will also report observed notable species including other ESA-listed species (e.g., giant manta rays), as long as it does not detract from the main purpose of detecting and reporting North Atlantic right whale.

## 2.3        Avoidance Measures

The USACE and BOEM (as appropriate) will implement the North Atlantic right whale Conservation Plan within an Atlantic coastal action area extending from the Virginia/North Carolina border south to Cape Canaveral, Florida, during the North Atlantic right whale migration and calving season from November 1 through April 30.  The following measures are in addition to the other 2020 SARBO PDCs and the Programmatic Implementation, Tracking, and Reporting requirements outlined in the 2020 SARBO Section 2.9.  Avoidance measures consist of the following:

NARW.1        Dredge Project Scheduling
The Risk-Based Adaptive Management Process (outlined in the 2020 SARBO Section 2.9.2.2) explains the process used to determine where, when, and how projects will be completed to minimize the risk to ESA-listed species.
- Hopper dredging and projects requiring survey vessels over 33-ft in length will be scheduled, to the maximum extent practicable, outside of North Atlantic right whale migration and calving season to avoid impacts to North Atlantic right whales, including reproducing females and newborn calves. Other information that will be considered includes where material is to be placed and whether the timing of the placement would be high risk for other listed species (e.g. sea turtles).

- Prior to each fiscal year (which is also prior to North Atlantic right whale calving season), the USACE and BOEM will notify NMFS of anticipated dredge projects planned in the South Atlantic and for those taking place in the Southeast Seasonal Management Area (SMA), shown in Figure 74, which minimization and avoidance measures will be accomplished.  This information will be provided as part of the Risk-Based Adaptive Management Process (outlined in the 2020 SARBO Section 2.9.2.2).

NARW.2        Captains and crew of USACE and USACE vessels, contracted vessels, and PSO requirements:
- All on-site project personnel associated with a project covered under SARBO including the vessel captain, crew, and PSO on dredge vessels, survey vessels, and all supporting vessels over 33-ft in length will be instructed on the presence of North Atlantic right whale and other ESA-listed species and the requirements to observe, avoid, and report North Atlantic right whale in the area.  The required distances that vessels must maintain from ESA-listed species, PSO observer coverage requirement for 100% monitoring on hopper dredging and relocation trawling, and reporting requirements are defined in the 2020 SARBO (PSO PDCs in Appendix H).

**Defendants' Exhibit C**

- All captains of dredges, relocation trawlers, survey vessels, and support vessels over 33-ft in length will provide a text message address (that is capable of receiving short emails as text messages) to receive real-time whale alerts throughout the calving season. The text message address will be provided to nmfs.ser.rw.subscribe@noaa.gov at least 14 days prior to the start of dredging or annually on November 1 if the vessel is utilized year round.

- The dredging company contractor for each project, before the start of dredging, will provide a single whale observer email address to receive aerial survey-related notifications (status, fly/no-fly plans, etc.) that will be immediately sent to all active vessels working in water for the project. The email address will be provided to nmfs.ser.rw.subscribe@noaa.gov and be confirmed annually, prior to each North Atlantic right whale calving season.

- All hopper dredges and relocation trawlers will have onboard dedicated daytime[91] PSOs that meet the qualifications provided by NMFS and detailed in SARBO with at-sea, large whale identification experience to conduct observations for the presence of whales and all other ESA-listed species. The PSO will have the primary duty of observation when the vessel is underway. Observers will be onboard dredges and will alternate to reduce observer fatigue. As needed, a crew member on the bridge will assist the PSO with whale observation duty while the vessel is underway. The PSO will provide crew members with appropriate training for large whale observation. Hopper dredges will submit an endangered species watch plan detailing how the requirements to minimize the risk of a North Atlantic right whale/dredge vessel interaction will be accomplished. The watch plan may be a component of an environmental protection plan.

- The PSO will note all sightings of ESA-listed species and marine mammals according to the reporting requirements in the 2020 SARBO Section 2.9and by submitting all necessary forms and information to the ODESS. All ESA-listed marine mammals spotted will also be immediately reported by calling 1-877-WHALE_HELP.

- All project vessels will carry operational automatic identification system transmitters as required by the U.S. Coast Guard. Transmitters will be powered on and transmitting while vessels are underway and NMFS will be provided the vessel name and vessel tracking number (maritime mobile service identities) so that all vessels operating under SARBO can be tracked and confirm compliance with this Plan. Vessel tracking numbers will be recorded in ODESS and emailed to NMFS at **SERO.Dredge@noaa.gov** for all vessels over 33-ft in length operating from the Virginia/North Carolina border south to Cape Canaveral, Florida, during the North Atlantic right whale migration and calving season from November 1 through April 30 (see SARBO General PDCs, Section 2, Appendix A).

---

[91] Daytime is defined as 30 minutes before sunrise to 30 minutes after sunset.

**Defendants' Exhibit C**

NARW.3        Vessel Speed Requirements

Speed requirements must be followed if a North Atlantic right whale has been spotted or reported in the area as defined below.  North Atlantic right whale presence may be determined by observers on the vessel, reports from aerial surveys, EWS, or confirmed public sighting reports.  All captains are required to use daily available information and reports on the presence of North Atlantic right whales and aerial survey activities in the project area.  These speed restrictions apply to all vessels associated with a project covered under SARBO.

- Vessels over 65 ft in length: When a whale is observed or reported within 38 nmi of dredge or support vessels, vessels must slow to 10 knots or slowest safe navigable speed for 36 hours[92] or until next North Atlantic right whale survey when no whales are observed, whichever is shorter.

- Vessels 33- 65 ft: When a whale is observed or reported within 38 nmi of dredge or support vessels which are within the Southeast SMA, vessels must slow to 10 knots or slowest safe navigable speed until the next North Atlantic right whale survey when no whales are observed.  Vessels may resume speed once outside the Southeast SMA.  Outside of the Southeast SMA, but within the range of North Atlantic right whale habitat, the vessel must slow to 10 knots for 36 hours, or until the next North Atlantic right whale survey when no whales are observed.

**Table 58.  Vessel Speed Requirements, if a North Atlantic right whale is spotted or reported[93] within 38 nmi of the vessel:**

| Vessel Size | Within the range of North Atlantic right whale[94] | Within the SMA (Figure 74) |
|---|---|---|
| 33-65 ft | • All vessels must slow to 10 knots or slowest safe navigable speed<br><br>• Slow speed maintained for 36 hours[95] or until next North Atlantic right whale survey when no whales are observed, <u>whichever is shorter</u>. | • All vessels must slow to 10 knots or slowest safe navigable speed<br><br>• Slow speed maintained until the next North Atlantic right whale survey when no whales are observed (<u>no time limit</u>).<br><br>• Vessels may resume speed once outside the Southeast SMA. |
| Over 65 ft | • All vessels must slow to 10 knots or slowest safe navigable speed<br><br>• Slow speed maintained for 36 hours or until next North Atlantic right whale survey when no whales are observed, <u>whichever is shorter</u>. | |

[92] Contractors will be required to use daily available information on the presence of North Atlantic right whales and aerial survey activities in the project area.

[93] Contractors will be required to use daily available information on the presence of North Atlantic right whales and aerial survey activities in the project area.

[94] Currently defined as occurring from the Virginia/North Carolina border south to Cape Canaveral, Florida

[95] Contractors will be required to use daily available information on the presence of North Atlantic right whales and aerial survey activities in the project area.

**Defendants' Exhibit C**



**Figure 74.  Seasonal Management Area for North Atlantic Right Whale[96]**

## 2.4        Volunteer Sighting Network

In addition to the contributions that USACE makes toward the EWS aerial surveys, the USACE Jacksonville District also provides annual funding for the Marineland Right Whale Project volunteer sighting network.  The Marineland Right Whale Project uses shore-based volunteer spotters to look for right whales between St. Augustine and Ponce Inlet, Florida.  The Marineland Right Whale Project not only relays additional whale sightings to the EWS system and the New England Aquarium's North Atlantic right whale sighting database, but project staff also provide North Atlantic right whale information to the public.

---

[96] This image includes the mandatory ship reporting area, which is defined under the Mandatory Ship Reporting Systems Rule (69 FR 58066).  This rule states that when ships greater than 300 gross tons enter 2 key right whale habitats (located off the northeast U.S. and off the southeast U.S.), they are required to report to a shore-based station.  In return, ships receive a message about right whales, their vulnerability to ship strikes, precautionary measures the ship can take to avoid hitting a whale, and locations of recent sightings.  These requirements are in addition to and separate from the requirements of the 2019 SARBO.

**Defendants' Exhibit C**

## Appendix I.        Relocation Trawling Net Guidance

The relocation net specifications for a lazy line required in Appendix B Section 3.5 are based on the guidance in the memo included in this appendix.



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
National Marine Fisheries Service
Southeast Fisheries Science Center
Mississippi Laboratories
P.O. Drawer 1207
Pascagoula, MS 39568-1207

November 30, 2007

MEMORANDUM FOR:        Stacy Carlson, Protected Resources Divison, SERO

FROM:                                  John Mitchell & Wendy Taylor
                                              Harvesting Systems Branch, SEFSC

SUBJECT:                            Recommendations for lazyline configuration to reduce dolphin
                                              interactions with turtle relocation trawlers

This memo is in reference to the conference call of November 5th during which representatives from SERO Protected Species Branch, SEFSC Harvesting Systems Branch, Army COE and several sea turtle relocation contract companies discussed methods of preventing the accidental entanglement of dolphins in the lazylines of contracted sea turtle relocation trawlers.  At the conclusion of the call, I offered to summarize the various techniques which were discussed in order to provide a reference for contractors who may wish to trial a particular method during future turtle relocation work. NOAA Fisheries would like to acknowledge the efforts of Captain Steve Bosarge, of Bosarge Boats, Pascagoula Mississippi, for allowing us to provide details of his method of lazyline rigging which seems to have real potential for reducing dolphin entanglement.

<u>Conventional lazyline rigging (Figure 1)</u>

Conventional lazylines are attached at their forward end to the top/back edge of the inside trawl door and at their aft end to a ring in the "elephant ear", a triangle of reinforced webbing sewn to the trawl bag which acts as a lifting strap (Figure 1).  The length of the lazyline is dependent on trawl size. As an example, a 55-ft. headrope length trawl might have a lazyline which is 80 to 85 feet in length. The conventional lazyline must be of sufficient length so as to allow the line to be hauled to the side of the boat upon haul back. The line is then led through a snatch block and wound around a cat head to in order to lift the bag to the side of the boat and eventually emptied on deck.  When in a fishing configuration, the ample length of the lazyline forms a 10-12 foot loop behind the tailbag. This loop floats even with, or slightly above and behind the tailbag.  It is in this loop of the lazyline, near the trawl bag, that underwater video obtained by NOAA Harvesting Systems gear researchers has documented dolphin interactions while the trawl is fishing. The animals appear to be using the line as a scratching post, moving back and forth against the line, rubbing it along their backs and bellies.  Based on our observations, it is conceivable that a dolphin could put a complete wrap of the lazyline around it's torso. With the tail flukes acting as a stop, the animal would be unable to free itself.   The following alternate lazyline rigging methods offer potential means to prevent dolphin entanglement.

<u>Method A : Conventional rigging using stiffer lazyline (PolyDAC or Polyester)</u>

This method simply replaces the conventional ¾" to 1" diameter polypropylene rope typically used for shrimp trawl lazylines with line made from polyDAC (a combination of polypropylene and polyester) or a polyester line. Both lines should be made with a "crab lay" which is a term relating to stiffness of the rope.  Crab lay rope is used in the commercial crab fishery of the Alaska and

**Defendants' Exhibit C**

provides an exceptionally tight twist to the rope to prevent loops when coiling.  Both a polyDAC and polyester ¾" crab lay line were evaluated by Harvesting Systems divers in June, 2007 during annual gear tests.  Divers found the polyDAC and polyester lines to be significantly stiffer and less pliable underwater than the conventional polypropylene lines. It was difficult for divers to form loops in either of the two line types.  Divers also noted that the polypropylene arced upward (positive buoyancy) and polydacron arced downward (negative buoyancy) while being towed.

PolyDAC or Polyester ¾" crab lay line can be purchased from major U.S. rope suppliers such as TrawlWorks, Sampson and others.  A recent check of cost resulted in a price of between 50 to 60 cents/foot for either rope type.

Method B: Bosarge Method of lazyline configuration (Figure 2).

This method replaces the conventional polypropylene lazyline with a stainless steel 3/8" cable. Steve Bosarge provides a very good description of the method in the following text:

> *"The modification to the original system totally removes the standard lazy lines and sugar line and replaces them with two 3/8 inch by 250 foot stainless steel cables in an entirely different routing arrangement.  Now the routing begins with the stainless steel cables spooled on a deck winch.  From there the cables run to the top of the boom where they go through separate blocks that are affixed to the boom.  The cables then run to the webbing strap (elephant ear).  This new system has benefited both the crew and the observers aboard the vessel by making gear retrieval faster and safer in inclement weather."*

Steve's method of rigging the lazyline is likely to be much safer for dolphins for the following reasons; 1.) The diameter of the cable is significantly smaller than standard polypropylene lazyline, and thus is probably less enticing to dolphins for rubbing and scratching interactions; 2.) The fishing angle of the cable is likely higher than that of the conventional lazyline due to the cable being led from the vessel boom.  We think it would be difficult for dolphins to interact with the cable at a higher fishing angle because they would have to orient themselves somewhat vertically while maintaining forward motion to do so.3.)  In comparison to conventional polypropylene line, cable requires more force/exertion in order to form a tight loop when fishing, thus decreasing the probability of entanglement.

As Steve mentions above, operational benefits to the Bosarge method include quicker and safer retrieval of the tailbags (time is not lost to crewmembers having to grapple the lazylines, feed the lines through blocks and then wind them around winch cat heads to bring bags aboard).  With the cable method, both tailbags are winched aboard and positioned over the deck for emptying in one simultaneous and continuous operation.

For the average shrimp fisher, there is an additional expense and some amount of special rigging which is required to use the cable method.  First, a dedicated winch, capable of hauling in two tailbags simultaneously is needed.  It is very likely that a vessel's try-net winch could be used for this purpose. Approximately 500 ft. of 3/8" stainless steel cable is required (estimated cost $750.00) as well as two (2), 5-ton "fat-boy" style try-net blocks (estimated cost $100.00 ea.).

**Defendants' Exhibit C**

<u>Method C: Bosarge Method of lazyline configuration using PolyDAC or PE "crab lay" line</u>

This method is identical in all respects to the above (Method B), with the replacement of 3/8" stainless steel cable with PolyDAC or Polyethylene "crab lay" line. Routing of the lazyline is the same as in the cable method. For the contractor, the advantage to this method over Method B is that a dedicated winch for the lazyline retrieval is not necessary. The trawl winch cat heads could be used to retrieve the lazyline. When fishing, the lazylines could be "tied-off" to the pin rail just aft of the trawl winches. Because the lines are routed through the boom, as in the cable method, we expect that the in-water fishing angle of the line would be higher (like the cable). The higher fishing angle along with stiffer lazyline should lessen the potential for dolphin entanglement over a standard lazyline configuration.

In FY08, the Harvesting Systems Branch plans to conduct qualitative assessments of all three of the above methods during TED evaluations aboard the *R/V Georgia Bulldog* (Feb.-April) using trawl-mounted underwater video cameras, and a DIDSON scanning sonar system. Additionally, we plan to conduct diver assessments and obtain underwater video of all three methods during annual gear evaluations using NOAA SCUBA divers in Panama City, Florida (June, 2008).

We would greatly appreciate feedback from the turtle relocation contractors who may trial the above mitigation methods. We are especially interested to know the following.

- Do contractors feel the methods are effective at preventing dolphin interactions/entanglements?

- What are the advantages and or disadvantages to working with PolyDAC / PE crab lay line during normal relocation operations?

- Is the stiffness of the the PolyDAC / PE crab lay line resilient, or is it degraded over the course of normal operations, i.e. winding around cat heads?

- Are their additional methods and or rigging modifications that may be worth investigating?

Responses can be emailed to my attention at john.mitchell@noaa.gov.

We look forward to continued collaboration with you, and the relocation contractors on this issue and hope that you will not hesitate to contact us if you have any questions.

**Defendants' Exhibit C**



**Defendants' Exhibit C**

**Appendix J.      NMFS Recommendations to Consider when Developing the Risk Assessment for the 2020 SARBO**

The USACE and/or BOEM will develop a risk assessment plan as outlined in the 2020 SARBO Section 2.9 that will incorporate information provided by the SARBO Team, including information on species presence in different areas and at different times, among other items. This appendix provides NMFS suggestions of specific factors for USACE and BOEM to consider with initial project planning, including items already discussed with the SARBO Team that are likely to be relevant to the risk assessment.  A general description on the ways in which the USACE and/or BOEM will use the risk-based assessment are outlined in the 2020 SARBO Section 2.92020.

## 1   Pre-Construction Risk Assessment

### 1.1      Example Factors Considered in Pre-Construction Risk Assessment

The USACE and BOEM consider many factors when determining when and how a project should be completed.  Considerations may include the urgency to complete work (e.g. current or expected traffic restrictions), dredge quantity expected, or the length of time needed to complete the project.

A.  Assess the potential risk to ESA-listed species by evaluating available information on species trends and historic use of the area:
  - Review the timing and location of aggregation areas, migration through the project area, spawning or nesting seasons.

    o  Sea turtles may be at higher densities during spring and fall migration along the coast.

    o  Green sea turtles may be at higher densities in entrance channels with groins or jetties that support macroalgae for foraging.

    o  Atlantic sturgeon maybe at higher densities staging at the mouth of sturgeon rivers prior to a spawning run.  Times vary by river and seasonal water temperatures.

  - Review species takes that has occurred at the project location during past dredging or placement projects.  This information can be used to assess the potential risk of future encounters.

  - Review species population assessments and recovery plans which can provide additional species information and use of an area.

B.  Assess the need for relocation trawling for each dredging project:
  - Review the location and timing of the project to determine the relocation trawling effort needed and if trawling should begin prior to or after construction has commenced.

  - Review species take that has occurred at the project location during past relocation trawling to determine the potential density and relocation trawling effort needed.

C.  Assess any timing considerations
  - Sea turtles: To minimize the risk of hopper dredging take of ESA-listed sea turtles, water temperature should be considered.  Completing projects, such as hopper dredging, when

**Defendants' Exhibit C**

water temperatures are colder and sea turtles are less abundant, may reduce the risk of take.  However, when water temperature drops below 11° C, sea turtles are at risk of being cold-stunned, which increases the risk of take by any equipment type (see cutterhead analysis in the 2020 SARBO Section 3.1.1.4.1).  Sea turtle temporal and spatial behavior patterns should be considered when evaluating trawling, and/or dredging activities.  A higher abundance of sea turtles may occur in certain locations during the Spring (March and April) and Fall (September and October) time periods as they migrate along the coast.

- North Atlantic right whales: Large dredging projects that require the use of high-speed survey vessels (similar to the Florida II) should avoid working during winter months when North Atlantic right whales are present, as outlined in the North Atlantic Right Whale Conservation Plan (Appendix F), to the extent practicable.

- Sea turtle nesting beaches: While the USACE is not proposing placement on beaches during sea turtle nesting season at this time, beach placement requires coordination with the U.S. Fish and Wildlife Service, as NMFS jurisdiction over listed sea turtles is limited to the marine environment.

- Sturgeon rivers: Project timing must consider the sturgeon specific PDCs and the information available for sturgeon rivers in Table 56 in Appendix E to minimize the risk of take.

D. Assess the equipment options available to reduce take
- Review the level of past take in the general area based on the equipment type used and the site conditions.

- Can the clean-up phase be completed by bed-leveling to reduce take?

- Would cutterhead dredging reduce turbidity in the area and minimize the risk of sedimentation issues for nearby coral and seagrasses?

E. Review take: including the species taken, number of takes for the entire project, the rate of takes (e.g., multiple in 1 day, daily, weekly), and number of takes for that species compared to the take limits allowed under SARBO.

F. Review any operational issues:
- Review the equipment to ensure it is working properly and that the drag head or cutterhead are remaining embedded in the sediment to the maximum extent practicable, as defined in the PDCs of the 2020 SARBO.  This may include reviewing the USACE Dredging Quality Management data collection system used to monitor dredging operations and dredged material placement.  USACE Dredging Quality Management data may be used to generate graphs as part of the risk assessments to determine if the dragheads are operating properly and only pumping when imbedded in the sediment.

- Evaluate the channel or borrow area conditions to assess whether the physical conditions of the dredging environment are impacting dredging operations and increasing the risk of take.

**Defendants' Exhibit C**

G.  Consider the progress of the project, such as how close is it to completion, to determine if the risk of continuing is appropriate.

H.  Condition of channel or borrow areas: Determine if the work can be deferred to another time or if the dredge can work in an alternate position of the channel or borrow area that promotes more efficient dredging operations and reduces entrainment risk.

I.  Clean up: If the take occurred during the cleanup phase, consider if bed-leveling or other cleanup dredging options are available that have less risk of take.

J.  Relocation trawling:
   • Determine if relocation trawling should begin, if it is not already occurring.
   • If trawling is already occurring, does the effort need to be increased?

636

**Defendants' Exhibit C**

**Appendix K.        SARBO Additional Consultation History**

Due the long and complex history of dredging and material placement within the action area, the consultation history is provided here as an appendix.  It includes many types of dredging equipment and restrictions are included in the history that are explained in greater detail in the 2020 SARBO Section 2.  The USACE Engineering Manual (EM) 1110-2-5025, Dredging and Dredged Material Management, (USACE 2015b) also provides more detail on the USACE navigation dredging program, dredge equipment, and dredge material management.  The consultation history was provided in most part by the USACE and BOEM as a part of the SARBO Biological Assessment (SARBA) provided in 2008 and updated in 2017.

## 1    USACE Consultation History

### 1.1            Prior to 1991

USACE has been responsible for the development and maintenance of navigable waterways in the U.S. since the 1800's.  The role of USACE with respect to navigation is to provide safe, reliable, and efficient waterborne transportation systems for the movement of commerce, national security needs, and recreation (Verna and Pointon 2000).

Prior to 1991, each USACE SAD District (i.e., Wilmington District [SAW], Charleston District [SAC], Savannah District [SAS], and Jacksonville District [SAJ]) prepared individual project Biological Assessments and consulted with NMFS under ESA Section 7 for each dredging event. NMFS later determined that individual consultations did not accurately assess the regional implications of dredging actions and suggested that a single regional Biological Opinion to address the dredging of channels and subsequent beach nourishment activities along the Atlantic coast from North Carolina through Florida was more appropriate, which the USACE agreed to and led to the development of the 1991 SARBO discussed below.

### 1.2            1991 SARBO

On November 25, 1991, NMFS issued a Biological Opinion on *Dredging of Channels in the Southeastern United States from North Carolina through Cape Canaveral Florida* (NMFS 1991, referred to as the 1991 SARBO) (NMFS 1991).  The 1991 SARBO stated that continued unrestricted hopper dredging along the Southeast Region's Atlantic coast could jeopardize the continued existence of listed sea turtles.  Therefore, a Reasonable and Prudent Alternative provided in the Opinion included seasonal restrictions of hopper dredging from December 1st through March 31st in channels from North Carolina through Canaveral Harbor, Florida; however, seasonal restrictions could be adjusted on a channel specific basis with appropriate supporting evidence.  The implementation of seasonal restrictions on hopper dredge operations proved effective in reducing sea turtle takes throughout the South Atlantic; however, more research assessing sea turtle abundance within channels was recommended in the Opinion.  The 1991 SARBO concluded that hopper dredging was unlikely to adversely affect North Atlantic right whales, contingent upon the institution of precautionary measures, including a North Atlantic right whale "watch."  The 1991 SARBO also concluded that other types of dredges, including clamshell, pipeline, split-hull hopper dredge Currituck, and sidecast dredges, were unlikely to adversely affect sea turtles.  An ITS of 2 Kemp's ridley, or 5 green, hawksbill or

**Defendants' Exhibit C**

leatherback turtle's mortalities, or 50 loggerhead turtle mortalities was provided.  Re-initiation of consultation was triggered for any project in which 5 turtles were taken.

**1.3          1995 SARBO**

On August 25, 1995, NMFS issued an update to the 1991 Opinion on the *Dredging of Channels in the Southeastern United States from North Carolina through Cape Canaveral Florida* (NMFS 1995, referred to as the 1995 SARBO) (NMFS 1995), which included beach nourishment activities, prohibited regular maintenance dredging by hopper dredge in Canaveral Harbor, Florida, eliminated a dredging window from North Carolina through Pawleys Island, South Carolina, adjusted dredging windows for other harbors in the Southeast, and included an annual incidental take of 7 Kemp's Ridley sea turtles, 7 green turtles, 2 hawksbill sea turtles, 20 loggerhead sea turtles, and 5 shortnose sturgeon.

The 1995 SARBO was developed in response to a new Regional Biological Assessment provided by the USACE, requesting that NMFS consider expansion of the dredging window based on: (1) the USACE conservative take record since 1991, (2) the willingness to continue dredging in the cooler months, during periods of reduced risk to sea turtles, to the maximum extent practicable, (3) the willingness to shut down when take numbers exceed anticipated numbers, and (4) the implementation of the turtle deflecting draghead on all hopper dredges to reduce take.  The 1995 Opinion incorporated a 1995 study, which evaluated sea turtle abundance in 6 South Atlantic U.S. channels (Canaveral Harbor, Florida; Kings Bay, Florida; Brunswick Harbor, Georgia; Savannah Harbor, Georgia; Charleston Harbor, South Carolina; and Morehead City Harbor, North Carolina) and looked at species composition, population structure, and spatial and temporal (seasonal) distributions (Dickerson et al. 1995).  This study was the first to scientifically evaluate sea turtle abundance and temporal distribution and concluded that fewer sea turtles were captured when water temperatures were at or below 16°C; thus, 16°C was recommended as a conservative threshold indicator for a reduced risk of sea turtle take during hopper dredging operations in the Atlantic.  Though this study helped define water temperature as a critical factor in sea turtle occurrence within these 6 channels, additional studies were recommended to refine site specific factors that may influence sea turtle presence (i.e. immigration/emigration periods, influence of coastal dynamics on water temperature, etc.).

Recognizing the new information gathered by Dickerson et al. (1995) and subsequent documentation in the USACE Regional Biological Assessment, the 1995 Opinion (NMFS 1995) did not include seasonal hopper dredging restrictions from Pawley's Island, South Carolina, through North Carolina or Titusville, Florida to Key West, Florida.  Furthermore, the dredging windows from Pawley's Island, South Carolina to Tybee Island, Georgia and from Tybee Island, Georgia to Titusville, Florida were expanded.

However, a series of new Terms and Conditions were identified in the 1995 SARBO to minimize take including an emphasis on the incorporation of the new turtle deflecting draghead on hopper dredges as a mechanism to reduce takes.

**Defendants' Exhibit C**

### 1.4        1997 SARBO

On April 9, 1997, NMFS issued an Interim Opinion on *Continued Hopper Dredging of Two Channels and Two Borrow Areas in the Southeastern United States During 1997* (NMFS 1997). The USACE hopper dredging activities in channels and borrow areas along the southeastern coast of the United States during the spring of 1997 resulted in an unanticipated high rate of sea turtle takes and were rapidly approaching the incidental take level established in the 1995 SARBO, which required re-initiation of consultation if more than 1 turtle was taken in any day, or 5 were taken in any single channel.  Re-initiation of formal consultation was required because 75% of the incidental take limit had been reached.  The interim consultation addressed the use of hopper dredges during 1997 in the Atlantic portion of the USACE SAD, including Morehead City Harbor, Wilmington Harbor, and the Myrtle Beach and Miami borrow areas (NMFS 1997). For these 3 projects, the annual incidental take total for loggerhead sea turtles was increased by 15.

On September 25, 1997, NMFS issued an Opinion on the *Continued Hopper Dredging of Channels and Borrow Areas in the Southeastern United States* (NMFS 1997), referred to as the 1997 SARBO.  This Opinion was written to amend the 1995 SARBO and supersede the 1997 Interim Opinion (NMFS 1997).  It set an annual documented incidental take of 7 Kemp's ridley sea turtles, 7 green sea turtles, 2 hawksbill sea turtles, 35 loggerhead seat turtles, and 5 shortnose sturgeon, and clarified monitoring requirements for beach nourishment projects.  Furthermore, the 1997 SARBO required hopper dredge windows (established in the 1995 SARBO), along with the requirement to minimize sea turtle takes by refining the turtle deflecting dragheads on hopper dredges, continued working in the cool water months to the maximum extent practicable, and agreed to shut down operations when high numbers of turtle takes occurred before approaching the incidental take limit for a given species (NMFS 1997).  Prior to the release of the Opinion, USACE implemented a USACE SAD protocol to effectively manage take numbers throughout each USACE District.  This protocol expressed the USACE commitment to dredge during cool water periods in channels where sea turtle abundance is high or where substrates render the turtle deflecting draghead ineffective.

## 2   Reinitiation of Consultation for the 2020 SARBO

### 2.1        2006

On March 23, 2006, the USACE Jacksonville District, submitted a request to initiate consultation with NMFS under Section 7 of the ESA for the use of bed-leveling devices for associated cleanup activities after cutterhead, hopper, and mechanical dredging in 4 ports on the east coast of Florida.  In a letter dated June 23, 2006, NMFS made the determination that bed-leveling is not part of the hopper dredging activity previously consulted on in the 1997 SARBO and as such, re-initiation of consultation was required pursuant to 50 CFR§ 402.16(c) ("if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the Biological Opinion.").  Furthermore, NMFS determined that reinitiation was also appropriate under 50 CFR § 402.16(d), because "a new species is listed or critical habitat designated that may be affected by the identified action."

**Defendants' Exhibit C**

On July 6, 2006, NMFS sent an e-mail to the SAJ providing guidance on the procedures the USACE should follow during re-initiation in order to cover the current use of bed-levelers.  On December 29, 2006, NMFS sent a letter to USACE SAJ notifying the SAJ of NMFS's intent to phase out the use of Section 10(a)(1)(A) permits for relocation of sea turtles near hopper dredging activities, by letting current permits expire.  NMFS recommended the USACE reinitiate consultation for dredging activities in the south Atlantic such that a new Opinion and ITS would be a more appropriate mechanism to cover relocation trawling take associated with dredging activities.  Informal communication and coordination with NMFS began with the USACE at this time and on April 30, 2007, the USACE SAD sent a letter to NMFS formally requesting re-initiation of consultation under Section 7 of the Endangered Species Act (ESA), in regard to the 1997 SARBO (NMFS 1997).

## 2.2        2008

On September 12, 2008, USACE SAD and BOEM provided a jointly prepared South Atlantic Regional Biological Assessment (USACE and USEPA 2008) to provide new information and analysis for a revised and updated SARBO.  NMFS received the letter on September 15, 2008 and considers this date the official request for consultation.

## 2.3        BOEM Consultation History

Pursuant to Public Law 103-426 (43 U.S.C. 1337(k)(2)) (1994), BOEM can authorize the use of Outer Continental Shelf (OCS) sand, gravel, or shell resources in approved projects.  Potential borrow areas are typically identified during the feasibility phase of beach nourishment, coastal restoration, or construction projects, a process which generally occurs well in advance of formal application to the BOEM for the use of OCS sand, gravel, and shell resources.

BOEM involvement with ESA Section 7 consultations with NMFS regarding offshore dredging activities in the South Atlantic dates to 1995 with the Duval County Shore Protection Project (Florida) and Myrtle Beach Storm Risk management Project (South Carolina).  Since that time, BOEM has continued to consult with NMFS on an individual project basis for dredging activities in the OCS while awaiting inclusion of those activities in 2020 SARBO.

## 2.4        USACE and BOEM Consultation History 2008-2016

Since the submission of the 2008 SARBA, USACE and BOEM staff have continued to work with NMFS staff to respond to data needs, newly listed species, and information requests.  The SARBO Team (consisting of members of NMFS, USACE, and BOEM staff) was formed to work together to determine the scope and scale of activities that should be included in the 2020 SARBO and how to improve the dredging program covered under SARBO while minimizing impacts to ESA-listed species and designated critical habitat.  The list below provides a highlight of the interim steps and accomplishments to complete this task.

- July 1, 2010: NMFS submitted a request to USACE SAD for additional information and raised certain areas of concern.  In a letter dated August 9, 2010, USACE SAD provided NMFS with the requested information, acknowledging unresolved issues.

**Defendants' Exhibit C**

- July 2012: USACE SAD and NMFS staff met to discuss revising and updating information for the 2020 SARBO.

- November 6, 2013: NMFS sent a second request for information letter resulting in further coordination NMFS to clarify the request and provide appropriate information.

- February 7, 2014: USACE SAD submitted a request to NMFS asking for NMFS to issue an "interim supplement" to the 1997 SARBO to address recent listings of the Atlantic sturgeon (New York Bight, Chesapeake Bay, Carolina, and South Atlantic, and Gulf of Maine DPS) and smalltooth sawfish (U.S. DPS) and to provide incidental take for Atlantic sturgeon (all 5 DPSs). NMFS declined the request for an "interim supplement," but clarified that while the reinitiation of consultation is ongoing, SAD should continue to conduct dredging operations under the Terms and Conditions of the 1997 SARBO and SAD's internal protocols for managing endangered species interactions with dredging. NMFS Southeast Region also recommended the preparation of an Endangered Species Act Section 7(a)(2)/7(d) jeopardy analysis. In response to this guidance, the USACE and BOEM have provided 7(a)(2)/7(d) analysis for all species and designated critical habitat listed since the completion of the 1997 SARBO.

- June 27, 2017: USACE SAD and BOEM provided NMFS an updated biological assessment (USACE 2017), including proposed Project Design Criteria (PDCs) necessary for the competition of a Programmatic Biological Opinion. As discussed between NMFS, USACE, and BOEM, the goal of framing this Biological Opinion as a Programmatic Opinion is to expand the scope of the dredging and dredge material placement activities considered, provide limits of how dredging and dredge material placement activities will occur through the use of PDCs, and to allow some flexibility in how these activities are completed in the future. The updated SARBA incorporated all 7(a)(2)/7(d) analysis for all species and designated critical habitat listed since the completion of the 1997 SARBO.

- August 6, 2017: USACE SAD, BOEM, and NMFS met in Atlanta, Georgia, to work toward resolution on outstanding issues and complete the required PDCs.

- February 2, 2018: USACE provided a quantitative analysis of anticipated impacts to ESA-listed species and critical habitat.

- April 25, 2018: USACE SAD sent a copy of GIS layers to NMFS for internal coordination needed to complete the 2020 SARBO that showed areas where activities are expected to continue to be dredged or have material placement.

- July 17-18, 2018: USACE SAD, BOEM, and NMFS senior leadership met in St. Petersburg, Florida to work toward resolution on outstanding issues and completed the required PDCs, specifically negotiating protection for North Atlantic right whale, Atlantic sturgeon, and ESA-listed corals. A completion date for 2020 SARBO was set for the summer of 2019.

- August 28, 2018: USACE SAD, BOEM, and NMFS met in Atlanta, Georgia, with state partners to solicit feedback on the draft PDCs and request any additional regional information available to improve protections of ESA-listed species.

- April 19, 2019: USACE SAD, BOEM, and NMFS met in St. Petersburg Florida to finalize negotiations for outstanding issues that included resolution of the necessary protections for

**Defendants' Exhibit C**

ESA-listed coral, Atlantic and shortnose sturgeon, Johnson's seagrass, and to North Atlantic right whales from geophysical surveys.

- September 13, 2019, the USACE SAD, BOEM, and NMFS finalized the mutually agreed upon PDCs for this Opinion and initiated consultation.[98]

- October 25, 2019, a draft of the Biological Opinion (NMFS tracking number SERO-2008-00000) was sent to the USACE and BOEM be provided to the USACE and BOEM prior to final signature.

- November 1, 2019, USACE provided comments to NMFS on the draft Opinion.  Requested changes to the type of equipment allowed in sturgeon rivers and the timing of work covered under this Opinion.  Also requested expanding the frequency of geophysical survey equipment covered under this Opinion.  USACE stated that the ITS did not seem to accurately reflect the level of work that will be covered under this Opinion and requested that it be recalculated.  USACE requested to review another draft to see the edits made to their substantial comments prior to finalization of the Opinion.

- November 8, 2019, BOEM provided comments to NMFS on the draft Opinion.

## 2.5          Key Information Gathered and Decisions Made by the SARBO Team

Following completion of the 2008 SARBA, the SARBO Team worked together to further define and expand the types of projects included under the 2020 SARBO and to collaboratively develop the PDCs necessary to be protective of ESA-listed species and designated critical habitats.  The updated SARBA provided by the USACE and BOEM to NMFS on June 27, 2017, described changes proposed at that time and documented the first round of protective measures developed.  These measures were revised through numerous calls, in-person meetings, and shared drafts of the PDCs and proposed action.  Key information gathered and considered during this further development of the proposed action, including those measures protective of ESA-listed species and designated critical habitats, is summarized below.  The details of the proposed action are discussed further in the 2020 SARBO Section 2.

## 2.5.1          Expanding Where Projects Could Occur from 1997 SARBO

The 2020 SARBO action area extends beyond the action area considered in previous iterations of SARBO, in part due to inclusion of projects in federal waters under the jurisdiction of BOEM.  The action area for 2020 SARBO specifically includes the following areas and projects that were not considered in the 1997 SARBO:

- Federal and territorial waters in the U.S. Caribbean (Puerto Rico and the U.S. Virgin Islands).

- Projects within critical habitat designated after completion of the 1997 SARBO (*Acropora* critical habitat, loggerhead critical habitat, Atlantic sturgeon critical habitat, revised North Atlantic right whale critical habitat, and Johnson's seagrass critical habitat).  The number of

---

[98] Under the ESA consultation is initiated once NMFS has all information necessary to conclude the consultation.  Because the PDCs that are the core of the project description were under development through the entire process, consultation was initiated very close to the issuance of the Opinion.

**Defendants' Exhibit C**

projects covered under the 2020 SARBO is expected to increase from the 1997 SARBO in areas where critical habitat was designated after completion of the 1997 SARBO, including *Acropor*a critical habitat, loggerhead critical habitat, Atlantic sturgeon critical habitat, revised North Atlantic right whale critical habitat, and Johnson's seagrass critical habitat. The number of projects completed under the 1997 SARBO in Johnson's seagrass, Atlantic sturgeon, and *Acropora* critical habitat were limited to those completed under a memo in which the USACE determined that completion of the project would not result in adverse modification to critical habitat, under ESA Section 7(a)(2)/7(d). Development of PDCs to protect these areas of designated critical habitat required extensive coordination between the SARBO Team and information gathering from other entities, including the species experts and state representatives to provide consistency with each state's regulations where possible.

- Maintenance dredging permitted by the USACE in areas not previously considered under the 1997 SARBO. The 2020 SARBO covers maintenance dredging actions in any area within the action area (2020 SARBO Section 2.8) as long as all relevant 2020 SARBO PDCs are met. This Opinion provides the definition of maintenance dredging and specific limitations in the SARBO PDCs. Generally, the 2020 SARBO will expand the areas that can be maintenance dredged, when funded, authorized, or carried out by USACE or BOEM. to include:

  o Navigational waterways required to be maintained under Title 33 (Navigation and Navigable Waters) that were initially included in 1997 SARBO, but were located in areas where subsequently listed species or designated critical habitat occur: Maintenance of these major navigation channels maintained as navigational waterways such as the Intracoastal Waterway (IWW) were covered under the 1997 SARBO, but effects to species listed and critical habitat designated following the completion of 1997 SARBO were not. These channels will be covered under the 2020 SARBO. For example, certain portions of the IWW occur in areas where critical habitat was designated after the completion of the 1997 SARBO, such as the portion of the IWW on the east coast of Florida within the range of Johnson's seagrass (listed in 1998 shortly after completion of the 1997 SARBO) and in Johnson's seagrass critical habitat designated in 2000. Maintenance of this portion of the IWW was later covered under a USACE SAJ Regulatory Division regional general permit in 2001 (NMFS 2001a)(SAJ-93 *Maintenance Dredging of the Ports and Intracoastal Waterway within the range of Johnson's Seagrass,* NMFS tracking number SER-2000-01199, signed June 4, 2001). Future maintenance dredging within the range of Johnson's seagrass in the Intracoastal waterway (IWW) will now be authorized by the USACE under the 2020 SARBO through the USACE Regulatory permitting process or be executed by the USACE Civil Works program. Other navigational waterways required to be maintained under Title 33 that are in the action area will continue to be carried out under SARBO as federally-permitted (USACE Regulatory permitted project) or as a federally-authorized (USACE Civil Works project), so long as they meet all other requirements of this Opinion.

  o Navigation channels and canals that are not required to be maintained under Title 33 are also covered such as the smaller channels or canals that provide access to coastal communities and/or coastal neighborhoods and channels in rivers that are not part of the main navigation channel such as the secondary channel sections of a braided river.

**Defendants' Exhibit C**

o   Ports and berths along a maintained navigation channel, including those not owned and operated by a Port Authority, or federally-required to be maintained such as in the individually maintained berths in Savannah Harbor.

o   Smaller areas such as public and private marinas, boat ramps, and around docks that were previously permitted by USACE and dredged.

### 2.5.2        Discussions Related to Project Timing

During consultation, the parties reviewed and modified seasonal work windows and restrictions based on new information that resulted in similar or improved protections for ESA-listed species This resulted in an expanded seasonal window that hopper dredging can occur under the 2020 SARBO (as compared to the 1997 SARBO), added seasonal restrictions on projects occurring in rivers where Atlantic and shortnose sturgeon occur, and modified seasonal protective measures required in areas where and when North Atlantic right whales may be present, while taking into account the need for continued protections for ESA-listed sea turtles.

Since changes in project timing can result in changes in the effects to multiple ESA-listed species and designated critical habitats, the SARBO Team coordinated with state and federal agencies to find all available data to evaluate effects.  The SARBO Team met with species experts within NMFS, USACE, and BOEM, along with state partners, to request available information, discuss the effects of expanding the seasonal hopper dredging window, and to develop measures to minimize or avoid risks to ESA-listed species and designated critical habitat.  Data gathered included information on (1) the risk to North Atlantic right whales from different types of equipment considered in this Opinion, and if changing the timing of projects could reduce that risk; (2) the risk to sea turtles from allowing limited dredging at times when and in areas where abundance is higher, and the risk from minimization measures like relocation trawling, and (3) the risk to Atlantic and shortnose sturgeon from modifications to project timing windows based on historic water quality data collected from rivers where sturgeon are known to be present.

Ultimately, the SARBO Team determined that the 2020 SARBO should include additional minimization measures as part of the proposed action, due to: (1) the scope and scale of this project spanning from North Carolina to the Caribbean and from inland rivers and water ways to federal water and (2) the complexity of balancing the risks to 25 ESA-listed species and 5 designated critical habitat units, and (3) the continued federal mandate for the USACE to maintain navigational waterways and beaches.  Many of the ESA-listed species within the action area have overlapping ranges and habitats, and some protective measures frequently applied to projects for certain ESA-listed species conflict with protection of other listed species or critical habitats in these overlapping areas.  The SARBO Team gave extensive consideration to which ESA-listed species could be affected by an activity covered under this Opinion, the probability of exposure based on project timing and anticipated species abundance in an area, and how to maximize protections for all ESA-listed species and designated critical habitat.  Additional consideration was given to species' current status and ability to recover when considering the risk to multiple species in a given area.  This approach resulted in the development of the risk-based adaptive management plan outlined in 2020 SARBO Section 2.9.2 while developing the PDCs provided in the South Atlantic Regional Biological Opinion (2020 SARBO) Project Design Criteria (PDCs) Overview and General PDCs.

**Defendants' Exhibit C**

Developing an approach to balance the needs of all 25 ESA-listed species and designated critical habitats in the action area took over a year of intensive literature review, coordination with species experts, and negotiations between NMFS, USACE, and BOEM, as highlighted in the following paragraphs.  Within the action area, potential effects to North Atlantic right whale, ESA-listed corals, and *Acropora* critical habitat were identified as being at greatest risk from the proposed action, without sufficient protective measures.  A discussion of the information gathered and negotiations made related to North Atlantic right whale is summarized below. Negotiations related to ESA-listed corals and *Acropora* critical habitat relate to potential changes to water quality is summarized in 2020 SARBO Section 2.5.3.

For North Atlantic right whale, the most notable consideration in this Opinion was reviewing the size, speed, purpose, location, and timing of dredging equipment and related vessels to look for ways to reduce the probability of a potential vessel collision with this species.  This included the involvement of the NMFS North Atlantic right whale species coordinator, review of all relevant literature, review of automatic identification system tracking data of vessels used for or to support dredging in the action area, coordination with species experts outside of NMFS, and multiple face-to-face meetings with NMFS, USACE, and BOEM, including senior leadership participation.  The negotiations resulted in an agreement to:

1. shift a portion of hopper dredging to summer months when North Atlantic right whale are not present in the action area,

2. fund up to 2 additional aerial survey teams north of the existing Florida/Georgia survey area (off the coasts of North and South Carolina) as needed to adequately cover the area to help identify when whales are actively or possibly migrating and where these whales are in the action area, in addition to the existing aerial survey team that surveys southern Georgia and northern Florida (described in Appendix F) , and

3. expand the time and distance that USACE vessels must reduce speeds when North Atlantic right whales are known to be in the area.

These increased protective measures for North Atlantic right whales are outlined in the North Atlantic Right Whale Conservation Plan (Appendix F).  An added benefit to the increased aerial surveys is that when North Atlantic right whales are observed, those locations will be broadcast to other commercial vessel traffic in the area to alert mariners to be on the lookout for this species.  Surveys will also aid in the reporting of other large ESA-listed species such as the newly listed giant manta ray.

The SARBO Team considered and acknowledged that shifting some dredging projects to warmer months in the negotiated North Atlantic Right Whale Conservation Plan may increase the risk of entrainment of sea turtles by hopper dredges due to the potential for higher densities of sea turtles in the project area.  It was determined that the proposed action should include allowing dredging in warmer months only in limited circumstances and after a risk based assessment was completed, as outlined in the 2020 SARBO Section 2.9.2.  This decision was made because even though the risk of a vessel strike to a North Atlantic right whale is low with the agreed upon PDCs, the consequence to the species from a single vessel strike would be high.  Conversely, the

**Defendants' Exhibit C**

risk of entrainment of a sea turtle increases when moving dredging from cooler winter to warmer summer months when sea turtles are more prevalent in warmer waters; however, the risk/impact to ESA-listed sea turtle species is minimized by the PDCs in this Opinion.  The SARBO Team agreed to continue to work collaboratively throughout the life of the 2020 SARBO to minimize the risk of entrainment to ESA-listed sea turtles as much as possible, through adherence to negotiated protective measures outlined in the PDCs of this Opinion and through the continued risk assessment process outlined in the 2020 SARBO Section 2.9.2.

### 2.5.3          Discussions Related to Water Quality

The SARBO team spent years gathering information and discussing the potential effects from turbidity and sedimentation generated during dredging and material placement.  Turbidity and sedimentation were of particular concern for Johnson's seagrass and ESA-listed corals.  Both Johnson's seagrass and ESA-listed corals are not mobile, and therefore cannot avoid turbidity or sedimentation.  As described in this Opinion, ESA-listed corals are under increased pressure range-wide from external sources resulting in the deterioration or loss of colonies by events like coral bleaching, and additional stressors, such as turbidity and sedimentation, can have high risk consequences to the status of the species.  Effects to ESA-listed corals have not previously been considered in a programmatic consultation of this nature, where the exact project locations and site conditions are unknown.  All of NMFS' previous Section 7 consultations involving potential effects to coral in the action area had involved reviewing the site-specific details of each project individually.  Based on lessons learned from recent dredging to deepen and widen Miami Harbor (NMFS 2011a), NMFS and the USACE have been reevaluating how to estimate and quantify the extent of anticipated and observed effects to ESA-listed corals for all dredging projects.  Hence, developing PDCs that accurately account for the risk of effects to ESA-listed corals at all future project locations that could be covered by this Opinion required extensive research and coordination, including involvement from the NMFS coral species team, reviewing available literature on the matter, and coordination with the local USACE SAJ and the Florida state agencies involved in state permitting processes.  Specific information was gathered for this Opinion to determine the potential distance that turbidity or sedimentation can extend beyond the work area for projects considered under this Opinion and the potential areas in which corals could be relocated to avoid harm from pipelines associated with projects was used to develop the PDCs, which will be discussed and evaluated in the effects analysis of this Opinion.

### 2.5.4          Geophysical and Geotechnical (G&G) Surveys

The 1997 SARBO did not consider G&G surveys conducted in association with dredging projects.  The USACE requested to have G&G surveys needed for dredging and material placement projects be included as part of the 2020 SARBO proposed action.  BOEM completed separate consultations with NMFS on G&G surveys they conduct as part of their marine minerals program, including those activities within the 2020 SARBO action area (NMFS 2019b).  Therefore, BOEM requested to be excluded from the G&G portion of this programmatic consultation, because a separate individual consultation covers BOEM's Atlantic and Gulf of Mexico OCS sand survey activities.  NMFS evaluated whether BOEM's G&G survey activities meet the definition for "effects of the action", and determined that they do not.  "Effects of the action" are defined as effects "caused by the proposed action, including the effects of other activities that are caused by the proposed action.  An effect or activity is caused by the proposed

**Defendants' Exhibit C**

action if it would not occur but for the proposed action and is reasonably certain to occur." (50 C.F.R. § 402.02). Thus, NMFS' determination regarding whether an effect or activity is caused by the proposed action is governed by a "but for" standard of causation. BOEM reports that while the results of G&G surveys may subsequently be used for identification of borrow areas under SARBO, the G&G surveys operate independently of the activities under consultation in SARBO, and are used for purposes beyond the 2020 SARBO proposed action. Thus, BOEM's G&G surveys within the 2020 SARBO action area do not depend on specific dredging or placement projects for justification. Because BOEM's G&G activities have utility apart from the proposed action, do not depend upon the activities included in the 2020 SARBO proposed action for justification, and would continue to occur regardless of the 2020 SARBO proposed action, we determined that BOEM's G&G activities, and related effects, are not caused by the proposed action. Therefore, NMFS did not consider BOEM's G&G surveys in this consultation. However, NMFS reviewed the Final Environmental Assessment, Sand Survey Activities for BOEM's Marine Minerals Program, Atlantic and Gulf of Mexico (BOEM 2019) and relied upon the assessment for information necessary to develop the USACE G&G PDCs and the associated effects analysis for the 2020 SARBO. NMFS also coordinated with the NMFS headquarters experts on acoustics to ensure accuracy of the G&G effects analysis from sound producing activities considered in this Opinion.

**Defendants' Exhibit C**