IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| ONE HUNDRED MILES,<br><br>    Plaintiff,<br><br>    v.<br><br>THE UNITED STATES ARMY CORPS OF ENGINEERS et al.,<br><br>    Defendants. | Docket No. 4:21-cv-00134-RSB-CLR |

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

The Corps admits that One Hundred Miles will succeed on the merits of this case — "the most important" factor for preliminary injunctive relief, according to the Eleventh Circuit. *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). Still, the Corps wants to move forward anyway, despite NEPA's clear mandate that until an agency completes a NEPA review "no action concerning the proposal may be taken that would … [h]ave an adverse environmental impact." 40 C.F.R. § 1506.1.

If permitted to move forward, the Corps' dredging project would cause irreparable harm to OHM and its members and would substantially undermine the public interest in protecting the environment and ensuring agency compliance with federal law. To prevent these harms, the Court should issue a preliminary injunction preventing the Corps from using a hopper dredge outside of traditional winter dredging windows.

**I.    OHM will suffer irreparable injury absent injunctive relief.**

Absent injunctive relief, OHM and its members will suffer irreparable harm to their aesthetic interests in observing, interacting with, protecting, tracking, studying, working with,

and enjoying local loggerhead sea turtles. The Corps' response mischaracterizes the harm to OHM and tries to fault Plaintiff for the consequences of the Corps' failure to conduct an environmental review in the months before undertaking this project. Yet even without the benefit of NEPA's informational and public participation process, the evidence shows a likelihood of irreparable injury.

The Corps' argument to the contrary is based on three propositions: (1) an alleged NEPA violation is not "a substitute" for irreparable harm; (2) harm to a species, rather than the movant, is insufficient to show irreparable harm; and (3) to establish irreparable harm to a movant's aesthetic interests in viewing a species, a movant must show harm at the species level.

The first two propositions are irrelevant and the third misunderstands OHM's threatened injury. OHM has not argued that NEPA is "a substitute" for irreparable harm or that harm to loggerhead turtles, standing alone, is adequate to show irreparable harm. Instead, OHM contends that the Corps' NEPA violation, when paired with the aesthetic and other injuries its members will suffer from the death of significant loggerhead sea turtles, amounts to irreparable harm—a position clearly supported by case law.

In the Eleventh Circuit, an injury is irreparable "if it cannot be undone through monetary remedies." *Sierra Club v. Martin*, 933 F. Supp. 1559, 1571 (N.D. Ga. 1996) (quoting *Northeastern Fla. Chapter v. Jacksonville,* 896 F.2d 1283, 1285 (11th Cir.1990)), *rev'd on other grounds,* 110 F.3d 1551 (11th Cir. 1997). Here, "once the [loggerhead sea turtles in Brunswick Harbor] are killed, they cannot be returned. More importantly, no monetary award can recompense Plaintiff[]." *Id.*

This is particularly true when, as here, a plaintiff shows a strong affinity for the particular animals or population of animals in question—so much so that observing or contemplating their

death is upsetting. For example, in *Fund for Animals v. Espy*, 814 F. Supp. 142 (D.D.C.1993), a conservation organization sought a preliminary injunction to stop a study by the U.S. Department of Agriculture that involved the capture and killing of 10 to 60 pregnant bison from a herd of 2,400 in Yellowstone National Park. *Id.* at 151. Like here, the plaintiffs were likely to succeed on their alleged a violation of NEPA, noting that the agency had not prepared either an EIS or EA. The plaintiffs lived near Yellowstone National Park and frequently visited the park, and had such an affinity for the bison "that the sight, or even the contemplation, of treatment in the manner contemplated" would inflict harm on plaintiffs' aesthetic interests. The court held that this satisfied the irreparable harm requirement, explaining:

> Such injury is not compensable in money damages because, while the injury threatened to these plaintiffs' aesthetic injuries would be palpable and concrete, they are not ownership interests in property susceptible to monetary valuation…. Nor can money damages compensate plaintiffs' procedural injury caused by defendant's NEPA violation. Thus, the injury experienced and threatened would be irreparable.

*Id*.

Similarly, in *Fund for Animals v. Clark*, 27 F. Supp. 2d 8 (D.D.C. 1998), the court granted a preliminary injunction based on irreparable harm caused by defendants' "failure to comply with NEPA and the aesthetic injury the individual plaintiffs would suffer from seeing or contemplating … bison being killed in an organized hunt." *Id.* at 14. Because the challenged hunt would have only killed bison to thin the herd, there was no concern about species-level harm.

Likewise, in *Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003), the court granted a preliminary injunction based on irreparable harm caused by the defendants' NEPA violation combined with the aesthetic injury arising from the killing of mute swans. Even though defendants argued that the swans in question would be from "remote areas where plaintiffs have not alleged they live or travel," the court still found irreparable harm, noting that "mere

3

contemplation of a particular treatment" of local animals for which plaintiffs have a strong affinity was enough (particularly when combined with defendants' NEPA violation) to establish irreparable harm. *Id.* at 220–21; *see also Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 163 (D.D.C. 2002).

Notably, in all of these cases, the courts found irreparable harm even though plaintiffs did not show species- or population-level impacts and "even though plaintiffs did not establish that the exact animals they regularly observed would be directly affected by the proposed action." *Fund for Animals v. Norton*, 281 F. Supp. at 221. Instead, the findings of irreparable injury were based on the "mere contemplation" of injury or mortality to individuals in the local populations of animals that were meaningful to plaintiffs.

Here, the affinity OHM's members have for local loggerhead sea turtles far exceeds the interests described in the above cases. OHM's members do not simply enjoy viewing these animals from a distance. As shown below and in the attached declarations, OHM's members have a long and deep connection with Georgia's threatened loggerhead sea turtles—they know many of them by name. *See generally* Second Dec. of Catherine Ridley ("Second Ridley Dec.") (attached as Ex. 23).  They interact with them, track them, and, in some cases, nurse them back to health for years after dredging-related injuries. *Id.*

The nature of loggerhead behavior contributes to this affinity. As acknowledged by the Corps, female sea turtles have "strong nest fidelity" and tend to return to the same nesting area year after year. Resp. Br. at 7. OHM's members are well aware of this, and it contributes to their ability to interact with these turtles. In fact, a loggerhead DNA program conducted by the University of Georgia in conjunction with Georgia DNR actually allows sea turtle volunteers l to track the nesting patterns of each individual turtle. Second Ridley Dec. ¶ 6. These members

watch as they come back year after year to nest on neighboring islands. *Id.* The turtles who would be harmed by spring and summer hopper dredging are turtles whose home base is in and around Brunswick Harbor and the islands and beaches where OHM's members live and volunteer. *Cf. Fund for Animals v. Norton*, 281 F. Supp. 2d at 221–22.

    To support its claim of harm, OHM submitted declarations of members with over a century of combined sea turtle conservation work and enjoyment on Jekyll, St. Simons, and Little Cumberland Islands. Docs. 5-5, 5-19–22. Dr. Norton, for example, is a wildlife veterinarian and director of the Georgia Sea Turtle Center on Jekyll Island. Doc. 5-5. He has dedicated his career to caring for sick and injured turtles and has first-hand experience with dredging-related traumas. When turtles are injured by hopper dredges in Georgia's harbors, Dr. Norton is the one who treats them—often for many months or years. *Id.* ¶ 15. Sadly, despite the best efforts of Dr. Norton and his team, many turtles still do not make it. *Id.* Dr. Norton also performs necropsies on individual sea turtles that are killed by hopper dredges in Georgia's waters and describes the gross pathology as "horrific." *Id.* ¶ 14. Based on his intimate work treating these turtles, Dr. Norton says it would be "devastating" for him to see the injuries and mortality caused by year-round dredging. *Id.* ¶ 21.

    Ms. Bell has volunteered her time for sea turtle conservation work for nearly forty years, much of that time as the director of the oldest loggerhead conservation project in the world. Doc. 5-20 ¶ 5. She has heard first-hand accounts from sea turtle technicians on dredges and is "horrified by the idea of returning to the days where loggerhead injuries and deaths were so common." *Id.* ¶¶ 10, 11.

    Ms. Carroll, the director of a local sea turtle conservation organization, has dedicated over three decades to sea turtle conservation work, publishing over fifty research papers and

devoting her career to conserving Georgia's local loggerhead population. Doc. 5-21 ¶¶ 4, 7, 8. Like the other declarants, she would be harmed by the loss of local loggerhead turtles in terms of her ability to observe, study, photograph, and protect these species, as well as the undermining of her science-based conservation work in Georgia. Doc. 5-21 ¶ 18.

Ms. Ridley, an OHM employee and member who also serves as the director of the neighboring St. Simons Island Sea Turtle Project, "fell in love with sea turtles in 2002," and "has done everything in [her] power (both professionally and personally) to work to protect them." Doc. 5-19 ¶ 21. She thinks "regularly about the hatchlings [she] helped leave the beach during [her] very first summer" twenty years ago and how "in another 10 years of so, some of them will be returning to our beaches to nest." *Id.* Given her deep connection and appreciation for Georgia's turtles, it would be "extremely upsetting" to her if they were killed by spring and summer dredging. Second Ridley Dec. ¶ 20.

Ms. Janssen, another St. Simons Sea Turtle Project volunteer, describes her volunteer experiences with similar fondness:

> It never ceases to amaze me how sea turtles survive the great odds to reach maturity and some thirty years later follow their instincts back to our beaches! Encounters with something so ancient is awesome! … I hope my small efforts will allow future generations to see this amazing [life] cycle in action.

Doc. 5-22 ¶ 6.

And it's not simply these declarants. As Ms. Ridley describes in her declaration, beachgoers often "adopt" turtle nests and follow them closely throughout the season. Second Ridley Dec. ¶ 19. In fact, many of the volunteers on her team decided to move to St. Simons after encountering sea turtles on vacation in order to continue working with them. *Id.*

Contrary to the Corps' mischaracterization of these substantial threatened injuries, OHM's members do not solely care about "enjoyment of the species" in the abstract. *See e.g.*,

6

Resp. Br. at 2. That is, the frame of reference for irreparable harm here is not just the threat to the Northwest Atlantic Distinct Population Segment considered by the 2020 SARBO, but the threat to a specific population of sea turtles whose natal home is the South Georgia coast. *See Fund for Animals v. Norton*, 281 F. Supp. 2d at 221.

The aesthetic harm to OHM's interest in Georgia's loggerhead sea turtles is bolstered by the Corps' failure to "tak[e] into account the reasonably foreseeable indirect and cumulative effects" of its proposed action as required by NEPA. *Fla. Wildlife Fed'n v. U.S. Army Corps of Engineers*, 404 F. Supp. 2d 1352, 1362 (S.D. Fla. 2005). Although "a NEPA violation [may be] insufficient, standing alone, to constitute irreparable harm justifying issuance of a preliminary injunction, when combined with the irreparable aesthetic injuries alleged by plaintiffs, such procedural harm does bolster plaintiffs' case for a preliminary injunction." *Fund for Animals v. Norton*, 281 F. Supp. 2d at 222. "If [the project] is not enjoined, these as yet unexamined effects would begin to take place, and no amount of subsequent environmental analysis would undo them." *Id.*; *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 35 (2008) ("[Where the federal government makes a decision] without the informed environmental consideration that NEPA requires, much of the harm that NEPA seeks to prevent has already taken place."); *accord Protect Key West, Inc. v. Cheney,* 795 F. Supp. 1552, 1563 (S.D. Fla. 1992) ("Irreparable harm results where environmental concerns have not been addressed by the NEPA process."). For purposes of injunctive relief based on a NEPA claim, it is also important that here the Corps is departing from three decades of practice—effectively "conducting a new type of activity" by hopper dredging in May and June. 555 U.S. at 23.

The Corps argues that OHM's injury would only be irreparable if there were impacts to sea turtles at the "population-level." But there is no such rule in the Eleventh Circuit. *See Sierra*

7

*Club*, 933 F. Supp. at 1571 (noting that requiring a showing of impacts to the population of a species as a whole "misapprehends the nature of irreparable harm" which does not focus on the significance or gravity of the injury).[1] The Corps represents it would stop dredging here at some point before it reached the regional take limits in the 2020 SARBO and thus argues there can be no irreparable harm. But equity augurs against adopting "the proposition that a violator of the law can choose the extent to which it violates a law before its actions are subject to review." *Id.*

The Corps unabashedly admits "it did not document its reasoning and explanation for deciding," without NEPA review, to dredge outside the windows that have been in place for three decades at Brunswick Harbor. Resp. Br. at 24. The Corps further concedes that OHM "will, on the merits of the case, likely succeed." *Id.* at 2. Not only does the Corps improperly suggest that the Court should ignore this blatant NEPA violation for purposes of an irreparable harm finding, but the Corps goes on to fault OHM for lacking project-specific evidence the Corps intentionally chose not to consider or put in the record before making its dredging decision, e.g. the expected number of loggerhead mortalities or other species impacts from this year's proposed dredging operation.[2] The Court sitting in equity for this motion should take all of this into account. *Marsh*, 872 F.2d at 497. After all, "[c]ompliance with NEPA…is not a triviality, but rather a fundamental component of federal environmental protection to assure that informed

---

[1] In any event, spring and summer hopper dredging posts a real risk to localized populations, as shown in Plaintiff's motion. Defendant's attempt to discount this by claiming that "a total of thirty-five loggerheads were killed during twenty-six years at Brunswick Harbor—not even two a year" misses the point entirely. Those lower take levels occurred because traditional winter dredging windows were in place during those years for the express purpose of avoiding the significant risks associated with spring and summer dredging.

[2] *Cf. N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1540 (11th Cir. 1990) ("[The NEPA document] also serves as a springboard for public comment and incorporates the critical views of other federal, state, and local agencies. The document offers these bodies notice of the program's expected environmental consequences and the opportunity to plan and implement corrective measures in a timely manner.").

decisions are made before it is too late." *Fla. Wildlife Fed'n v. U.S. Army Corps of Engineers*, 404 F. Supp. 2d 1352, 1362 (S.D. Fla. 2005), *judgment clarified*, No. 0580339, 2005 WL 3465181 (S.D. Fla. Nov. 21, 2005).

Moreover, in none of the cases relied on by the Corps was there an admission by the federal government that it failed to write a decision document under NEPA or conduct project-specific environmental analysis. Resp. Br. at 2, 24. Again, this is critical because NEPA requires a hard look at environmental impacts *before the federal decision is made* and this function of NEPA is defeated if analysis occurs only after the project and its effects have begun. *See Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) ("The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits."); *accord Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009).

Further, the cases cited by the Corps as arguably supporting a "population-level" standard where federal action implicated NEPA are distinguishable, even setting aside that in both cases the agency had conducted project-specific NEPA analysis. There, the court did not find a likelihood of success on the NEPA claims. In addition, those cases did not involve plaintiffs with a demonstrated affinity for individual animals in the population at risk. *S. Utah Wilderness All. v. Thompson*, 811 F. Supp. 635, 644 (D. Utah 1993) (no likelihood of success); *id.* at 641–42 (finding no irreparable harm in challenge to adequacy of EA where coyotes would remain a viable species after the Animal Damage Control program, especially where such programs had been conducted successfully since 1973); *Idaho Rivers United v. United States Army Corps of Engineers*, 156 F. Supp. 3d 1252, 1269 n.16 (W.D. Wash. 2015) (not reaching likelihood of success); *id.* at 1261–64 (finding no irreparable harm in challenge to adequacy of an EIS—

analyzing effects of proposed dredging in the same place and time previously dredged—because plaintiff Nez Perce Tribe failed to establish irreparable injury to the species population as a whole). The Nez Perce in *Idaho Rivers United* was found to have an interest in its time-immemorial relationship with the Pacific lamprey as a whole, and so the court held that the irreparable injury must be to that species-level interest. *Id.* at 1264 (noting that witness had testified that "as long as there were Pacific lamprey swimming upstream," he would be satisfied). Indeed, the court noted that there can be "irreparable injury from the deaths of individual animals where plaintiffs have established an affinity for or an aesthetic interest in the particular, individual animals at issue"—but explained that it was not the case there. *Id.* at 1263–64 (collecting cases).

In short, the Corps seeks to ignore its violation of NEPA, to benefit from its own failure to assess the environmental effects of its proposed dredging operations, and to impose a heightened "population-level" standard. The Court should decline to adopt this view for the reasons above. Because the Corps failed to conduct any project-specific environmental analysis and OHM's members have a particular affinity for and interest in Georgia's sea turtles who would be harmed, OHM has established a likelihood of irreparable harm.

**II.     The public interest and balance of equities weigh in favor of injunctive relief.**

   **A.     Any additional draft restrictions would be short-term and make up only a small fraction of those already in place.**

OHM recognizes that regular removal of sediment is necessary to maintain economically productive shipping channels. It has never opposed or challenged maintenance dredging in the past, and it is not asking the Court to enjoin all future dredging here. Instead, in light of the well-documented harms caused by hopper dredging during certain months, OHM is asking the Court to temporarily stop the Corps from using a hopper dredge for a portion of the year. This request

is not an unreasonable one—the Corps has limited dredging to winter dredging for nearly three decades, during which the Port of Brunswick has grown into the largest automobile port in the nation.

In its response brief, the Corps alleges that shallower water caused by a lack of maintenance dredging "could disrupt over $5 billion worth of cargo annually." Resp. Br. at 9. To the extent the Corps is suggesting a preliminary injunction would cause this level of disruption, this figure is grossly misleading. First, it assumes that all transport restrictions or delays would be attributable to the preliminary injunction. But the Corps apparently has not dredged Brunswick Harbor to its authorized dimensions since 2010. U.S. Army Corps of Eng'rs, Brunswick Harbor Operations & Maintenance Dredging, GA, available [online](). During the most recent three years, the Corps removed less than half of the material needed to reach the harbor's authorized dimensions. Doc. 10-4 at ¶ 4. This year, to dredge the harbor to its authorized depth, the Corps would need to remove nearly 4 million cubic yards of material—over three times more than it has contracted to remove. Doc. 10-4 at ¶ 4. All this to say, Brunswick Harbor has been shallower than authorized for years and will continue to be regardless of whether the Corps proceeds with dredging next week or in December.

Second, the $5 billion figure assumes that any transport restrictions or delays would be "long-term." Resp. Br. at 9. They would not. As explained above, OHM seeks an injunction prohibiting only (1) the use of hopper dredges (2) outside of traditional dredging windows. Under OHM's narrowly tailored request, the Corps could begin hopper dredging as soon as December—or far sooner, if it chooses to use a different, less harmful type of dredge.

Third, the $5 billion figure refers broadly to "disruption" of cargo but does not identify what type of disruption—or estimate any cost to commerce associated with such disruption

(instead identifying only the value of the cargo). Indeed, despite operating with incomplete maintenance dredging for over a decade, the Port of Brunswick has grown into the largest automobile port in the nation, the second busiest port in the nation for total RO/RO cargo, and the busiest port in the nation for RO/RO imports. Doc. 10-4 at ¶ 3. A short delay in maintenance dredging would not change that (and the Corps has not shown or suggested otherwise).

Finally, to the extent a short delay in maintenance dredging would create any additional draft restrictions, those restrictions are entirely attributable to the Corps—not this lawsuit. The Corps began soliciting bids for 2021 maintenance dredging in August 2020 and should have begun the NEPA process well before then. Instead, it chose to violate the law and ignore impacts to federally threatened species—ultimately doing a disservice to both the Port and protected loggerhead sea turtles. As another court put it, "A further delay here would really be attributable to the Corps itself, for it could have avoided this lawsuit (and others like it) by scrupulously following all relevant federal laws." *Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-21747-CIV, 2008 WL 11332080, at *13 (S.D. Fla. Nov. 14, 2008).

### B.   The Corps' shift to spring and summer dredging is based on convenience, not concerns about the North Atlantic Right Whale.

The Corps argues that the public interest favors spring and summer dredging because winter dredging is potentially harmful to North Atlantic Right Whales, a critically endangered species that travels to Georgia's coast during winter months. However, the Corps' shift to spring and summer dredging appears to be based on convenience, not concerns about right whale conservation. In February, the Corps said:

> The removal of the hopper dredge window will allow hopper dredging to occur any time of year, however, it should not be assumed that hopper dredging will necessarily occur within the spring and summer months. *Under this year-round alternative, hopper dredging would occur when a hopper contract dredge is available and not confine dredging impacts to any particular time of year.*

12

*See* U.S. Army Corps of Eng'rs, Wilmington Harbor and Morehead City Harbor Dredging and Bed Leveling: Final Environmental Assessment and Finding of No Significant Impact (Feb. 2021), at 75 ("NC Final EA"), Doc. 5-1 (emphasis added).

More importantly, the data does not support the Corps' claim that winter dredging is harmful to right whales. Although channel dredging has been conducted during winter months since at least 1994, no lethal or injurious collisions have ever been documented between right whales and hopper dredges or dredge support vessels in Georgia (or the United States) since the beginning of observation in 1991.[3] Mem. from Mark Dodd, Sr. Wildlife Biologist, Ga. Dep't of Nat. Res., to Kelie Moore, Coastal Consistency Coordinator, Ga. Dep't of Nat. Res. (Feb. 22, 2021), at 4 ("DNR Mem."), Doc. 5-4. In any event, the public interest the Corps purports to promote would be far better served if the Corps simply imposed more protective speed restrictions during right whale calving and migration season, DNR Mem. at 10—a consideration it could and should have considered as part of a NEPA review.

    **C.**    **There is an overwhelming public interest in ensuring the consideration of unknown or uncertain impacts, protecting the environment, and requiring compliance with federal law.**

On the other side of the scale, there is an overwhelming public interest in ensuring the consideration of unknown or uncertain impacts, protecting the environment, and requiring compliance with federal law.

Although NEPA does not mandate particular results, courts have routinely recognized its important role in effecting sound environmental decisions by the federal government. As now-Justice Breyer put it, "NEPA is designed to influence the decisionmaking process; its aim is to

---

[3] According to a DNR memorandum, "the SARBO describes one potential interaction between a whale and a dredge in 2005, but a dead or injured whale was not observed and the encounter was never verified." DNR Mem. at 4.

13

make government officials notice environmental considerations and take them into account."

*Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989). As described by the Eleventh Circuit:

> NEPA essentially forces federal agencies to document the potential environmental impacts of significant decisions before they are made, thereby ensuring that environmental issues are considered by the agency and that important information is made available to the larger audience that may help to make the decision or will be affected by it.

*Wilderness Watch & Pub. Emps. for Env't Resp. v. Mainella*, 375 F.3d 1085, 1094 (11th Cir. 2004). In so doing, the statute "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

Here, the Corps has quite plainly overlooked and underestimated potential environmental impacts—and those impacts are relevant to the public interest even if they may not rise to the level of likely irreparable harm. For example, in addition to harming sea turtles, spring and summer dredging poses significant risks to fisheries. The South Atlantic Fishery Management Council (SAFMC), which is responsible for the conservation and management of fish stocks within the federal 200-mile limit of the Atlantic off the coasts of North Carolina, South Carolina, Georgia and east Florida, has identified essential fish habitat for brown shrimp, white shrimp, pink shrimp, gag grouper, gray snapper, black sea bass, Spanish mackerel, summer flounder, and several shark species in or around the project area. U.S. Army Corps of Eng'rs, Brunswick Harbor Modifications Study, Glynn County, GA: Draft Integrated Feasibility Report and Environmental Assessment and Draft FONSI (June 2020), available online. According to the SAFMC, spring and summer maintenance dredging can be detrimental to many of these fisheries. During the North Carolina NEPA process described in OHM's opening brief, the SAFMC warned:

> [Spring and summer dredging] would likely impact larvae and early juvenile of Gag Grouper (*Mycteroperca microlepis*), Gray Snapper (*Lutjanus griseus*) and other finfish …. The proposed action could also impact economically important crustacean species such as Pink Shrimp (*Farfentepenaeus duorarum*), Brown Shrimp (*Farfantepenaeus aztecus*), and White Shrimp (*Litopenaeus setiferus*) that spawn offshore in the winter and recruit to nearby estuaries in spring (April – June). Allowing hopper dredging and bed leveling outside of the current December 1 through April 15 window would increase risk of injury, mortality, or poor recruitment in these fisheries. Allowing these activities during the spring and summer months would potentially impact Council-managed species that are in critical early life stages in, and adjacent to, the project area at these times.

Letter from Melvin Bell, Chair, South Atlantic Fishery Mgm't Council, to Emily Hughes, U.S. Army Corps of Eng'rs (Oct. 1, 2020) at 2–3 ("SAFMC Letter"), Doc. 5-9.

Despite these documented impacts in North Carolina, the Corps has done no analysis of how or if shifting dredging away from winter months would impact these species in Georgia. Given the economic and recreational importance of Georgia's fisheries, the public interest plainly favors analyzing these impacts before proceeding with potentially harmful dredging operations. In addition, the Corps itself notes that there are twenty-five threatened and endangered species in and around the project area. Many of those species, like the West Indian Manatee, are not considered by the SARBO and should have been considered in a NEPA analysis. *See* U.S. Army Corps of Eng'rs, Final Environmental Impact Statement: Brunswick Harbor Deepening Project (Mar. 1998) at 23 ("1998 EIS"), Doc. 5-16 (noting that hopper dredging may impact West Indian manatees and that "if dredging were conducted during the winter, there would be less likelihood of harming these mammals").

Finally, and perhaps most importantly, there is an overwhelming public interest in requiring compliance with federal law. *See Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-21747-CIV, 2008 WL 11332080, at *12 (S.D. Fla. Nov. 14, 2008) ("Ensuring that federal laws are followed certainly cannot be said to be adverse to the public interest, especially when

15

the balance of the harms favors granting an injunction so that such federal law violations can be remedied."); *Sierra Club*, 933 F. Supp. at 1572 (finding that "the public has an interest in preventing Defendants from acting in manners inconsistent with the applicable law," as well as an "interest in preserving vital aspects of the environment" and holding that public interest weighed in favor of granting preliminary injunction because "birds that will be killed cannot be replaced"); *Florida Key Deer v. Stickney*, 864 F. Supp. 1222, 1241 (S.D. Fla. 1994) ("Good administration of [a] statute is in the public interest and that will be promoted by taking timely steps when necessary to prevent violations even when they are about to occur or prevent their continuance after they have begun.") (internal quotations and citations omitted); *cf. Poarch Band of Creek Indians v. Hildreth*, 656 F. App'x 934, 944 (11th Cir. 2016) (holding that compliance with federal statutory scheme serves the public interest).

Here, the Corps did not so much as pretend to comply with NEPA before abandoning these decades-old seasonal dredging restrictions. The Corps' attempt to dismiss its blatant noncompliance by framing it as a mere failure to write something down is unconvincing. After all, the documentation and publication of an agency's analysis is fundamental to NEPA's central purpose. And this is not a case of mere technical noncompliance. Indeed, the Corps has not produced a single email or document indicating it gave any thought to NEPA whatsoever—even though it received an overwhelming number of letters from its constituents expressing their concern about the environmental impacts of spring and summer dredging. Second Ridley Dec. ¶ 21. Instead, the Corps apparently decided on its own that it need not comply with the law—at least not in Georgia.

Contrary to the Corps' suggestion, such blatant noncompliance is not minor or harmless. As the Eleventh Circuit put it:

> NEPA imposes procedural requirements *before* decisions are made in order to ensure that those decisions take environmental consequences into account. Permitting an agency to avoid a NEPA violation through a subsequent, conclusory statement that it would not have reached a different result even with the proper analysis would significantly undermine the statutory scheme…. In the absence of evidence that an agency seriously considered environmental impacts prior to making its decision, violations of NEPA cannot be considered harmless.

*Wilderness Watch*, 375 F.3d at 1096 (emphasis in original).

The Court should not sanction this flagrant disregard for federal law, particularly not in the name of public interest.

## CONCLUSION

Given the admitted violation of federal law, the likelihood of irreparable harm, and the public interest in protecting the environmental and ensuring compliance with the law, the Court should enter a preliminary injunction enjoining the Corps or its agents from proceeding with hopper dredging in Brunswick Harbor outside of traditional winter dredging windows.

Respectfully submitted this 18th day of May, 2021.

**SOUTHERN ENVIRONMENTAL LAW CENTER**

/s/ *Megan Hinkle Huynh*
Megan Hinkle Huynh
Georgia Bar No. 877345
Robert D. Sherrier
Georgia Bar No. 979890
*Admitted pro hac vice*
Ten 10th Street NW, Suite 1050
Atlanta, Georgia 30309
Phone: (404) 521-9900
Fax: (404) 521-9909
mhuynh@selcga.org
bsherrier@selcga.org

*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I certify that on May 18, 2021, I electronically filed the foregoing *Reply in Support of Motion for Preliminary Injunction* with the Clerk of Court using the CM/ECF system.

/s/ *Megan Hinkle Huynh*